# EXHIBIT 3

Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

Peter D. St. Phillip (*Pro hac vice* to be filed)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com

[Additional counsel on signature page]

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| HEALTH CARE SERVICE CORP., <br><br> Plaintiff <br><br> v. <br><br> MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT PLC, <br><br><br> Defendants | Case No.: RG20056354 <br><br><br> FIRST AMENDED COMPLAINT <br><br> JURY TRIAL DEMANED |

# TABLE OF CONTENTS

I.    NATURE OF THE CASE ..................................................................................1

II.   PARTIES ......................................................................................................5

III.  JURISDICTION AND VENUE .....................................................................9

IV.   REGULATORY FRAMEWORK ..................................................................10

    A.    Federal Government Health Programs.................................................10

    B.    FDA Regulation of Drug Labeling and Marketing.....................................13

V.    FACTUAL ALLEGATIONS .........................................................................15

    A.    Development of Acthar Gel ...............................................................5

    B.    Mallinckrodt Acquires Acthar ..........................................................15

    C.    Mallinckrodt's Acthar Pricing Scheme.............................................18

        1.    Mallinckrodt Controls the Only Distributor of Acthar.....................18

        2.    Mallinckrodt Illegally Expands Its Customer Base..........................20

            a.    Mallinckrodt Employs a Sham Co-Pay Charity to Promote Acthar as a Treatment for MS ...............................................20

            b.    Mallinckrodt's Sales Force Promotes Off-Label Prescriptions ................28

                i.    The Brod Protocol..........................................................29

                ii.   Mallinckrodt Expands to Other Rare Diseases ...................31

            c.    Mallinckrodt Provides Kickbacks to Physicians.............................33

        3.    Mallinckrodt Acquires Acthar's Only Potential Competitor ............36

VI.   MALLINCKRODT'S FRAUDULENT CONCEALMENT OF THE ILLEGAL SCHEME AND CONTINUING VIOLATIONS...............................................41

VII.  MARKET POWER AND MARKET DEFINITION ......................................42

VIII. MARKET EFFECTS .....................................................................................47

IX.   ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE....................47

X.    CLAIMS FOR RELIEF .................................................................................50

XI.   PRAYER FOR RELIEF ................................................................................66

XII.  JURY DEMAND ...........................................................................................67

1    Plaintiff Health Care Service Corporation ("HCSC") hereby sues Defendants Mallinckrodt

2    ARD LLC (formerly known as Questcor Pharmaceuticals, Inc. ("Questcor")), Mallinckrodt ARD

3    Inc., and its parent corporation Mallinckrodt plc (collectively "Defendants" or "Mallinckrodt").

4    Based on personal knowledge as to facts pertaining to it, and upon information and belief as to all

5    other matters, HCSC alleges as follows:

6    **I.      NATURE OF THE CASE**

7        1.      This action arises from one of the most outrageous price-gouging schemes in the history

8    of American medicine.

9        2.      H.P. Acthar Gel ("Acthar") is a drug that has been available since 1952. For nearly half

10   a century, its price was modest. In 2001, a vial of the drug cost $40 at retail.

11       3.      By 2018, the same vial cost over $39,000, amounting to a 97,500% price increase. It is

12   as if the price of milk increased from $3 to over $2,900 per gallon, or a mortgage payment rose from

13   $2,000 to over $2 million per month.

14       4.      These eye-popping price increases are not an accident, a market anomaly, or a

15   necessary byproduct of legislation. They are the intended result of purposeful and illegal conduct by

16   Acthar's producers, Mallinckrodt and its predecessor Questcor. This conduct consists of a complex,

17   multipart scheme involving monopoly, bribery, racketeering, fraud, and other deceptive and unfair

18   practices that have imposed exorbitant costs on those financially responsible for the costs of the drug,

19   including third-party payors ("TPPs") like HCSC here.

20       5.      Though Acthar may be a billion-dollar golden goose for Mallinckrodt today, its origins

21   were humble. The drug is an adrenocorticotropic hormone ("ACTH") analogue produced from the

22   pituitary gland of pigs. It was invented in the late 1940s by the meat company Armour, as a byproduct

23   of pork-processing operations. At the time, Acthar was considered a miracle drug because it

24   stimulated the body's production of cortisol, provoking a natural anti-inflammatory response that was

25   beneficial for the treatment of various conditions. Acthar was given broad approval by the FDA in

26   1952   to treat a wide range of ailments at a time when such broad approvals were commonplace and

27   did not require support from clinical trials.

28

6. Acthar's FDA approval also occurred before the commercial development of synthetic steroid drugs (corticosteroids) and many popular non-steroidal anti-inflammatory drugs (NSAIDs), such as ibuprofen. The advent of these safe, inexpensive alternative treatments in pill form reduced the need for an injectable drug derived from the pituitary gland of pigs. By the 1990s, only a few key uses remained for Acthar, such as to treat infantile spasms. But other than for a handful of similarly rare conditions, Acthar is either a drug of last resort or not known to be clinically effective.

7. Consequently, the drug became unprofitable for its manufacturer, Aventis Pharmaceuticals, Inc., which had considered stopping production. But the drug was saved in 2001, when Mallinckrodt's predecessor Questcor purchased the right to produce this unprofitable and largely-outdated drug for $100,000 plus modest royalties, seeing it as a potential gold mine for exploitation.

8. Thereafter, Questcor began a run of outrageous price increases. The cost of Acthar ballooned from $40 in 2001, to $750 immediately after it was acquired, to $1,650 by 2007. That same year, the price rose to $23,269 per vial. Over the next several years, the price increases continued: the price of Acthar was increased eight more times so that, by 2018, the drug cost $38,892 per vial. And since treatment with Acthar usually requires at least three vials, a single course of treatment can cost nearly $120,000. The following charts the course of Acthar pricing:



9.      In just over a decade, Acthar went from a nearly extinct, financial sinkhole to a billion-dollar cash machine. In August 2014—in the midst of this meteoric price rise—Questcor merged into Mallinckrodt in a deal worth approximately $5.6 billion. At the time, Acthar was the only drug product Questcor sold.

10.     Mallinckrodt has been able to inflate and maintain the shocking price increases of Acthar through several types of related and improper conduct.

11.     *First*, Mallinckrodt vertically integrated its sales by distributing Acthar exclusively through one specialty pharmacy. Mallinckrodt agreed with Express Scripts Holding Company ("Express Scripts"), a Missouri-based pharmacy benefit management company, to provide integrated services through certain of Express Scripts' subsidiaries. Mallinckrodt's effort to consolidate distribution through a single channel helped it maintain control over pricing pressures.

12.     *Second*, Mallinckrodt shifted the focus of Acthar's marketing and relatedly used an illegal co-pay charity to keep demand high. Though Acthar is a first-line treatment for infantile spasms, that market is small, and Mallinckrodt sought to redirect its marketing efforts away from the poor public-relations consequences of earning billions of dollars off of sick children. Consequently,

Mallinckrodt aggressively marketed the drug for the treatment of conditions more common among adult patients, including multiple sclerosis ("MS").   To allay patient and physician concerns about the high cost of the drug, Mallinckrodt used a charitable foundation for the illegal purpose of paying patient co-pays. This fund—Chronic Disease Fund ("CDF")—provided "patient assistance" funds for Acthar only, and not for other drugs. Mallinckrodt financed the foundation, directed patients to the fund, paid their co-pays as "donations," and then marketed the drug as "free." Mallinckrodt knew that TPPs' prescription drug plans prohibited members from receiving money to assist in paying copayments, but disregarded the terms of these agreements. In other words, these copayment subsidies were bribes to patients and a vehicle through which Mallinckrodt could persuade physicians that the astronomical price of the drug should not be a barrier to prescribing it.

13.   *Third*, Mallinckrodt further expanded the market by preying on vulnerable patients with aggressive promotion of an unproven and ineffective dosing regimen. Acthar's label instructs patients to inject the drug as part of a daily dosing regimen to be used for 2-3 weeks at a time. This regimen was extremely expensive because it required use of multiple daily vials of the drug and increased the risk of side effects in patients. To solve these problems, Mallinckrodt developed a different dosing regimen that only required patients to use Acthar for five days, even though there was no clinical evidence that the five-day dosing regimen was effective. This dosing regimen was not FDA approved or indicated on the Acthar label. This dosing protocol had a two-fold effect: (1) patients reported fewer side effects, lending credibility to Mallinckrodt's unsupported claim of superior tolerability for Acthar when compared to steroids; and (2) the price seemed affordable when compared with the cost of administering the drug according to the label's instructions.

14.   Simultaneous with its off-label marketing push, Mallinckrodt maintained artificially-high demand of Acthar through a pervasive bribery scheme to doctors. Doctors would not otherwise be inclined to prescribe an antiquated and expensive drug that requires refrigeration and injection when cheaper, more effective pills and other remedies were available. So under the guise of "education" and "marketing," Mallinckrodt funneled millions of dollars to thousands of doctors to encourage the use of Acthar as a first-line treatment and to promote the five-day dosing regimen.

Mallinckrodt paid bribes thinly disguised as compensation for speaking engagements and sham clinical research studies, and even paid undisguised bribes such as gift cards to doctors' staff.

15.     *Finally*, Mallinckrodt eliminated the competition by engaging in a "catch-and-kill" scheme for an Acthar competitor called Synacthen Depot ("Synacthen"), a much cheaper synthetic equivalent ACTH.  Drug giant Novartis AG ("Novartis") was already selling Synacthen in Europe, Asia, and Latin America, but the drug was not approved for use in the United States. After Novartis launched an auction for Synacthen, Mallinckrodt substantially outbid the competition for the rights to Synacthen in the U.S. But rather than undertake the process of obtaining FDA approval for the only drug that was a direct competitor of its best-selling product, Mallinckrodt never seriously attempted to bring Synacthen to market for any clinical use for which Acthar was approved. In other words, Mallinckrodt bought Synacthen then killed its development. This kept the price of Acthar artificially high and allowed Mallinckrodt to continue to reap enormous profits.

16.     HCSC paid inflated prices for Acthar for at least eight years due to Mallinckrodt's monopolization and racketeering, and reimbursed unnecessary Acthar treatments due to Mallinckrodt's off-label marketing and prescribing doctors' misrepresentations that they had not received illegal kickbacks from Mallinckrodt. By this action, HCSC seeks to recoup from Mallinckrodt its ill-gotten gains.

## A.   Development of Acthar Gel

17.     Acthar is an ACTH analogue used as an anti-inflammatory. Though its exact mechanism of operation is unclear, it is believed to stimulate the body's own steroidal hormones (such as cortisol and corticosterone), as well as to affect the body's steroid-independent immunomodulatory and anti-inflammatory pathways.

18.     Acthar's active ingredient is extracted from pig pituitary glands. It was invented in 1948 by the pharmaceutical division of the Armour meatpacking and processing company. The original form of ACTH had a half-life of only 10 minutes, so Acthar was developed for clinical use by creating a repository gel tailored to a patient's individual needs. The gel must be refrigerated and is applied through either an intramuscular or a subcutaneous depot injection (i.e., an injection that

deposits the drug in a localized mass, which is gradually absorbed by the body over an extended period).

19.     Acthar's invention either was roughly contemporaneous with, or preceded, the development of certain corticosteroids, a class of steroids that can also be used to fight inflammation. Well-known examples of corticosteroids include hydrocortisone and prednisone. Acthar's invention also predated the discovery of ibuprofen and certain over-the-counter NSAIDs in pill form that are also used to combat inflammation.

20.     The FDA first approved Acthar for marketing in the United States in 1952. This was before drugs were required to demonstrate "substantial evidence" of the efficacy for a marketed indication. Its original label lacked evidence from controlled clinical trials.

21.     Acthar was approved to treat multiple sclerosis ("MS") in 1979. Today, Acthar's FDA label contains an approval for the treatment of MS as follows: "Acthar Gel (repository corticotropin injection) is indicated for the treatment of acute exacerbations of multiple sclerosis in adults. Controlled clinical trials have shown Acthar Gel to be effective in speeding the resolution of acute exacerbations of multiple sclerosis. However, there is no evidence that it affects the ultimate outcome or natural history of the disease."

22.     MS "relapses," "acute exacerbations," or "flares" (collectively "MS exacerbations") are temporary periods of increased disease activity in an MS patient, manifested by the worsening of existing MS symptoms or the onset of other MS symptoms.

23.     The FDA-approved label of Acthar indicates a dosage and administration of a two-to-three-week course of treatment, "In the treatment of acute exacerbations of multiple sclerosis, daily intramuscular or subcutaneous doses of 80-120 units for 2-3 weeks may be administered. It may be necessary to taper the dose."

24.     The FDA has approved several medications for the long term treatment of MS patients, including medications to slow the accumulation of physical disability from the disease or to decrease the frequency of acute exacerbations. These medications are sometimes referred to as MS "disease modifying" drugs or therapies. Acthar is not a "disease modifying" drug or therapy for MS.

25.     Acthar is also approved for indications of idiopathic membranous nephropathy, exacerbations of dermatomyositis (polymyositis), symptoms of sarcoidosis, and inflammatory conditions of the eye. As an adjunctive therapy administered with the primary therapy to enhance effectiveness, Acthar is approved for indications of psoriatic and rheumatoid arthritis.

26.     However, there remains a lack of evidence to support the use of Acthar for most indications. The clinical evidence supporting the effectiveness of Acthar in treating some of these conditions consists of small (fewer than 25 participants) uncontrolled trials and case reports. For many of these conditions, including MS, Acthar is not considered the first-line—or even second- or third-line— treatment.

27.     For most indications, there is also a lack of evidence to support Acthar's use over lower-cost synthetic corticosteroids, which can cost as little as $0.20 per pill (less than $20 for a typical course of treatment), as compared to the $39,000 per-vial cost of Acthar (or $117,000 for a three-vial treatment).

28.     The only condition for which Acthar may be considered the most effective, "first-line" treatment is infantile spasms, an indication that the FDA approved in 2010. Infantile spasms impact around 1,200 infants per year in the United States.

29.     Armour Pharmaceutical Company, then Rhone-Poulenc Rorer, then Aventis (now Sanofi) owned Acthar until 2001. To that point, the drug was priced competitively with other anti-inflammatory medications. But since it was expensive to produce, difficult to apply, and (except for certain indications such as infantile spasms) not known to be more effective than simpler, cheaper, and more widely available drugs, Aventis considered discontinuing production of Acthar.

## II.     PARTIES

30.     Plaintiff HCSC is the nation's largest customer-owned health insurer and the fourth largest health insurer overall, with more than 16 million members. It is organized as a Mutual Legal Reserve Company under Illinois law and is an independent licensee of the Blue Cross and Blue Shield Association ("BCBSA"). Through its operating divisions, HCSC has an exclusive license to offer BCBSA-branded health plans in Illinois, Montana, New Mexico, Oklahoma, and Texas. Through its

operating divisions and subsidiaries, it also offers other health plans and health-related services. It is headquartered at 300 E. Randolph Street, Chicago, Illinois.

31.    HCSC, through its operating divisions and subsidiaries, provides, inter alia: (1) Medicare benefits through contracts with the Centers for Medicare and Medicaid Services ("CMS"), for Medicare beneficiaries through a variety of Medicare Advantage plans offered under Part C of Medicare, and prescription drug benefits under Part D of Medicare; (2) benefits under various states' Medicaid programs; and (3) private commercial health insurance plan benefits that cover the medical expenses incurred by plan beneficiaries on an individual or group basis. These benefits include prescription drug coverage under which claims for Acthar were submitted and paid.

32.    HCSC, through its operating divisions, also administers health plan benefits for its members and group customers, including self-funded customers that contract with HCSC to administer health insurance benefits on their behalf and pursue recoveries related to those claims. Many of these health plan benefits provide members with prescription drug coverage under which claims for Acthar were submitted and paid. HCSC is also pursuing recovery related to those claims.

33.    Defendant Mallinckrodt ARD LLC is a California LLC with its principal place of business at 1425 Route 206, Bedminster, NJ, 07921. Mallinckrodt ARD LLC was previously named Mallinckrodt ARD, Inc., and before that was named Questcor Pharmaceuticals, Inc.

34.    Mallinckrodt ARD LLC is a subsidiary of defendant Mallinckrodt plc, an Irish public limited company. On April 4, 2014, Mallinckrodt plc entered into an Agreement and Plan of Merger with Questcor and absorbed Questcor as a wholly owned subsidiary on August 14, 2014 for approximately $5.6 billion.[1]

35.    Questcor survived the merger as a wholly-owned indirect subsidiary of Mallinckrodt plc and continued to market Acthar thereafter, until changing its name to Mallinckrodt ARD, Inc. on July 27, 2015.

---

[1] On August 14, 2014, pursuant to the Agreement and Plan of Merger among Questcor, Mallinckrodt, and Quincy Merger Sub, Inc. ("Merger Sub"), Merger Sub merged with and into Questcor, with Questcor being the surviving entity. As a result of the merger, Questcor became a wholly-owned indirect subsidiary of Mallinckrodt.

36.     At all times relevant to this action, Mallinckrodt plc was an active participant in the schemes of its subsidiary, acting with knowledge of its subsidiary's conduct. Indeed, it was the then-existing and proposed conduct of Questcor that caused Mallinckrodt plc to acquire Questcor in the first place.

37.     On January 26, 2019, Mallinckrodt ARD, Inc. converted to Mallinckrodt ARD LLC and it continues to market Acthar to this day. Mallinckrodt ARD LLC, its parent, Mallinckrodt, plc, and its predecessors Mallinckrodt ARD Inc. and Questor, shall be collectively referred to as "Mallinckrodt" or "Defendants."

38.     At all relevant times, Mallinckrodt manufactured, marketed, and sold Acthar in the United States market.

## III.     JURISDICTION AND VENUE

39.     This Court has personal jurisdiction over each Defendant because each Defendant carried on a continuous and systematic part of its general business within the State of California, and purposefully caused harm and tortious injury in this State. This Court may exercise personal jurisdiction over each Defendant consistent with due process, Cal. Code Civ. Proc. § 410.10, and the Fourteenth Amendment to the Constitution of the United States. Moreover, each Defendant has transacted the business that is the subject matter of this lawsuit in this State.

40.     HCSC suffered injury in this State because Mallinckrodt, through its misconduct, caused it to pay supracompetitive prices for Acthar in this State and/or caused it to pay off-label prescriptions for Acthar and/or Acthar prescriptions induced by Mallinckrodt's bribes in this State and for HCSC's California members, as more particularly alleged below.

41.     HCSC's injuries arose from these unlawful activities, because they were the means through which Mallinckrodt caused HCSC to pay supracomeptitive prices for Acthar prescriptions and/or caused it to pay off-label prescriptions for Acthar and/or Acthar prescriptions induced by Mallinckrodt's bribes.

42.     Venue is proper in this Alameda County under Cal. Civ. Proc. Code § 394 because, as set forth above, part of HCSC's injury occurred in this County.  Plaintiff paid for actionable Acthar

claims for one or more members residing in this County in amounts that substantially exceed the jurisdictional threshold of this Court pursuant to Cal. Const. art. VI, § 10 and Cal. Civ. Proc. Code § 88.

## IV.    REGULATORY FRAMEWORK

### B.  Federal Government Health Programs

43.    Congress established Medicare in 1965 to provide health insurance coverage for people aged sixty-five or older and for people with certain disabilities or afflictions.[2]

44.    In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act,[3] which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. Under Medicare Part D, Medicare contracts with private entities, known as Part D Plan Sponsors, to administer prescription drug plans.[4]

45.    Under the Medicare statute, a Part D beneficiary may be required to make a partial payment for the cost of prescription drugs in the form of a co-payment, coinsurance, or deductible (collectively "co-pays"). The co-pays can be substantial for expensive medications and vary throughout the year, depending on a beneficiary's total Part D covered expenses incurred that year up to that point.[5]

46.    Medicare co-pays exist to encourage physicians and beneficiaries to be efficient consumers of federally-reimbursed health care products, while also encouraging those manufacturing such products to price them based on market forces such as consumer sensitivity and competition. Manufacturers paying the Medicare copays of those seeking to buy their drug circumvent this congressionally-designed check on health care costs. As the United States Department of Health and Human Services, Office of the Inspector General has observed, drug manufacturers paying the Medicare Part D co-pays of patients using their products "eliminat[e] a market safeguard against

---

[2] See 42 U.S.C. §§ 1395 et seq.
[3] Pub. L. 108-173, 117 Stat. 2066.
[4] See 42 C.F.R. S 423.4.
[5] See 42 U.S.C. § 1395w-102.

inflated prices."[6] Abuse of copayment is common in the industry. In 2019, seven drug manufacturers – Actelion Pharmaceuticals US Inc., Amgen Inc., Astellas Pharma US Inc., Alexion Pharmaceuticals, Inc., Jazz Pharmaceuticals Inc., Lundbeck LLC, and US Worldmeds LLC – paid a combined total of over $624 million to resolve claims that they illegally paid patient copays for their own drugs through purportedly independent foundations that the companies in fact treated as mere conduits.[7]

47.    HCSC operates and administers Medicare Part D plans on behalf of the U.S. government for many thousands of members. HCSC also provides coverage for pharmaceuticals, including Acthar, through other plans, including medical insurance (Medicare Part B), Medicare Advantage (Medicare Part C), Medicaid, and commercial healthcare plans. Through its administration of these plans, HCSC bears significant risk that the costs and utilization of healthcare services will rise. When HCSC assumes these risks, it relies in large part on the protections afforded by law against submissions of false or fraudulent claims to healthcare providers.

48.    HCSC's agreements with its providers include a provision that requires the provider to certify its compliance with state and federal law, as well as rules promulgated by government entities such as the Centers for Medicare and Medicaid Services ("CMS"), the division of the Department of Health and Human Services that administers Medicare and Medicaid. These contractual provisions are essential for HCSC to ensure that it receives prompt payments and reimbursements from CMS for valid claims, and to ensure that it does not pay invalid claims that might increase costs to both itself and Medicare.

49.    When a pharmacy dispenses drugs to a HCSC Part D member, the pharmacy submits a claim to HCSC, which in turn submits an electronic record of the claim, called a Prescription Drug

---

[6] HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623, 70625 (Nov. 22, 2005).
[7] "Justice Department Recovers over $3 Billion from False Claims Act Cases in Fiscal Year 2019," *available at* https://www.justice.gov/opa/pr/justice-department-recovers-over-3-billion-false-claims-act-cases-fiscal-year-2019.

Event ("PDE"), to CMS. After dispensing the drug, the pharmacy receives reimbursement from HCSC for the portion of the drug cost not paid by the Part D member at the point of sale.

50.   PDE claims data are necessary for CMS to administer the Part D program and to reimburse Part D Plan Sponsors such as HCSC. Generating and submitting PDE data is a condition of payment for CMS' provision of Medicare funds to Part D Plan sponsors.[8]

51.   Part D Plan Sponsors must comply with "[f]ederal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. § 3729, et seq.), and the anti-kickback statute (§ 1127B(b)) of the Act)."[9] Any "downstream" or "related" entities that Part D Plans subcontract with (including pharmacies dispensing medication and manufacturers selling medication) must also comply with these, and any other, contractual obligations of the Part D Plan and with all applicable federal laws, regulations, and CMS instructions.[10]

52.   CMS regulations require Part D Plan Sponsors and related "downstream" entities that generate and submit PDE claims data to certify that such data is true, accurate, and complete and that the PDE data is the basis for obtaining federal reimbursement for the health care products or services reflected therein.[11]

53.   The Medicare Anti-Kickback Statute[12] ("AKS") arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are excessively costly, medically unnecessary, of poor quality, or potentially harmful to patients. In particular, when determining what conduct to prohibit, Congress determined that the inducements at issue would "contribute significantly to the cost" of federal health care programs absent federal penalties as a deterrent.[13]

---

[8] *See* 42 C.F.R. § 423.322.
[9] 42 C.F.R. § 423.505(h)(l).
[10] *See* 42 C.F.R. § 423.505(i)(3).
[11] *Id.* § 423.505(k).
[12] 42 U.S.C. § 1320a-7b(b).
[13] H.R. Rep.No. 95-393, at 53 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3056.

54.     The AKS provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit, or receive remuneration to induce the referral of business reimbursable under a federal health benefits program.[14] The offense is a felony punishable by a fine of up to $25,000 and imprisonment for up to 5 years.

55.     The AKS defines remuneration to include anything of value, including "cash" and "in-kind" payments or rebates.[15] Money and other forms of financial subsidies that can be used to pay or waive Medicare copays constitute remuneration under the AKS.

56.     The AKS further provides that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act ("FCA")]."[16] Under this provision, claims submitted to federal health care programs that result from violations of the AKS are per se false or fraudulent within the meaning of 31 U.S.C. § 3729(a).

### C.   FDA Regulation of Drug Labeling and Marketing

57.     The Food and Drug Administration ("FDA") regulates the marketing and promotion of prescription drugs. Under the Federal Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. § 301, *et seq.*, and its implementing regulations, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use before it is able to market a prescription drug in the United States.[17]

58.     Furthermore, pursuant to the FDCA, the FDA strictly regulates the content of product promotion and drug labeling information used by drug companies to market and sell FDA-approved prescription drugs.

59.     The FDA interprets "labeling" in its regulations broadly to include items that are 1) descriptive of a drug; 2) supplied by the manufacturer or its agents; and 3) intended for use by

---

[14] 42 U.S.C. § 1320a-7b(b)(2); 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).
[15] 42 U.S.C. § 1320a-7b(b)(2).
[16] 42 U.S.C. § 1320a-7b(g).
[17] 21 U.S.C. § 331(d); 21 U.S.C. §§ 355(a), 360b(a).

medical personnel.[18] The FDCA defines both misleading statements and the omission of material facts in product labeling as "misbranding."[19] Labeling includes brochures, booklets, detailing pieces, literature, reprints, sound recordings, exhibits and audio visual material.[20] The FDA regulations deem "advertising" to include any media-based activities that appear in magazines, newspapers, published journals and on television, radio, and telephone communications systems.[21] Oral statements made by a company's sales representative relating to a pharmaceutical product have also been deemed to constitute advertising or promotion.

60. Among other requirements, all information provided by drug companies about its products must present a "fair balance" between positive and negative information about a drug.[22]

61. Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a drug in violation of the FDCA.[23]

62. Misbranding also exists where, among other things, promotional and marketing materials and presentations for an FDA-approved drug "[c]ontain[] a representation or suggestion, not approved or permitted for use in the labeling, that a drug is better, more effective, useful in a broader range or conditions or patients … than has been demonstrated by substantial evidence or substantial clinical experience …."[24]

63. Furthermore, a drug must have labeling that provides adequate information for its safe and effective use by practitioners for all the purposes for which it is intended, including all purposes for which it is advertised or represented.[25] Thus, an approved drug that is intended by the drug company for an unapproved use would be misbranded, because the drug does not satisfy the requirement that its labeling bear adequate directions for use.

---

[18] 21 C.F.R. § 202.1.
[19] 21 U.S.C. § 321(n).
[20] 21 C.F.R. § 202.1 (l)(2).
[21] 21 C.F.R. § 202.1(l)(1).
[22] 21 C.F.R. § 202.1(e)(5)(ii).
[23] 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371; 21 C.F.R. §§ 202.1(e)(6), (e)(7); 21 C.F.R. § 1.21.
[24] 21 C.F.R. § 202.1(e)(6)(ii).
[25] 21 C.F.R. §§ 201.100(c)(1), 201.100(d), 201.56, 201.57, and 201.80.

64.    As a result, drug companies may only promote their products for uses approved by the FDA.[26]

65.    Drug companies may only be involved in the provision of information about off-label uses in limited circumstances. One such circumstance is where a drug company provides funding to an accredited independent sponsor of continuing medical education programs, provided the content of the programs is truly independent and the drug company does not influence this content.[27]

66.    Another circumstance is where a physician makes a bona fide, unsolicited request to the drug company for information about an off-label use.[28]

67.    In those limited circumstances where a drug company can provide information about an off-label use, such information is required to present a fair balance and not be false or misleading.

68.    These guidelines regarding off-label uses create a structure whereby a drug company can effectively but illegally encourage off-label uses of a drug by acting through purportedly-independent medical education program providers and physicians that are in fact under the effective control of the drug company. This is exactly the conduct Mallinckrodt engaged in here with respect to Acthar.

## V.    FACTUAL ALLEGATIONS

### D.  Mallinckrodt Acquires Acthar

69.    In July 2001, Questcor acquired worldwide rights to sell and manufacture Acthar from Aventis. In view of the price-gouging to come, the price was a pittance: $100,000, plus modest royalties.

70.    Immediately after acquiring the rights to sell Acthar, Questcor increased the price from approximately $40 per vial to nearly $750 per vial.

---

[26] *Id.*
[27] FDA, Guidance for Industry, Industry-Supported Scientific and Educational Activities (December 1997).
[28] FDA, Draft Guidance for Industry, Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices (December 2011).

71.     By the end of 2006, Acthar accounted for 94 percent of Questcor's net sales. On August 27, 2007, Questcor increased the price of Acthar by more than 1,300% overnight, from $1,650 to $23,269 per vial.

72.     Since that time, Questor and Mallinckrodt raised the price of Acthar on multiple occasions such that it cost $38,892 in 2018.

73.     Acthar net sales increased from $218 million in 2011 to more than $1 billion in 2015.

74.     Medicare spending on Acthar increased geometrically from 2011 to 2015, with total spending of nearly $2 billion and more than $600 million in 2016 alone. The following chart reveals the number of Medicare Part D claims for Acthar has grown by more than 700% from 2011 to 2016:

| Year | Claim Count | Total Spending |
|------|-------------|----------------|
| 2011 | 1,471 | $49,456,911 |
| 2012 | 3,387 | $141,451,608 |
| 2013 | 6,752 | $262,581,602 |
| 2014 | 9,611 | $391,189,653 |
| 2015 | 11,209 | $503,999,371 |
| 2016 | 12,867 | $636,174,840 |
| **Total:** | **45,297** | **$1,984,853,985** |

### E.  Mallinckrodt's Acthar Pricing Scheme

75.     Mallinckrodt designed and coordinated a multifaceted scheme (the "Acthar Pricing Scheme") intended to charge and maintain inflated prices for Acthar, including through a conspiracy to defraud payors such as HCSC. Built on Mallinckrodt's monopolistic practices, the scheme consisted of several subsidiary schemes: (1) control over the only distributor of Acthar (2) illicit patient co-pay subsidies through sham charitable funds; (3) promotion of an off-label dosing regimen; (4) kickbacks to the Prescribing Doctors (as defined below); and (5) acquisition of Acthar's only potential competitor.

### 1.  Mallinckrodt Controls the Only Distributor of Acthar

76.     Mallinckrodt has complete control over the price of Acthar and has on many occasions increased its price without negotiating with any of the purchasers or consumers of Acthar. Mallinckrodt is the sole entity with control over the wholesale acquisition cost (WAC) of Acthar that determines the price at which Acthar is sold throughout the pharmaceutical distribution chain. No other company has any influence over the price of Acthar in the marketplace.

77.     Acthar is a "specialty pharmaceutical" and generally unavailable at most retail pharmacies. It is instead available primarily in specialty pharmacies, which focus on high-cost, high-complexity, and/or high-touch medication therapy for patients with complex disease states.

78.     Because of this, in June 2007, Mallinckrodt agreed with Express Scripts Holding Company ("Express Scripts"), a Missouri-based pharmacy benefit management company, to provide integrated services critical to the scheme through certain of Express Scripts' subsidiaries.

79.     Priority Healthcare Distribution Inc., doing business as CuraScript SD ("CuraScript"), a Florida-based specialty pharmacy distributor, served as Mallinckrodt's exclusive distributor for Acthar. CuraScript was engaged by Mallinckrodt to deliver Acthar to a network of specialty pharmacies, who then deliver the medicine to patients' homes.

80.     United BioSource Corporation, formerly known as HealthBridge and now known as United BioSource LLC ("UBC"), a Pennsylvania-based company, provided pharmaceutical support services. During most of the relevant time period, UBC was also an Express Scripts subsidiary,

though Express Scripts completed its sale of UBC to a private equity firm in 2018. UBC designed and operationalized patient access centers that assist patients and prescribers with navigating prescription drug coverage and pharmacy options through patient access programs, including patient assistance programs, reimbursement, alternate funding, and compliance services. UBC was engaged by Mallinckrodt to act as the administrator for the reimbursement of Acthar, interacting directly with patients and third-party payors by coordinating various patient assistance programs, including the ASAP and PAP programs described further below.

81.     Accredo Health Group, Inc., doing business as Liberty Pennsylvania, Medco Health Solutions, Liberty Texas, Gentiva, or Gentiva Health Services ("Accredo"), is also an Express Scripts subsidiary. Accredo is a specialty pharmacy services company that assists patients in obtaining medications, including by advocating for insurance coverage of the drug.

82.     UBC acted as the hub between these entities, designing and coordinating Acthar's sale, distribution, and reimbursement through its patient access programs at Mallinckrodt's direction. So, for example, when a doctor prescribes an initial or renewal course of Acthar to a patient, the prescription is sent to the "Acthar Hub" and a case manager is assigned to the patient through UBC or Accredo, which performs administrative services associated with obtaining insurance coverage of the drug from insurers such as HCSC. Payment by the insurer or other payor is then made to CuraScript, which ships the medication to specialty pharmacies or directly to the patient. As set forth further below, CuraScript has no role in setting the price, which is functionally set by Mallinckrodt alone. CuraScript merely acts as Mallinckrodt's conduit, collecting payment and shipping the medication.

83.     HCSC is obligated to and does pay the prices of Acthar that Mallinckrodt sets. Express Scripts' CuraScript SD unit serves as the exclusive distributor of Acthar. But CuraScript SD has no independent authority to set the price of Acthar and bears no risk from Acthar sales. CuraScript bears no pricing risk for Acthar because it is guaranteed an adjustment in its acquisition costs if Mallinckrodt changes the price of Acthar. Furthermore, CuraScript is paid a fixed fee for each vial of Acthar sold by Mallinckrodt (CuraScript SD does no marketing or selling of Acthar) so it does not

incur any benefit or cost based on the price of Acthar. In 2009 that fixed fee was set at $230 per vial. CuraScript bears no risk of holding Acthar in inventory because Mallinckrodt has agreed to accept returns of any Acthar which goes unsold before its expiration date. With respect to sales of Acthar, CuraScript is completely controlled by Mallinckrodt and acts merely as its conduit.

84.    In addition to dictating its actions through contractual terms, Mallinckrodt confirmed that CuraScript SD was subject to its control by telling the SEC that, if CuraScript SD were to fail to perform in the way that it wished, Mallinckrodt could quickly and easily switch to a distributor who would provide "equivalent services." CuraScript SD had no choice but to comply with Mallinckrodt's directives because it was at risk of being terminated and replaced with a distributor that would.

85.    HCSC paid for more than $100 million worth of Acthar during the relevant period. HCSC's Acthar purchases were made according to the wholesale cost that Mallinckrodt set and controlled.

### 2.    Mallinckrodt Illegally Expands Its Customer Base

86.    Mallinckrodt soon realized that it could generate significant revenue if it could successfully sell Acthar as a first-line treatment for MS at the new price of $23,000 per vial.

87.    Mallinckrodt re-established a pilot MS sales force in 2008 to try to generate Acthar MS referrals at the new price.

88.    To accomplish this goal, Mallinckrodt employed a three-part scheme to mislead doctors into prescribing Acthar over other cheaper and more effective therapies while assuaging their concerns about the high cost of the drug.

### a.    Mallinckrodt Employs a Sham Co-Pay Charity to Promote Acthar as a Treatment for MS

89.    Not long after raising Acthar's price to over $23,000 per vial in 2007, Questcor knew that it might have priced itself out of the MS market because Acthar had many cheaper, more effective competitors in that market. Questor also saw, however, that the market potential of successfully selling Acthar as an MS treatment at the new price would be hundreds of millions of dollars.  Questcor also understood that, for some insurance plans, the over-$23,000 price could lead to very high patient

costs. Medicare Part D beneficiaries, for example, could owe thousands of dollars in co-pays for one vial of Acthar while advancing through the deductible, initial coverage limit, and coverage gap.

90.     Questcor realized that subsidizing co-pay obligations could help overcome some doctor and patient cost concerns and allow it to charge the unjustifiably high prices for one vial of Acthar.

91.     Questcor knew that it was illegal to subsidize Medicare co-pays directly, so it sought to accomplish the same result through a "co-pay assistance fund" that it designed, created, and used as a conduit to pay patient co-pay subsidies for Acthar (but no other drug).

92.     BioSolutia Inc., now known as CareMetx, LLC, ("BioSolutia") is a Maryland-based firm that provided health-care consulting services to Mallinckrodt, including through an individual consultant (the "BioSolutia Consultant") who was retained full time to work on Acthar, and who helped design and implement Mallinckrodt's schemes.

93.     The operation was spearheaded by the executives of Questcor and aided by the BioSolutia Consultant, who was retained full-time specifically for the purpose of assisting with Acthar reimbursement.

94.     In the spring of 2010, Questcor provided funding for one foundation called the National Organization for Rare Disorders ("NORD") but was dissatisfied with what it considered to be the small scale of the operation, and looked instead for a foundation where it could fund co-pays on a much larger scale. The individuals involved in this decision include a Questor Senior Manager of Specialty Distribution (the "Senior Manager"), Vice President of Commercial Operations (the "Commercial VP"), Executive Vice President and Chief Business Officer (the "CBO"), and the BioSolutia Consultant.

95.     In May 2010, these individuals agreed on a plan of action to reach out to the Chronic Disease Fund ("CDF") to discuss starting a new fund for Questcor. CDF is a Texas nonprofit corporation with its principal office located in Plano, Texas. CDF operates funds that receive payments from pharmaceutical manufacturers and others, and that then use those payments, less administrative fees that CDF charges, to cover the drug copay obligations of patients, including Medicare patients.

96.    Though CDF already had a fund for MS patients, Questcor sought to establish an "MS Exacerbation Co-Pay Fund" distinct from CDF's existing fund because Questcor did not want to make payments to a fund that might pay the co-pays of MS drugs other than Acthar.

97.    Questcor approached CDF and requested that it open an MS exacerbation co-pay fund. On June 1, 2010, CDF gave a presentation to the CBO and other Questcor employees demonstrating CDF's operational capabilities to meet the expected ramp up in demand. Internally, Questcor viewed the choice of NORD versus CDF as "Mom and Pop vs. Walmart." Within two weeks, Questcor decided to move its co-pay programs from NORD to CDF to operate its scheme on a larger scale.

98.    Questcor and CDF established a new "MS Acute Exacerbation Fund" just for patients with government insurance, such as Medicare Part D, and just for the co-pays of Acthar but no other drugs. For patients with private insurance, Questcor had CDF open a separate Acthar "Private Fund" for Questcor to fund Acthar co-pays.

99.    Questcor and CDF agreed that the MS Acute Exacerbation Fund would cover the copays of Acthar but not the copays of other drugs. CDF made the nature of the fund clear when it sent Questcor a program specification sheet on July 9, 2010, which stated that the product for the MS Acute Exacerbation Fund was Acthar.

100.    Questcor's donation agreement with CDF falsely represented that the funds were generally for treatment of patients with acute exacerbations of MS with any medically appropriate therapy, when in fact Questcor intended and demanded that the fund was for patients using Acthar exclusively. The agreement also falsely stated that CDF already operated a co-pay assistance program for acute exacerbations of multiple sclerosis. In fact, CDF did not already have such a fund, it was created at the behest of Questcor, and Questcor viewed the fund as its own.

101.    Key individuals at Mallinckrodt agreed and shared the view that the fund was established and controlled by Mallinckrodt and exclusively available to Acthar patients. For example:

- In an email from Mallinckrodt's CBO to CDF's Senior Director of Operations on July 15, 20l0 -telling her to expect Mallinckrodt's first payment the next day Mallinckrodt's CBO wrote: "I have notified NORD's President . . . that we have

now established co-pay funds at CDF to help address out [sic] expanding needs for patient support and monitoring of funding flows."

- On July 21, 2010, the BioSolutia Consultant wrote to several specialty pharmacies, copying the Mallinckrodt Senior Manager, that "[Mallinckrodt] will be adding [CDF] as an administrator/source of funding for their copay assistance programs for Acthar."

- On October 19, 2010, the Senior Manager wrote to the sales force again that: "Please be sure that your offices are aware of our Copay Assistance Program" and reminded them that "a key point to cover when discussing copay assistance" is that "[Mallinckrodt] established an Acute Exacerbations of Multiple Sclerosis 'bucket'. As a result, Acthar patients needing copay assistance will not be using funds provided by the manufacturers of the disease modifying therapies."

- On October 26, 2011, the Senior Manager wrote to the Executive Director of CDF in an email titled "[Mallinckrodt] copay funds" to schedule a discussion about future payments to CDF and "operational things."

- On January 15,2012, the Senior Manager wrote to the Commercial VP about the need for more payments to CDF: "I anticipate a higher demand on our copay funds this month because most Med-D patients will need coverage for the donut hole because everything reset on January 1."

102.   On July 15, 2010, Mallinckrodt's CBO approved a wire transfer for $150,000 from Mallinckrodt to CDF to fund the MS Acute Exacerbation Fund and Private Fund. CDF received the wire on July 16, 2010, and the MS Acute Exacerbation fund opened at that time. From this point, the MS Acute Exacerbation Fund paid copays for Acthar but not for any other drug.

103.   Questcor monitored its co-pay support programs by receiving detailed financial reports from CDF containing information about how many patients were enrolled in the fund, how much the fund had already paid out, and how much had been allocated to enrolled patients. The reports also

stated the percentage of patients approved to receive co-pay subsidies, the average co-pay amount paid by the fund, the total number of resulting drug "dispenses" (broken out by new dispenses vs. refills), and the remaining fund balance. Because these funds paid Acthar co-pays only, all of these reported metrics were specific to Acthar. This gave Questcor the ability to monitor its fund balances and confirm the amount of future payments to CDF necessary to keep paying Acthar co-pay subsidies smoothly.

104.   Mallinckrodt also compared this information to internal information it received in reports from ASAP to check that the amounts CDF reported as necessary for future Acthar subsidies were, in fact, necessary for that purpose. The reports from ASAP included a daily "Case Review" report, via the BioSolutia Consultant, that identified: the status of each Acthar referral received; confirmation that specific patients had been referred to and accepted by CDF; and confirmation that these patients' Acthar vial(s) had been purchased and shipped as a result. The reports also identified whether referrals to CDF (and approvals by CDF) were for Medicare Part D patients.

105.   This information, combined with the CDF reports, confirmed for Mallinckrodt that CDF was using Mallinckrodt's "donations" to pay the Acthar Medicare copays of the same patients Mallinckrodt sent to CDF. If there were questions about whether a request from CDF for more funding was justified, Mallinckrodt double-checked the request against this information to confirm it.

106.   Questcor thereafter made co-pay assistance an important part of its sales and marketing program. Questcor sent patients to CDF through Questcor's "reimbursement hub" for Acthar, called the Acthar Support and Access Program ("ASAP"), which was administered by UBC under Questcor's direction and control. Questcor and UBC controlled ASAP, which included a call center that received referrals for Acthar from physician offices and patients. Questcor's sales force took steps to ensure that any Acthar prescriptions were routed through ASAP so that Questcor could track them. Patients sometimes had their co-pays paid for months or years through the fund.

107.   With the success of its MS exacerbation fund, Questcor repeated this scheme with lupus and rheumatoid arthritis ("RA"). Questcor established new, separate exacerbation funds for each

disease to ensure that only patients treating with Acthar would receive the benefits of the fund's "donations."

108.   In 2011, Questcor sought to subsidize patient co-pays to induce sales of Acthar to patients with Lupus by directing CDF to create  a "Lupus Exacerbation" fund. Questcor was the sole donor to the fund. The fund agreement falsely stated that the fund was for "any medically appropriate therapy," when, just as with MS,  Questcor called the fund an exacerbation fund to fund only Acthar copays at the exclusion of other therapies. It also falsely stated that CDF already had such a fund. In fact, the CBO acknowledged that Lupus fund would replicate the MS fund model, writing the "only real maintenance drug [for Lupus] is Benlysta" and that the fund should be named in such a way to "capture most of the use of Acthar but exclude most Benlysta use." "For example," the CBO wrote, "our current MS fund is titled 'MS acute exacerbations', which allows Actahr [sic] patients to get covered but excludes Avonex, Copaxone, etc. patients."

109.   Questcor and UBC referred patients to the fund through ASAP and tracked the patients thereafter. In November 2011, Questor wired an initial $25,000 payment to CDF to open the fund. The Lupus Exacerbation fund paid the co-pays of Acthar but no other drug for treatment of Lupus, again often for months or years.

110.   In 2012, after it stared marketing Acthar as a treatment for RA, Questcor repeated the co-pay charity scheme yet again to fund the Acthar co-pays for  RA patients. Executives at Questcor directed CDF to create the "RA Exacerbation Fund." Just as with the MS and Lupus exacerbation funds, Questcor financed the RA fund, sent patients to the fund through ASAP with UBC's assistance, tracked the patients, and paid subsidies for sometimes months' or years' worth of refills of Acthar but no other drug.

111.   Questor followed the same model with the MS, Lupus, and RA exacerbation funds. Questcor was the sole donor to each fund and CDF received the vast majority of its patient referrals to each fund from Questcor. After establishing the funds, CDF provided financial reports to Questcor that enabled Questcor to determine how much of its donations had already been spent on Acthar

patients and how much more would be necessary to pay the Acthar co-pays for patients Questcor referred to CDF.[29]

112.   In 2012, Questcor became concerned that it would lose referrals to the fund for lack of sufficient co-pay assistance. Questcor therefore implemented an "automatic offering" of co-pay assistance to all patients with co-pays greater than $150, administered by UBC through the reimbursement hub. The ASAP program referred over 98 percent of the patients who received co-pay subsidies from the MS, Lupus, or RA Exacerbation funds at CDF.

113.   Questcor then worked to exclude patients with insurance from its free drug program. Questcor retained NORD to operate a "Patient Assistance Program" ("PAP") that offered free Acthar to patients who met certain financial criteria and could not afford the drug's high price. ASAP also sent certain patients to NORD for that purpose. However, Questcor intentionally did not send Acthar patients with Medicare or other insurance coverage for the drug to the NORD PAP. Instead, Questcor sent those patients to CDF, where they received co-pay subsidies to cover their costs, which triggered insurance reimbursement for Acthar. Questcor also required patients to appeal insurance coverage denials of Acthar before referring them to the PAP. In other words, whenever possible, Mallinckrodt sought to cause claims to be submitted for Acthar so that Mallinckrodt could get paid from a sale of the drug as opposed to giving it away for free through the NORD PAP.

114.   Questcor marketed guaranteed co-pay assistance to physicians and patients as a way to neutralize concerns about the price and to induce sales and Medicare reimbursement. This began immediately after establishing the MS Acute Exacerbation Fund at CDF and continued throughout the relevant time period. For example, on August 4, 2010, the Senior Manager provided all regional sales managers with "talking points to use with [their] teams" on how to sell Acthar using copay assistance at CDF. He wrote that the "[m]essaging to [doctors]" should be " we offer copay assistance" and that "patients that need assistance will [ ] get approved over the phone in most cases."

---

[29] Settlement Agreement between the United States of America and Chronic Disease Fund, d/b/a Good Days, dated October 23, 2019, *available at* https://www.justice.gov/usao-ma/pr/foundations-resolve-allegations-enabling-pharmaceutical-companies-pay-kickbacks-medicare.

The company training materials instructed the sales force: "DO NOT APOLOGIZE FOR THE PRICE." The training instead directed sales representatives to "[r]eview [the] co-pay coverage program" with prescribers who expressed concern about the drug's price.

115.    Furthermore, after Questcor conducted research and discovered that price was an obstacle to more prescriptions, Questcor's internal remediation plan noted the importance of co-pay support because cost to the patients was a key concern of physicians.

116.    Questcor's sales force continued to promote Acthar to physicians and patients as free, regardless of its actual, exorbitant price, due to virtually guaranteed Acthar co-pay subsidies through CDF in this manner, with the intent to induce fraudulent Medicare Part D and other claims.

117.    The funds worked as planned. After Questcor established the co-pay conduit at CDF, Questcor achieved significant growth in Acthar MS sales and corporate revenue. For example, Acthar MS sales nearly quadrupled between the third quarter of 2010 (when Questcor established the MS "acute exacerbation" fund) and the third quarter of 2013.

118.    Questcor also intensified its dramatic price increases. On January 3, 2011 Questcor raised Acthar's price to over $24,430 per vial. Less than six months later, it raised the price again to over $25,600 per vial. In December 2011, it raised the price to over $27,300 per vial. In May 2012, it raised the price to over $28,680 per vial. In June 2013, it raised the price to over $30,100 per vial. In January 2014, it raised the price to over $31,600 per vial. In December 2014 it raised the price to over $32,200 per vial.

119.    Mallinckrodt knowingly and willfully violated the AKS by paying illegal Acthar co-pay subsidies as described above to induce prescriptions and sales of Acthar reimbursed by Medicare, and knowingly and willfully violated the FCA, and its prohibition on submitting, or causing to be submitted, false claims to federal health care programs, including Medicare.

120.    On information and belief, Mallinckrodt continued to pay or substantially subsidize required patient co-payments for Acthar after 2014 and continues to do so until today.

### b. Mallinckrodt's Sales Force Promotes Off-Label Prescriptions

121.   Mallinckrodt's co-pay subsidies were one way to prop up demand and receive payment from third-party payors such as HCSC. To further expand the Acthar market, Questcor engaged in off-label promotion of the drug.

122.   Acthar's approved dosing for acute MS exacerbations calls for "daily intramuscular or subcutaneous doses of 80-120 units for 2-3 weeks . . . . It may be necessary to taper the dose."

123.   The full dosing information also states, "Dosage should be individualized according to the medical condition of each patient. Frequency and dose of the drug should be determined by considering the severity of the disease and the initial response of the patient."

124.   The approved dosing regimen would require as many as three to six vials or more of Acthar (each vial contains five 80-unit doses), for a total cost of $75,000 to $140,000.

125.   By comparison, treatment with solumedrol (methylprednisolone), the steroidal treatment that is the standard of care for a MS flare-up, costs approximately $2,000 or less.

126.   The Acthar regimen also requires patients to self-administer injections daily for several weeks, which compares unfavorably with the three days of infusions (undertaken in a hospital outpatient visit) necessary for the solumedrol treatment.

127.   Questcor faced the difficult problem of convincing doctors to prescribe a drug that was not proven to be superior to steroids, at an exorbitant cost and with a lengthier course of treatment when administered in accordance with the label.

128.   To address this problem, Questcor marketed the drug by focusing on appropriate "patient types" for Acthar, among whom were people who had had adverse reactions or tolerability problems with IV steroids.

129.   Questcor trained its sales representatives to encourage healthcare providers to search for patients that had had any adverse event or inadequate response to steroids and solicit these patients as appropriate candidates for Acthar treatment. Notably, however, the drug insert for Acthar makes clear that "[c]ommon adverse reactions for H.P. Acthar Gel are similar to those of corticosteroids," because adverse responses to the two drugs both relate to their steroidogenic effects.

130.   Nevertheless, Questcor represented Acthar as an alternative for people who had adverse responses to IV steroids and marketing materials promoted the idea that it could be tolerated better.

131.   The clear import of Questcor's written marketing materials — which sales representatives were trained to repeat in person — was that Acthar was better tolerated than steroids.

132.   Various Questcor marketing materials for Acthar made improper or false claims:

a.   A glossy handout in which Questcor profiles a patient who allegedly experienced "steroid psychosis" on IV solumedrol but tolerated Acthar well without side effects;

b.   A brochure where the patient profiled reportedly experienced "irritability, insomnia, and anxiety" on solumedrol, but reported "no significant side effects" with Acthar; and

c.   Another sales piece quotes a patient as saying that steroids made her "miserable," but Acthar did not.

133.   Notwithstanding Questcor's glossy marketing brochures, clinical evidence actually shows that adverse responses to Acthar are generally the same as those for IV steroids; there is no evidence supporting the claim that Acthar is better tolerated than steroids.

### i.   The Brod Protocol

134.   Questcor maintained its fiction of superior tolerability by promoting the "Brod protocol" -- a simpler and shorter five-day dosing regimen that only requires one vial of the drug. This dosing protocol solved two important problems for Questcor: (1) patients receive only one third of the recommended dosage, so they report fewer side effects, lending credibility to Questcor's unsupported claim of superior tolerability for Acthar; and (2) the $24,000 to $29,000 price tag of a single vial seems affordable when compared with the cost of administering the drug per the label's instructions.

135.   In a September 2010 employee training session, a conference call one of Questcor's sales trainers, Jessica Wettstein, outlined how sales representatives should promote the 5-day dosing regimen of the Brod Protocol.

136.   Sales representatives were told that five days of Acthar is equal to three days of solumedrol.

137.   However, there are no peer-reviewed studies showing that a five-day dosing regimen of Acthar is equally effective as a three-day treatment with solumedrol. To the contrary, studies comparing the two drugs find similar efficacy between a three-day dose of solumedrol and the approved, two-to-three-week dose of Acthar.

138.   Questcor sales representatives were also instructed to "prefill" insurance forms with patient information, as well as other data, for the healthcare provider. Representatives would leave these pre-filled order forms with medical staff for easy access when an appropriate candidate for Acthar might call.

139.   The "Brod protocol" was based on the ideas of Staley A. Brod, M.D., a Professor of Neurology at the University of Texas. Dr. Brod first promoted the five-day dosing regimen, notwithstanding the lack of any peer-reviewed studies demonstrating its efficacy.

140.   Also, Dr. Brod was among the numerous doctors and nurses paid by Questcor to travel and promote Acthar to their colleagues. He and others conveyed to audiences of neurologists, nurses, and patients that they rarely used anything other than the five-day dosing schedule. Dr. Brod and other paid Questcor speakers did not, however, cite supporting data for the short-term regimen other than anecdotal stories from patients.

141.   It was not just doctors who promoted the five-day dosage. For example, in a May 2011 email, Questcor Northwest Regional Manager John Russell told his entire sales force that "more than 60% of MS use with Acthar requires only one vial of the drug." One vial is a five-day dose.

142.   Literature prepared by Questcor's Medical Science Liaisons (MSL) addressing the five-day dosing regimen states clearly that the five-day dose is an off-label use of the drug and offers only one tidbit of data.

143.   Addressing the five-day dosing regimen, the MSL letter cites to a study sponsored by Questcor and published in 2011, which occurred after Questcor began promoting the five-day regimen. That study was an open-label clinical trial involving 21 subjects that sought subjective

1   patient assessments for efficacy of a five-day dose of Acthar administered intramuscularly or

2   subcutaneously. The study did not compare the five-day dose to a placebo, or to the approved three-

3   day dose of solumedrol, or to the two-to-three week regimen of Acthar. Instead, it simply recorded

4   patient's subjective responses to questions about their symptoms and experience with the drug on the

5   five-day regimen.

6        144.   Molly Nickerson, a Questcor Medical Science Liaison ("MSL"), made clear in a June

7   4, 2012 email to a Questcor sales representative that the five-day dosing schedule was off-label. In a

8   phone call on that same date, she explained to a colleague that the five-day dosing schedule could

9   only be discussed by an MSL after an unsolicited medical information request form submitted by a

10   doctor.

11        145.   Yet that is not what happened. Questcor sales representatives routinely told doctors,

12   nurses, and other medical staff that they should prescribe the five-day dosage and even prepared

13   prescription forms for them with the five-day dosing regimen already written in.

14        146.   To further promote the Brod protocol, Questcor used speaker programs with both

15   physicians and patients promoting the five-day off label use of Acthar. For example, Questcor's

16   "Meet-the-expert" program consisted of one-on-one promotions geared towards specific doctors that

17   would occur (i) over the telephone when the sales specialist would call the speaker from a target's

18   office and ask the speaker to promote directly to the target (ii) by video, where the target cannot ask

19   any questions of the speaker, or (iii) in one-on-one presentations over a meal. In the "Meet-the-

20   expert" program, the speakers were paid to promote the Brod protocol over the Acthar label's dosing

21   instructions.

22           *ii.*     ***Mallinckrodt Expands to Other Rare Diseases***

23        147.   In addition to MS, Mallinckrodt made an aggressive push to move away from

24   prescriptions for infantile spasms and towards conditions generally affecting elderly patients, and

25   therefore to increase reimbursement by Medicare and third-party payors like HCSC. Mallinckrodt

26   has heavily marketed Acthar to neurologists (for MS), to nephrologists (for idiopathic membranous

27   nephropathy and nephrotic syndrome), to rheumatologists (for a variety of conditions including

28

rheumatoid arthritis), to pulmonologists (for sarcoidosis), and to ophthalmologists (for severe allergic or inflammatory eye conditions).

148.   In 2014, the president of Mallinckrodt's autoimmune and rare-disease business, Gary Phillips, gave a presentation to investors detailing a strategy to expand Acthar's sales to patients in rheumatology, pulmonology, ophthalmology, dermatology, and kidney disease. In the several decades prior, Acthar had not been prescribed in large quantities for these conditions, despite having been FDA approved for such treatments. Although there were no new medical studies suggesting Acthar was needed to treat any of these conditions, the president pledged to "expand significantly" Acthar's sales force in the fields of rheumatology and pulmonology in the upcoming year. That sales effort was wildly successful at expanding the market for Acthar beyond infantile spasms. Now fewer than 10% of Acthar's sales come from prescriptions for infantile spasms, and more than 98% of Plaintiff's expenditures for Acthar were made for insureds over the age of 18.

149.   The active ingredient in Acthar is Corticotropin. Corticotropin is naturally secreted by the body's pituitary gland. Acthar is similar to corticosteroids such as prednisone, hydrocortisone, dexamethasone in that each of these drugs affects the levels of the hormone cortisol in the body. For most of Acthar many indications, there is no medical justification to use Acthar over cheaper corticosteroids such as prednisone, which costs about $20 for an average course of treatment whereas Achtar costs over $100,000. The illegal co-payment and bribery schemes at issue here caused Achtar to be prescribed in instances where it was medically unnecessary, and where medical data does not support Acthar use. But that does not mean, as explained below, that corticosteroids are substitutes for Acthar. As Acthar is a last-line treatment, and can treat critical conditions such as infant spasms, they are not. Prices for corticosteroids were flat or slightly declining at the same time Acthar prices spiked dramatically. To say the least, the monopoly that Mallinckrodt created with Acthar provided perverse incentives for Mallinckrodt to market Acthar for off-label uses.

### c. Mallinckrodt Provides Kickbacks to Physicians

150.   In conjunction with its off-label marketing scheme, Mallinckrodt paid kickbacks to the doctors prescribing high volumes of Acthar (the "Prescribing Doctors") in exchange for continued increased prescriptions for Acthar.

151.   Mallinckrodt has paid many of the top prescribers substantial fees using a variety of methods to disguise the payments as legitimate fees, when in fact the payments were incentives and rewards for off-label promotion.

152.   One method Mallinckrodt used was to disguise the payments as "research," specifically payments for clinical trials of supposed new indications of Acthar. Dr. Brod, for example, creator of the "Brod protocol," was paid to conduct several investigative clinical trials of the five-day course of treatment for Acthar.  The trials were of dubious scientific value in that they were not placebo-controlled and double blind. The studies were never published in any peer-reviewed publication. Nevertheless, Mallinckrodt paid Dr. Brod to promote these sham clinical trials to physicians across the country, and even had him accompany sales representatives on calls to doctors.

153.   Mallinckrodt also used its paid speakers program to funnel payments to doctors who prescribed high volumes of Acthar. Sales specialists would identify potential physicians to become speakers based on volume potential. Additionally, to be selected as a qualified speaker, physicians must have written a threshold number of prescriptions for Acthar. Those physicians who were selected for the paid speaker program were required to participate in training over the telephone. The speakers could receive as much as $2,000 per presentation or $6,000 per day for giving presentations, with no cap on the amount that a speaker could earn.

154.   Although speakers were compensated on the high end of the industry standard, what qualified as a speaking engagement for which the speaker was compensated was a very low bar. Only as few as three people- who need not be physicians- were required to attend for a physician to be eligible for the full fee. Even spouses were allowed to attend.

155.   The paid speaker program was just a thinly-veiled effort to reward physicians who prescribed Acthar. Indeed, approximately 90% of all prescriptions for Acthar are written by approved speakers.

156.   Mallinckrodt employed other tactics to encourage off-label prescriptions such as taking doctors on paid junkets, entertaining them with lavish means, sponsoring meals and happy hours, and bribing doctors and their staff with gift cards in exchange for prescribing Acthar.

157.   From 2013 to 2016, Mallinckrodt paid doctors nearly $27.5 million in Acthar-related payments. A handful of doctors received unusually large sums of money: during the same period, Mallinckrodt paid more than $6.5 million to only 288 prescribers for consulting, promotional speaking, and other services related to Acthar.

158.   The goal of Mallinckrodt's scheme was to increase its sales of Acthar at the expense of those who paid for it—primarily health insurers such as Plaintiff. Mallinckrodt required the assistance and complicity of the Prescribing Doctors to achieve its ends. It knew that in order to increase the prescription rates of Acthar, the Prescribing Doctors would need to prescribe Acthar in situations in which it was not indicated and instead of considerably more cost-effective medications.

159.   A 2018 study published in JAMA Network Open concluded that "[a]ggressive sales tactics and payments from [Mallinckrodt] may influence prescribing behavior for [Acthar]." Indeed its "findings suggest that financial conflicts of interest may be driving use of corticotropin in the Medicare program." The study examined Medicare data about the providers who submitted more than ten claims for Acthar. It noted that "[a]mong the 50 prescribers (21.3%) who received more than $10,000 in payments during the year [2015], corticotropin expenditures per prescriber (mean [SD], $1,304,884 [$1,022,937]) were more than double that of the 45 prescribers (19.2%) who received $25 or less (mean [SD], $594,976 [$256,357])." The study's invariable regression analysis further showed that "Medicare spending on [Acthar] increased by 7.9% (approximately $53,000) for every $10,000 increase in payments to prescribers," or a return of investment of approximately 5:1. The study further noted that 207 of 235 frequent corticotropin prescribers (88%) who submitted more

than 10 claims received a corticotropin-related payment from Mallinckrodt. By contrast, a recent study found that, among all specialists, only 35% receive payments from the pharmaceutical industry.

160.   Mallinckrodt has paid many of the top prescribers to HCSC's members. These include the following:

| Prescribing Doctor | State | Amount Mallinckrodt Paid to the Prescribing Doctor[30] | Amount HCSC Paid for Prescriptions Ordered by Prescribing Doctor |
|---|---|---|---|
| A | Illinois | 130,000 | 3,054,341 |
| B | Illinois | 218,000 | 1,658,783 |
| C | Colorado | 44,000 | 1,515,961 |
| D | Ohio | 176,000 | 1,138,697 |
| E | Texas | 359,000 | 1,017,415 |
| F | Wisconsin Texas(1991-2015) | 163,000 | 739,523 |
| G | Oklahoma | 480,000 | 567,206 |
| H | Oklahoma | 230,000 | 659,476 |
| I | Illinois | 163,000 | 668,725 |

161.   When the source of the payment information was updated with data for the years 2017 and 2018, prescribers G and I, for example, received $145,972 and $135,727 from Mallinckrodt, respectively.

162.   On September 4, 2019, Mallinckrodt agreed to pay over $15 million dollars to settle claims related to its physician kickback scheme.[31]

---

[30] All prescriber information is limited to the time period August 2013 through December 2018. *See* http://projects.propublica.org/docdollars.

[31] "Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for 'Wining and Dining' Doctors," (September 4, 2019) *available at* https://www.justice.gov/opa/pr/drug-maker-mallinckrodt-agrees-pay-over-15-million-resolve-alleged-false-claims-act-liability.

### 3. Mallinckrodt Acquires Acthar's Only Potential Competitor

163.   Synacthen is a synthetic ACTH drug with similar biological activities and pharmacological effects as Acthar. In Europe, Canada, and other parts of the world, doctors treat patients with Synacthen for the same conditions that are treated with Acthar in the U.S. Synacthen has the same first 24 amino acids as Acthar, making it a substitute.

164.   Questcor itself considered the drugs so similar that it submitted Synacthen information to support its application to the FDA to expand the label indications for Acthar. It also cited Synacthen studies in its Acthar marketing materials.

165.   Before June 2013, Novartis marketed and sold Synacthen abroad. For years, Questcor viewed Synacthen as a significant potential competitive threat to its monopoly. Questcor therefore sought to acquire the rights to Synacthen as a defensive move to prevent competitors from acquiring it and developing it as a competitor to Acthar.

166.   In late 2011, Novartis decided to divest its exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States. Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

167.   Each of the three firms planned to develop and use Synacthen to compete directly with Acthar, and to price Synacthen well below Acthar. The three firms had the necessary expertise and financing, as well as sufficient business and regulatory plans, to develop Synacthen for the U.S. market.

168.   The Synacthen asset package sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug product and the manufacturing process. Because Synacthen had a long history of safe and effective use abroad, a buyer would not need to begin the research, development, testing, or manufacturing process from scratch. The asset package would therefore substantially lower the barriers to entry in the U.S. ACTH market.

169.   The bidding process occurred in late 2012 and early 2013. Questcor signed a confidentiality agreement with Novartis and submitted an offer for Synacthen. Novartis negotiated with the three alternative bidders in parallel with Questcor, and each company had exchanged deal terms with Novartis and submitted a formal offer. The offers by the three alternative bidders were comparable to each other in value and structured similarly.  They each included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. Synacthen sales. Unlike the three alternative bidders, however, Questcor had only inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. It nevertheless submitted a bid several multiples higher than the other bidders. Novartis knew that Questcor did not intend to bring Acthar to market. Questcor had done comparatively little to bring Synacthen to market, and Questcor would have understood the desire to preserve the Acthar monopoly.

170.   On June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements"), that gave Questcor exclusive rights to develop, market, and sell Synacthen in the United States. Under the Agreements, Questcor is obligated to pay a minimum of $135 million to Novartis for Synacthen.

171.   Questcor claimed that it acquired Synacthen to develop it for new, non-Acthar indications, but given the drugs' similarities, any therapeutic indication that Questcor might have pursued with Synacthen could have been pursued with Acthar.

172.   Fourteen months after acquiring Synacthen, Mallinckrodt plc acquired Questcor for $5.6 billion, an amount almost entirely attributable to the value of Acthar.

173.   Neither Questcor nor Mallinckrodt made more than superficial efforts to pursue commercialization of Synacthen. Instead Mallinckrodt chose to shelve the asset and thereby to protect Acthar's monopoly pricing.

174.   In January 2014, Retrophin sued Questcor for antitrust violations in the United States District Court for the Central District of California.

175.   In the Retrophin Complaint, Retrophin claimed,

"[i]n June of 2013, plaintiff Retrophin was poised to challenge Questcor's monopoly. It had negotiated an agreement to purchase from Novartis AG ("Novartis"), the rights to sell in the US a product called Synacthen. ...

Retrophin planned to obtain FDA approval to sell Synacthen in the US and compete head to head against Questcor by dramatically undercutting Questcor's price for Acthar. It had negotiated and was ready to sign an agreement to purchase the US rights to Synacthen from Novartis. The signing was scheduled for June 11, 2013. The signing of the agreement was so imminent that a press release had been prepared to announce the deal.

On June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor swept in and acquired the rights to Synacthen. In doing so, it preserved and entrenched its ACTH monopoly in US and eliminated the competitive threat posed by Retrophin's acquisition of Synacthen. There was no procompetitive aspect of Questcor's acquisition of Synacthen.

…

In anticipation of the transaction, Retrophin had prepared a plan to obtain regulatory approvals for, and sell Synacthen. It devised a strategy for going directly to Phase III clinical drug trials in order to obtain FDA approval for the use of Synacthen to treat Infantile Spasms and Nephrotic Syndrome. It also planned to file a Treatment Investigational New Drug Application which, if approved by the FDA, would have allowed Retrophin to offer Synacthen to patients for free while it was awaiting FDA approval to market Synacthen for Infantile Spasms and Nephrotic Syndrome. This would have given patients immediate relief from Questcor's pricing and would have developed substantial goodwill for Retrophin and Synacthen in both the patient and medical communities. Retrophin believed that the history of Synacthen's use in other countries would aid it in obtaining FDA approval.

In anticipation of the product launch, Retrophin had put in place a clinical apparatus to conduct clinical trials necessary to obtain FDA approval. It planned to begin to market Synacthen upon FDA approval.

Given its expertise as a biopharmaceutical company focusing on rare diseases, Retrophin was ready, willing and able to enter the Relevant Markets with Synacthen subject to FDA approval. Retrophin's entry into the Relevant Markets would have broken Questcor's monopoly. The result would have been unambiguously procompetitive. Retrophin's entry into the market and its introduction of Synacthen as

an alternative to Acthar would have benefitted all participants in the markets -—— other than Questcor.[32]

176.   Judge Staton ruled that Retrophin had stated a claim for antitrust injury, holding "Retrophin alleges that it was foreclosed from using Synacthen to enter the Relevant Markets and compete with Questcor, and that as a result Questcor continues to maintain a monopoly in the Relevant Markets through Acthar.  …  Retrophin's injury—exclusion from the Relevant Markets— is inseparable from the alleged harm to competition."[33] Concerning the allegations that Retrophin would have entered the market with Synacthen and obtained FDA approval, Judge Staton ruled "Retrophin has sufficiently alleged an intent and preparedness to enter the market, and that the necessity of FDA approval under these circumstances does not render the alleged harm too speculative."[34]

177.   Questcor subsequently settled Retrophin's claims by paying it $15.5 million.

178.   The FDA had approved Cortrosyn, a rapid acting version of a similar drug formulation to Synacthen, in 2009. That makes it more likely that the FDA would have approved Synacthen, which is a longer-acting synthetic ACTH drug.

179.   Had Mallinckrodt or any other company acting in good faith been motivated to obtain FDA approval for treatments that would have competed with Acthar, it could have done so. In June 2016, Mallinckrodt announced that it sought FDA approval for a Fast Track designation for its Investigational New Drug application ("IND") for Synacthen in the treatment of Duchenne muscular dystrophy ("DMD").

180.   The IND application was granted in September 2016, but Mallinckrodt took no further steps with respect to testing or approval of Synacthen. Mallinckrodt knew that Synacthen could treat

---

[32] *Retrophin Inc. v. Questcor Pharmaceuticals, Inc.*, No. 8:14-cv-00026, Dkt.1 (C.D. Cal Jan. 7, 2014) at  ¶¶ 4-6, 50-52.
[33] *Retrophin Inc. v. Questcor Pharmaceuticals, Inc.*, No. 8:14-cv-00026, Dkt.34 (C.D. Cal Aug. 8, 2014) at  10.
[34] *Id.* at 11.

infant spasms and other indications, however, because in 2015 it dramatically increased prices of Synacthen in Canada and was criticized for this conduct.

181.   Under the terms of the Novartis deal, Mallinckrodt was to make payments to Novartis based on development milestones and Novartis could take Synacthen back if it did not appear Mallinckrodt had made serious efforts to develop Synacthen. Internal Mallinckrodt communications show that the IND it obtained for DMD was window-dressing and Mallinckrodt had no such good faith intent. Mallinckrodt was required to periodically submit dossiers under the terms of the licensing agreement. The IND for DMD appears to be its token efforts to comply. Rather than develop Synacthen Mallinckrodt "dragged their feet," "put very little effort into developing Synacthen in the US," and "to call [Synacthen] an active development program would have been a gross overstatement."[35]

182.   Nevertheless, Mallinckrodt's success in obtaining an IND show that a company acting in good faith, such as Retrophin, could have marketed Synacthen within a year or so after obtaining the license from Norvartis in 2013.

183.   This conduct led the U.S. Federal Trade Commission ("FTC"), joined by the states of Alaska, Maryland, New York, Texas, and Washington, to bring an action against Mallinckrodt under the FTC Act, Section 2 of the Sherman Act, and state antitrust laws. On January 18, 2017, the FTC announced that Mallinckrodt had agreed to pay $100 million to settle the suit, nearly as much as Questcor had originally paid for Synacthen.

184.   The parties also filed, and the court approved, a stipulated court order requiring Questcor to grant a license to develop Synacthen to treat infantile spasms and nephrotic syndrome to a licensee approved by the FTC.[36] To ensure Questcor complied with its obligations, the order required that a monitor would verify that Questcor granted the license within 120 days of the entry

---

[35] *Shenk, et al. v. Mallinckrodt PLC, et al.*, 1:17-cv-00145-DLF (D.D.C. May 18, 2018), Cons. Class Action Compl. ¶¶ 89-90.

[36] *Federal Trade Commission, et al v. Mallinckrodt ARD INC. et al*, No. 1:17-cv-00120, Dkt. 16 (D.D.C. Jan. 30, 2017).

of the order; after that time, a trustee would be appointed to effectuate the license. The order also requires Questcor to provide periodic reports on its efforts, and provide the Commission with advance notice of any future acquisitions of U.S. rights to ACTH drugs.[37] On July 14, 2017, the FTC announced that it had approved a sublicense granting West Therapeutic Development, LLC ("West") certain rights to develop and market Synacthen in the United States.[38]

185.    Rather than to seek approval and development of Synacthen, West entered into an agreement with Depomed (now Assertio) in November 2017 to develop an alternative synthetic ACTH treatment in exchange for a share of revenues for this treatment. Unlike Retrophin, West has not been engaged in an effort to obtain FDA approval of Synacthen. Instead, West has used the license of Synacthen to leverage a business deal. This state of affairs would not have transpired had Questcor not interfered with the bidding for Synacthen.

186.    Had Questcor not engaged in a "catch and kill" scheme to acquire the rights to Synacthen in 2013, a competitor that was really, willing, and able to bring Synacthen to market would have actually done so. This competition would have reduced the price of Acthar, as a competing product would have been brought to market lower prices for HCSC.

## VI.    MALLINCKRODT'S FRAUDULENT CONCEALMENT OF THE ILLEGAL SCHEME AND CONTINUING VIOLATIONS

187.    Mallinckrodt actively concealed the existence of its illegal scheme and the acts underlying it through false or misleading statements to HCSC and to the public. Mallinckrodt falsely maintained that it would develop and seek FDA approval of Synacthen when in reality it purposefully failed to put the effort and resources into obtaining a broad FDA approval of Synacthen as an alternative to Acthar.

188.    Mallinckrodt also failed to disclose to HCSC its arrangements with CDF that created specialized funds that were illegally to reimburse co-payments for Acthar, despite its certifications

---

[37] *See id.*

[38] "FTC Approves Sublicense for Synacthen Depot Submitted by Mallinckrodt ARD Inc.," (July 14, 2017), *available at* https://www.ftc.gov/news-events/press-releases/2017/07/ftc-approves-sublicense-synacthen-depot-submitted-mallinckrodt.

to HCSC that it was following federal law and CMS rules that prohibited such copayment subsidies for Medicare patients.

189.   Further, to avoid sanction and regulation by the FDA, Mallinckrodt's scheme as alleged above depended on Mallinckrodt's affirmative concealment of its extensive involvement in the off-label promotion of Acthar. Indeed, Mallinckrodt used its MSLs to promote the off-label use of Acthar under the guise of medical education activities. In addition, Mallinckrodt used other methods, such as incentives for physicians who achieved a certain number of off-label prescriptions, to conceal its conduct.

190.   Due to Mallinckrodt's fraudulent concealment, HCSC could not have discovered and remained unaware of the foregoing conduct until the Federal Trade Commission and the United States Department of Justice brought these acts and practices to light through investigations, legal actions, and/or settlements.

191.   Furthermore, the misconduct alleged in this Complaint is of a continuing nature and has continuing harm to HCSC. Every prescription for an off-label use of Acthar for which HCSC paid and continues to pay is part of a continuing course of conduct.

## VII.   MARKET POWER AND MARKET DEFINITION

192.   Mallinckrodt has exercised substantial market power, *i.e.* monopoly power, with respect to Acthar in the United States because it had the power to maintain the price of the drug it sold as Acthar at supracompetitive levels without losing so many sales as to make the supracompetitive price unprofitable.

193.   Mallinckrodt does not set the price of Acthar by reference to other drugs prescribed to treat the same indications that Acthar treats. Acthar is priced substantially higher than non-ACTH drugs used to treat the same indications. This suggests that there is no competitive constraint on Mallinckrodt's ability to set prices. Indeed, Acthar represents 100% of the market for ACTH drugs in the United States. The power to profitably increase prices is prima facie evidence of Mallinckrodt's market power.

194.   If HCSC is legally required to prove market power circumstantially by first defining a relevant product market, HCSC alleges that the relevant market is long-acting ACTH drugs. Both Achtar and Synacthen are long-acting ACTH drugs.

195.   Short-acting ACTH drugs (such as Acthrel or Cortrosyn) are insufficient substitutes for Acthar because short-acting ACTH drugs could not provide the same treatment, and are not designed to treat the same conditions that long-acting ACTH drugs treat.  There is no overlap in the medical conditions that the drugs are approved to treat or diagnose. Short-acting ACTH are poor treatments for chronic or persistent conditions that long-acting ACTH drugs are designed to treat. Short-acting ACTH drugs would need to be given intravenously, or in impractically frequent time intervals.

196.   Long acting ACTH drugs is a separate market from drugs that treat some of the same conditions, such as corticosteroids.

197.   The First Data Bank ("FDB") drug database assigns Acthar a different Standard Therapeutic Class than corticosteroids. Corticosteroids like prednisone are in FDB's "Glucocorticoids" Standard Therapeutic Class. In contrast, FDB classifies Acthar in the "Adrenocorticotrophic Hormones" Standard Therapeutic Class. The only other drugs in the "Adrenocorticotrophic Hormones" Standard Therapeutic Class are Synacthen and several short-acting (non-depot) formulations of natural and synthetic ACTH which are approved by the FDA only for use in the testing of adrenal function.

198.   Glucocorticoids and Acthar are also produced in very different ways. Acthar is produced by a single factory in Prince Edward Island, Canada, using biological processes that make it expensive to produce. Manufacturers can chemically synthesize Glucocorticoid drugs in a variety of facilities throughout the world that cannot produce Acthar.

199.   Acthar is considered to be distinct from the corticosteroid drugs within the classification. First, Acthar is a "last line" treatment used when other corticosteroids have failed. Additionally, as explained by Mallinckrodt it does not operate as a steroid but has a different mechanism: "Acthar is not a steroid. But one of the ways it is thought to work is by helping your

body produce its own natural steroid hormones." Finally, Acthar is marketed as being clinically superior to other corticosteroids.

200.    Acthar and Synacthen have a biological mechanism of action that is distinct from other drugs in that they stimulate the adrenal gland to produce cortisol. Glucocorticoid drugs are synthetic forms of cortisol that do not work through the adrenal gland.

201.    The cross-price elasticity between Synacthen and Acthar is relatively high (it is over 2.0).

202.    The cross-price elasticity between Acthar and either corticosteroids or Glucocorticoids is low. From 2011 to 2019, while the price of Acthar was skyrocketing, prices of Glucocorticoids were flat or slightly declining.

203.    Indeed, Acthar does not exhibit significant, positive cross-elasticity of demand regarding price with any other product.

204.    Acthar is an ACTH analogue used as an anti-inflammatory prescribed to treat infantile spasms and acute exacerbations of MS. The FDA approved the drug for sale in the United States in 1952. Mallinckrodt brought it to market under the name Acthar in 2001, which achieved corresponding revenue growth of over $1 billion. Acthar's pharmacological profile, side effects, and efficacy profile differs from other ACTH drugs, corticosteroids, and anticonvulsants used to treat the same or similar conditions. These other drugs cannot automatically be substituted for Acthar by pharmacists, and do not exhibit price cross-elasticity of demand regarding Acthar. Acthar is therefore differentiated from all products.

205.    For example, Acthar costs nearly four times the amount of Sabril, the only other FDA-approved drug for the treatment of infantile spasms. But Sabril has a different molecular structure, works differently, and is prescribed for a smaller set of patients than Acthar. Acthar is also not considered a substitute for several earlier-line treatments for idiopathic membranous nephropathy. Most idiopathic membranous nephropathy patients are treated with low-cost drugs, and more severe cases might be treated with Rituxan, a drug that is still less expensive than Acthar. And as with Sabril, these drugs operate differently than Acthar does.

206.   One of the main reasons for the absence of competition or a lower-cost substitute is the unavailability of Synacthen.

207.   The pharmaceutical marketplace is characterized by a disconnect between the payment obligation and the product selection. State laws prohibit pharmacists from dispensing many pharmaceutical products to patients without a prescription written by a doctor, including Acthar. This prohibition divorces the payment obligation and the product selection: the patient (and usually his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

208.   Studies show that doctors typically are not aware of the relative costs of pharmaceuticals, and, even when they are, they are insensitive to price differences because they do not have to pay for the products.

209.   Unlike many consumer products, where consumers are provided with a choice of functionally-similar products at the point of sale and make purchasing decisions primarily based on price, the initial purchasing decision for prescription drugs is made by the physician, not by consumers of these products.

210.   To be a substitute for antitrust purposes, a functionally similar product must exert sufficient pressure on prices and sales of another product, so the price of that product cannot be maintained above levels maintained in a competitive market. No other ACTH product (except Synacthen) will, or would, take away sufficient sales from this drug to prevent Mallinckrodt from raising or maintaining the price of its product above levels that would prevail in a competitive market.

211.   Despite the lack of patent protection for Acthar, the U.S. ACTH market is still characterized by high barriers to entry regarding competition in the relevant markets due to regulatory protections, and high costs of entry and expansions. This includes FDA approval, which is required to market drugs to U.S. consumers. Drugs sold outside of the U.S. are therefore not viable substitutes.

212.   Furthermore, developing a safe, effective, and reliable substitute would require substantial investments of resources and time, with no guarantee of success. One would have to source the active ingredient, develop a sustained-release depot injection formulation, scale

production, and conduct clinical trials, particularly because Acthar is derived from a biological and not a chemical process. Mallinckrodt's CEO has assured investors that Acthar "has significant durability in the marketplace" because "it will be very difficult for this product to be replicated in any way [by] a generic."

213.   Mallinckrodt has had, and exercised, the power to exclude competition from the relevant market.

214.   Mallinckrodt needed to control only Synacthen, and no other products, in order to raise prices of Acthar substantially above competitive levels and gain massive profits. Only the market entry of a competing ACTH product such as Synacthen would diminish Mallinckrodt's ability to maintain its dominance over the market.

215.   Due to its possession of the license to produced Synacthen, Mallinckrodt's power to exclude competitors reduced output of ACTH drugs and restricted competition in this market, while Mallinckrodt maintained enormous profits.

216.   Accordingly, while Mallinckrodt maintained its license for Synacthen, purchasers and payors, like HCSC, were denied the competitive effects of other manufacturers entering the market and a reduction of the supra-competitive prices caused by Mallinckrodt's misconduct.

217.   During the relevant period, Mallinckrodt has controlled competition in this market and profitably maintain the price of these products well above competitive levels.

218.   The relevant geographic market is the entire United States and its territories. At all relevant times prior to generic entry, Mallinckrodt's market share in the relevant market was 100%, demonstrating market power. Acthar was, and still is, the only FDA approved long-acting ACTH drug on the market, and Mallinckrodt has ensured that Synacthen could not pose a competitive threat.

219.   The relevant period is from 2011 through the present. HCSC specifically alleges that the conduct and patterns of conduct alleged here occurred and continued to occur throughout this period.

## VIII.  MARKET EFFECTS

220.   The Acthar Scheme has enabled Mallinckrodt to: (a) delay the entry of Synacthen in the United States for at least six years; (b) fix, raise, maintain, or stabilize the price of Acthar products; (c) maintain a monopoly in the United States market for Acthar products; and (d) allocate 100% of the United States market for Acthar to Mallinckrodt for up to eight years.

221.   But for the continuing illegal agreements between Mallinckrodt and Novartis (which included financial inducements to delay the launch of less expensive Synacthen), another company, such as Retrophin, would have begun manufacturing Synacthen shortly after acquiring the license from Novartis and launched the product earlier than Mallinckrodt.

222.   Mallinckrodt's unlawful actions have delayed the sale of an Acthar competitor in the United States and unlawfully enabled Mallinckrodt to sell Acthar at artificially inflated, supracompetitive prices.  But-for Mallinckrodt's illegal conduct, competition to Acthar would have begun prior to 2014, and would have included Synacthen.

## IX.    ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE

223. During the relevant period, HCSC purchased substantial amounts of Acthar. Because of Mallinckrodt's illegal conduct, HCSC was compelled to pay, and did pay, artificially inflated prices for their drug requirements on these purchases. Those prices were substantially greater than the prices that HCSC would have paid absent the alleged illegal conduct because: (1) the price of Acthar was artificially inflated by Mallinckrodt's illegal conduct; and/or (2) HCSC was deprived of the opportunity to purchase lower-priced Synacthen sooner.

224. As a consequence, HCSC has sustained substantial losses and damage to its business and property in overcharges. The full amount, form, and components of such damages will be calculated after discovery and upon proof at trial.

225. Mallinckrodt's efforts to monopolize and restrain competition in the market for ACTH drugs substantially affected interstate and foreign commerce.

226. At all material times, Mallinckrodt manufactured, promoted, distributed, and sold, and/or prevented the manufacturing, promotion, distribution, and sale of, substantial amounts of these

drugs in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

227.  At all material times, Mallinckrodt transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of these drugs.

228.  Throughout the relevant period, Mallinckrodt, CDF, and the Prescribing Doctors used thousands of mail and interstate wire communications to create and manage their scheme, which involved nationwide distribution of Acthar through the Prescribing Doctors and CuraScript at the direction of Mallinckrodt. Mallinckrodt communicated with CDF through mail and wires and made multiple payments to CDF through mail and wires. Mallinckrodt communicated with the Prescribing Doctors through the mails and wires, caused thousands of reimbursement requests to be submitted by the Prescribing Doctors over the wires or by mail, and made illegal kickback payments to the Prescribing Doctors over the wires or by mail.

229.  To further its efforts to monopolize and restrain competition in the market for these drugs, Mallinckrodt employed the U.S. mail and interstate and international wire lines, as well as means of interstate and international travel. Mallinckrodt's activities were within the flow of and have substantially affected interstate commerce.

230.  As a result of Mallinckrodt's multi-pronged scheme to inflate Acthar's price and utilization, HCSC incurred significant losses. A substantial portion of HCSC's business is evaluating, underwriting, and managing risks involved in insuring healthcare costs. As a commercial insurer, HCSC bears significant risk of utilization of unnecessary, ineffective, or uneconomical medical care. The same is true for HCSC's Medicare plans.

231.  For HCSC's Medicare business in particular, HCSC bears the risk of rising prescription drug prices and utilization in part through Part D "risk corridors" and Medicare Advantage capitation payments. Both of these Medicare provisions shift risk from the federal government to HCSC to pay for some or all of the increased costs of prescription drugs for the Medicare members it covers. As such, HCSC benefits financially when costs and utilization of prescription drugs are lower than

1    expected and conversely it is harmed when costs and utilization of prescription drugs are higher than

2    expected. In addition, for the portion of costs covered by the government under these programs,

3    HCSC bears a risk of non-payment if claims are found to be false or fraudulent by the government.

4        232.   Mallinckrodt's scheme was designed to cause and did cause HCSC and others to pay

5    for Acthar prescriptions that they would otherwise not have reimbursed and to pay more for those

6    prescriptions than they otherwise would have paid. HCSC was among the group of health insurers

7    who were the targets of Mallinckrodt's scheme. Mallinckrodt knew that nearly all of its sales of

8    Acthar in the United States would be sold to patients who carried prescription drug insurance that

9    would bear the majority of Acthar's cost. HCSC's insurance plans bore the majority of Acthar's costs

10   for its members and HCSC was therefore directly injured as a result of Mallinckrodt's illegal conduct.

11       233.   But for Mallinckrodt's scheme to perpetuate its ACTH monopoly, illegally subsidize

12   HCSC's members' co-pays, and pay kickbacks to Prescribing Doctors, HCSC would have paid for

13   fewer Acthar prescriptions and it would have paid less for those prescriptions that it otherwise would

14   have covered. Specifically, but for Mallinckrodt's monopolistic conduct, including its acquisition of

15   Synacthen, HCSC would have benefitted from increased competition in the market for ACTH drugs

16   and would have either paid lower prices for Acthar or steered its members to lower priced Synacthen.

17   Similarly, but for Mallinckrodt's kickbacks, Mallinckrodt and the Prescribing Doctors would not

18   have defrauded HCSC by falsely certifying their compliance with federal and state law through

19   submissions for reimbursements for Acthar prescriptions. Finally, but for Mallinckrodt's kickback

20   scheme and illegal copay assistance through CDF, prescription rates for Acthar would have been

21   lower, and HCSC's members would have received different care from their physicians that was more

22   effective, less harmful, or more cost effective than Acthar.

23       234.   As a consequence of Mallinckrodt's conduct, HCSC paid significant overcharges for

24   Acthar prescriptions. In Alameda County alone, HCSC paid over $998,000 for Acthar prescriptions.

25   In the absence of such conduct, HCSC would have paid a small fraction of that amount. HCSC has

26   also incurred administrative, investigative, legal, and other costs as a result of Mallinckrodt's

27   conduct.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## X.  CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF NEW JERSEY RICO, (N.J.S.A. § 2C:41-2(c))

235.   HCSC incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

236.   Mallinckrodt is a "person" within the meaning of the New Jersey's Racketeer Influenced and Corrupt Organizations Act ("NJ RICO"), N.J.S.A. § 2C:41-1(b), that conducted the affairs of an enterprise through a pattern of racketeering activity in violation of N.J.S.A. § 2C:41-2(c).

237.   The Acthar Enterprise is an enterprise within the meaning of N.J.S.A. § 2C:41-1(c), consisting of CDF—including its corporate parents, siblings, subsidiaries, employees, and agents. The Acthar Enterprise was an ongoing organization that functioned as a continuing unit. The Acthar Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Mallinckrodt is a "person" distinct from the Acthar Enterprise.

238.   Mallinckrodt established the Acthar Enterprise to fraudulently increase its sales of Acthar. Mallinckrodt subsidized co-pays through CDF to increase the rate of prescriptions of Acthar in lieu of less expensive alternative treatment. Mallinckrodt and CDF knew that their scheme violated federal and state laws.

239.   False representations of compliance with federal and state laws were made to HCSC for payment over the wires or by mail. These false representations were made directly to HCSC and were a condition of reimbursement by HCSC for all Acthar claims submitted. The illegal payments were sent over the wires or by mail to CDF.

240.   The Acthar Enterprise engaged in and affected engaged in and affected trade or commerce in the State of New Jersey and elsewhere (including this State), because among other things, it marketed, sold, purchased, or provided Acthar from its facilities in New Jersey to thousands of individuals throughout the United States.

241.  Mallinckrodt has asserted control over the Acthar Enterprise by designing, organizing, and funding the phony charitable funds at CDF used for Acthar co-pays.

242.  Mallinckrodt has conducted and participated in the affairs of the Acthar Enterprise through a pattern of racketeering activity that includes acts indictable under that includes "conduct defined as 'racketeering activity' under Title 18, U.S.C. § 1961(1)(A), (B) and (D)," N.J.S.A. § 2C:41-1(a)(2), including acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity), and state bribery statutes, including but not limited to N.J. Stat. § 2C:21-10.

243.  These acts were to further Mallinckrodt's unlawful scheme, which consisted of utilizing a co-pay charity illegally to inflate the price of Acthar and actively concealing information about Mallinckrodt's activities as set forth above.

244.  This enterprise used the mails and wire to implement the scheme. The coordination and utilization of CDF disease-specific co-pay funds involved several written and/or oral communications transmitted through mail and/or wire, a few examples of which are cited above.

245.  Mallinckrodt acted with the requisite scienter with respect to these acts. At all times, Mallinckrodt acted with the specific intent to defraud. In the alternative, Mallinckrodt acted recklessly by creating conditions and incentives that it knew, or should have known, would cause its officers, employees, and/or agents to engage in the fraudulent scheme described above.

246.  The effect of Mallinckrodt's racketeering activity was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct.

247.  HCSC suffered injuries when it reimbursed those prescriptions for Acthar that otherwise would not have been made and/or paid the higher prices that resulted from the illegal conduct.

248.  HCSC's injuries were directly and proximately caused by Mallinckrodt's racketeering activities as described above.

249.  By virtue of these violations of N.J.S.A. § 2C:41-2(c), Mallinckrodt is jointly and severally liable to HCSC for three times the damages HCSC has sustained, plus the cost of this suit, including reasonable attorneys' fees pursuant to N.J.S.A. § 2C:41-2(c).

## COUNT II

## CONSPIRACY TO VIOLATE NJ RICO, (N.J.S.A. § 2C:41-2(d))

250.  HCSC incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

251.  Section 2C:41-2(d) of NJ RICO provides that it "shall be unlawful for any person to conspire as defined by N.J.S.A. 2C:5-2, to violate any of the provisions of this section."

252.  Mallinckrodt has violated Section 2C:41-2(d) by conspiring with CDF to violate Section 2C:41-2(c).  The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Acthar Enterprise described previously through a pattern of racketeering activity.

253.  Mallinckrodt and its co-conspirator have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud HCSC of money.

254.  The nature of the above-described Mallinckrodt's co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an Section 2C:41-2(d) violation of NJ RICO by conspiring to violate Section 2C:41-2(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

255.  As a direct and proximate result of Mallinckrodt's overt acts and predicate acts in furtherance of violating Section 2C:41-2(d) violation of NJ RICO by conspiring to violate Section 2C:41-2(c), HCSC has been injured in its business and property as set forth more fully above.

256.  Mallinckrodt and its co-conspirators have sought to and have engaged in the commission of overt acts, including unlawful racketeering predicate acts:

a.  Multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1342;

b.  Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346;

c.  Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346;

d.  Multiple instances of unlawful activity in violation of 18 U.S.C. §1952;

e.  Multiple instances of bribery in violation of state statutes, including but not limited to N.J. Stat. § 2C:21-10.

257.  The purpose and effect of the conspiracy was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct.

258.  HCSC suffered injuries when it reimbursed those prescriptions for Acthar that otherwise would not have been made and/or paid the higher prices that resulted from the illegal, conspiratorial conduct.

259.  HCSC's injuries were directly and proximately caused by Mallinckrodt's racketeering activities as described above.

260.  By virtue of these violations of Section 2C:41-2(d) , Mallinckrodt is jointly and severally liable to HCSC for three times the damages HCSC has sustained, plus the cost of this suit, including reasonable attorneys' fees pursuant to N.J.S.A. § 2C:41-4(c).

**COUNT III**

**MONOPOLIZATION UNDER STATE LAW**

261.  HCSC incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

262.  Mallinckrodt has, and at all relevant times had, monopoly power in the market for the sale of ACTH drugs in the United States.

263.  By intervening in the bidding process for Synacthen and purchasing the exclusive license to market Synacthen in the United States, Mallinckrodt eliminated the potential competitive threat posed by an independently owned Synacthen license. Mallinckrodt's conduct was reasonably

1  capable of contributing significantly to the preservation of Mallinckrodt's monopoly power and

2  monopoly pricing of Acthar in the United States. Mallinckrodt's exclusionary conduct to consolidate

3  distribution through Express Scripts is additional anticompetitive conduct that restrained the relevant

4  market.

5      264.  By means of this scheme, Mallinckrodt intentionally and wrongfully maintained

6  market power with respect to ACTH in violation of the following state laws:

7       a.  Arizona Rev. Stat. §§ 44-1403, et seq., with respect to purchases of Acthar in Arizona.

8       b.  Cal. Bus. & Prof. Code §§ 17200, et seq., and California common law, with respect to

9           purchases of Acthar in California.

10      c.  Conn. Gen. Stat. Ann. § 35-24, et seq., with respect to purchases of Acthar in

11          Connecticut.

12      d.  D.C. Code §§ 28-4503, et seq., with respect to purchases of Acthar in the District of

13          Columbia.

14      e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases of Acthar in Florida.

15      f.  Hawaii Code §§ 480, et seq., with respect to purchases of Acthar in Hawaii.

16      g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases of Acthar in Illinois.

17      h.  Iowa Code §§ 553.5 et seq., with respect to purchases of Acthar in Iowa.

18      i.  Md. Code Ann., Com. Law § 11–201 et seq., with respect to purchases of Acthar in

19          Maryland.

20      j.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases of Acthar in Massachusetts

21          by HCSC, who paid substantially higher prices for Acthar in actions and transactions

22          occurring substantially within Massachusetts.

23      k.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases of Acthar in Maine.

24      l.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases of Acthar in

25          Michigan.

26      m.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to

27          purchases of Acthar in Minnesota.

28

n.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases of Acthar in Mississippi.

o.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases of Acthar in Nebraska.

p.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases of Acthar in Nevada by HCSC, who paid substantially higher prices for Acthar in actions and transactions occurring substantially within Nevada.

q.  N.H. Rev. Stat. Ann. §§ 356.1, et seq., with respect to purchases of Acthar in New Hampshire.

r.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases of Acthar in New Mexico.

s.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases of Acthar in North Carolina.

t.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases of Acthar in North Dakota.

u.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases of Acthar in Oregon.

v.  10 L.P.R.A. §§ 257, et seq., with respect to purchases of Acthar in Puerto Rico.

w.  R.I. Gen. Laws §§ 6-36-1, et seq., with respect to purchases of Acthar in Rhode Island.

x.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases of Acthar in South Dakota.

y.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases of Acthar in Utah.

z.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases of Acthar in Vermont.

aa. W.Va. Code §§ 47-18-4, et seq., with respect to purchases of Acthar in West Virginia.

bb. Wis. Stat. §§ 133.03, et seq., with respect to purchases of Acthar in Wisconsin by HCSC, in that the actions and transactions alleged herein substantially affected and continue to affect the people of Wisconsin, whereby HCSC paid substantially higher prices for Acthar at Wisconsin pharmacies.

265.  The effect of Mallinckrodt's actions to maintain its monopoly was to stabilize or raise the price of Acthar to a higher level than it would have commanded in the absence of the monopolistic conduct.

266.  HCSC suffered injuries when it paid those higher prices.

1

## COUNT IV

2

## CONTRACT OR CONSPIRACY IN RESTRAINT OF TRADE UNDER STATE LAWS

3      267.   HCSC incorporates by reference each of the above paragraphs of this Complaint as

4   though fully stated herein.

5      268.   Mallinckrodt entered into an exclusive agreement with Novartis to license the right to

6   market Synacthen in the United States.

7      269.   That agreement restrained trade in the market for the sale of ACTH drugs in the United

8   States. Mallinckrodt's exclusionary conduct to consolidate distribution through Express Scripts is

9   additional anticompetitive conduct that restrained the relevant market.

10     270.   The effect of that agreement was to maintain or raise the price of Acthar to a higher

11  level than it would have commanded in the absence of the agreement.

12     271.   HCSC suffered injuries when it paid those higher prices.

13     272.   The agreement between Mallinckrodt and Novartis constitutes an anticompetitive

14  agreement in restraint of trade in violation of the laws of the following states:

15     a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases of Acthar in Arizona.

16     b.   Cal. Bus. & Prof. Code §§ 17200, et seq., Cal Bus. & Prof Code §§ 16700, et seq., §§

17          16720 et seq., §§ 16750(a) with respect to purchases of Acthar in California.

18     c.   Conn. Gen. Stat. Ann. § 35-24, et seq., with respect to purchases of Acthar in

19          Connecticut.

20     d.   D.C. Code §§ 28-4502, et seq., with respect to purchases of Acthar in the District of

21          Columbia.

22     e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases of Acthar in Florida.

23     f.   Hawaii Code §§ 480-1, et seq., with respect to purchases of Acthar in Hawaii.

24     g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases of Acthar in Illinois.

25     h.   Iowa Code §§ 553.2 et seq., with respect to purchases of Acthar in Iowa.

26     i.   Kansas Stat. Ann. §§ 50-101, et seq., §§ 50-158, et seq. with respect to purchases of

27          Acthar in Kansas.

28

j.   Md. Code Ann., Com. Law § 11–201 et seq., with respect to purchases of Acthar in Maryland.

k.   Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases of Acthar in Maine.

l.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases of Acthar in Michigan.

m.   Minn. Stat. §§ 325D.49, et seq., with respect to purchases of Acthar in Minnesota.

n.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases of Acthar in Mississippi.

o.   Mont. Code Ann. 30-14-205 with respect to purchases of Acthar in Montana.

p.   Neb. Code Ann. §§ 59-801, et seq., with respect to purchases of Acthar in Nebraska.

q.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases of Acthar in Nevada by HCSC, who paid substantially higher prices for Acthar in actions and transactions occurring substantially within Nevada.

r.   N.H. Rev. Stat. Ann. §§ 356.2 et seq., with respect to purchases of Acthar in New Hampshire.

s.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases of Acthar in New Mexico.

t.   N. Y. General Business Law § 340, et seq., with respect to purchases of Acthar in New York.

u.   N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases of Acthar in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-02, et seq., with respect to purchases of Acthar in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases of Acthar in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases of Acthar in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases of Acthar in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases of Acthar in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases of Acthar in Tennessee.

bb. Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases of Acthar in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases of Acthar in Vermont.

dd. W.Va. Code §§ 47-18-1, et seq., and W. Va. Code St. R. § 142-9-2, with respect to purchases of Acthar in West Virginia.

ee. Wis. Stat. §§ 133.01, et seq., with respect to purchases of Acthar in Wisconsin, in that the actions and transactions alleged herein substantially affected and continue to affect the people of Wisconsin, whereby HCSC paid substantially higher prices for Acthar at Wisconsin pharmacies.

## COUNT V

## UNFAIR AND DECEPTIVE PRACTICES UNDER STATE LAWS

273.   HCSC incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

274.   Mallinckrodt engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Mallinckrodt's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, HCSC was deprived of the opportunity to purchase a cheaper ACTH drug and forced to pay artificially inflated prices for Acthar.

275.   There was and is a gross disparity between the price that HCSC paid and continues to pay for its indirect purchases of Acthar, including by assignment from its subsidiaries, and the value received, given that a much cheaper substitute generic product should be available, and prices for Acthar should be much lower, but for Mallinckrodt's unlawful scheme.

276.   By engaging in the foregoing conduct, Mallinckrodt has engaged in in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases of Acthar in Arkansas.

b.   Ariz. Code §§ 44-1522, et seq., with respect to purchases of Acthar in Arizona.

c.   Cal. Bus. & Prof. Code §§ 17200, et seq. with respect to purchases of Acthar in California.

d.   Colo. Rev. Stat § 6-1-105, et seq., with respect to purchases of Acthar in Colorado.

e.   D.C. Code §§ 28-3901, et seq., with respect to the purchases of Acthar in the District of Columbia.

f.   Fla. Stat. §§ 501.201, et seq., with respect to purchases of Acthar in Florida.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases of Acthar in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases of Acthar in Illinois.

i.   Ind. Code §§ 24-5-0.5-1, et seq., with respect to the purchases of Acthar in Indiana.

j.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases of Acthar in Kansas.

k.   La. Rev. Stat. Ann. § 51:1401, et seq., with respect to the purchases of Acthar in Louisiana.

l.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases of Acthar in Maine.

m.   Mass. Ann. Laws ch. 93A, et seq., with respect to the purchases of Acthar in Massachusetts.

n.   Mich. Stat. §§ 445.901, et seq., with respect to purchases of Acthar in Michigan.

o.   Minn. Stat. § 325D.43, et. seq., Minn. Stat. § 325F.69, *et seq*., and Minn. Stat. § 8.31, et seq., with respect to purchases of Acthar in Minnesota.

p.   Miss. Code. Ann. § 75-24-1, et seq., with respect to purchases of Acthar in Mississippi.

q.   Missouri Stat. §§ 407.010, et seq., with respect to purchases of Acthar in Missouri.

r.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases of Acthar in Nebraska.

s.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases of Acthar in Nevada.

t.   N.H. Rev. Stat. §§ 358-A:1, et seq., with respect to purchases of Acthar in New Hampshire.

u.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases of Acthar in New Mexico.

v.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases of Acthar in New York.

w.   N.C. Gen. Stat. §§ 75-1.1, et seq., with respect to purchases of Acthar in North Carolina.

x.   N.D. Cent. Code § 51-15-01, et seq., with respect to purchases of Acthar in North Dakota.

y.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases of Acthar in Oregon.

z.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases of Acthar in Pennsylvania.

aa.   S.C. Stat. Ann. § 39-5-10, et seq., for purchases of Acthar in South Carolina.

bb.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases of Acthar in South Dakota.

cc.   Utah Code §§ 13-11-1, et seq., with respect to purchases of Acthar in Utah.

dd.   9 Vt. § 2451, et seq., with respect to purchases of Acthar in Vermont.

ee.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases of Acthar in Virginia.

ff.   W.Va. Code §§ 46A-6-101, et seq., with respect to purchases of Acthar in West Virginia.

gg.   Wis. Stat. § 100.18; Wis. Stat. § 100.20, et. seq., with respect to purchases of Acthar in Wisconsin.

hh.   Wyo. Stat. Ann. § 40-12-101, et seq., with respect to purchases of Acthar in Wyoming.

277.   HCSC is a person or consumer entitled to protection under the foregoing state laws.

278.   Mallinckrodt directly misrepresented to HCSC that it was complying with federal and state laws, including laws against bribery, kickbacks, and false claims to the government. In addition, through its payments to doctors, Mallinckrodt induced the Prescribing Doctors to falsely certify to HCSC through the prior authorization process that they had not received any illegal kickbacks from manufacturers.

279.   Mallinckrodt intended payors such as HCSC to rely on these certifications. The intention may be inferred by the very nature of the representation, whose sole purpose is to procure payment for Acthar.

280.   These representations and certifications were made in an effort by Mallinckrodt to sell Acthar to the consuming public, and were addressed to the market generally by having Acthar paid for at inflated prices by third-party payors such as HCSC. The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare, raising the cost of insurance, and obstructing the availability of Acthar and its synthetic substitute to consumers.

281.   HCSC relied on these misrepresentations to its detriment, which were material to its decision to pay for Acthar treatments.

282.   HCSC was directly and proximately injured by Mallinckrodt and its coconspirators' conduct, suffered an injury in fact, and suffered actual, ascertainable damages. HCSC would not have paid for Acthar, or would have paid only a small fraction of the amount it actually did pay, had Mallinckrodt refrained from engineering the false representations or otherwise disclosed its schemes.

283.   Mallinckrodt's conduct offends established public policy and the public interest, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

## COUNT VI

## FRAUD

284.   HCSC incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

285.   In order to effectuate its scheme, Mallinckrodt either made or caused to be made three kinds of false representations and certifications directly to HCSC.

286.   First, Mallinckrodt directly misrepresented to HCSC that it was complying with state and federal law, including laws related bribery, kickbacks, and false claims.

287.   When a pharmacy dispenses drugs to a HCSC Part D member, the pharmacy submits a claim to HCSC, which in turn submits an electronic record of the claim, called PDE, to CMS.

288.   CMS regulations require Part D Plan Sponsors and related "downstream" entities that generate and submit PDE claims data to certify that such data is true, accurate, and complete and that the PDE data is the basis for obtaining federal reimbursement for the health care products or services reflected therein. Id. § 423.505(k). Congress has determined that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

289.   Mallinckrodt made such certifications and therefore directly misrepresented to HCSC that it was complying with federal law.

290.   Second, when providers, including the Prescribing Doctors, prescribe pharmaceutical treatment, they must generally obtain prior authorization from insurers such as HCSC. By going through the prior authorization process, the Prescribing Doctors represent to HCSC that the prescription medication is medically necessary, up-to-date, and non-duplicative. They are further representing that they are not violating state or federal law applicable to the provision of their services.

291.   Mallinckrodt, CDF, and the Prescribing Doctors knew that offering or accepting money or other consideration in exchange for prescriptions was a violation of the law and CMS policies and procedures. Mallinckrodt, CDF, and the Prescribing Doctors knew that their enterprise was a violation of these rules because it involved a payment in exchange for an increased rate of prescriptions.

292.   Through its unlawful payments to the Prescribing Doctors and its payments to patients through the CDF funds, Mallinckrodt caused false certifications and representations to be made to HCSC during the prior authorization process.

293.   Third, HCSC's members are required to pay what they owe for drug coverage under Medicare Part D and other kinds of plans, and they are advised in their evidence of coverage documents that they must pay their share of the cost when they obtain prescription drugs. Through its illegal scheme to pay patient co-pays through phony charitable funds at CDF, Mallinckrodt caused HCSC's members to unintentionally misrepresent that they had paid their contractual share of prescription drug coverage.

294.   This misrepresentation is and was material, as no TPP would agree to pay for prescription drugs if that TPP was aware that a drug company intended to violate FDA laws, regulations, directives, and requirements with respect to marketing and distribution of a drug.

295.   Accordingly, Mallinckrodt intended for TPPs to rely on its representation that it would comply with FDA laws, regulations, directives, and requirements with respect to marketing and distribution of Acthar.

296.   HCSC was induced to and reasonably relied on Mallinckrodt's representation that it would comply with all FDA laws, regulations, directives, and requirements with respect to marketing and distribution of Acthar.

297.   Mallinckrodt's misrepresentation caused injury to HCSC, in that HCSC has made millions of dollars in payments for Acthar that it would not have made had Mallinckrodt not made this misrepresentation.

## COUNT VII

## INSURANCE FRAUD UNDER STATE LAWS

298.   HCSC incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

299.   Mallinckrodt and its co-conspirators have committed insurance fraud in violation of the following state laws:

a.   Alaska Stat. § 21.36.360, et seq. (Alaska);

b.   Ark Code §§ 23-66-501, et seq. (Arkansas);

c.   A.R.S. §§20-463, et seq. (Arizona);

d.   Cal. Ins. Code §§1871, et seq. (California);

e.   Conn. Gen. Stat §§ 53a-215, et seq. (Connecticut);

f.   Colo. Rev. Stat. §§ 10-1-128, et seq. (Colorado);

g.   Fla. Stat. §§ 817.234, et seq. (Florida);

h.   Ga. Code Ann., §§ 33-1-9, et seq (Georgia);

i.   I.C.A. §§ 505.1, et seq. (Iowa);

j.   720 ILCS 5/17-10.5; 740 ILCS 92/1, et seq.(Illinois);

k.   IC 35-43-5-4.5, et seq. (Indiana);

l.   K.S.A. 40-2,118, et seq. (Kansas);

m.   Ky. Rev. Stat. §§ 304.47-011, et seq. (Kentucky);

n.   LSA-R.S. 22:1924, et seq. (Louisiana);

o.   24-A M.R.S.A. §§ 2186 (Maine);

p.   Mass. Ann. Laws ch. 266, 111A et seq. (Massachusetts);

q.   Md. Code Ins. §§ 27-401, et seq. (Maryland);

r.   M.C.L.A. 500.4511, et seq. (Michigan);

s.   M.S.A. §§ 609.611, et seq. (Minnesota);

t.   Missouri Stat. §§375.99, et seq. (Missouri);

u.   Miss. Code Ann. §§ 71-3-69, et seq. (Mississippi);

v.   Montana Code §§ 33-1-1202, et seq. (Montana);

w.   N.C. Gen. Stat. §§ 58-2-160, et seq. (North Carolina);

x.   Neb. Rev. Stat. §§ 44-6604, et seq. (Nebraska);

y.   NRS 686A.2815, et seq. (Nevada);

z.   NH Rev Stat §§ 638:20, et seq. (New Hampshire);

aa.   N.J. Stat. §§ 17:33A, et seq. (New Jersey);

bb.   NM Stat §§ 59A-16C-1, et seq. (New Mexico);

cc.   N.Y. Penal Law §§ 176.00, et seq. (New York);

dd.   N.D. Code §§ 26.1-01, et seq. (North Dakota);

ee.   R.C. §§ 2913.47, et seq. (Ohio);

ff.   36 OK Stat §§ 36-101, et seq. (Oklahoma);

gg.   O.R.S. §§ 165.692, et seq. (Oregon);

hh.   18 Pa. Cons. Stat. Ann. §§ 4117 (Pennsylvania);

ii.   SC Code §§ 38-55-570, et seq. (South Carolina);

jj.   Tenn. Code Ann. §§ 56-53-101, et seq. (Tennessee);

kk.   Tex. Penal Code Ann. §§ 35.01, et seq. (Texas);

ll.   Utah Code §§ 31A-31-103, et seq. (Utah);

mm.  WI Stat §§ 943.395, et seq. (Wisconsin); and

nn.   W.S.1977 §§ 26-1-101, et seq. (Wyoming).

300.   Mallinckrodt knowingly presented or caused to be presented to HCSC statements in support of claims for insurance benefits for Acthar that it knew contained false and/or misleading information. Mallinckrodt knew and intended that by engaging in its schemes to pay kickbacks to doctors and illegally subsidize co-payments through phony charitable funds that misleading and/or false information would be submitted to HCSC and other third party payors in connection with insurance claims.

301.   The statements of the co-conspirator doctors who prescribed Acthar and the pharmacies who filled Acthar prescriptions to HCSC were false because they certified compliance with federal and state laws and regulations that were not, in fact, complied with. Among the laws which the doctors and pharmacies were not in compliance with were the anti-kickback statutes.

302.   The compliance certifications were material to HCSC decision to reimburse claims for Acthar that Mallinckrodt caused to be submitted. Had the certification of compliance with federal and state laws and regulations been withheld or corrected by the doctors or pharmacies, HCSC would not to have paid these claims.

303.   HCSC's injuries were directly and proximately caused by the false or misleading statements that Mallinckrodt made to it, or caused to be submitted to it, as described above.

## COUNT VIII

## UNJUST ENRICHMENT

304.   HCSC incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

305.   As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Mallinckrodt has profited and benefited from payments HCSC made for Acthar as a result of its schemes.

306.   The circumstances of Mallinckrodt's receipt of monies based on the conduct set forth in this Complaint are such that, in equity and good conscience, Mallinckrodt should not retain such monies, the amount of which is to be determined at trial.

307.   HCSC is entitled in equity to seek restitution of Mallinckrodt's wrongful profits, revenues and benefits received as a result of its schemes.

308.   HCSC states this claim to the extent that it is deemed not to have an adequate legal remedy.

## XI.    PRAYER FOR RELIEF

309.   Based on the foregoing, HCSC requests that the Court enter an order that:

    a.    Enters judgment in favor of HCSC and against Defendants;

    b.    Awards HCSC its actual, consequential, compensatory, and/or other damages in an amount to be determined at trial;

    c.    Awards HCSC punitive damages;

    d.    Awards HCSC treble damages under any provision of law, including state law, that permits doubling or trebling of damages;

    e.    Ordering Mallinckrodt to restore to HCSC the benefits Mallinckrodt unlawfully retained at HCSC's expense;

    f.    Awards HCSC its reasonable costs and expenses, including attorneys' fees;

1         g.    Awards HCSC pre-and post-judgment interest at the statutory rates; and

2         h.    Provides any other relief that the Court deems proper.

3 **XII.**  **JURY DEMAND**

4     HCSC demands a trial by jury on all issues so triable.

5

6    Dated:  October 1, 2020        Respectfully submitted:

7

8            **SCHNEIDER WALLACE COTTRELL KONECKY LLP**

9            *Todd M. Schneider*

10            Todd M. Schneider (SBN 158253)
           Jason H. Kim (SBN 220279)

11            Matthew S. Weiler (SBN 236052)
           Kyle G. Bates (SBN 299114)

12            2000 Powell Street
           Suite 1400

13            Emeryville, CA 94608

14            (415) 421-7100
           TSchneider@schneiderwallace.com

15            JKim@schneiderwallace.com
           MWeiler@schneiderwallace.com

16            KBates@schneiderwallace.com

17            **LOWEY DANNENBERG, P.C.**

18            Peter D. St. Phillip (*Pro hac vice* to be filed)

19            44 South Broadway, Suite 1100
           White Plains, NY 10601

20            (914) 997-0500
           PStPhillip@lowey.com

21            Renee A. Nolan (*Pro hac vice* to be filed)

22            One Tower Bridge
           100 Front Street, Suite 520

23            West Conshohocken, PA 19428

24            (215) 399-4770
           rnolan@lowey.com

25

26            *Counsel for Plaintiff Health Care Service Corporation*

27

28