# EXHIBIT 6

**CM-010**

22687409

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Todd M. Schneider (SBN 158253), Jason H. Kim (SBN 220279<br>Matthew S. Weiler (SBN 236052), Kyle G. Bates (SBN 299114)<br>Schneider Wallace Cottrell Konecky LLP<br>2000 Powell Street, Suite 1400, Emeryville, California 94608<br>TELEPHONE NO.: 415-421-7100   FAX NO.: 415-421-7105<br>ATTORNEY FOR *(Name)*: Health Care Service Corp. | FILED<br>ALAMEDA COUNTY<br><br>FEB 27 2020<br><br>CLERK OF THE SUPERIOR COURT<br>By _____<br>Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, California 94612
BRANCH NAME: Rene C. Davidson Courthouse

CASE NAME:
Health Care Service Corp. v. Mallinckrodt ARD, LLC, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER:<br>RG20056354 |
|---|---|---|---|---|
| ☑ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| ☐ Auto (22)<br>☐ Uninsured motorist (46) | ☐ Breach of contract/warranty (06)<br>☐ Rule 3.740 collections (09) | ☒ Antitrust/Trade regulation (03)<br>☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property<br>Damage/Wrongful Death) Tort** | ☐ Other collections (09)<br>☐ Insurance coverage (18) | ☐ Mass tort (40)<br>☐ Securities litigation (28) |
| ☐ Asbestos (04)<br>☐ Product liability (24)<br>☐ Medical malpractice (45)<br>☐ Other PI/PD/WD (23) | ☐ Other contract (37)<br>**Real Property**<br>☐ Eminent domain/Inverse<br>condemnation (14)<br>☐ Wrongful eviction (33) | ☐ Environmental/Toxic tort (30)<br>☐ Insurance coverage claims arising from the<br>above listed provisionally complex case<br>types (41) |
| **Non-PI/PD/WD (Other) Tort** | ☐ Other real property (26) | **Enforcement of Judgment** |
| ☐ Business tort/unfair business practice (07)<br>☐ Civil rights (08)<br>☐ Defamation (13) | **Unlawful Detainer**<br>☐ Commercial (31)<br>☐ Residential (32) | ☐ Enforcement of judgment (20)<br>**Miscellaneous Civil Complaint**<br>☐ RICO (27) |
| ☐ Fraud (16)<br>☐ Intellectual property (19)<br>☐ Professional negligence (25)<br>☐ Other non-PI/PD/WD tort (35) | ☐ Drugs (38)<br>**Judicial Review**<br>☐ Asset forfeiture (05)<br>☐ Petition re: arbitration award (11) | ☐ Other complaint *(not specified above)* (42)<br>**Miscellaneous Civil Petition**<br>☐ Partnership and corporate governance (21)<br>☐ Other petition *(not specified above)* (43) |
| **Employment**<br>☐ Wrongful termination (36)<br>☐ Other employment (15) | ☐ Writ of mandate (02)<br>☐ Other judicial review (39) | |

2. This case ☑ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☒ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☒ Substantial amount of documentary evidence
   d. ☒ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ☒ monetary  b. ☒ nonmonetary; declaratory or injunctive relief  c. ☒ punitive
4. Number of causes of action *(specify)*:
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: February 27, 2020
Matthew S. Weiler, Esq.
_____     ► _____
(TYPE OR PRINT NAME)                                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) *(if the
   case involves an uninsured
   motorist claim subject to
   arbitration, check this item
   instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
     Wrongful Death
Product Liability *(not asbestos or
   toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice–
     Physicians & Surgeons
   Other Professional Health Care
     Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
     and fall)
   Intentional Bodily Injury/PD/WD
     (e.g., assault, vandalism)
   Intentional Infliction of
     Emotional Distress
   Negligent Infliction of
     Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) *(not civil
   harassment)* (08)
Defamation (e.g., slander, libel)
   (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
     *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
     Contract *(not unlawful detainer
     or wrongful eviction)*
   Contract/Warranty Breach–Seller
     Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/
     Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections
     Case
Insurance Coverage *(not provisionally
   complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent
     domain, landlord/tenant, or
     foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
   drugs, check this item; otherwise,
   report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court
     Case Matter
   Writ–Other Limited Court Case
     Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor
     Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   *(arising from provisionally complex
   case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of
     County)
   Confession of Judgment *(non-
     domestic relations)*
   Sister State Judgment
   Administrative Agency Award
     *(not unpaid taxes)*
   Petition/Certification of Entry of
     Judgment on Unpaid Taxes
   Other Enforcement of Judgment
     Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
   above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-
     harassment)*
   Mechanics Lien
   Other Commercial Complaint
     Case *(non-tort/non-complex)*
   Other Civil Complaint
     *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition *(not specified
   above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult
     Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late
     Claim
   Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Ex. 6

*Unified Rules of the Superior Court of California, County of Alameda*

F. ADDENDUM TO CIVIL CASE COVER SHEET

| Short Title: | Case Number: |
|---|---|
| Health Care Service Corp. v. Mallinckrodt ARD, LLC | |

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

| | |
|---|---|
| | [ ] Hayward Hall of Justice (447) |
| [X] Oakland, Rene C. Davidson Alameda County Courthouse (446) | [ ] Pleasanton, Gale-Schenone Hall of Justice (448) |

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) |
|---|---|---|
| Auto Tort | Auto tort (22) | [ ] 34 Auto tort (G) <br> **Is this an uninsured motorist case?** [ ] yes [ ] no |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] 75 Asbestos (D) |
| | Product liability (24) | [ ] 89 Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] 97 Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] 33 Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] 79 Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] 80 Civil rights (G) |
| | Defamation (13) | [ ] 84 Defamation (G) |
| | Fraud (16) | [ ] 24 Fraud (G) |
| | Intellectual property (19) | [ ] 87 Intellectual property (G) |
| | Professional negligence (25) | [ ] 59 Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] 03 Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] 38 Wrongful termination (G) |
| | Other employment (15) | [ ] 85 Other employment (G) |
| | | [ ] 53 Labor comm award confirmation |
| | | [ ] 54 Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] 04 Breach contract / Wrnty (G) |
| | Collections (09) | [ ] 81 Collections (G) |
| | Insurance coverage (18) | [ ] 86 Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] 98 Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] 18 Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] 17 Wrongful eviction (G) |
| | Other real property (26) | [ ] 36 Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] 94 Unlawful Detainer - commercial **Is the deft. in possession** |
| | Residential (32) | [ ] 47 Unlawful Detainer - residential **of the property?** |
| | Drugs (38) | [ ] 21 Unlawful detainer - drugs **[ ] Yes [ ] No** |
| Judicial Review | Asset forfeiture (05) | [ ] 41 Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] 62 Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] 49 Writ of mandate |
| | | **Is this a CEQA action (Publ.Res.Code section 21000 et seq)** [ ] Yes [ ] No |
| | Other judicial review (39) | [ ] 64 Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [X] 77 Antitrust / Trade regulation |
| | Construction defect (10) | [ ] 82 Construction defect |
| | Claims involving mass tort (40) | [ ] 78 Claims involving mass tort |
| | Securities litigation (28) | [ ] 91 Securities litigation |
| | Toxic tort / Environmental (30) | [ ] 93 Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] 95 Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] 19 Enforcement of judgment |
| | | [ ] 08 Confession of judgment |
| Misc Complaint | RICO (27) | [ ] 90 RICO (G) |
| | Partnership / Corp. governance (21) | [ ] 88 Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] 68 All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] 06 Change of name |
| | | [ ] 69 Other petition |

Ex. 6

P. 214

# EXHIBIT 7

Schneider Wallace Cottrell Konecky
Wotkyns LLP
Attn:  Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA   94608____

Mallinckrodt ARD LLC

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Health Care Service Corp<br><br>          Plaintiff/Petitioner(s)<br>          VS.<br><br>Mallinckrodt ARD LLC<br>          Defendant/Respondent(s)<br>          (Abbreviated Title) | No. <u>RG20056354</u><br><br><br>NOTICE OF HEARING |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

Complex Determination Hearing
Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE:  04/07/2020    TIME:  03:00 PM    DEPARTMENT:  23
LOCATION:  Administration Building, Fourth Floor
          1221 Oak Street, Oakland

Case Management Conference:
DATE:  05/19/2020    TIME:  03:00 PM    DEPARTMENT:  23
LOCATION:  Administration Building, Fourth Floor
          1221 Oak Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 23 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 267-6939.  Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 23.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions.  Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732.  No fee is charged for this service.  For further information, go to **Direct Calendar Departments** at

**http://apps.alameda.courts.ca.gov/domainweb**.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be scheduled for hearing in Department 23.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 23 by e-mail at Dept.23@alameda.courts.ca.gov or by phone at (510) 267-6939.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated:  03/03/2020            Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

---

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 03/04/2020.

By _____

Deputy Clerk

# EXHIBIT 8

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Matthew Weiler, 236052<br>Schneider Wallace Cottrell Konecky LLP<br>2000 Powell Street, Suite 1400<br>Emeryville, CA 94608<br>TELEPHONE NO.: (510)740-2905<br>ATTORNEY FOR *(Name):* Plaintiff | **FILED BY FAX**<br>ALAMEDA COUNTY<br><br>March 13, 2020<br><br>CLERK OF<br>THE SUPERIOR COURT<br>By Milagros Cortez, Deputy<br><br>CASE NUMBER:<br>**RG20056354** |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF<br>Superior Court of California, Alameda County<br>1225 Fallon Street, #109<br>Oakland, CA 94612-4293 | |

| PLAINTIFF/PETITIONER: Health Care Service Corp. | CASE NUMBER:<br>RG20056354 |
|---|---|
| DEFENDANT/RESPONDENT: Mallinckrodt ARD LLC, et al. | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>Mallinckrodt - 102029 |

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action. **BY FAX**
2. I served copies of:

Complaint, Civil Case Cover Sheet, Civil Case Cover Sheet Addendum, Summons on Complaint, Notice of Hearing, Alternative Dispute Resolution (ADR) Information Package

3. a. Party served:  Mallinckrodt ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.)

   b. Person Served: Peter Cayetano-CT Corporation System - Person Authorized to Accept Service of Process

4. Address where the party was served: 818 West Seventh Street, Suite 930
   Los Angeles, CA 90017
5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 03/05/2020        (2) at  (time): 2:30PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:

   d. on behalf of:

   Mallinckrodt ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.)
   under: Other: Limited Liability Company
7. **Person who served papers**
   a. Name:          Jessica Brown
   b. Address:       One Legal - P-000618-Sonoma
                     1400 North McDowell Blvd, Ste 300
                     Petaluma, CA 94954

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 40.00
   e I am:
      (3) registered California process server.
         (i)  Employee or independent contractor.
         (ii) Registration No.:2019217220
         (iii) County:  Los Angeles

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.
Date:  03/05/2020

Jessica Brown
(NAME OF PERSON WHO SERVED PAPERS)                                        (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

OL# 14517371        **Ex. 8**
p. 219

# EXHIBIT 9

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FILED BY FAX LY |
|---|---|
| Matthew Weiler, 236052<br>Schneider Wallace Cottrell Konecky LLP<br>2000 Powell Street, Suite 1400<br>Emeryville, CA 94608<br>TELEPHONE NO.: (510)740-2905<br>ATTORNEY FOR (Name): Plaintiff | ALAMEDA COUNTY<br><br>March 13, 2020<br><br>CLERK OF<br>THE SUPERIOR COURT<br>By Milagros Cortez, Deputy |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF<br>Superior Court of California, Alameda County<br>1225 Fallon Street, #109<br>Oakland, CA 94612-4293 | CASE NUMBER:<br><br>RG20056354 |
| PLAINTIFF/PETITIONER: Health Care Service Corp.<br><br>DEFENDANT/RESPONDENT: Mallinckrodt ARD LLC, et al. | CASE NUMBER:<br>RG20056354 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>Mallinckrodt - 102029 |

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action. **BY FAX**
2. I served copies of:

Complaint, Civil Case Cover Sheet, Civil Case Cover Sheet Addendum, Summons on Complaint, Notice of Hearing, Alternative Dispute Resolution (ADR) Information Package

3. a. Party served: Mallinckrodt PLC

   b. Person Served: Peter Cayetano-CT Corporation System - Person Authorized to Accept Service of Process

4. Address where the party was served: 818 West Seventh Street, Suite 930
   Los Angeles, CA 90017
5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 03/05/2020    (2) at (time): 2:30PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:


   d. on behalf of:

   Mallinckrodt PLC
   under: CCP 416.10 (corporation)
7. **Person who served papers**
   a. Name:        Jessica Brown
   b. Address:    One Legal - P-000618-Sonoma
                  1400 North McDowell Blvd, Ste 300
                  Petaluma, CA 94954

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 40.00
   e I am:
       (3) registered California process server.
           (i) Employee or independent contractor.
           (ii) Registration No.: 2019217220
           (iii) County: Los Angeles
8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.
Date: 03/05/2020


Jessica Brown
(NAME OF PERSON WHO SERVED PAPERS)                              (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

OL# 14517370      **Ex. 9**
                   p. 221

# EXHIBIT 10

Schneider Wallace Cottrell Konecky
Wotkyns LLP
Attn: Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA 94608____

Mallinckrodt ARD LLC

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Health Care Service Corp | No. <u>RG20056354</u> |
| Plaintiff/Petitioner(s) | |
| VS. | NOTICE OF HEARING (AMENDED) |
| Mallinckrodt ARD LLC | Complex Determination Hearing on 04/21/2020 has been vacated and rescheduled. |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

Complex Determination Hearing

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE: 05/05/2020    TIME: 03:00 PM    DEPARTMENT: 23
LOCATION: Administration Building, Fourth Floor
              1221 Oak Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 23 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 267-6939. Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 23.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions. Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732. No fee is charged for this service. For further information, go to **Direct Calendar Departments** at
**http://apps.alameda.courts.ca.gov/domainweb**.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be scheduled for hearing in Department 23.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 23 by e-mail at Dept.23@alameda.courts.ca.gov or by phone at (510) 267-6939.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated:  04/20/2020                    Chad Finke  Executive Officer / Clerk of the Superior Court

                                      By        _____

                                                                    Deputy Clerk

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 04/20/2020.

                                      By        _____

                                                                    Deputy Clerk

# EXHIBIT 11

ENDORSED
FILED
ALAMEDA COUNTY

APR 3 0 2020

CLERK OF THE SUPERIOR COURT
By _C. Collins_ Deputy

1   ARNOLD & PORTER KAYE SCHOLER LLP
    Matthew M. Wolf (*PHV* to be filed)
2   Laura S. Shores (*PHV* to be filed)
    Sonia Kuester Pfaffenroth (SBN 223984)
3   Michael B. Bernstein (*PHV* to be filed)
    Adam M. Pergament (SBN 267557)
4   601 Massachusetts Avenue, N.W.
    Washington, D.C. 20001-3743
5   Telephone:    (202) 942-5000
    Facsimile:    (202) 942-5999
6   matthew.wolf@arnoldporter.com
    laura.shores@arnoldporter.com
7   sonia.pfaffenroth@arnoldporter.com
    michael.b.bernstein@arnoldporter.com
8   adam.pergament@arnoldporter.com
9
    D. Eric Shapland (SBN 193853)
10  777 South Figueroa Street, 44th Floor
    Los Angeles, CA 90017-5844
11  Telephone:    (213) 243-4000
    Facsimile:    (213) 243-4199
12  eric.shapland@arnoldporter.com
13
    Attorneys for Defendant
14  Mallinckrodt ARD LLC and
    Mallinckrodt plc
15

SCHNEIDER WALLACE COTTRELL
KONECKY LLP
Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:    (415) 421-7100
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mweiler@schneiderwallace.com
kbates@schneiderwallace.com

Attorneys for Plaintiff
Health Care Service Corporation
**[Additional counsel on signature page]**

16

17              SUPERIOR COURT OF THE STATE OF CALIFORNIA

18                        COUNTY OF ALAMEDA

19

20  HEALTH CARE SERVICE CORP.,

21                Plaintiff,

22        v.

23  MALLINCKRODT ARD LLC (f/k/a Mallinckrodt
    ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and
24  MALLINCKRODT plc,

25                Defendants.

26

Case No. RG20056354

**STIPULATION TO EXTEND
DEADLINE FOR DEFENDANTS TO
FILE DEMURRER OR ANSWER
COMPLAINT AND [PROPOSED]
ORDER**

Dept:          23
Judge:         Hon. Brad Seligman

Action Filed:  February 27, 2020

27

28

167583668

STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE AND PAGE LIMITS FOR DEMURRER

BY FAX

Ex. 11
p. 226

**WHEREAS,** Plaintiff Health Care Service Corp. ("HCSC") filed its Complaint in this action on February 27, 2020 and personally served the Summons and Complaint on Defendants Mallinckrodt ARD, LLC and Mallinckrodt plc (collectively "Mallinckrodt") on March 5, 2020.

**WHEREAS**, absent any further extension arising from the emergency closure of the Court due to the coronavirus pandemic, Mallinckrodt's answer or demurrer currently is due by May 4, 2020, under the Presiding Judge Tara M. Desauteels's April 3, 2020 Order which declared every day until May 1, 2020 a holiday for purposes of calculating deadlines.

**WHEREAS,** HCSC provisionally designated, and Mallinckrodt does not oppose the designation of, this case as complex, given that the Complaint asserts claims under the antitrust, unfair business practices, and anti-fraud statutes of California and over 30 other states, that HCSC seeks hundreds of millions of dollars in damages, and that other actions involving similar claims are pending in a few other courts around the country.

**WHEREAS,** this case has been assigned to Department 23 pending (a) a hearing in Department 23 on the preliminary designation of the case as complex, a hearing which, due to the coronavirus pandemic, has been continued from April 6, 2020 to May 5, 2020 and (b) assignment of this case to a complex or general civil department of this Court for all purposes.

**WHEREAS,** HCSC and Mallinckrodt have met and conferred regarding the substance of HCSC's Complaint, Mallinckrodt plans to respond to the Complaint by filing a demurrer, and the parties would like to establish an appropriate schedule for briefing the demurrer, even as the coronavirus pandemic prevents and may continue to prevent related filings and new motion practice.

**WHEREAS,** HCSC and Mallinckrodt believe that an extension of page limits for briefing in relation to the demurrer is appropriate in light of the facts that the Complaint contains hundreds of allegations regarding five categories of conduct and nine counts asserting antitrust, unfair trade practices, insurance fraud and civil RICO theories under over thirty states' laws.

**NOW THEREFORE,** pursuant to Cal. R. Court, Rules 3.501(17) and 3.503, the parties submit this Stipulation and [Proposed] Order and request the Court's consent to:

1     (a)    continue the deadline for Mallinckrodt to serve and (if the Court is accepting such

2             filings) file a demurrer to the Complaint in the above-titled action until Wednesday,

3             May 20, 2020, and extend the page limit for the brief in support of the demurrer to

4             25 pages;

5     (b)    establish deadline for HCSC to serve and (if the Court is accepting such filings) file

6             any brief in opposition to a demurrer of a June 5, 2020, and extend the page limit for

7             that brief to 25 pages;

8     (c)    establish a deadline for Mallinckrodt to serve and (if the Court is accepting such

9             filings) file a reply in support of the a demurrer of June 19, 2020, and extend the

10           page limit for that brief to 12 pages; and

11    (d)    consideration with the Court at the first Case Management Conference in this

12           matter, which is currently set for May 19, 2020, of both (i) an appropriate date for

13           filing any demurrer-related papers that may have been served on a date on which the

14           Court was not accepting filings and (ii) a date for hearing on the demurrer.

15     **IT IS SO STIPULATED.**

16  Dated: April 30, 2020          By:

17                                     D. Eric Shapland

18                                   **ARNOLD & PORTER KAYE SCHOLER LLP**

19                                   777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844

20                                   Telephone:    (213) 243-4000
Facsimile:     (213) 243-4199

21                                     eric.shapland@arnoldporter.com

22                                   *Attorneys for Defendant Mallinckrodt ARD
LLC and Mallinckrodt plc*

23  Dated: April 30, 2020          By:

24                                     Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)

25                                   Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)

26                                   **SCHNEIDER WALLACE COTTRELL KONECKY LLP**

27                                   2000 Powell Street, Suite 1400

28                                   Emeryville, CA 94608

- 3 -

Telephone:     (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

**LOWEY DANNENBERG, P.C.**
Peter D. St. Phillip *(PHV* to be filed)
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone:     (914) 997-0500
pstPhillip@lowey.com

**Renee A. Nolan** *(PHV* to be filed*)*
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone:     (215) 399-4770
rnolan@lowey.com

*Counsel for Plaintiff Health Care Service*
*Corporation*

**IT IS SO ORDERED:**

Dated: _____          By: _____
                                              JUDGE OF THE SUPERIOR COURT
                                              FOR THE COUNTY OF ALAMEDA



**Superior Court of California**
*County of Alameda*

```
Superior Court of California, County of Alameda        Receipt Nbr: 918182
Rene C. Davidson Alameda County Courthouse             Clerk: mbanks
1225 Fallon Street                                     Date: 05/04/2020
Oakland, CA  94612
```

| Type | Case Number | Description | Amount |
|------|-------------|-------------|--------|
| Filing | RG20056354 | Extension of Time to Respond to Com | $20.00 |

```
        Total Amount Due:      $20.00
        Pricr Payment:
        Current Payment:       $20.00
        Balance Due:            $.00
        Overage:
        Excess Fee:
        Change:

Payment Method:
        Cash:
        Check:                 $20.00
```

# EXHIBIT 12

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Health Care Service Corp** | **No. RG20056354** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Mallinckrodt ARD LLC** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department   23                    Honorable   Brad Seligman              , Judge

Cause called for: Complex Determination Hearing on May 05, 2020.

COMPLEX DETERMINATION

The Court designates this case as complex pursuant to Rule 3.400 et seq. of the California Rules of Court. Counsel are advised to be familiar with the Alameda County Local Rules concerning complex litigation, including Rule 3.250 et seq. An order assigning the case to one of the three complex judges and an initial case management order will be issued.

COMPLEX CASE FEES

Pursuant to Government Code section 70616, any non-exempt party who has appeared in the action but has not paid the complex case fee is required to pay the fee within ten days of the filing of this order. The complex case fee is $1,000 for each plaintiff or group of plaintiffs appearing together and $1,000 PER PARTY for each defendant, intervenor, respondent or other adverse party, whether filing separately or jointly, up to a maximum of $18,000 for all adverse parties. All payments must identify on whose behalf the fee is submitted. Please submit payment to the attention of the Complex Litigation Clerk located in the Civil Division at the Rene C. Davidson Courthouse, 1225 Fallon Street, Oakland, CA 94612. Please make check(s) payable to the Clerk of the Superior Court. Documents may continue to be filed as allowed under Local Rule 1.9. Note that for those admitted pro hac vice, there is also an annual fee. (Gov't Code section 70617.)

PROCEDURES

Calendar information, filings, and tentative rulings are available to the public at http://www.alameda.courts.ca.gov/domainweb/. All counsel are expected to be familiar and to comply with pertinent provisions of the Code of Civil Procedure, the California Rules of Court, the Alameda County Superior Court Local Rules and the procedures outlined on the domain web page of the assigned department.

SERVICE OF THIS ORDER

Counsel for plaintiff(s) shall have a continuing obligation to serve a copy of this order on newly joined parties defendant not listed on the proof of service of this order and file proof of service. Each party defendant joining any third party cross-defendant shall have a continuing duty to serve a copy of this order on newly joined cross-defendants and to file proof of service.

Minutes of    05/05/2020
Entered on    05/05/2020

Chad Finke  Executive Officer / Clerk of the Superior Court

By

_____

Deputy Clerk

# EXHIBIT 13

Schneider Wallace Cottrell Konecky
Wotkyns LLP
Attn:  Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA   94608____

Mallinckrodt ARD LLC

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

Health Care Service Corp

Plaintiff/Petitioner(s)

VS.

Mallinckrodt ARD LLC

Defendant/Respondent(s)
(Abbreviated Title)

No. <u>RG20056354</u>

Order

Complaint - Antitrust/Trade Regulation

---

The Complex Determination Hearing was set for hearing on 05/05/2020 at 03:00 PM in Department 23 before the Honorable Brad Seligman.  The Tentative Ruling was published and has not been contested.

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows:  COMPLEX DETERMINATION

The Court designates this case as complex pursuant to Rule 3.400 et seq. of the California Rules of Court.  Counsel are advised to be familiar with the Alameda County Local Rules concerning complex litigation, including Rule 3.250 et seq. An order assigning the case to one of the three complex judges and an initial case management order will be issued.

COMPLEX CASE FEES

Pursuant to Government Code section 70616, any non-exempt party who has appeared in the action but has not paid the complex case fee is required to pay the fee within ten days of the filing of this order. The complex case fee is $1,000 for each plaintiff or group of plaintiffs appearing together and $1,000 PER PARTY for each defendant, intervenor, respondent or other adverse party, whether filing separately or jointly, up to a maximum of $18,000 for all adverse parties.  All payments must identify on whose behalf the fee is submitted. Please submit payment to the attention of the Complex Litigation Clerk located in the Civil Division at the Rene C. Davidson Courthouse, 1225 Fallon Street, Oakland, CA  94612.  Please make check(s) payable to the Clerk of the Superior Court.  Documents may continue to be filed as allowed under Local Rule 1.9.  Note that for those admitted pro hac vice, there is also an annual fee.  (Gov't Code section 70617.)

PROCEDURES

Calendar information, filings, and tentative rulings are available to the public at http://www.alameda.courts.ca.gov/domainweb/.   All counsel are expected to be familiar and to comply with pertinent provisions of the Code of Civil Procedure, the California Rules of Court, the Alameda County Superior Court Local Rules and the procedures outlined on the domain web page of the assigned department.

SERVICE OF THIS ORDER

---

Order

Counsel for plaintiff(s) shall have a continuing obligation to serve a copy of this order on newly joined parties defendant not listed on the proof of service of this order and file proof of service. Each party defendant joining any third party cross-defendant shall have a continuing duty to serve a copy of this order on newly joined cross-defendants and to file proof of service.

Dated:  05/05/2020

facsimile

_____
Judge Brad Seligman

---

Order

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number:  RG20056354
Order After Hearing Re: of 05/05/2020

# DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 05/06/2020.

Chad Finke  Executive Officer / Clerk of the Superior Court

By

_____
                                        Deputy Clerk

Ex. 13
p. 237

# EXHIBIT 14



**Superior Court of California**
*County of Alameda*

```
Superior Court of California, County of Alameda        Receipt Nbr: 918738
Rene C. Davidson Alameda County Courthouse             Clerk: ccollins
1225 Fallon Street                                     Date: 05/08/2020
Oakland, CA  94612
```

| Type | Case Number | Description | Amount |
|------|-------------|-------------|--------|
| Service | RG20056354 | 2 Complex Fee - Defendant Party(s) | $2000.00 |

```
        Total Amount Due:     $2,000.00
        Prior Payment:
        Current Payment:      $2,000.00
        Balance Due:               $.00
        Overage:
        Excess Fee:
        Change:

Payment Method:
        Cash:
        Check:                $2,000.00
```

# Arnold & Porter

**Eric Shapland**
+1 213.243.4238 Direct
Eric.Shapland@arnoldporter.com

ENDORSED
FILED
ALAMEDA COUNTY

MAY 0 8 2020

CLERK OF THE SUPERIOR COURT
By *C. Collins* Deputy

May 7, 2020

**VIA MESSENGER**

Complex Litigation Clerk
Superior Court of the County of Alameda
Civil Division, Rene C. Davidson Courthouse
1225 Fallon Street
Oakland, CA 94612

     Re:    ***Health Care Service Corp. v. Mallinckrodt ARC LLC***
            **Case No. RG20056354**

Dear Sir/Madam:

    Enclosed please find a check in the amount of $2000 for payment of complex fees on behalf of Defendants Mallinckrodt ARD LLC and Mallinckrodt plc in the above-referenced action.  Please contact me if you have any questions.

    Thank you.

                 Sincerely,

                 /s/ Eric Shapland
                 Eric Shapland

Enclosure

**Arnold & Porter Kaye Scholer LLP**
777 South Figueroa Street, 44th Floor  |  Los Angeles, CA 90017-5844  |  **www.arnoldporter.com**

167784857

Ex. 14
p. 240

# EXHIBIT 15

*Superior Court of California, County of Alameda*



*Notice of Assignment of Judge for All Purposes*

Case Number: RG20056354
Case Title:     Health Care Service Corp VS Mallinckrodt ARD LLC
Date of Filing: 02/27/2020

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the Local Rules of the Superior Court of California, County of Alameda, this action is hereby assigned by the Presiding Judge for all purposes to:**

| | |
|---|---|
| **Judge:** | **Brad Seligman** |
| **Department:** | **23** |
| **Address:** | **Administration Building** |
| | **1221 Oak Street** |
| | **Oakland  CA  94612** |
| **Phone Number:** | **(510) 267-6939** |
| **Fax Number:** | **0** |
| **Email Address:** | **Dept.23@alameda.courts.ca.gov** |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

**Please note: In this case, any challenge pursuant to Code of Civil Procedure section 170.6 must be exercised within the time period provided by law.  (See Code Civ. Proc. §§ 170.6, subd. (a)(2) and 1013.)**

**NOTICE OF NONAVAILABILITY OF COURT REPORTERS:** Effective June 4, 2012, the court will not provide a court reporter for civil law and motion hearings, any other hearing or trial in civil departments, or any afternoon hearing in Department 201 (probate). Parties may arrange and pay for the attendance of a certified shorthand reporter. In limited jurisdiction cases, parties may request electronic recording.

Amended Local Rule 3.95 states: "Except as otherwise required by law, in general civil case and probate departments, the services of an official court reporter are not normally available. For civil trials, each party must serve and file a statement before the trial date indicating whether the party requests the presence of an official court reporter."

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

**Ex. 15**
p. 242

## General Procedures

Following assignment of a civil case to a specific department, all pleadings, papers, forms, documents and writings can be submitted for filing at either Civil Clerk's Office, located at the René C. Davidson Courthouse, Room 109, 1225 Fallon Street, Oakland, California, 94612, and the Hayward Hall of Justice, 24405 Amador Street, Hayward, California, 94544. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

<div align="center">
ASSIGNED FOR ALL PURPOSES TO<br>
JUDGE Brad Seligman<br>
DEPARTMENT 23
</div>

All parties are expected to know and comply with the Local Rules of this Court, which are available on the court's website at: http://www.alameda.courts.ca.gov/Pages.aspx/Local-Rules(1) and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processes (ADR) prior to the Initial Case Management Conference. The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days". Plaintiff received that form in the ADR information package at the time the complaint was filed. The court's website also contains this form and other ADR information. If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

You may schedule case management hearings, law & motion hearings and other calendar events with Department 23 by EMAIL ONLY. The use of email is not a substitute for filing pleadings or filing other documents. You must provide copies of all email communications to each party (or the party's attorney if the party is represented) at the same time that you send the email to the Court and you must show that you have done so in your email. Courtesy copies of all moving, opposition and reply papers should be delivered directly to Dept. 23 in the Administration Building 1221 Oak St. 4th Floor Oakland, CA 94612.

## Schedule for Department 23

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held: Mondays through Thursdays from 9:00 am - 1:30 pm.

- Case Management Conferences are held: Tuesdays beginning at 3:00 pm. and Fridays 9:15 am

- Law and Motion matters are heard: Tuesdays beginning at 3:00 pm. and Fridays 9:30 am; in exceptional circumstances, motions may be set at other times.

- Settlement Conferences are heard: N/A

- Ex Parte matters are heard: Tuesdays at 3:00 pm. and Fridays 9:00 am

- Reservations by email only. The court conducts discovery conferences pursuant to Local Rule 3.31 as described in the Initial Case Management Order issued in each case. No discovery motions will be scheduled prior to conference with the court. Email to schedule a conference. The email should briefly state the manner in which the parties have met and conferred.

## Law and Motion Procedures

To obtain a hearing date for a Law and Motion or ex parte matter, parties must contact the department as follows:

- Motion Reservations
  Email:          Dept23@alameda.courts.ca.gov

  Reservations by email only. (See Special Motion above)

- Ex Parte Matters
  Email:          Dept23@alameda.courts.ca.gov

  Reservations by email only.

## Tentative Rulings

The court may issue tentative rulings in accordance with the Local Rules.  Tentative rulings will become the Court's order unless contested in accordance with the Local Rules. Tentative rulings will be available at:

- Website:  www.alameda.courts.ca.gov/domainweb, Calendar Information for Dept. 23

- Phone:  1-866-223-2244

Dated:  05/07/2020

_____
                                    Facsimile
Presiding Judge,
Superior Court of California, County of Alameda

---

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as attached hereto and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 05/08/2020

By  _____
                                    digital
Deputy Clerk

Ex. 15
p. 244

| SHORT TITLE: Health Care Service Corp VS Mallinckrodt ARD LLC | CASE NUMBER: RG20056354 |
|---|---|

ADDITIONAL ADDRESSEES

Schneider Wallace Cottrell Konecky
Wotkyns LLP
Attn:  Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA   94608_____

**Ex. 15**
p. 245

# EXHIBIT 16

Schneider Wallace Cottrell Konecky
Wotkyns LLP
Attn:  Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA   94608____

Mallinckrodt ARD LLC

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Health Care Service Corp<br><br>Plaintiff/Petitioner(s)<br><br>VS.<br><br>Mallinckrodt ARD LLC<br><br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG20056354</u><br><br>Stipulation and Order Re: Extension of<br>Time to Respond to Complaint Granted |

IT IS ORDERED THAT Defendant's Stipulation and Order Re: Extension of Time to Respond to Complaint is granted, subject to the court's acceptance of new motions.

Defendant(s) Mallinckrodt PLC, Mallinckrodt ARD LLC may have until May 20,2020 to file a responsive pleading in this action.

Dated:  05/12/2020

digital

_____

Judge Brad Seligman

Ex. 16
p. 247

# EXHIBIT 17

Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

Peter D. St. Phillip (*Pro hac vice* to be filed)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com

[Additional counsel on signature page]

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| HEALTH CARE SERVICE CORP., <br><br> Plaintiff <br><br> v. <br><br> MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT PLC, <br><br><br> Defendants | Case No.: RG20056354 <br><br><br><br> CASE MANAGEMENT CONFERENCE STATEMENT FOR MAY 19, 2020 CASE MANGEMENT CONFERENCE |

1

## I.      INTRODUCTION

Plaintiff Health Care Service Corporation and Defendants Mallinckrodt ARD LLC and Mallinckrodt plc (collectively "Mallinckrodt") have met and conferred in advance of the Case Management Conference scheduled for May 19, 2020.

## II.     PLAINTIFF'S STATEMENT OF DISPUTED FACTUAL AND LEGAL ISSUES

Health Care Service Corp. ("HCSC"), a Blue Cross licensee that provides health care services and purchases pharmaceutical products for thousands of patients, brings claims under state and federal laws against Mallinckrodt relating to anticompetitive conduct and fraudulent sales and marketing practices for H.P. Acthar Gel ("Acthar"). Acthar is an adrenocorticotropic hormone ("ACTH") treatment with humble beginnings. Although available since 1952, the price leapt 97,500% from 2001 (when it cost $40 a vial) to 2018 (when that same vial cost over $39,000). Acthar is a critical treatment, used to control infant seizures, and is derived from the pituitary gland of pigs.

HCSC alleges this price increase is the result of a complex, multipart scheme involving monopoly, the abuse of exclusive distribution agreements, bribery, racketeering, fraud, and other deceptive and unfair practices that have imposed exorbitant costs on those financially responsible for the costs of the drug, including third-party payors ("TPPs") like HCSC here. No other explanation exists for these unconscionable price increases, which by far outstrip the prices of any inputs, such as pigs.

Mallinckrodt manufactures Acthar and orchestrated a monopoly in the market for ACTH drugs, through its control of pricing and distribution of Acthar. Mallinckrodt's predecessor, Questcor Pharmaceuticals, Inc. ("Questcor"), initiated a series of escalating price increases, while at the same time taking measures to ensure that competing ACTH products and channels of distribution were eliminated.

Starting in 2007, CuraScript SD became the exclusive distributor of Acthar. Questcor/Mallinckrodt consolidated this control by operating Express Scripts in a vertically integrated operation. This dynamic allowed Questcor/Mallinckrodt to control prices of Acthar. In

2

2013, Questcor acquired the rights to develop a synthetic ACTH drug called Synacthen Depot ("Synacthen"). Through Questcor, Mallinckrodt kept Synacthen off the market by out-bidding potential buyers and has 'mothballed' Synacthen after acquiring it.

Mallinckrodt's campaign of fraudulent sales and marketing further inflated prices. Mallinckrodt used a charitable foundation, the Chronic Disease Fund ("CDF"), for the illegal purpose of paying patient co-pays. Mallinckrodt financed CDF and used it to expand the prescription base of Acthar beyond infant spasms. Mallinckrodt promoted "off label" use of Acthar to further increase its consumption, encouraging unproven daily dosing regimens that were ineffective but highly lucrative. To encourage wider prescription, Mallinckrodt developed a dosing regimen that only required patients to use Acthar for five days, even though there was no clinical evidence that the five-day dosing regimen was effective. This dosing regimen was not FDA approved or indicated on the Acthar label. This dosing protocol had a two-fold effect: (1) patients reported fewer side effects, lending credibility to Mallinckrodt's unsupported claim of superior tolerability for Acthar when compared to steroids; and (2) the price seemed affordable when compared with the cost of administering the drug according to the label's instructions. Finally, Mallinckrodt funneled millions of dollars to doctors under the guise of speaking engagements and sham clinical research studies to promote the foregoing. These payments were necessary because Acthar is expensive, requires refrigeration unlike other pill treatments, and needs to be injected into the body. HCSC contends that under the circumstances these payments are 'bribes' and not legitimate education or marketing programs.

The foregoing facts give rise to the following legal issues:

1. Whether Defendant fraudulently concealed any of the foregoing facts.

2. Whether Defendant violated New Jersey's Racketeer Influenced and Corrupt Organizations Act ("NJ RICO"), N.J.S.A. §§ 2C:41-1(b), 2C:41-2(c), et al.

3. Whether Defendant violated Section 2C:41-2(d) of NJ RICO by conspiring to engage in the foregoing acts.

4. Whether Defendant violated state antitrust laws by monopolizing the market for ACTH.

3

5. Whether Defendant violated state antitrust law by entering into agreements in restraint of trade relating to Acthar.

6. Whether Defendant engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of state consumer protection statutes.

7. Whether Defendant's conduct constitutes fraud under state laws.

8. Whether Defendants violated state insurance fraud laws.

## III.   DEFENDANTS' STATEMENT OF DISPUTED FACTUAL AND LEGAL ISSUES

HCSC is one of the nation's largest healthcare insurers.  It claims that for eight years it paid too much for too many prescriptions for Acthar® Gel ("Acthar"), despite having contemporaneously reviewed for medical necessity each Acthar prescription that it covered.  (Cmplt. ¶ 16, ¶ 271.)  Acthar is a unique, complex injectable biopharmaceutical product that is approved by the FDA for use in nineteen serious and hard-to-treat rare medical conditions, such as infantile spasms, lupus, multiple sclerosis, nephrotic syndrome, and rheumatoid arthritis.  While HCSC labels a 2007 price increase for Acthar "price gouging," HCSC admits that Mallinckrodt's predecessor-in-interest Questcor Pharmaceuticals, Inc. ("Questcor") raised the price to pull Acthar out of, as HCSC describes it, a "financial sinkhole" to "save" the product from being removed from the marketplace.  (Cmplt. ¶¶ 7-9.) Thereafter, the price of Acthar has risen at only five percent per year, not counting inflation.  (*Id.*)

Saving Acthar was critically important for the small patient population that needs it. Questcor's 2007 price increase was necessary to make manufacturing and selling the injectable specialty therapy viable.  Questcor (and later Mallinckrodt, which acquired Acthar in 2014) made significant investments in medical research into the product's safety and efficacy for existing and new indications as well as educating prescribers about Acthar's FDA-approved indications so the therapy is appropriately prescribed to the patients for whom it is a suitable treatment.  Questcor also improved the distribution system for Acthar by shifting to a specialty-pharmaceutical distribution model, which provides greater care, speed, and expertise in ensuring this perishable specialty therapeutic is efficiently delivered to patients who need it urgently.  As is typical for specialty pharmaceutical

products, Questcor also established a patient support program, or "hub," that helps patients for whom Acthar has been prescribed submit claims for insurance coverage, appeal denials of coverage, secure financial assistance with co-payment obligations, coordinate home delivery, and provides injection training and support.

HCSC attempts to recast Acthar's turnaround as the result of illegal monopoly, bribery, racketeering, and fraud by Questcor, after it purchased the rights to Acthar in 2001, and later by Mallinckrodt, which Defendant Mallinckrodt plc purchased from Questcor in 2014. In essence, HCSC's suit seeks to retroactively renegotiate the price it paid over the last eight years for medically necessary prescriptions. Once stripped of HCSC's incendiary labels, none of the categories of alleged misconduct supports the Complaint's nine counts under forty states' laws.

HCSC complains about Questcor's enhancements to the distribution system for Acthar using nefarious phrases like "exclusive" and "vertically integrated operation," but exclusive distribution and other "vertical" agreements are presumptively procompetitive.

HCSC further alleges that Questcor violated 32 states' antitrust laws when, in June 2013, Questcor acquired the development rights to a synthetic ACTH product called Synacthen Depot ("Synacthen"), which is not FDA approved, and thus secured an illegal monopoly in the "ACTH drug market." But HCSC's alleged market definition is legally deficient, and HCSC does not and cannot plead injury resulting from the acquisition. If these claims were not subject to dismissal, the appropriate relevant antitrust market, Synacthen's realistic prospects for FDA approval and whether there would be any resulting effect on competition and HCSC would be issues in dispute.

HCSC also complains that Mallinckrodt has funded programs that help patients insured by HCSC who have been prescribed Acthar pay their co-payments for the therapy. But Mallinckrodt's conduct in regard to those programs was lawful and consistent with relevant industry guidance, and HCSC fails to state a claim otherwise; in any event, because the alleged misconduct has been well known since 2013, HCSC's claims are time barred. Under these claims, Mallinckrodt's intent to operate in compliance with applicable laws, and the effect of co-payment assistance on utilization would be issues in dispute.

5

Similarly, HCSC attempts to label Questcor's and Mallinckrodt's respective significant investments in medical research and education from 2011 to the present as "bribes" paid to doctors in exchange for writing Acthar prescriptions.  But HCSC pleads no facts supporting that mischaracterization.  If these claims were not subject to dismissal, the parties would dispute whether payments to doctors were legitimate compensation for services, whether prescriptions written by the subject doctors were medically appropriate, and HCSC's policies and practices concerning coverage of Acthar.

HCSC also alleges that Questcor promoted Acthar for an off-label dosing regimen to treat multiple sclerosis.  Doctors are, of course, free to prescribe off label.  HCSC fails to identify with the requisite particularity any unlawful promotional activity by anyone at Questcor or Mallinckrodt to any particular doctor, let alone a connection between any such alleged promotion, reliance thereon, and reimbursement by HCSC, which mandates dismissal of HCSC's fraud-based claims.  If these claims were not subject to dismissal, promotional activity by Questcor and Mallinckrodt for Acthar, and HCSC's policies and practices concerning coverage of Acthar would be issues in dispute.

## IV.   AGREED UPON AND DISPUTED CASE MANAGEMENT ISSUES

The parties have met and conferred and, subject to the Court's approval, have agreed to a briefing schedule for Defendant's demurrer to HCSC's complaint. On April 30, 2020 the parties submitted a stipulation and proposed order to the Court on the schedule and an enlargement of page limits to accommodate briefing the issues. Under the parties' proposal, (1) Defendant will serve and lodge a 25-page demurrer on May 20, 2020; (2) HCSC will lodge and serve a 25-page opposition brief on June 5, 2020; and (3) Defendant will lodge and serve a 12-page reply brief on June 19, 2020.

The parties request a hearing date at the Court's earliest convenience.

The parties agree that they will submit for entry by the Court a Protective Order, and stipulations concerning electronically stored information ("ESI") and expert discovery. Should the parties not agree on certain aspects of these orders, they will meet and confer to resolve their differences and, if they cannot, they will submit proposed orders identifying where the parties are not in agreement.

6

A.    <u>Plaintiff's Position on Case Management Issues and Discovery</u>

HCSC believes that discovery should commence following the Case Management Conference on May 19, 2020 and that the Court should enter a partial case schedule proposed below.

Initiation of discovery should not burden Defendant because Mallinckrodt has produced in several other actions and in government investigations many, if not most, of the documents HCSC will seek in this litigation. For example, in two consolidated proceedings, Defendant has agreed to a case management schedule that provides for fact discovery to close by September 30, 2020. *See City of Rockford v. Mallinckrodt ARD LLC*, Case No. 3:17-cv-50107 (N.D. Ill. June 17, 2019), ECF No. 215.[1]

HCSC believes that periodic status conferences will help with the progress of this litigation. HCSC proposes that the Court conduct bi-monthly status conferences, and that the parties submit a statement outlining any outstanding issues one week before any scheduled conference. In light of the COVID-19 pandemic, which has impacted the Court and parties alike, HCSC proposes to conduct status conferences by video conference or some other method convenient to the Court. Based on Defendants' proposal, described below, to conduct "substantial" discovery against HCSC when the most germane issues with respect to HCSC will be the straight-forward matters of the nature and extent HCSC's purchases, HCSC anticipates that periodic conferences will assist the parties in conducting efficient and focused discovery.

Finally, whatever issues will be raised by Defendants in their forthcoming demurrer are not likely to be case-dispositive. The viability of HCSC's core theories of liability are well-established. That courts have, on the margins, reached different results with respect to certain aspects of claims that are similar to those alleged by HCSC here does not warrant delay in setting a case schedule or discovery deadlines. HCSC will meet and confer with Defendants to prioritize, for early discovery, documents that have already been produced in other litigation.

---

[1] Consolidated with *MSP Recovery Claims, et al. v. Mallinckrodt ARD LLC*, Case No. 18-cv-00379 (N.D. Ill.).

| Date | Event |
|------|-------|
| January 29, 2021 | Fact discovery deadline |
| February 28, 2021 | Plaintiff to produce expert reports |
| May 30, 2021 | Defendants to produce expert reports |
| August 30, 2021 | Summary judgment or summary adjudication deadline |
| TBD | Trial |

B. <u>Defendants' Position on Case Management Issues and Discovery</u>

It would be a waste of the parties' and the Court's resources to rush headlong into discovery or set a case schedule without the benefit of the Court's ruling on Defendants' forthcoming demurrer and motion to strike.  HCSC challenges five categories of conduct alleging nine separate counts under the laws of over forty different states, and it places at issue all Acthar prescriptions that HCSC covered back to 2011.  As previewed above, there are several grounds on which to dismiss and/or strike the Complaint in its entirety.  Mallinckrodt has cooperated with HCSC on a schedule by which to present those issues to the Court, notwithstanding delays occasioned by precautions to stop the spread of the coronavirus, so that the Court can consider those issues as soon as it is ready to resume hearing new demurrers.  Courts addressing similar claims by other Acthar payors have substantially narrowed or dismissed the actions on the pleadings.[2]

---

[2] *See MSP Recovery Claims, Series LLC, et al. v. Mallinckrodt ARD Inc.*, No. 3:20-cv-50056 (N.D. Ill. Mar. 23, 2020) (dismissing, with leave to amend, complaint for failure to plead standing); *Humana Inc. v. Mallinckrodt ARD LLC*, No. CV 19-06926 (C.D. Cal. March 9, 2020) ("*Humana* Order") (dismissing, with leave to amend, antitrust and tortious interference—but allowing RICO, consumer protection, and common law—claims); *Acument Global Technologies, Inc. v. Mallinckrodt ARD, Inc.*, No. CT-2275-19 (Cir. Ct. Shelby Cty. Tenn. Feb. 21, 2020) (dismissing fraud and consumer protection, but allowing antitrust and unjust enrichment, claims); *Washington Cty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, __ F. Supp. 3d __, No. CV JKB-19-1854, 2020 WL 43016 (D. Md. Jan. 3, 2020) (dismissing action by rejecting fraud and consumer-protection claims); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730 (N.D. Ill. 2019) (dismissing RICO and common-law, but allowing antitrust, claims); *but see Steamfitters Local Union No. 420 v. Mallinckrodt ARD*, LLC, No. 19-cv-03047 (E.D. Pa. Dec. 19, 2019) (denying, without an opinion,

8

Even if the Court were to determine that dismissal of the Complaint in its entirety is not warranted, elimination of entire categories of conduct or a narrowing of the damages period will have a substantial effect on the scope of appropriate discovery in this case.  It thus makes sense to resolve the issues presented by Mallinckrodt's demurrer and motion to strike before commencing discovery in this action.

To the extent that the Court permits any of the claims to go forward, the parties can tailor their discovery to only those remaining claims, including the substantial discovery Mallinckrodt would need to take of HCSC.  Initiating discovery now, without the benefit of the Court's ruling on Mallinckrodt's demurrer and motion to strike, will result in unnecessary and wasteful efforts by the parties to take discovery on legally deficient claims during a global pandemic the mitigation of which continues to impact the parties' businesses as well as potential witnesses, document custodians, and the like.  For the same reasons, Mallinckrodt respectfully requests that the Court wait until after ruling on Mallinckrodt's demurrer and motion to strike before setting a schedule.

If the Court is inclined to set a schedule, Mallinckrodt respectfully requests that the Court enter the schedule below.  HCSC's proposed schedule is based on the mistaken premise that fact discovery in the *Rockford* litigation, which is proceeding on antitrust claims challenging the distribution agreement and the Synacthen acquisition **only**, ends in September 2020.  To the contrary, the court has extended all civil case deadlines in that district for at least 77 days.[3]  Accordingly, fact discovery in *Rockford* will not end until December 2020, at the earliest.

Furthermore, to the extent discovery is warranted here, Mallinckrodt agrees that discovery it has produced or may produce in the future in other Acthar-related cases will be responsive to HCSC's discovery requests in this case.  But, HCSC's schedule does not adequately account for Mallinckrodt's

---

motion to dismiss RICO, consumer-protection, and common-law claims); *Int'l Union of Operating Engineers Local 542 v. Mallinckrodt ARD, LLC*, No. 2018-14059 (Pa. Commw. Ct., Montgomery Cty. Jan. 8, 2019) (denying preliminary objections to antitrust-related theories of harm brought under consumer protection statute)

[3] *In re: Coronavirus COVID-19 Public Emergency* ¶ 2 (N.D. Ill. Arp. 24, 2020), *available at* https://www.ilnd.uscourts.gov/_assets/_documents/AMENDED%20GENERAL%20ORDER%2020-0012.pdf

9

need to take substantial discovery of HCSC—one of nation's largest healthcare insurers—on any surviving claims.  Accordingly, Mallinckrodt respectfully submits that, if the Court is inclined to enter a schedule at this time, it enter the schedule below.

| Date | Event |
|---|---|
| June 30, 2021 | Fact discovery deadline |
| July 29, 2021 | Plaintiff to produce expert reports |
| September 28, 2021 | Defendants to produce expert reports |
| December 17, 2021 | Motions for summary judgment or summary adjudication |
| TBD | Trial |

Dated:  May 12, 2020

Respectfully submitted:

**SCHNEIDER WALLACE COTTRELL KONECKY LLP**

*/s/ Matthew S. Weiler*
Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
2000 Powell Street
Suite 1400
Emeryville, CA 94608
(415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

**LOWEY DANNENBERG, P.C.**
Peter D. St. Phillip (*Pro hac vice* to be filed)
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
PStPhillip@lowey.com

Renee A. Nolan (*Pro hac vice* to be filed)
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
(215) 399-4770
rnolan@lowey.com

*Counsel for Plaintiff Health Care Service Corporation*

US 167804944v9
US 167804944v14

**ARNOLD & PORTER KAYE SCHOLER LLP**

By:

/s/ D. Eric Shapland
D. Eric Shapland

777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:    (213) 243-4000
Facsimile:    (213) 243-4199
eric.shapland@arnoldporter.com

*Attorneys for Defendant Mallinckrodt ARD LLC
and Mallinckrodt plc*

US 167804944v9
US 167804944v14

# Tyler B. Smith

| | |
|---|---|
| **From:** | RingCentral <service@ringcentral.com> |
| **Sent:** | Tuesday, May 12, 2020 6:37 PM |
| **To:** | Tyler B. Smith |
| **Subject:** | Fax Message Transmission Result to +1 (510) 2671546 - Sent |




Fax Transmission Result

Here are the results of the 13-page fax you sent from your phone number **(855) 394-6767, Ext. 305**

| Name | Phone Number | Date and Time | Result |
|---|---|---|---|
| | +1 (510) 2671546 | Tuesday, May 12, 2020 at 6:36 PM | Sent |

*Your fax(es) included the following file(s), which were rendered into fax format for transmission:*

| File Name | Result |
|---|---|
| Case Management Conference Statement for 5/19/29 CMC.pdf | Success |

View this message on your [RingCentral app](RingCentral app).

Thank you for using RingCentral!

> Glip - your online destination for teams to work, share, track projects and communicate. **Get started**

By subscribing to and/or using RingCentral, you acknowledge agreement to our Terms of Use.

Copyright 2020 RingCentral, Inc. All rights reserved. RingCentral is a registered trademark of RingCentral, Inc., 20 Davis Drive, Belmont, CA 94002, USA.

**Ex. 17**
p. 261

Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

Peter D. St. Phillip (*Pro hac vice* to be filed)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF ALAMEDA**

| | |
|---|---|
| HEALTH CARE SERVICE CORP., | Case No.: RG20056354 |
| Plaintiff | |
| v. | PROOF OF SERVICE |
| MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT PLC, | |
| Defendants | |

**PROOF OF SERVICE**
1

I, Tyler B. Smith, declare the following:

I am over the age of eighteen years and not a party to the within entitled action.  I am employed at Schneider Wallace Cottrell Konecky LLP located at 2000 Powell Street, Suite 1400, Emeryville, CA 94608.

On May 12, 2020, I served the following document(s) described as:

- CASE MANAGEMENT CONFERENCE STATEMENT FOR MAY 19, 2020 CASE MANGEMENT CONFERENCE
- FAX CONFIRMATION OF SENDING

on the following interested party(s):

D. Eric Shapland
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:  (213) 243-4000
Facsimile:   (213) 243-4199
eric.shapland@arnoldporter.com

[✓]   **BY ELECTRONIC SERVICE** by electronically mailing a true and correct copy in PDF format through SWCKW's electronic mail system to the email address(s) set forth above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on May 12, 2020, at Emeryville, California.

Tyler B. Smith

2

# EXHIBIT 18

ENDORSED
FILED
ALAMEDA COUNTY

MAY 1 5 2020

CLERK OF THE SUPERIOR COURT
By *C. Collins* Deputy

1   ARNOLD & PORTER KAYE SCHOLER LLP
Matthew M. Wolf (*PHV* to be filed)
2   Laura S. Shores (*PHV* to be filed)
Sonia Kuester Pfaffenroth (SBN 223984)
3   Michael B. Bernstein (*PHV* to be filed)
Adam M. Pergament (SBN 267557)
4   601 Massachusetts Avenue, N.W.
Washington, D.C. 20001-3743
5   Telephone:  (202) 942-5000 / Fax:  (202) 942-5999
matthew.wolf@arnoldporter.com
6   laura.shores@arnoldporter.com
sonia.pfaffenroth@arnoldporter.com
7   michael.b.bernstein@arnoldporter.com
adam.pergament@arnoldporter.com
8
9
10  D. Eric Shapland (SBN 193853)
777 South Figueroa Street, 44th Floor
11  Los Angeles, CA 90017-5844
Telephone:  (213) 243-4000 / Fax:  (213) 243-4199
12  eric.shapland@arnoldporter.com

13  *Attorneys for Defendants*
14  *Mallinckrodt ARD LLC and Mallinckrodt plc*

15          SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                  COUNTY OF ALAMEDA

17  HEALTH CARE SERVICE CORP.,                    Case No. RG20056354

18              Plaintiff,                         **DEFENDANTS MALLINCKRODT**
**ARD LLC AND MALLINCKRODT**
19      v.                                         **PLC'S PEREMPTORY**
**CHALLENGE PURSUANT TO**
20  MALLINCKRODT ARD LLC (f/k/a Mallinckrodt      **CODE CIV. PROC. § 170.6**
ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and
21  MALLINCKRODT plc,                             **DECLARATION OF D. ERIC**
**SHAPLAND IN SUPPORT**
22              Defendants.                        **THEREOF**
23
                                                   [CCP § 170.61]
24
                                                   Action Filed:  February 27, 2020
25
26                                                 Dept:  23
                                                   Judge:  Hon. Brad Seligman
27
28

167812690

DEFS. MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S PEREMPTORY CHALLENGE
PURSUANT TO CODE CIV. PROC. § 170.6; DECLARATION OF D. ERIC SHAPLAND

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Code of Civil Procedure § 170.6, Defendants Mallinckrodt ARD LLC and Mallinckrodt plc hereby move that this action, which has been assigned to the Honorable Judge Brad Seligman, be reassigned from Judge Seligman, and that no matters hereinafter arising in this action be heard or assigned to Judge Seligman. This Motion is made within 15 days of the Court's Notice of Assignment of Judge For All Purposes (Code Civ. Proc. § 170.6(a)(2)).

This Motion is based on the matters contained herein, the requirements of Code of Civil Procedure § 170.6, and the Declaration of D. Eric Shapland attached hereto.

Defendants request that the relief herein requested be granted.

Dated: May 15, 2020                    Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: _____
D. Eric Shapland

Matthew M. Wolf (*PHV* to be filed)
Laura S. Shores (*PHV* to be filed))
Sonia Kuester Pfaffenroth
Michael B. Bernstein (*PHV* to be filed)
Adam M. Pergament

*Attorneys for Defendants*
*Mallinckrodt ARD LLC  and*
*Mallinckrodt plc*

DEFS. MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S PEREMPTORY CHALLENGE
PURSUANT TO CODE CIV. PROC. § 170.6; DECLARATION OF D. ERIC SHAPLAND

### DECLARATION OF D. ERIC SHAPLAND IN SUPPORT OF PEREMPTORY CHALLENGE PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 170.6

I, D. Eric Shapland, declare as follows:

1.     I am an attorney admitted to practice before the courts of the State of California and counsel with the law firm of Arnold & Porter Kaye Scholer LLP. My firm and I serve as counsel to Defendants Mallinckrodt ARD LLC and Mallinckrodt plc ("Mallinckrodt") in the above-captioned action.

2.     I make this declaration in support of Mallinckrodt's Motion for Peremptory Challenge of the Honorable Judge Brad Seligman pursuant to Code of Civil Procedure § 170.6. The facts stated herein are based upon my personal knowledge and, if called upon to testify thereto, I could and would competently do so.

3.     On May 7, 2020, the Court issued a notice assigning the above-captioned action to Judge Brad Seligman for all purposes.

4.     I declare that Judge Brad Seligman is prejudiced against me or my client or my client's interests, such that I believe that my client cannot have a fair and impartial trial or hearing before Judge Seligman.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 15 day of May 2020, at Los Angeles, California.


D. Eric Shapland

DEFS. MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S PEREMPTORY CHALLENGE PURSUANT TO CODE CIV. PROC. § 170.6; DECLARATION OF D. ERIC SHAPLAND

# PROOF OF SERVICE

1. I am over eighteen years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 777 South Figueroa Street, Forty-Fourth Floor, Los Angeles, California 90017-5844.

2. On **May 15, 2020**, I served the following document(s):

   **DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S PEREMPTORY CHALLENGE PURSUANT TO CODE CIV. PROC. § 170.6; DECLARATION OF D. ERIC SHAPLAND IN SUPPORT THEREOF**

3. I served the document(s) on the following person(s):

   **[SEE ATTACHED SERVICE LIST]**

4. The documents were served by the following means:

   ☐ **By U.S. Mail**. I enclosed the document(s) in a sealed envelope or package addressed to the person(s) at the address(es) in Item 3 and **(check one)**:

   ☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

   ☐ placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

   I am employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California.

   ☐ **By Overnight Delivery/Express Mail**. I enclosed the documents and an unsigned copy of this declaration in a sealed envelope or package designated by **[name of delivery company or U.S. Postal Service for Express Mail]** addressed to the persons at the address(es) listed in Item 3, with **[Express Mail postage or, if not Express Mail, delivery fees]** prepaid or provided for. I placed the sealed envelope or package for collection and delivery, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for express delivery. On the same day the correspondence is collected for delivery, it is placed for collection in the ordinary course of business in a box regularly maintained by **[name of delivery company or U.S. Postal Service for Express Mail]** or delivered to a courier or driver authorized by **[name of delivery company]** to receive documents.

   ☐ **By Messenger Service**. I served the documents by placing them in an envelope or package addressed to the persons at the address(es) listed in Item 3 and providing them to a professional messenger service for service. (*See* attached Declaration(s) of Messenger.)

- 4 -

DEFS. MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S PEREMPTORY CHALLENGE PURSUANT TO CODE CIV. PROC. § 170.6; DECLARATION OF D. ERIC SHAPLAND

Ex. 1B
p. 268

☐  **By Facsimile Transmission.**  Based on an agreement between the parties to accept service by facsimile transmission, which was confirmed in writing, I faxed the document(s) and an unsigned copy of this declaration to the person(s) at the facsimile numbers listed in Item 3 on **May 15, 2020**, at **[type time]**.  The transmission was reported as complete without error by a transmission report issued by the facsimile machine that I used immediately following the transmission.  A true and correct copy of the facsimile transmission report, which I printed out, is attached hereto.

☒  **By Electronic Service (E-mail).**  Based on California Rule of Court 2.251(c)(3), or on a court order, or on an agreement of the parties to accept service by electronic transmission, I transmitted the document(s) to the person(s) at the electronic notification address(es) listed in Item 3 on **May 15, 2020**.

☐  **Via Court Notice of Electronic Filing.**  The document(s) will be served by the court via NEF and hyperlink to the document(s).  On **May 15, 2020**, I checked the CM/ECF docket for this case or adversary proceeding and determined that the person(s) listed in Item 3 are on the Electronic Mail Notice List to receive NEF transmission at the email addresses indicated in Item 3 **[or on the attached service list, if applicable]**.

☐  **Via Electronic Notification.**  The document(s) will be served via electronic notification on **May 15, 2020** on the person(s) listed in Item 3 at the email addresses indicated in Item 3 **[or on the attached service list, if applicable]**.

☒  **STATE:**  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐  **FEDERAL:**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Dated:  **May 15, 2020**.

Signature:  _Kathryn Jensen_

Type or Print Name: Kathryn Jensen
E-Service Address:
kathryn.jensen@arnoldporter.com

- 5 -

DEFS. MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S PEREMPTORY CHALLENGE
PURSUANT TO CODE CIV. PROC. § 170.6; DECLARATION OF D. ERIC SHAPLAND

Ex. 18
p. 269

1

2

3

*Health Care Service Corp. v. Mallinckrodt ARD LLC,* etc., et al.
Alameda Superior Court Case No. RG20056354

## SERVICE LIST

4

5

6

7

8

9

10

11

Todd M. Schneider
Jason H. Kim
Matthew S. Weiler
Kyle G. Bates
SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:    (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

*Counsel for Plaintiff*
*Health Care Service*
*Corporation*

12

13

14

15

Peter D. St. Phillip
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone:    (914) 997-0500
PStPhillip@lowey.com

16

17

18

19

Renee A. Nolan
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone:    (215) 399-4770
rnolan@lowey.com

20

21

22

23

24

25

26

27

28

- 6 -

DEFS. MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S PEREMPTORY CHALLENGE
PURSUANT TO CODE CIV. PROC. § 170.6; DECLARATION OF D. ERIC SHAPLAND

Ex. 18
p. 270

# EXHIBIT 19

# Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Health Care Service Corp<br><br>Plaintiff/Petitioner(s)<br><br>VS.<br><br><br>Mallinckrodt ARD LLC<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG20056354</u><br><br>Tentative Case Management Order |

This Tentative Case Management Order is issued by Judge Brad Seligman on 05/18/2020.

ORDER re: CASE MANAGEMENT

The Court has ordered the following after review of the case, including timely filed Case Management Statements, without a conference.

FURTHER CONFERENCE

A further Case Management Conference is scheduled for 06/24/2020 at 09:00 AM in Dept. 23.

Updated Case Management Statements in compliance with Rule of Court 3.725, must be filed no later than 5 days before the hearing. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day.

OTHER ORDERS

1. Parties should prompty file motion papers and request a reservation # for 6/24 for pleadings motions.
2. If after meeting and conferring the parties cannot resolve discovery issues, an email should be sent to the clerk requesting a discovery conference.  The court will address an overall discovery schedule at the next CMC (and requests the parties to outline their discovery plans). While the court does not issue a stay on discovery at this time, it expects the parties to engage in focused, limited discovery prior to the 6/24 hearing.

NOTICES

The Court orders counsel and/or self-represented parties to obtain a copy of this order from the court's website  http://www.alameda.courts.ca.gov/domainweb.

Any delay in the trial, caused by non-compliance with any order contained herein, shall be the subject of sanctions pursuant to CCP 177.5.

# EXHIBIT 20

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Health Care Service Corp** | **No. RG20056354** |
| Plaintiff/Petitioner(s) | |
| **VS.** | **Minutes** |
| **Mallinckrodt ARD LLC** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department   23                    Honorable   Brad Seligman            , Judge

Cause called for Case Management Conference on May 19, 2020.

ORDER re: CASE MANAGEMENT

The Court has ordered the following after review of the case, including timely filed Case Management Statements, without a conference.

FURTHER CONFERENCE

A further Case Management Conference is scheduled for 06/24/2020 at 09:00 AM in Dept. 23.

Updated Case Management Statements in compliance with Rule of Court 3.725, must be filed no later than 5 days before the hearing. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day.

OTHER ORDERS

1. Parties should prompty file motion papers and request a reservation # for 6/24 for pleadings motions.
2. If after meeting and conferring the parties cannot resolve discovery issues, an email should be sent to the clerk requesting a discovery conference.  The court will address an overall discovery schedule at the next CMC (and requests the parties to outline their discovery plans). While the court does not issue a stay on discovery at this time, it expects the parties to engage in focused, limited discovery prior to the 6/24 hearing.

NOTICES

The Court orders counsel and/or self-represented parties to obtain a copy of this order from the court's website  http://www.alameda.courts.ca.gov/domainweb.

Minutes of      05/19/2020
Entered on      05/19/2020

Chad Finke  Executive Officer / Clerk of the Superior Court

By _____
         digital

                              Deputy Clerk

_____

**Minutes**

**Ex. 20**

# EXHIBIT 21

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Health Care Service Corp<br><br><div align="right">Plaintiff/Petitioner(s)</div><br>VS.<br><br>Mallinckrodt ARD LLC<br><br><div align="right">Defendant/Respondent(s)</div><div align="right">(Abbreviated Title)</div> | No. <u>RG20056354</u><br><br>Case Management Order<br><br>Date:  05/19/2020<br>Time:  03:00 PM<br>Dept:  23<br>Judge:  Brad Seligman |

ORDER re: CASE MANAGEMENT

The Court has ordered the following after review of the case, including timely filed Case Management Statements, without a conference.

FURTHER CONFERENCE

A further Case Management Conference is scheduled for 06/24/2020 at 09:00 AM in Dept. 23.

Updated Case Management Statements in compliance with Rule of Court 3.725, must be filed no later than 5 days before the hearing. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day.

OTHER ORDERS

1. Parties should prompty file motion papers and request a reservation # for 6/24 for pleadings motions. 2. If after meeting and conferring the parties cannot resolve discovery issues, an email should be sent to the clerk requesting a discovery conference.  The court will address an overall discovery schedule at the next CMC (and requests the parties to outline their discovery plans). While the court does not issue a stay on discovery at this time, it expects the parties to engage in focused, limited discovery prior to the 6/24 hearing.

NOTICES

The Court orders counsel and/or self-represented parties to obtain a copy of this order from the court's website  http://www.alameda.courts.ca.gov/domainweb.

Any delay in the trial, caused by non-compliance with any order contained herein, shall be the subject of sanctions pursuant to CCP 177.5.

Dated:  05/19/2020

facsimile

_____
Judge Brad Seligman

# EXHIBIT 22

22713476



SCHNEIDER WALLACE
COTTRELL KONECKY LLP

May 12, 2020

**FILED**
ALAMEDA COUNTY

MAY 20 2020

CLERK OF THE SUPERIOR COURT
By _____
Deputy

**VIA U.S. MAIL**

Clerk of the Court
Superior Court of California, County of Alameda
1221 Oak Street
Oakland, CA 94612

> Re:  **HCSC v. Mallinkrodt Ard, LLC, et al.**
> **Superior Court of California, County of Alameda**
> **Case No. RG20056354**

Dear Clerk:

Enclosed is check number 19119, in the amount of $1,000.00, which shall serve as payment toward the complex filing fee in the above-referenced matter.

Sincerely,

SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP

RECEIVED
MAY 20 2020
ALAMEDA COUNTY SUPERIOR COURT

Onyebuchi Okeke
Legal Secretary

Enclosure.

**Ex. 22**
p. 279

# EXHIBIT 23

## *Superior Court of California, County of Alameda*



## *Notice of Reassignment of Judge for All Purposes*

Case Number: RG20056354
Case Title:     Health Care Service Corp VS Mallinckrodt ARD LLC
Date of Filing: 02/27/2020

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the Local Rules of the Superior Court of California, County of Alameda, this action is hereby reassigned by the Presiding Judge for all purposes to:**

| | |
|---|---|
| **Judge:** | **Stephen Kaus** |
| **Department:** | **19** |
| **Address:** | **Administration Building** |
| | **1221 Oak Street** |
| | **Oakland  CA  94612** |
| **Phone Number:** | **(510) 267-6935** |
| **Fax Number:** | |
| **Email Address:** | **Dept.19@alameda.courts.ca.gov** |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

**Please note: In this case, any challenge pursuant to Code of Civil Procedure section 170.6 must be exercised within the time period provided by law.  (See Code Civ. Proc. §§ 170.6, subd. (a)(2) and 1013.)**

NOTICE OF NONAVAILABILITY OF COURT REPORTERS: Effective June 4, 2012, the court will not provide a court reporter for civil law and motion hearings, any other hearing or trial in civil departments, or any afternoon hearing in Department 201 (probate). Parties may arrange and pay for the attendance of a certified shorthand reporter. In limited jurisdiction cases, parties may request electronic recording.

Amended Local Rule 3.95 states: "Except as otherwise required by law, in general civil case and probate departments, the services of an official court reporter are not normally available. For civil trials, each party must serve and file a statement before the trial date indicating whether the party requests the presence of an official court reporter."

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

Ex. 23
p. 281

## General Procedures

Following assignment of a civil case to a specific department, all pleadings, papers, forms, documents and writings can be submitted for filing at either Civil Clerk's Office, located at the René C. Davidson Courthouse, Room 109, 1225 Fallon Street, Oakland, California, 94612, and the Hayward Hall of Justice, 24405 Amador Street, Hayward, California, 94544. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

<div align="center">

ASSIGNED FOR ALL PURPOSES TO
JUDGE Stephen Kaus
DEPARTMENT 19

</div>

All parties are expected to know and comply with the Local Rules of this Court, which are available on the court's website at: http://www.alameda.courts.ca.gov/Pages.aspx/Local-Rules(1)  and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processes (ADR) prior to the Initial Case Management Conference.  The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days".  Plaintiff received that form in the ADR information package at the time the complaint was filed.  The court's website also contains this form and other ADR information.  If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

You may schedule case management hearings, law & motion hearings and other calendar events with Dept. 19 by e-mail.  The use of e-mail is not a substitute for filing pleadings or filing other documents.  You must provide copies of all email communications to each party (or the party's attorney if the party is represented) at the same time that you send the e-mail to the Court and you must show that you have done so in your e-mail.

Courtesy copies of all moving, opposition and reply papers should be delivered directly to Dept. 19 in the Administration Building, 1221 Oak St. 3rd floor Oakland, CA 94612

## Schedule for Department 19

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held:  Monday through Thursday at 8:30 a.m. to 1:30 p.m.

- Case Management Conferences are held:  Tuesday at 3:00 p.m.

- Law and Motion matters are heard:  Mondays and Wednesdays at 3:00 p.m.

- Settlement Conferences are heard:  As Scheduled by Judge

- Ex Parte matters are heard:  Mondays and Wednesdays at 3:00pm

- Civil Jury Trial Readiness Hearings heard on Fridays at 2:00 p.m.

## Law and Motion Procedures

To obtain a hearing date for a Law and Motion or ex parte matter, parties must contact the department as follows:

**Ex. 23**
p. 282

- Motion Reservations
     Email:          Dept.19@alameda.courts.ca.gov

     Please provide: 1) Name of case; 2) Case number; 3) Title of motion; 4) Moving
     party; 5) Name of Responding Party's Counsel and email address.

- Ex Parte Matters
     Email:          Dept19@alameda.courts.ca.gov

**<u>Tentative Rulings</u>**

The court may issue tentative rulings in accordance with the Local Rules.  Tentative rulings
will become the Court's order unless contested in accordance with the Local Rules.
Tentative rulings will be available at:

- Website:  www.alameda.courts.ca.gov/domainweb, Calendar Information for Dept. 19
- Phone:  1-866-223-2244

Dated:  05/21/2020

_____
                                                            Facsimile
                              Presiding Judge,
             Superior Court of California, County of Alameda

---

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct:  I am the clerk of the above-named court and
not a party to this cause.  I served this Notice by placing copies in envelopes addressed as
attached hereto and then by sealing and placing them for collection, stamping or metering
with prepaid postage, and mailing on the date stated below, in the United States mail at
Alameda County, California, following standard court practices.

     Executed on 05/22/2020

                                                                                       digital
                    By    _____
                                                    Deputy Clerk

**Ex. 23**
p. 283

| SHORT TITLE:<br>    Health Care Service Corp VS Mallinckrodt ARD LLC | CASE NUMBER:<br>    RG20056354 |
|---|---|

ADDITIONAL ADDRESSEES

Schneider Wallace Cottrell Konecky
Wotkyns LLP
Attn:  Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA    94608_____

# EXHIBIT 24

Schneider Wallace Cottrell Konecky                    Mallinckrodt ARD LLC
Wotkyns LLP
Attn:  Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA    94608____

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Health Care Service Corp<br><br>                   Plaintiff/Petitioner(s)<br><br>VS.<br><br><br>Mallinckrodt ARD LLC<br>              Defendant/Respondent(s)<br>           (Abbreviated Title) | No. <u>RG20056354</u><br><br>Declaration Re: Peremptory Challenge<br>as to Brad Seligman Granted |

IT IS ORDERED that the Defendant's Declaration Re: Peremptory Challenge as to Brad Seligman is granted.

Dated:  05/21/2020

digital

_____

Judge Brad Seligman

# EXHIBIT 25

Schneider Wallace Cottrell Konecky
Wotkyns LLP
Attn: Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA  94608____

Mallinckrodt ARD LLC

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Health Care Service Corp<br><br>            Plaintiff/Petitioner(s)<br><br>VS.<br><br>Mallinckrodt ARD LLC<br><br><br><br>           Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG20056354</u><br><br><br>NOTICE OF HEARING (AMENDED)<br><br>  Case Management Conf Continuance on<br>06/24/2020 has been vacated and rescheduled. |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above entitled action has been set for:

      Case Management Conf Continuance

    You are hereby notified to appear at the following Court location on the date and time noted below:

Case Management Conf Continuance:
DATE: 06/23/2020   TIME: 03:00 PM   DEPARTMENT: 19
LOCATION: Administration Building, Third Floor
              1221 Oak Street, Oakland

Dated: 05/26/2020        Chad Finke  Executive Officer / Clerk of the Superior Court

                           By    _____
                                       Deputy Clerk

---

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

    Executed on 05/26/2020.

                     By    _____
                                       Deputy Clerk

# EXHIBIT 26

1  ARNOLD & PORTER KAYE SCHOLER LLP
   Matthew M. Wolf (*PHV* to be filed)
2  Laura S. Shores (*PHV* to be filed)
   Sonia Kuester Pfaffenroth (SBN 223984)
3  Michael B. Bernstein (*PHV* to be filed)
   Adam M. Pergament (SBN 267557)
4  601 Massachusetts Avenue, N.W.
   Washington, D.C. 20001-3743
5  Telephone:    (202) 942-5000
   Facsimile:    (202) 942-5999
6  matthew.wolf@arnoldporter.com
   laura.shores@arnoldporter.com
7  sonia.pfaffenroth@arnoldporter.com
   michael.b.bernstein@arnoldporter.com
8  adam.pergament@arnoldporter.com
9
10 D. Eric Shapland (SBN 193853)
   777 South Figueroa Street, 44th Floor
11 Los Angeles, CA 90017-5844
   Telephone:    (213) 243-4000
12 Facsimile:    (213) 243-4199
   eric.shapland@arnoldporter.com
13
14 *Attorneys for Defendants*
15 *Mallinckrodt ARD LLC and Mallinckrodt plc*

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                         COUNTY OF ALAMEDA

18 | HEALTH CARE SERVICE CORP., | Case No. RG20056354 |
19 | Plaintiff, | **THE DEFENDANT** |
20 | v. | **MALLINCKRODT ENTITIES'** |
   | | **NOTICE OF DEMURRER AND** |
21 | MALLINCKRODT ARD LLC (f/k/a Mallinckrodt | **DEMURRER TO HCSC'S** |
22 | ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and | **COMPLAINT; SHAPLAND** |
   | MALLINCKRODT plc, | **DECLARATION** |
23 | | Date:   Aug. 5, 2020 |
24 | Defendants. | Time:  3:00 p.m. |
   | | Dept:  19 |
25 | | Judge: Hon. Stephen Kaus |
   | | Reservation No. R-2179414 |
26 | | |
27 | | Action Filed:  February 27, 2020 |
28

167608157

NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT; DECLARATION

ENDORSED
FILED
ALAMEDA COUNTY
MAY 28 2020
CLERK OF THE SUPERIOR COURT
By _____ Deputy
Jessica Florio

BY FAX

Ex. 26
p. 290

**<u>NOTICE OF DEMURRER</u>**

TO THE COURT, ALL INTERESTED PARTIES, AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on August 5, 2020 at 3:00 pm, or as soon thereafter as the matter may be heard, in Department 19 of this Court's Complex Division, located at 1221 Oak Street, 3rd Floor, Oakland, CA 94612, defendants Mallinckrodt ARD LLC and Mallinckrodt plc ("Mallinckrodt") will and hereby do demur to plaintiff Health Care Service Corporation's ("HCSC") Complaint, pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a).

Mallinckrodt demurs to the Complaint on the following grounds:

- **Demurrer to Count One (New Jersey RICO Act):**  Count One fails to state facts sufficient to constitute a cause of action.

- **Demurrer to Count Two (Conspiracy to Violate New Jersey RICO Act):**  Count Two fails to state facts sufficient to constitute a cause of action.

- **Demurrer to Count Three (Monopolization under 28 States' Laws):**  Count Three fails to state facts sufficient to constitute a cause of action.

- **Demurrer to Count Four (Restraint of Trade under 31 States' Laws):**  Count Four fails to state facts sufficient to constitute a cause of action.

- **Demurrer to Count Five (Unfair and Deceptive Practices Acts under 34 States' Laws):**  Count Five fails to state facts sufficient to constitute a cause of action.

- **Demurrer to Count Six (Fraud):**  Count Six fails to state facts sufficient to constitute a cause of action.

- **Demurrer to Count Seven (Insurance Fraud Statutes under 40 States' Laws):**  Count Seven fails to state facts sufficient to constitute a cause of action.

- **Demurrer to Count Eight (Tortious Interference with Contractual Relations):**  Count Eight fails to state facts sufficient to constitute a cause of action.

- **Demurrer to Count Nine (Unjust Enrichment):**  Count Nine fails to state facts sufficient to constitute a cause of action.

1    Mallinckrodt bases this Demurrer on this Notice of Demurrer, the following Demurrer to

2    the Complaint and each of its counts, the supporting Memorandum in support of Demurrer and

3    Motion to Strike (filed contemporaneously in a separate document given that the memorandum

4    supports both a demurrer and a motion to strike), the supporting Declaration of Eric Shapland, all

5    records and pleadings on file with the Court in this action, all other matters of which judicial

6    notice may be taken, including matters subject to Mallinckrodt's contemporaneously filed Request

7    for Judicial Notice in support of Demurrer and Motion to Strike, and all further evidence and

8    argument that may be presented in Reply to any Opposition to this Demurrer at or before the

9    hearing on this Demurrer.

10

11   Dated:  May 28, 2020                        Respectfully Submitted,

12                                               **ARNOLD & PORTER KAYE SCHOLER LLP**

13

14                                               By:  _____

15                                                    D. Eric Shapland

16                                               *Attorneys for Defendant*
                                                 *Mallinckrodt ARD LLC  and*
17                                               *Mallinckrodt plc*

18

19

20

21

22

23

24

25

26

27

28

## GENERAL DEMURRER TO PLAINTIFF'S COMPLAINT

1.     Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), defendant Mallinckrodt ARD LLC and Mallinckrodt plc ("Mallinckrodt") generally demurs to plaintiff Health Care Service Corporation's ("HCSC") Complaint ("Cmplt."), in its entirety, on the ground that the Complaint fails to state facts sufficient to constitute a cause of action.

## DEMURRER TO PLAINTIFF'S COUNT ONE

### NEW JERSEY RICO ACT

2.     Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), Mallinckrodt generally demurs to the first cause of action (violation of the New Jersey RICO Act) on the ground that the Complaint fails to state facts sufficient to constitute a cause of action because the conduct on which it is based—Mallinckrodt's provision of, or support for, copay assistance programs— neither constitutes a commercial bribe (as HCSC's members do not owe it a fiduciary duty) nor involves any actionable fraud (because any allegation that certifications of compliance with law were false because of associated violations of the federal Anti-Kickback Statute are time barred under the N.J. RICO Act's limitation period).

## DEMURRER TO PLAINTIFF'S COUNT TWO

### CONSPIRACY TO VIOLATE NEW JERSEY RICO ACT

3.     Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), Mallinckrodt generally demurs to the second cause of action (conspiracy to violate New Jersey RICO Act) on the ground that the Complaint fails to state facts sufficient to constitute a cause of action because the conduct on which it is based—Mallinckrodt's provision of, or support for, copay assistance programs—neither constitutes a commercial bribe (as HCSC's members do not owe it a fiduciary duty) nor involves any actionable fraud (because any allegation that certifications of compliance with law were false because of associated violations of the federal Anti-Kickback Statute are time barred under the N.J. RICO Act's limitation period).

## DEMURRER TO PLAINTIFF'S COUNT THREE

## MONOPOLIZATION UNDER 28 STATES' LAWS

4.     Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), Mallinckrodt generally demurs to the third cause of action (unlawful monopolization under 28 states' antitrust laws) on the ground that the Complaint fails to state facts sufficient to constitute a cause of action because:

    (a)    HCSC's allegations regarding the distribution of H.P. Acthar® Gel ("Acthar") (Cmplt. ¶¶ 11, 76-85) address presumptively procompetitive conduct, and HCSC makes no factual allegation that the form of distribution harms competition; and

    (b)    HCSC's allegations regarding Mallinckrodt's predecessor in interest Questcor Pharmaceuticals, Inc.'s ("Questcor") acquisition of rights to Synacthen Depot ("Synacthen") (*id.* ¶¶ 15, 162-76) fail to state a claim on three independent grounds: (i) HCSC's "ACTH-only" market improperly excludes non-ACTH economic substitutes for Acthar; (ii) HCSC fails to allege facts connecting the acquisition to the current price of Acthar; (iii) HCSC's claims are barred by the statutes of limitations or other legal bars applicable to the 28 states' antitrust laws invoked under this Count.

## DEMURRER TO PLAINTIFF'S COUNT FOUR

## UNREASONABLE RESTRAINT OF TRADE UNDER 31 STATES' LAWS

5.     Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), Mallinckrodt generally demurs to the fourth cause of action (unreasonable restraint of trade under 31 states' antitrust laws) on the ground that the Complaint fails to state facts sufficient to constitute a cause of action because:

    (a)    HCSC's allegations regarding the distribution of Acthar (*id.* ¶¶ 11, 76-85) address presumptively procompetitive conduct, and HCSC makes no factual allegation that the form of distribution harms competition; and

    (b)    HCSC's allegations regarding Questcor's acquisition of rights to Synacthen (*id.* ¶¶ 15, 162-76) fail to state a claim on two independent grounds:  (i) HCSC's "ACTH-only" market improperly excludes non-ACTH economic substitutes for Acthar; (ii)

HCSC fails to allege facts connecting the acquisition to the current price of Acthar; and (iii) HCSC's claims are barred by the statutes of limitations or other legal bars applicable to the 31 states' antitrust laws invoked under this Count.

## DEMURRER TO PLAINTIFF'S COUNT FIVE

### UNFAIR AND DECEPTIVE PRACTICES UNDER 34 STATES' LAWS

6. Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), Mallinckrodt generally demurs to the fifth cause of action (violation unfair and deceptive trade practices acts of 34 states) on the ground that the Complaint fails to state facts sufficient to constitute a cause of action because:

(a) HCSC's allegations regarding the distribution of Acthar (*id.* ¶¶ 11, 76-85) address presumptively procompetitive conduct, and HCSC makes no factual allegation that the form of distribution harms competition;

(b) HCSC's allegation that Mallinckrodt has improperly funded programs assisting patients with co-payments that must be made to obtain insurance coverage for medically necessary prescriptions (*id.* ¶¶ 12, 89-120) involved no actionable and unlawful, misleading or fraudulent conduct because (i) they involve no commercial bribes and (ii) any alleged violation of the federal Anti-Kickback statute is barred by the statutes of limitations or other legal bars applicable to the 34 states' unfair and deceptive practices acts invoked under this Count;

(c) HCSC's conclusion that payments to doctors as compensation for research or speaking engagements were thinly disguised bribes (*id.* ¶¶ 14, 149-61) fails to support the Count for two independent reasons (i) it does not rely on facts making that conclusion plausible, and (ii) it does not rely on facts connecting the conduct to HCSC's alleged injury given HCSC's review of all Acthar prescriptions for medical necessity and the public disclosure of the payments to doctors; and

(d) HCSC allegations that Questcor promoted Acthar for an off-label dosing regimen to treat multiple sclerosis ("MS") (*id.* ¶¶ 13, 121-48) fail to plead any false statement and lack any reasonable specificity with respect to any alleged statements or reliance.

**DEMURRER TO PLAINTIFF'S COUNT SIX**

**COMMON LAW FRAUD**

7.      Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), Mallinckrodt generally demurs to the sixth cause of action (fraud) on the ground that the Complaint fails to state facts sufficient to constitute a cause of action because:

(a)      HCSC's allegations that Mallinckrodt certified compliance with law but improperly funded programs assisting patients with co-payments that must be made to obtain insurance coverage for medically necessary prescriptions (*id.* ¶¶ 12, 89-120) involved no actionable fraudulent conduct because (i) the programs involve no commercial bribes and (ii) any alleged violation of the federal Anti-Kickback statute is barred by the statute of limitations for common law fraud; and

(b)      HCSC's allegations that Mallinckrodt certified compliance with law and conclusion that payments to doctors as compensation for research or speaking engagements were thinly disguised bribes (*id.* ¶¶ 14, 149-61) fail to support the Count for two independent reasons (i) it does not rely on facts making that conclusion plausible, and (ii) it does not rely on facts connecting the conduct to HCSC's alleged injury given HCSC's review of all Acthar prescriptions for medical necessity and the public disclosure of the payments to doctors.

**DEMURRER TO PLAINTIFF'S COUNT SEVEN**

**VIOLATION OF INSURANCE FRAUD STATUTES OF 40 STATES**

8.      Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), Mallinckrodt generally demurs to the seventh cause of action (violation of 40 states' insurance fraud statutes) on the ground that the Complaint fails to state facts sufficient to constitute a cause of action because the statutes do not provide private rights of action and are subject to other legal bars to recovery, and the additional alternative reason that HCSC has failed to plead actionable misconduct under those statutes because:

(a)      HCSC's allegations that Mallinckrodt certified compliance with law but improperly funded programs assisting patients with co-payments that must be made to obtain

NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT; DECLARATION

insurance coverage for medically necessary prescriptions (*id.* ¶¶ 12, 89-120) involved no actionable fraudulent conduct because (i) the programs involve no commercial bribes and (ii) any alleged violation of the federal Anti-Kickback statute is barred by the statutes of limitations or other legal bars applicable to the 4 of the 40 states' insurance fraud statutes that do provide private remedies; and

(b)    HCSC's allegations that Mallinckrodt certified compliance with law and conclusion that payments to doctors as compensation for research or speaking engagements were thinly disguised bribes (*id.* ¶¶ 14, 149-61) fail to support the Count for two independent reasons (i) it does not rely on facts making that conclusion plausible, and (ii) it does not rely on facts connecting the conduct to HCSC's alleged injury given HCSC's review of all Acthar prescriptions for medical necessity and the public disclosure of the payments to doctors.

## DEMURRER TO PLAINTIFF'S COUNT EIGHT

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

9.    Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), Mallinckrodt generally demurs to the eighth cause of action (tortious interference with contractual relations) on the ground that the Complaint fails to state facts sufficient to constitute a cause of action because, by copay assistance, HCSC's members do not breach their contractual obligations to HCSC.

## DEMURRER TO PLAINTIFF'S COUNT NINE

## UNJUST ENRICHMENT

10.    Pursuant to Code of Civil Procedure §§ 430.10(e) and 430.50(a), Mallinckrodt generally demurs to the ninth cause of action (unjust enrichment) on the ground that the Complaint fails to state facts sufficient to constitute a cause of action.

## PRAYER

Mallinckrodt prays for the following relief:

1.    That HCSC take nothing by reason of its Complaint;

2.    That the demurrers to the Complaint and to each of the specific causes of action set forth therein be sustained;

NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT; DECLARATION

1      3.     That HCSC's Complaint be dismissed without leave to amend;

2      4.     That Mallinckrodt be awarded its costs; and

3      5.     For any other or further relief as this Court deems just and proper.

4

5    Dated:  May 20, 2020                          Respectfully Submitted,

6                                                  ARNOLD & PORTER KAYE SCHOLER LLP

7

8                                                  By: _____

9                                                       D. Eric Shapland

10                                                 *Attorneys for Defendant*
                                                   *Mallinckrodt ARD LLC  and*
11                                                 *Mallinckrodt plc*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 9 -

NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT; DECLARATION

Ex. 26
p. 298

**DECLARATION OF ERIC SHAPLAND**

I, D. Eric Shapland, hereby declare as follows:

1.     I am an attorney licensed to practice law in the State of California, and I am of counsel with the law firm of Arnold & Porter Kaye Scholer LLP, counsel of record for Defendants Mallinckrodt ARD LLC and Mallinckrodt plc (the "Defendant Mallinckrodt Entities") in this action. I am a member of good standing of the State Bar of California.

2.     I make this declaration upon personal knowledge of the facts set forth herein, and, if called upon to testify, could and would testify competently to such facts if called to do so.

3.     Pursuant to Code of Civil Procedure §§ 430.41 and 435.5, on April 16 and 28, 2020, I met via telephone with Matthew Weiler, counsel for plaintiff Health Care Service Corp. to discuss the grounds on which the Defendant Mallinckrodt Entities rest this Demurrer (as well as the contemporaneously filed Motion to Strike) to attempt in good faith to resolve the matter. The parties did not reach an agreement resolving the objections raised.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed this 20th day of May, 2020, in Los Angeles, California.

_____
D. Eric Shapland

---

- 10 -
NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT; DECLARATION

Ex. 26
p. 299

# EXHIBIT 27

1   ARNOLD & PORTER KAYE SCHOLER LLP
    Matthew M. Wolf (*PHV* to be filed)
2   Laura S. Shores (*PHV* to be filed)
    Sonia Kuester Pfaffenroth (SBN 223984)
3   Michael B. Bernstein (*PHV* to be filed)
    Adam M. Pergament (SBN 267557)
4   601 Massachusetts Avenue, N.W.
    Washington, D.C. 20001-3743
5   Telephone:    (202) 942-5000
    Facsimile:    (202) 942-5999
6   matthew.wolf@arnoldporter.com
7   laura.shores@arnoldporter.com
    sonia.pfaffenroth@arnoldporter.com
8   michael.b.bernstein@arnoldporter.com
9   adam.pergament@arnoldporter.com

10  D. Eric Shapland (SBN 193853)
11  777 South Figueroa Street, 44th Floor
    Los Angeles, CA 90017-5844
12  Telephone:    (213) 243-4000
    Facsimile:    (213) 243-4199
13  eric.shapland@arnoldporter.com

14
    *Attorneys for Defendants*
15  *Mallinckrodt ARD LLC and Mallinckrodt plc*

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                          COUNTY OF ALAMEDA

18  HEALTH CARE SERVICE CORP.,                    Case No. RG20056354

19                  Plaintiff,                    **DEFENDANT MALLINCKRODT**
                                                  **ENTITIES' NOTICE OF MOTION**
20          v.                                    **AND MOTION TO STRIKE**
                                                  **ALLEGATIONS FROM PLAINTIFF**
21  MALLINCKRODT ARD LLC (f/k/a Mallinckrodt      **HCSC'S COMPLAINT; SHAPLAND**
    ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and   **DECLARATION**
22  MALLINCKRODT plc,
                                                  Date:   Aug. 5, 2020
23                  Defendants.                   Time:   3:00 p.m.
24                                                Dept:   19
                                                  Judge: Hon. Stephen Kaus
25                                                Reservation No. R-2179416
26                                                Action Filed:  February 27, 2020

27

28

167782202

        NOTICE OF MOT. & MOT. TO STRIKE ALLEGATIONS FROM COMPLT.; SHAPLAND DECL.

Ex. 27
p. 301

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL INTERESTED PARTIES, AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on August 5, 2020 at 3:00 pm, or as soon thereafter as the matter may be heard, in Department 19 of this Court's Complex Division, located at 1221 Oak Street, 3rd Floor, Oakland, CA 94612, defendants Mallinckrodt ARD LLC and Mallinckrodt plc ("Mallinckrodt") will and hereby do move to strike allegations from plaintiff Health Care Service Corporation's ("HCSC") Complaint, pursuant to Code of Civil Procedure §§ 436(a).

Specifically, Mallinckrodt requests that the Court strike the following allegations from the Complaint:

**Allegations Regarding Distribution of H.P. Acthar® Gel ("Acthar"):**

- Complaint ¶¶ 11, 76-85:  HCSC's allegations that entirely lawful enhancements to the distribution system for Acthar are among the five types of allegedly improper conduct by which Mallinckrodt was able to inflate Acthar's price.

**Allegations Regarding Copay Assistance Programs:**

- Complaint ¶¶ 12, 89-120:  HCSC's allegations that Mallinckrodt's copay assistance programs and its contributions to copay assistance funds of an independent charity Chronic Disease Fund ("CDF") are among the five types of allegedly improper and actionable conduct by which Mallinckrodt was able to inflate the price of Acthar® Gel ("Acthar").

- Complaint ¶ 323, lns. 5-6:  HCSC's allegations that Mallinckrodt's copay assistance programs constituted a violation of state bribery statutes and thus is "racketeering" activity under New Jersey's RICO Act.

- Complaint ¶¶ 273-75:  HCSC's allegations that contributions to CDF copay assistance funds involved actionable fraud or breach of its members' contractual obligations to HCSC.

- Complaint ¶ 281, ln. 22:  HCSC's allegation that Mallinckrodt's copay assistance programs involve any actionable fraud.

**Allegations Regarding Payments to Doctors**

- Complaint ¶¶ 14, 149-61:  HCSC's allegations regarding Mallinckrodt's investments in medical research and education and conclusions that those investments were "thinly disguised" bribes to doctors in exchange for writing Acthar prescriptions causing harm to HCSC.

- Complaint ¶ 259:  HCSC's conclusion that Mallinckrodt made payments to doctors to induce them to make false certifications.

- Complaint ¶¶ 272-73:  HCSC's conclusions that Mallinckrodt made payments to doctors in exchange for increased rates of prescriptions.

- Complaint ¶ 181, lns. 21-22:  HCSC's conclusion that Mallinckrodt made payments to doctors in exchange for increased rates of prescriptions.

**Allegations Regarding Supposed False, Off-Label Promotion**

- Complaint ¶¶ 13, 121-48:  HCSC's allegations that Mallinckrodt promoted Acthar for off-label uses.

**Allegations Regarding the Synacthen Depot ("Synacthen") Acquisition**

- Complaint ¶¶ 15, 162-76, 244-47, 249-53:  HCSC's allegations that the 2013 acquisition of rights to Synacthen Depot ("Synacthen") by Mallinckrodt (through its predecessor in interest Questcor Pharmaceuticals, Inc.) was an act of illegal monopolization or otherwise an unreasonable restraint of trade for which HCSC may seek relief under 31 states' antitrust acts.

- Complaint ¶ 200:  HCSC's allegation that the relevant period on its antitrust claims begins in 2011.

- Complaint ¶ 203:  HCSC's allegation that competition with Acthar would have begun prior to 2014 but for the acquisition.

**Allegations Regarding Inadmissible Settlements**

- Complaint ¶ 161:  HCSC's allegation about a September 4, 2019 settlement agreement between Mallinckrodt and the United States Department of Justice.

1        •     Complaint ¶ 175: HCSC's allegation about a January 18, 2017 settlement between

2             Mallinckrodt and the Federal Trade Commission.

3  **Allegations Invoking Inapplicable States' Laws**

4        •     Complaint ¶ 245: Reference to any of the 28 state antitrust acts that HCSC invokes

5             in support of Count III and that the Court determines to be subject to a legal bar.

6        •     Complaint ¶ 253: Reference to any of the 31 state antitrust acts that HCSC invokes

7             in support of Count IV and that the Court determines to be subject to a legal bar.

8        •     Complaint ¶ 245: Reference to any of the 34 state unfair and deceptive trade

9             practices acts that HCSC invokes in support of Count V and that the Court

10            determines to be subject to a legal bar.

11        •     Complaint ¶ 280: Reference to any of the 40 state insurance fraud statutes that

12            HCSC invokes in support of Count VII and that the Court determines to be subject

13            to a legal bar.

14        Mallinckrodt bases its motion on this Notice of Motion and Motion, the supporting

15  Memorandum in support of Demurrer and Motion to Strike (filed contemporaneously in a separate

16  document given that the memorandum supports both a demurrer and a motion to strike), the

17  supporting Declaration of Eric Shapland, all records and pleadings on file with the Court in this

18  action, all other matters of which judicial notice may be taken, including matters subject to

19  Mallinckrodt's contemporaneously filed Request for Judicial Notice in support of Demurrer and

20  Motion to Strike, and all further evidence and argument that may be presented in Reply to any

21  Opposition to this Motion at or before the hearing on this Motion.

22  Dated: May 28, 2020                  Respectfully Submitted,

23

24                        **ARNOLD & PORTER KAYE SCHOLER LLP**

25                        By:  _____

26                            D. Eric Shapland

27                        *Attorneys for Defendant*
                            *Mallinckrodt ARD LLC  and*

28                        *Mallinckrodt plc*

## DECLARATION OF ERIC SHAPLAND

I, D. Eric Shapland, hereby declare as follows:

1.      I am an attorney licensed to practice law in the State of California, and I am of counsel with the law firm of Arnold & Porter Kaye Scholer LLP, counsel of record for Defendants Mallinckrodt ARD LLC and Mallinckrodt plc (the "Defendant Mallinckrodt Entities") in this action.  I am a member of good standing of the State Bar of California.

1.      I make this declaration upon personal knowledge of the facts set forth herein, and, if called upon to testify, could and would testify competently to such facts if called to do so.

2.      Pursuant to Code of Civil Procedure §§ 430.41 and 435.5, on April 16 and 28, 2020, I met via telephone with Matthew Weiler, counsel for plaintiff Health Care Service Corp. to discuss the grounds on which the Defendant Mallinckrodt Entities rest this Motion to Strike (as well as the contemporaneously filed Demurrer to the Complaint) to attempt in good faith to resolve the matter.  The parties did not reach an agreement resolving the objections raised.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  This declaration was executed this 20th day of May, 2020, in Los Angeles, California.

D. Eric Shapland

# EXHIBIT 28

1  ARNOLD & PORTER KAYE SCHOLER LLP
   Matthew M. Wolf (*PHV* to be filed)
2  Laura S. Shores (*PHV* to be filed)
   Sonia Kuester Pfaffenroth (SBN 223984)
3  Michael B. Bernstein (*PHV* to be filed)
   Adam M. Pergament (SBN 267557)
4  601 Massachusetts Avenue, N.W.
   Washington, D.C. 20001-3743
5  Telephone:    (202) 942-5000
   Facsimile:    (202) 942-5999
6  matthew.wolf@arnoldporter.com
   laura.shores@arnoldporter.com
7  sonia.pfaffenroth@arnoldporter.com
   michael.b.bernstein@arnoldporter.com
8  adam.pergament@arnoldporter.com
9
10 D. Eric Shapland (SBN 193853)
   777 South Figueroa Street, 44th Floor
11 Los Angeles, CA 90017-5844
   Telephone:    (213) 243-4000
12 Facsimile:    (213) 243-4199
   eric.shapland@arnoldporter.com
13
14 *Attorneys for Defendant*
15 *Mallinckrodt ARD LLC and Mallinckrodt plc*

**FILED**
ALAMEDA COUNTY

MAY 2 8 2020

CLERK OF THE SUPERIOR COURT
By _____
                                BEBERLY

16             SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                        COUNTY OF ALAMEDA

18 | HEALTH CARE SERVICE CORP., | Case No. RG20056354 |
19 |             Plaintiff, | **THE DEFENDANT** |
20 |          v. | **MALLINCKRODT ENTITIES'** **MEMORANDUM IN SUPPORT OF** **DEMURRER AND MOTION TO** |
21 | MALLINCKRODT ARD LLC (f/k/a Mallinckrodt | **STRIKE** |
22 | ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT plc, | |
23 |             Defendants. | Date:   August 5, 2020 |
24 | | Time:   3:00 p.m. Dept:   19 |
25 | | Judge: Hon. Stephen Kaus Res. Nos. 2179414 & 2179416 |
26 | | Action Filed:  February 27, 2020 |
27
28

167782201

Ex. 28
p. 307

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................10

II.     THE COMPLAINT ................................................................................................14

        A.      Acthar and Its Manufacture, Promotion, Distribution, and Sale Before Questcor
                Acquired Its Rights. ...........................................................................................14

        B.      Questcor's Acquisition and Repositioning of Acthar ...........................................15

        C.      HCSC and Its Purported Claims for Relief............................................................16

III.    THE LEGAL STANDARD.......................................................................................16

IV.     ARGUMENT ............................................................................................................17

        A.      Questcor's Distribution Model Is Presumptively Lawful and HCSC Fails to Plead
                Otherwise. ...........................................................................................................17

        B.      HCSC's Allegations Regarding Co-Pay Assistance Do Not State a Claim............20

                1.      Co-Pay Assistance Is Not a Commercial Bribe. ........................................21

                2.      HCSC's Claims Based on the Allegation that CDF Co-Pay Assistance
                        Funds Violated the Federal Anti-Kickback Statute Are Time Barred.......22

                3.      Co-Pay Assistance Is Not a Tortious Interference with Contracts. ...........24

        C.      HCSC Fails to Support Its Conclusory Allegations That Payments to Doctors
                Were Unlawful......................................................................................................24

        D.      HCSC's Allegations of  Off-Label Promotion Lack the Particularity Necessary to
                Plead Fraud or Causation. ....................................................................................27

        E.      HCSC's Challenge to Questcor's Acquisition of Synacthen Rights Fails to State a
                Claim....................................................................................................................29

                1.      HCSC Fails to Allege a Relevant Antitrust Market in which Acthar
                        Competes.................................................................................................30

                2.      HCSC Fails to Allege Injury to its Business or Property from any
                        Reduction in Competition as a Result of the Synacthen Acquisition. .......31

                3.      HCSC's Claims Are Barred by the Applicable Statutes of Limitations. ...33

V.      CONCLUSION.........................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Fed'n of State, Cty. & Mun. Emp. Dist. Council 37 Health & Sec. Plan v.*
*Bristol-Myers Squibb Co.*,
948 F. Supp. 2d 338 (S.D.N.Y. 2013)......................................................21

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*,
256 F.3d 799 (D.C. Cir. 2001) ...............................................................32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................25

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
813 F. Supp. 2d 569 (S.D.N.Y. 2011)....................................................31

*Blue Cross of California Inc. v. Insys Therapeutics Inc.*,
390 F. Supp. 3d 996 (D. Az. 2019) ........................................................24

*Brotech Corp. v. White Eagle Int'l Techs. Grp.*,
No. 03-232, 2004 WL 1427136 (E.D. Pa. June 21, 2004)......................32

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...............................................................................30

*Cetel v. Kirwan Fin. Grp., Inc.*,
460 F.3d 494 (3d Cir. 2006)...................................................................22

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019) .....................................................11

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977).....................................................................11, 18, 19

*Crane & Shovel Sales Corp. v. Bucyrus-Eric Co.*,
854 F.2d 802 (6th Cir. 1988) .................................................................19

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
784 F. Supp. 2d 508 (D.N.J. 2011)........................................................27

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*,
357 F.3d 1 (1st Cir. 2004).......................................................................19

*E&L Consult., Ltd. v. Doman Indus. Ltd.*,
472 F.3d 23 (2nd Cir. 2006)....................................................................19

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ..................................................................25

Ex. 28
p. 309

*Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods.*,
  129 F.3d 240 (2d Cir. 1997) ............................................................................18, 19

*Health Care Serv. Corp. v. Olivares*,
  No. 2:10-cv-221, 2011 WL 4591913, at *1, 6-7 (E.D. Tex. Sept. 2, 2011),
  *report and recommendation adopted*, No. 2:10-cv-221, 2011 WL 4591915
  (E.D. Tex. Sept. 30, 2011) ...........................................................................................26

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ....................................................................................30

*Humana Inc. v. Mallinckrodt ARD LLC*,
  No. CV 19-06926 (C.D. Cal. Mar. 9, 2020) (RJN Ex. J)................................. *passim*

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ......................................................................................................18

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) ........................................................................................25

*Meijer, Inc. v. Biovail Corp.*,
  533 F.3d 857 (D.C. Cir. 2008) ...............................................................................31, 33

*Midwestern Mach. Co., Inc. v. Northwest Airlines, Inc.*,
  392 F.3d 265 (8th Cir. 2004) ..................................................................................33, 34

*MSP Recovery Claims, Series LLC, et al. v. Mallinckrodt ARD Inc.*,
  No. 3:20-cv-50056 (N.D. Ill. Mar. 23, 2020) ............................................................11

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ..................................................................................................30

*Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*,
  381 F.3d 717 (7th Cir. 2004) ........................................................................................18

*Rutman Wine Co. v. E&J Gallo Winery*,
  829 F.2d 729 (9th Cir. 1987) ........................................................................................19

*Sidney Hillman Health Center v. Abbott Labs.*,
  873 F.3d 574 (7th Cir. 2017) ........................................................................................28

*Steamfitters Local Union No. 420 v. Mallinckrodt ARD*,
  LLC, No. 19-cv-03047 (E.D. Pa. Dec. 19, 2019) .....................................................11

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.*,
  711 F.3d 1264 (11th Cir. 2013) ....................................................................................32

*Takeda Pharm. Co. Ltd. v. Zydus Pharm. (USA) Inc.*,
  358 F. Supp. 3d 389 (D.N.J. 2018) ..............................................................................33

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010).........................................................................................28

*United States v. Caronia*,
    703 F.3d 149 (2012)...................................................................................................27

*United States v. General Electric Co.*,
    272 U.S. 476 (1926)..................................................................................................19

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).....................................................................................33

*United States ex rel. Worsfold v. Pfizer Inc.*,
    No. 09-11522-NMG, 2013 WL 6195790 (D. Mass. Nov. 22, 2013)........................28

*Utts v. Bristol-Myers Squibb Co.*,
    251 F. Supp. 3d 644 (S.D.N.Y. 2017), *aff'd sub nom.*
    *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019) ......................27

*Verizon Comm'n v. Law Offices of Curtis Trinko*,
    540 U.S. 398 (2004)..................................................................................................15

*Wash. Cty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*,
    _ F. Supp. 3d _, No. CV JKB-19-1854, 2020 WL 43016 (D. Md. Jan. 3, 2020) ........11, 13, 28

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ....................................................................................34

**State Cases**

*Acument Global Techs., Inc. v. Mallinckrodt ARD, Inc.*,
    No. CT-2275-19 (Cir. Ct. Shelby Cty. Tenn. Feb. 21, 2020) ...................................11

*Aryeh v. Canon Bus. Sols., Inc.*,
    55 Cal. 4th 1185 (2013) ............................................................................................34

*Barton v. New United Motor Manufacturing, Inc.*,
    43 Cal. App. 4th 1200 (1996) ...................................................................................22

*Bernson v. Browning-Ferris Indus.*,
    7 Cal. 4th 926 (1994) ................................................................................................22

*Bert G. Gianelli Distributing Co. v. Beck & Co.*,
    172 Cal. App. 3d 1020 (1985) ..................................................................................19

*Blank v. Kirwan*,
    39 Cal. 3d 311 (1985)...............................................................................................17

*Bldg. Permit Consultants, Inc. v. Mazur*,
    122 Cal. App. 4th 1400 (2004) .................................................................................26

*Brandon G. v. Gray,*
111 Cal. App. 4th 29 (2003) ...........................................................................24

*Cal. Logistics, Inc. v. State of Cal.,*
161 Cal. App. 4th 242 (2008) .........................................................................17

*Caliber Bodyworks, Inc. v. Super. Ct.,*
134 Cal. App. 4th 365 (2005) ...................................................................17, 25

*Chavez v. Whirlpool Corp.,*
93 Cal. App. 4th 363 (2001) .....................................................................12, 20

*Chicago Title Ins. Co. v. Great Western Fin. Corp.,*
69 Cal. 2d 305 (1968) .....................................................................................29

*In re Cipro Cases I & II,*
348 P.3d 845 (2015) ........................................................................................30

*Clark v. Lesher,*
106 Cal. App. 2d 403 (1951) ..........................................................................33

*Commonwealth Mortg. Assurance Co. v. Superior Court,*
211 Cal. App. 3d 508 (1989) ..........................................................................26

*Doe v. City of Los Angeles,*
42 Cal. 4th 531 (2007) .......................................................................17, 23, 25

*Exxon Corp. v. Superior Court,*
51 Cal. App. 4th 1672 (Cal. Ct. App. 1997) ............................................19, 30

*Fox v. Ethicon Endo-Surgery, Inc.,*
35 Cal. 4th 797 (2005) ....................................................................................23

*Freeman v. San Diego Ass'n of Realtors,*
77 Cal. App. 4th 171 (1999) .....................................................................15, 29

*Gutierrez v. Carmax Auto Superstores California,*
19 Cal. App. 5th 1234 (2018) .........................................................................27

*Int'l Union of Oper. Eng'rs Local 542 v. Mallinckrodt ARD, LLC,*
No. 2018-14059 (Pa. Commw. Ct., Mont. Cty. Jan. 8, 2019) ........................11

*Lazar v. Super. Ct.,*
12 Cal. 4th 631 (1996) ..............................................................................27, 28

*Lloyd Design Corp. v. Mercedes Benz of N. Am., Inc.,*
66 Cal. App. 4th 716 (1998) ...........................................................................30

*Lopez v. Sony Elecs., Inc.,*
5 Cal. 5th 627 (2018) ................................................................................19, 24

- 6 -

*Marsh v. Anesthesia Svcs. Medical Group, Inc.*,
  200 Cal. App. 4th 480 (2011) ...............................................................................19, 29

*McKelvey v. Boeing North Am., Inc.*,
  74 Cal. App. 4th 151 (1999) .........................................................................................23

*Motors, Inc. v. Times Mirror Co.*,
  102 Cal App. 3d 735 (1980) .........................................................................................29

*Munter v. Eastman Kodak Co.*,
  28 Cal. App. 660 (1915) ...............................................................................................29

*PH II, Inc. v. Super. Ct.*,
  33 Cal. App. 4th 1680 (1995) ................................................................................17, 22

*Prakashpalan v. Engstrom, Lipscomb & Lack*,
  223 Cal. App. 4th 1105 (2014) ...............................................................17, 25, 26, 32

*Redwood Theatres, Inc. v. Festival Enters., Inc.*,
  200 Cal. App. 3d 687 (1988) ........................................................................................30

*Seidler v. Mun. Ct.*,
  12 Cal. App. 4th 1229 (1993) .......................................................................................16

*Shasta Douglas Oil Co. v. Work*,
  212 Cal. App. 2d 618 (1963) ........................................................................................19

*Stansfield v. Starkey*,
  220 Cal. App. 3d 59 (1990) ..........................................................................................28

*Stop Youth Addiction v. Licky Stores*,
  17 Cal. 4th 553 (1998) ..................................................................................................29

*State of California ex rel. Van de Kamp v. Texaco, Inc.*,
  46 Cal. 3d 1147 (1988) .................................................................................................29

*Wilke & Holzheiser, Inc. v. Dep't of Alcoholic Beverage Control*,
  65 Cal. 2d 349 (1966) ...................................................................................................19

*Young v. Gannon*,
  97 Cal. App. 4th 209 (2002) .........................................................................................17

**Federal Statutes**

21 U.S.C. § 355(b) .................................................................................................................32

21 U.S.C. § 355(d) .................................................................................................................32

42 U.S.C. § 1320a-7b(b) ........................................................................................................20

Sherman Act § 2 .....................................................................................................................34

**State Statutes**

Alaska Stat. §§ 11.46.660(a) & 11.46.670 .................................................................21

Bus. & Prof. Code § 16750(a).................................................................................29, 33

Bus. & Prof. Code § 17208 ....................................................................................22, 29

Cartwright Act....................................................................................................29, 33, 34

Civ. Proc. Code § 338(d) .............................................................................................22

Civ. Proc. Code § 410.30 .............................................................................................29

Civ. Proc. Code § 430.10 .............................................................................................17

Civ. Proc. Code § 430.30(a).........................................................................................17

Civ. Proc. Code § 431.10 .............................................................................................17

Civ. Proc. Code § 436(a)........................................................................................17, 25

Evid. Code § 1152(a) ...................................................................................................25

N.J. Stat. § 2C:21-10 ...................................................................................................21

Penal Code § 641.3 ......................................................................................................21

**Regulations**

70 Fed. Reg. 70,623 (Nov. 22, 2005)...........................................................................22

79 Fed. Reg. 31,120, 31,120-22 (May 30, 2014) .........................................................23

MEMO ISO DEMURRER & MOT. TO STRIKE

**Other Authorities**

10 *American Law of Torts* § 32:19 (2020) .......................................................................26

Areeda & Hovenkamp, *Antitrust Law*, ¶ 338b (4th ed. 2020) ......................................32

2 Callmann on Unfair Competition, Trademarks and Monopolies § 9:9
  (4th ed. June 2019)......................................................................................................24

Bob Cohen, *Right to Private Action Under State Consumer Protection Act—Preconditions to Action*, 117 A.L.R.5th 155 § 2[a] (2004) ..................................................................26

**MEMORANDUM**

Defendants Mallinckrodt ARD LLC and Mallinckrodt plc (collectively "Mallinckrodt") respectfully submit this memorandum in support of their demurrer to, and motion to strike allegations from, the Complaint ("Cmplt.") of plaintiff Health Care Service Corporation ("HCSC").

## I.    INTRODUCTION

HCSC, one of the nation's largest and most sophisticated healthcare insurers, claims that for the last eight years it paid too much for too many prescriptions for Acthar® Gel ("Acthar") (Cmplt. ¶ 16), Mallinckrodt's injectable specialty biopharmaceutical product with a long history, complex manufacturing process, and FDA approval for 19 serious and hard-to-treat medical conditions (*id* ¶¶ 56-57, 62-64 & Request for Judicial Notice ("RJN") Ex. G). HCSC would attribute the price for and volume of its purchases to alleged illegal monopoly, bribery, and fraud by Mallinckrodt's predecessor in interest Questcor Pharmaceuticals, Inc. ("Questcor") and later Mallinckrodt, which acquired Questcor in 2014. (*Id.* ¶¶ 4, 10-15.) HCSC concedes, however, that it contemporaneously reviewed for medical necessity each Acthar prescription that it covered. (*Id.* ¶ 271.) And while HCSC labels a 2007 price increase for Acthar as "price gouging" (*id.* ¶ 1), HCSC admits that Questcor made that price adjustment to pull Acthar out of a "financial sinkhole" and "save" the therapeutic after purchasing its rights in 2001. (*Id.* ¶¶ 7-9.) Since 2007, the price of Acthar has risen at only five percent per year not counting inflation. (*Id.* ¶ 8.)

Saving Acthar, which was critically important for the small number of patients who need it (*id.* ¶¶ 6, 61, 67), was not just a matter of pricing. Questcor made significant investments in medical research into the product's safety and efficacy for new indications—investments that have only grown under Mallinckrodt's ownership—as well as education for prescribers about Acthar's FDA-approved indications, so the therapy is appropriately prescribed to the patients for whom it is a suitable treatment. (*See id.* ¶¶ 14, 148, 151.) Questcor also improved the distribution system for Acthar—which requires special handling and must be refrigerated—by shifting to the specialty-pharmaceutical distribution model, which provides greater care, speed, and expertise in ensuring this perishable specialty therapeutic is efficiently delivered to patients who need it urgently. (*See id.* ¶¶ 57, 76-79, 83.) As is typical for specialty pharmaceuticals, Questcor also established a patient

support program or "hub" that, as HCSC admits, helps patients submit insurance claims, appeal denials of coverage, secure financial assistance with co-payment obligations, coordinate home delivery, and provide injection training and support. (*Id.* ¶¶ 80-82, 89-115.)

HCSC's effort to recast the resulting turnaround of Acthar as the result of illegal monopoly, bribery, and fraud is a disingenuous litigation tactic, by which it seeks to retroactively renegotiate the price it paid over the last eight years for medically necessary prescriptions. A few other third-party payers ("TPPs") have tried to do the same by filing similar cases in other courts, which most often have substantially narrowed or dismissed the actions on the pleadings.[1] Once stripped of HCSC's incendiary labels, none of the five categories of alleged misconduct supports the Complaint's nine counts for relief under forty states' laws:

**(1)     Enhanced Distribution and Patient Support.**   HCSC first complains about Questcor's changes to Acthar's distribution model by using phrases like "vertical integration," "exclusive distribution," or "consolidation into a single distribution channel" (*id.* ¶¶ 11, 76-85) as if they were labels for anticompetitive conduct. But all states whose antitrust laws HCSC invokes adhere to *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977), which holds that exclusive distribution agreements and other "vertical restraints" are *presumptively procompetitive* because they allow for just the kind of improvements in distribution that Questcor achieved for Acthar. HCSC's allegation that the distribution agreement helped Questcor "maintain control over pricing pressures" (*id.* ¶ 11) both (a) makes no economic sense, because it already held that power as

---

[1]     *MSP Recovery Claims, Series LLC, et al. v. Mallinckrodt ARD Inc*., No. 3:20-cv-50056 (N.D. Ill. Mar. 23, 2020) (dismissing, with leave to amend, complaint for failure to plead standing); *Humana Inc. v. Mallinckrodt ARD LLC*, No. CV 19-06926 (C.D. Cal. Mar. 9, 2020) ("*Humana* Order") (RJN Ex. J) (dismissing, with leave to amend, antitrust and tortious interference—but allowing RICO, consumer protection, and common law—claims); *Acument Global Techs., Inc. v. Mallinckrodt ARD, Inc*., No. CT-2275-19 (Cir. Ct. Shelby Cty. Tenn. Feb. 21, 2020) (dismissing fraud and consumer protection, but allowing antitrust and unjust enrichment, claims); *Wash. Cty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, _ F. Supp. 3d _, No. CV JKB-19-1854, 2020 WL 43016 (D. Md. Jan. 3, 2020) (dismissing action of fraud and consumer-protection claims); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730 (N.D. Ill. 2019) (dismissing RICO and common-law, but allowing antitrust, claims); *but see Steamfitters Local Union No. 420 v. Mallinckrodt ARD*, LLC, No. 19-cv-03047 (E.D. Pa. Dec. 19, 2019) (denying, without an opinion, motion to dismiss RICO, consumer-protection, and common-law claims); *Int'l Union of Oper. Eng'rs Local 542 v. Mallinckrodt ARD, LLC*, No. 2018-14059 (Pa. Commw. Ct., Mont. Cty. Jan. 8, 2019) (same).

1   Acthar's only manufacturer and (b) contradicts well-established law.  That contradiction leaves

2   HCSC without allegations of harm to competition required to state a claim under any state's antitrust

3   laws, and thus "necessarily implies that the conduct is not 'unfair' toward consumers," *Chavez v.*

4   *Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).

5         **(2)**     **Co-pay Assistance.** HCSC also complains that Mallinckrodt has improperly funded

6   programs assisting patients with co-payments that must be made to obtain insurance coverage for

7   medically necessary prescriptions.  (*Id.* ¶¶ 12, 89-120.)  Mallinckrodt is committed to removing

8   barriers to patient access to its products and has offered robust patient assistance programs as

9   permitted by law.  Interested in keeping those barriers, HCSC accuses patients who receive co-pay

10  assistance of taking bribes or breaching their contractual obligations to HCSC (*id.* ¶¶ 12, 223, 288),

11  accusations that were rejected on the pleadings by another court in an identical challenge to Questcor

12  and Mallinckrodt's programs, *Humana* Order at 27-28 (rejecting bribery theory) & 34 (rejecting

13  tortious interference theory).  HCSC also alleges that Questcor's donations between 2010 and 2014

14  to charitable funds operated by the Chronic Disease Fund ("CDF") violated 2005 regulatory

15  guidance on federal law applicable to Medicare Part D programs because the funds covered only

16  Acthar prescriptions.  (*Id.* ¶¶ 95-119.)  HCSC, however, was put on constructive notice of its claims

17  regarding CDF by as early as 2013, when prominent media outlets, such as the *New York Times*,

18  reported on this conduct and specifically Questcor's contributions to Acthar-only funds at CDF.

19  HCSC does not allege that Questcor continued to contribute to CDF funds after supplemental

20  regulatory guidance in 2014 addressed the issue of single-drug funds.  (*Id.* ¶ 120.)  As result, all

21  claims based on CDF contributions are time barred.

22        **(3)**     **Payments to Doctors.** With sweeping and general allegations, HCSC labels Questcor

23  and Mallinckrodt's investments in medical research and healthcare-provider education as "thinly

24  disguised" bribes paid to doctors in exchange for writing Acthar prescriptions.  (*Id.* ¶¶ 14, 149-61.)

25  But HCSC admits that the amount of compensation for this work was within the range of the

26  "industry standard."    (*Id.* ¶ 153).    And HCSC pleads no other facts supporting its

27  mischaracterization.  In addition, HCSC's conclusory allegation that it would not have covered

28  Acthar prescriptions had it known of these payments is contradicted by its allegations elsewhere

1    that compensation provided to doctors has been publicly disclosed since 2013 (*id.* ¶ 158) and that

2    HCSC reviewed for medical necessity each claim for an Acthar prescription (*id.* ¶ 271).  And HCSC

3    fails to identify a single doctor who wrote a prescription as a result of an illegal payment.  These

4    failures compel dismissal of HCSC's claims regarding purported bribes to doctors.

5         **(4)    Off-Label Promotion.**  HCSC alleges that Questcor promoted Acthar for an off-label

6    dosing regimen to treat multiple sclerosis ("MS").  (*Id.* ¶¶ 13, 121-48.)  HCSC dedicates several

7    paragraphs to outlining at a generalized level allegations of internal discussions about the

8    development of marketing strategy for Acthar.  But nowhere does HCSC allege with particularity a

9    single instance of any actual off-label promotion of Acthar by anyone at Questcor or Mallinckrodt

10   to a single doctor—let alone to a doctor who wrote a prescription for such off-label use for an HCSC

11   beneficiary.  HCSC's failure to plead fraud and reliance with particularity mandates dismissal of

12   the fraud-based claims.  *See Wash. Cty.*, 2020 WL 43016, at *11.

13        **(5)    The Synacthen Transaction.**  HCSC alleges that Questcor violated 32 states'

14   antitrust laws when it acquired, in June of 2013, the development rights to the synthetic ACTH drug

15   Synacthen Depot ("Synacthen"), which HCSC alleges would have served as a price-disciplining

16   alternative for Acthar but-for the acquisition.  (*Id.* ¶¶ 15, 162-76).  These claims fail for multiple

17   reasons.  *First*, HCSC rests its claims on a proposed relevant antitrust market in which only Acthar

18   competes (*id.* ¶ 183), even as HCSC admits that Acthar faces competition from other

19   pharmaceuticals (*id.* ¶¶ 6, 58, 89, 166-68).  The admission is fatal to the claims, *Humana* Order at

20   5-13 (dismissing with leave to amend similar claims based on Acthar-only market).  *Second*, HCSC

21   has not sufficiently alleged actual injury from this transaction or a proper form of relief.  According

22   to HCSC, but for the 2013 acquisition, "competition to Acthar would have begun prior to 2014, and

23   would have included Synacthen."  (*Id.* ¶ 203.)  But Synacthen is a different drug that is not FDA-

24   approved for sale in the United States (*id.* ¶ 15), and approval depends on the outcome of lengthy

25   and uncertain clinical trials and FDA evaluation.  HCSC admits that Mallinckrodt sublicensed its

26   rights to Synacthen almost three years ago (*id.* ¶ 176); HCSC does not plead that the sublicensee

27   has obtained FDA approval; and HCSC pleads nothing about any timetable for or nature of such

28   approval.  *Finally*, waiting almost seven years to sue, HCSC blew the 32 states' time bar.

For these and other reasons stated below, the Complaint fails to state a claim for relief, and Mallinckrodt respectfully urges the Court to dismiss this action in its entirety.  Alternatively, the Court should substantially narrow the scope of this kitchen-sink action by dismissing specific counts and/or striking from the Complaint, as substantively defective and irrelevant matter, categories of alleged misconduct that do not support any claim for relief as well as requests for damages that are unsupported by any claim stated.

## II.      THE COMPLAINT

### A.      Acthar and Its Manufacture, Promotion, Distribution, and Sale Before Questcor Acquired Its Rights.

Acthar's active ingredient is an adrenocorticotropic hormone analogue ("ACTH") that is extracted from pig pituitary glands.  (Cmplt. ¶¶ 5, 56-57.)  Once extracted, refined, and purified through a process protected by trade secrets, the ACTH is combined with a gel to extend its release into, and therapeutic effects on, the body.  (*Id.* ¶ 57.)  The gel requires special handling, including refrigeration until use, which occurs through a repository injection.  (*Id.*)

The FDA approved Acthar first in 1952 for numerous conditions causing inflammation (*id.* ¶¶ 5, 56, 185) and later in 1979 for multiple sclerosis ("MS") (*id.* ¶ 60).  By the 1990s, low-cost synthetic steroidal and non-steroidal anti-inflammatory drugs were available, competing with Acthar for many of the FDA-approved indications for which there are large patient populations.  (*Id.* ¶¶ 6, 58, 66-68.)  By this time, doctors regularly prescribed Acthar for only a few uses.  One was an "off-label" use as the standard of care to treat approximately 1,200 annual cases of infantile spasms ("IS") (*id.* ¶¶ 67-68), a rare but catastrophic syndrome affecting infants up to two years of age.  Acthar was also prescribed as a last-resort treatment for a small population of patients suffering from "acute exacerbations" of multiple sclerosis ("MS"), which is a disease state marked by a "worsening of existing MS symptoms or the onset of other MS symptoms," or other rare conditions, when multiple other treatment options, including steroids, have failed.  (*Id.* ¶ 6, 61.)

As HCSC admits, by 2001, high production costs and low sales volume made Acthar "unprofitable for its manufacturer" which "considered stopping production" (*id.* ¶ 7), and Acthar was a "nearly extinct, financial sinkhole," (*id.* ¶ 9).  But then, "the drug was saved in 2001, when . . . Questcor purchased the right to produce this unprofitable . . . drug."  (*Id.* ¶ 7.)

**B.      Questcor's Acquisition and Repositioning of Acthar**

HCSC uses 2001—the point in time at which Acthar was at its lowest, when it was a "financial sinkhole"—as the starting point for its allegation of "a run of outrageous price increases" for Acthar.  (Cmplt. ¶¶ 7-9.)  But a new pricing strategy and repositioning is exactly what Acthar needed to remain on the market and available to the patients who need it.  In our economic system, pricing a product according to its value "is not only not unlawful; it is an important element of the free-market system . . . .  [It] is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth."  *Verizon Comm'n v. Law Offices of Curtis Trinko*, 540 U.S. 398, 407 (2004); *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 200 (1999).  And in 2007, Questcor implemented a common pricing strategy for important drugs with small patient populations (an orphan pricing strategy), under which it raised Acthar's price to $23,269 per vial.  (Cmplt. ¶ 8.)  This adjustment occurred before any alleged unlawful conduct.  Since 2007, the price of Acthar has risen at about five percent per year, not counting inflation.  (*Id.*)  HCSC makes no allegation that this adjusted price was out of line with the price other specialty pharmaceutical products that, like Acthar, are prescribed to treat small patient populations suffering from rare and/or difficult to treat conditions.

In addition to this 2007 price adjustment, Questcor made other changes to Acthar's positioning in the market to improve the viability of the product.  Questcor began the process of securing FDA approval to add IS to Acthar's label, which would finally permit doctors to be appropriately educated about Acthar's effectiveness for treating this rare disease.  (RJN Ex. F.)  Questcor also transitioned Acthar into a distribution system well-suited for specialty pharmaceuticals, one capable of handling "high-cost, high-complexity, and/or high-touch medication therapy for patients with complex disease states."  (Cmplt. ¶ 77.)  Questcor retained CuraScript SD to distribute the medicine to multiple specialty pharmacies capable of carefully delivering Acthar to patients' homes.  (*Id.* ¶ 79.)  Questcor also retained United BioSource Corporation ("UBC") to design and administer "patient access centers," such as the Acthar Support and Access Program ("ASAP"), to "assist patients and prescribers with navigating prescription drug coverage," pharmacy options, and patient co-pay assistance programs, and to provide other patient

support services (including nurses to advise patients on administration and storage).  (*Id.* ¶ 80.)  And Questcor made significant investments in lawfully educating doctors to make them aware of Acthar as an option for appropriate patients suffering from its many FDA-approved indications, as well as researching into Acthar's safety and efficacy for disease states where existing therapies are ineffective.  (*Id.* ¶¶ 14, 147.)

In 2014, Mallinckrodt plc acquired Questcor, which became Defendant Mallinckrodt ARD LLC—the entity that continues to manufacture and sell Acthar.  (*Id.* ¶¶ 9, 20, 24.)  Today, in addition to remaining the standard of care for treating IS, Acthar provides relief from symptoms of acute exacerbations of MS; and it is a "last line" alternative when steroids and other therapies are not effective for treating various conditions such as rheumatoid arthritis ("RA"), Lupus, and nephrotic syndrome ("NS"), which affects the kidneys.  (*Id.* ¶¶ 60, 62, 64, 185-86.)

### C.     HCSC and Its Purported Claims for Relief

HCSC offers Blue Cross Blue Shield plans in five states and other private plans around the country.  (*Id.* ¶ 17.)  It also contracts with the federal government to sponsor Medicare Part D prescription drug benefits and Part C Medicare Advantage Plans.  (*Id.* ¶ 18.)  HCSC alleges that it has spent over $100 million on Acthar prescriptions since 2011.  (*Id.* ¶ 85.)  HCSC admits that, at all times relevant to its claims, it has had a prior authorization process in place to ensure the medical necessity of Acthar prescriptions before providing coverage.  (*Id.* ¶ 259.)

HCSC alleges that Questcor and later Mallinckrodt were able to "inflate" the price of Acthar through five "types of related and improper conduct" (*Id.* ¶ 10):  (1) structured distribution for Acthar (*id.* ¶¶ 11, 76-85); (2) co-pay assistance programs (*id.* ¶¶ 12, 89-120); (3) payments to doctors for research and education (*id.* ¶¶ 14, 149-61); (4) alleged false, off-label promotion (*id.* ¶¶ 13, 121-48); and (5) acquiring the rights to the synthetic ACTH product Synacthen (*id.* ¶¶ 15, 162-76).  HCSC asserts nine separate counts under the laws of over forty different states (*id.* ¶¶ 216-96) and places at issue every Acthar prescriptions that it covered back to 2011.  (*Id.* ¶ 297.)

## III.    THE LEGAL STANDARD

"A demurrer tests . . . whether [the complaint] states facts sufficient to constitute a cause of action upon which relief may be granted."  *Seidler v. Mun. Ct*., 12 Cal. App. 4th 1229, 1233 (1993);

*see also Cal. Logistics, Inc. v. State of Cal.*, 161 Cal. App. 4th 242, 247 (2008); Civ. Proc. Code § 430.10(e).  In assessing the sufficiency of the complaint, "the trial court may consider all material facts pleaded in the complaint and those arising by reasonable implication therefrom," *Young v. Gannon*, 97 Cal. App. 4th 209, 220 (2002), as well as all judicially noticeable facts, Civ. Procd. Code § 430.30(a); *Blank v. Kirwan*, 39 Cal. 3d 311, 318 (1985).  Factual allegations offered in support of a claim "must be plausible."  *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1120 (2014).  Trial courts "do not assume the truth of contentions, deductions, or conclusions of law."  *Cal. Logistics*, 161 Cal. App. 4th at 247; *see also Doe v. City of Los Angeles*, 42 Cal. 4th 531, 550 n.5 (2007) (holding that "boilerplate allegations that defendants knew or were on notice of" illegal activity "would not be sufficient . . . .").

A motion to strike eliminates "irrelevant . . . matter inserted in any pleading."  Civ. Proc. Code § 436(a).  "Irrelevant matter" includes (a) "an allegation that is not essential to the statement of a claim" and (b) "a demand for judgment requesting relief not supported by the allegations of the complaint."  Civ. Proc. Code § 431.10(b) & (c).  Thus, "when a substantive defect is clear from the face of a complaint, . . . a defendant may attack that portion of the cause of action by filing a motion to strike."  *PH II, Inc. v. Super. Ct.*, 33 Cal. App. 4th 1680, 1682–83 (1995).  A motion to strike is also "[t]he appropriate procedural device for challenging a portion of a cause of action seeking an improper remedy."  *Caliber Bodyworks, Inc. v. Super. Ct.*, 134 Cal. App. 4th 365, 385 (2005).

## IV.    ARGUMENT[2]

### A.    Questcor's Distribution Model Is Presumptively Lawful and HCSC Fails to Plead Otherwise.

While HCSC includes Questcor's exclusive distribution agreement with CuraScript SD and "integrated" patient services agreement with UBC on its list of "several types of related and

---

[2]    Mallinckrodt organizes its argument around the five categories of alleged misconduct.  In its Demurrer, Mallinckrodt identifies each of the arguments with which the Court must agree in order to dismiss each specific count and, in its Motion to Strike, Mallinckrodt identifies the allegations that should be stricken from the Complaint if the Court elects not to dismiss related counts.  Count VII for alleged violations of 40 states' insurance-fraud statutes is the only count that Mallinckrodt does not reference below.  In California and 35 of the other states, the statutes do not provide a private right of action, and the other four have other legal bars or elements similar to common-law fraud and thus fail for the same reasons as Count V.  (RJN Ex. K (Table of Out of State Authorities I).)

improper conduct" by Questcor and later Mallinckrodt (Cmplt. ¶¶ 10-11, 75, 79-80), HCSC does not expressly reference those agreements in support of any of its nine purported claims for relief. The omission is telling.  As various admissions throughout the Complaint reveal, Questcor's agreement with CuraScript ensures that Acthar is distributed to pharmacies for a modest, flat fee with the care required for a hard-to-manufacture and perishable therapeutic and the speed required to treat acute and otherwise urgent conditions.  (*Id.* ¶¶ 57, 60, 67, 77, 83.)  Similarly, Questcor's patient support services agreement with UBC concededly helps patients "navigat[e] prescription drug coverage," find co-payment and other financial assistance, and coordinate delivery.  (*Id.* ¶¶ 57, 80-82.)  Given the obvious benefits, it is unsurprising that HCSC's Complaint fails to plead how these agreements give rise to a cause of action or support any of HCSC's claims for relief.

The allegations fail to state a claim under any of the 32 states' antitrust laws referenced in Counts III or IV.  In contrast to certain agreements among competitors, agreements between companies that work together in the chain of distribution for a product—so-called vertical agreements—are not subject to any *per se* rule of illegality.  As first recognized by the United States Supreme Court, vertical agreements have the potential to stimulate interbrand competition, which is competition between different manufacturers' products, even as they diminish intrabrand competition, which is competition among distributors of the same manufacturer's product.  *GTE Sylvania*, 433 U.S. at 52, 54.  Specifically, just as HCSC acknowledges Questcor to have done here, "manufacturers can use [vertical restraints] to induce" downstream sellers to, among other things, provide additional services that affect "a manufacturer's goodwill and the competitiveness of his product," and that "might not be provided by retailers in a purely competitive situation" due to "market imperfections such as the so-called 'free rider' effect."  *Id.* at 55.  Because interbrand competition is the "primary purpose of the antitrust laws," courts have held that these benefits will outweigh any impairment to intrabrand competition and leave the vertical restraint presumptively reasonable and lawful, unless the vertical restraint is shown to have a net harm to interbrand competition.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007).[3]  *GTE*

---

[3]     *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 736 (7th Cir. 2004) ("vertical exclusive distributorships . . . are presumptively legal"); *Electronics Commc'ns Corp. v.*

*Sylvania* has been adopted by courts of California, *Bert G. Gianelli Distributing Co. v. Beck & Co.*, 172 Cal. App. 3d 1020, 1045 (1985), and the other states on whose laws HCSC relies to challenge the distribution agreement, RJN Ex. L (Table of Out of State Authorities II).

HCSC has failed to meet its pleading burden under *GTE Sylvania*.  To survive a demurrer "where an antitrust plaintiff alleges vertical restraints, facts must be pled showing 'some anticompetitive effect in the larger, interbrand market.'" *Marsh v. Anesthesia Svcs. Medical Group, Inc.*, 200 Cal. App. 4th 480, 495 (2011) (sustaining demurrer for failure to state a claim for relief); *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1680–81 (Cal. Ct. App. 1997) ("[A]n antitrust plaintiff attacking vertical restraints cannot make out a case unless the plaintiff can show some anticompetitive effect in the larger, interbrand market.").[4]  In an attempt to meet this burden, HCSC alleges that the agreements "helped [Questcor] maintain control over pricing pressures." (Cmplt. ¶ 11.)  HCSC recognizes, however, that Questcor, and later Mallinckrodt, was the sole manufacturer of Acthar.  (*Id.* ¶¶ 76, 182, 198, 243.)  An exclusive distribution arrangement "provides no monopolistic benefit to [a monopolist] that it does not already enjoy . . . ." *E&L Consult., Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2nd Cir. 2006).  And, while HCSC alleges that, under the agreement, Questcor exerted too much control over CuraScript because "CuraScript has no independent authority to set the price of Acthar," "bears no risk from Acthar sales," and "is completely controlled by Mallinckrodt and acts merely as its conduit" (Cmplt. ¶ 82-83), the net of HCSC's allegations amount to nothing more than that CuraScript was a consignment seller, an arrangement which is not a restraint of trade under the antitrust laws, *Shasta Douglas Oil Co. v. Work*, 212 Cal. App. 2d 618, 622 (1963) (citing *United States v. General Electric Co.*, 272 U.S. 476, 488 (1926)); *Wilke & Holzheiser, Inc. v. Dep't of Alcoholic Beverage Control*, 65 Cal. 2d 349,

---

*Toshiba Am. Consumer Prods.*, 129 F.3d 240, 245 (2d Cir. 1997) (same); *Crane & Shovel Sales Corp. v. Bucyrus-Eric Co.*, 854 F.2d 802, 807 (6th Cir. 1988) (same).

[4]    *See also E&L Consult., Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2nd Cir. 2006) (affirming dismissal for failure to state a claim for relief); *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 8–9 (1st Cir. 2004) (same); *Elecs. Commc'ns Corp.*, 129 F.3d at 245 (same); *Crane & Shovel Sales Corp.*, 854 F.2d at 807 (same); *Rutman Wine Co. v. E&J Gallo Winery*, 829 F.2d 729, 734-36 (9th Cir. 1987) (same).

366 n.13 (1966). HCSC's allegations relating to CuraScript fall short of alleging a violation of any state antitrust laws at issue here.

Having failed to plead that Questcor's control over its own pricing of its product constitutes a violation of state antitrust laws, it necessarily follows that HCSC cannot attempt to label the exclusive distribution agreement an "unfair" business practice in support of Count V. As the Court of Appeal recognized in *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (App. 2001):

> If the same conduct is alleged to be both an antitrust violation and an "unfair" business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers. . . . [C]onduct alleged to be "unfair" because it unreasonably restrains competition and harms consumers . . . is not "unfair" if the conduct is deemed reasonable and condoned under the antitrust laws.

*Id.* at 375. The procompetitive nature of the distribution agreement with CuraScript bars any suggestion that it is unfair.

For these reasons, HCSC's challenge to Acthar's structured distribution and patient support system must fail as a matter of law, no matter the legal theory HCSC pursues. No count can survive dismissal based on those allegations, which should be stricken from the Complaint.

## B.     HCSC's Allegations Regarding Co-Pay Assistance Do Not State a Claim.

HCSC's effort to transform Questcor's and Mallinckrodt's efforts to help ensure that patients have access to medically necessary prescriptions into illegal conduct is equally unavailing. The focus of HCSC's allegations is a set of contributions that Questcor began making to CDF funds in 2010 to help patients suffering from acute exacerbations of MS and in 2011 to help patients suffering from exacerbations of rheumatoid arthritis and Lupus (Cmplt. ¶¶ 95-112). HCSC's allegations also refer to Questcor's alleged provision of assistance to certain patients for co-pays greater than $150 and Mallinckrodt's co-pay assistance programs after the 2014 acquisition of Questcor (*id.* ¶ 120). HCSC alleges that all of these co-pay assistance programs (1) violated state commercial bribery statutes (Counts I and II under the New Jersey RICO Act) (*id.* ¶¶ 12, 223); (2) violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b) (Cmplt. ¶ 119), which does not provide a private right of action but allegedly renders false certifications of "compliance with law" that

Questcor made when HCSC was covering Acthar prescriptions for enrollees in its Medicare Advantage plans under Medicare Part D (Counts I, II, V and VI) (*id.* ¶¶ 219-220, 259, 267-70, 281); and (3) tortiously interfered with HCSC's contracts with its members (Count VIII) (*id.* ¶¶ 256-90). None of these theories states a claim for relief; the respective counts in the Complaint should be dismissed for failure to state a claim or, at a minimum, the allegations regarding co-pay assistance programs should be stricken as "substantively defective" for the following three reasons.

### 1. Co-Pay Assistance Is Not a Commercial Bribe.

Contrary to HCSC's contention, manufacturers do not make a commercial bribe by providing co-pay assistance for their pharmaceuticals.[5]   Commercial bribery statutes prohibit someone from accepting a benefit in exchange for violating a fiduciary duty.  The only such statute that HCSC cites, for example, expressly provides:  "A person commits a crime if he . . . accepts . . . any benefit as consideration for knowingly violating or agreeing to violate a *duty of fidelity* . . . ." N.J. Stat. § 2C:21-10 (emphasis added) (cited at Cmplt. ¶ 223).   Other state statutes expressly prohibit conduct that constitutes such a breach.  *E.g.*, Penal Code § 641.3 (paying another's employee to induce him or her to provide an unauthorized benefit); Alaska Stat. §§ 11.46.660(a) & 11.46.670 (paying a physician to breach the physician's duty to a patient).

Helping patients afford the medication their doctor has deemed medically appropriate and necessary by providing co-pay assistance involves no payment to a doctor to write the prescription, and patients do not breach any fiduciary duty to their insurers by accepting assistance because they do not owe such a duty to their insurers, as the few cases that have addressed HCSC's unique contention have held.  *Am. Fed'n of State, Cty. & Mun. Emp. Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 355–62 (S.D.N.Y. 2013); *Humana* Order at 23. As the court in *Humana* reasoned when it rejected the same theory HCSC advances here—namely, that Questcor's contributions to CDF were bribes: "The only parties that receive consideration as part of the co-pay funds are CDF and the patients . . . .   Therefore, Plaintiff has not sufficiently alleged that the co-pay assistances funds constituted bribery."  *Id.*

---

[5]    Thus, at a minimum, HCSC's allegation that co-pay assistance constitutes racketeering activity as a violation of state bribery statutes (Cmplt. ¶ 223:5-6) should be stricken from the Complaint.

1

2

### 2. HCSC's Claims Based on the Allegation that CDF Co-Pay Assistance Funds Violated the Federal Anti-Kickback Statute Are Time Barred.

HCSC's allegations that Questcor's contributions to certain CDF funds for "exacerbation" disease states violated the AKS are based on alleged conduct that has been in the public record since 2013 and that HCSC should have discovered (and was on constructive notice) at least six years ago. The statutes of limitations on HCSC's related claims began to run then. *See Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 931 (1994). At five years or less,[6] the relevant limitations periods all expired before HCSC filed this suit in 2020. Thus, HCSC's claims based on those allegations are time barred, and the claims should be dismissed or, at a minimum, the associated co-pay allegations stricken from the Complaint.[7]

Judicially noticeable facts and admissions in the Complaint make HCSC's longstanding constructive notice clear. CDF set these funds up specifically for patients who were enrollees in Medicare Part D plans. (Cmplt. ¶¶ 98, 113.) The Department of Health and Human Services Office of Inspector General ("OIG") had issued guidance on how independent charity patient assistance programs ("PAPs") could comply with protections that are afforded to Medicare by the AKS, over and above those afforded by commercial bribery statutes. (RJN Ex. A (Publication of OIG Special Advisory Bulletin on Patient Assistance Programs ("PAPs") for Medicare Part D Enrollees ("2005 SAB"), 70 Fed. Reg. 70,623 (Nov. 22, 2005).) While the intent for the CDF funds was that they would be a manner to comply with the OIG's guidance, HCSC alleges that the CDF funds still violated the AKS because they did not comply with conditions on the OIG's approval of independent charity PAPs in the 2005 SAB.

---

[6]     Counts I and II are subject to a four-year limitation period. *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 510 (3d Cir. 2006) (N.J. RICO claims). Count V is subject to limitation periods that are four years in California, Bus. & Prof. Code § 17208 (Unfair Competition Law), and five years or less in all other relevant states except Maine, Michigan, Minnesota, North Dakota, Pennsylvania, and Vermont, which do not provide a claim for HCSC for other legal reasons, RJN Ex. M (Table of Out of State Authorities III). Count VI is subject to a three-year period. Civ. Proc. Code § 338(d).

[7]     When the complaint and judicially noticeable facts show that the statute of limitations prevents alleged misconduct from supporting a claim for relief, the claim can be dismissed by sustaining a demurrer, *see Barton v. New United Motor Mfg., Inc.*, 43 Cal. App. 4th 1200, 1210 (1996), unless other alleged misconduct supports the claim, in which case the allegations of misconduct can be stricken from the complaint, *PH II, Inc.*, 33 Cal. App. 4th at 1682–83.

The precise manner in which HCSC alleges the CDF funds violated the AKS has long been in the public record.  HCSC alleges that, because the CDF funds were limited to patients with exacerbation disease states, only Acthar patients received assistance from the funds, and thus they served as an unlawful "conduit to pay patient co-pay subsidies for Acthar (but no other drug)." (Cmplt. ¶ 91; *id* ¶¶ 12, 96, 98, 102, 107-09, 110, 119.)   Major U.S. news outlets reported on Questcor's donations to CDF funds and the Acthar-only nature of those funds as early as 2013. (RJN Ex. C (Bill Alpert, *Too Close for Comfort*, Barron's (Oct. 19, 2018)) & D (Andrew Pollack, *Drug Maker's Donations to Co-Pay Charity Face Scrutiny*, N.Y. Times (Dec. 18, 2013)).)   The *New York Times* reported, for example, that "although the [CDF] already offered support for multiple sclerosis, it started a new program for 'acute exacerbations of M.S.,' *which applies only to Acthar*."   (RJN Ex. D at 30 (emphasis added)).  In addition, in May 2014, the OIG supplemented its guidance regarding PAPs "based on experience [it] gained" since issuing the 2005 SAB and specifically singled out the emergence of single-drug funds for costly, specialty pharmaceuticals and advised that they would be subject to scrutiny.[8]  (RJN Ex. B (Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs ("2014 SAB")), 79 Fed. Reg. 31,120, 31,120-22 (May 30, 2014).)

The public attention Questcor's donations received clearly put HCSC on constructive notice of its co-pay assistance claims and the specific concerns it alleges today.  *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807-08 (2005) (holding that plaintiffs have constructive knowledge "if they have the opportunity to obtain knowledge from sources open to their investigation" (internal quotation marks omitted)); *McKelvey v. Boeing North Am., Inc.*, 74 Cal. App. 4th 151, 160, n.11

---

[8]    HCSC makes no specific factual allegation that any contributions to CDF supposedly violating the AKS continued after the OIG issued the 2014 SAB.  Rather, HCSC offers the generic allegation that, "[o]n information and belief, Mallinckrodt continued to pay or substantially subsidize required patient co-payments for Acthar after 2014 and continues to do so until today." (Cmplt. ¶ 120.)  Helping patients meet co-payment obligations for medically necessary prescriptions is not unlawful.  HCSC's allegation conspicuously fails to allege that, after 2014, Mallinckrodt continued making contributions to the CDF exacerbation funds for MS, Lupus and RA, or any single-drug fund for Medicare enrollees.  Thus, the allegation is patently insufficient to plead violations after 2014.  *Doe v. City of Los Angeles*, 42 Cal. 4th at 550 (holding insufficient "allegations of information and belief that merely asserted the facts so alleged without alleging . . . information that leads the plaintiff to believe that the allegations are true").

1    (1999) (declining to toll statute of limitations because plaintiffs failed to explain "how they managed

2    to ignore those 'newspaper articles'" that provided an account of their alleged injury), *abrogation*

3    *by statute on other grounds recognized by Lopez v. Sony Elecs., Inc.*, 5 Cal. 5th 627, 633 n.3 (2018);

4    *Brandon G. v. Gray*, 111 Cal. App. 4th 29, 37 (2003).

### 3.    Co-Pay Assistance Is Not a Tortious Interference with Contracts.

HCSC's allegations regarding co-pay assistance fail to support any plausible claim that Mallinckrodt induced patients to breach any contractual obligation to their insurers—a breach which is an essential element of HCSC's tortious interference theory, 2 Callmann on Unfair Competition, Trademarks and Monopolies § 9:9 (4th ed. June 2019).  HCSC points to its form member contract, which allegedly contains a promise "that members will pay their share of the costs for prescription drugs."  (Cmplt. ¶ 286.)  Incredibly, HCSC then alleges that its members breach that promise when accepting co-pay assistance to cover their share of the costs, and that HCSC was harmed by the breach because it would not have had to provide (medically necessary) healthcare to its members had they then not been able to meet their co-pays.  (*Id.* ¶¶ 288-89.)  Patients do *not*, however, breach their obligation to cover "their share of the costs" by accepting co-pay assistance to do so.  As OIG has advised, "cost-sharing assistance furnished by a [patient assistance program], including a manufacturer [patient assistance program], will count toward a beneficiary's [true out-of-pocket] expenditures, even if the [patient assistance program] does not comply with the fraud and abuse laws." RJN Ex. A at 10.

As a result, HCSC's tortious interference claim must be dismissed in its entirety, just as an identical claim regarding the same CDF funds was dismissed in *Humana*.  *Humana* Order at 34; *see also Blue Cross of California Inc. v. Insys Therapeutics Inc.*, 390 F. Supp. 3d 996, 1009 (D. Az. 2019) (dismissing prescription TPP's claim that manufacturer's co-pay assistance program tortuously interfered with TPP's contract).

### C.    HCSC Fails to Support Its Conclusory Allegations That Payments to Doctors Were Unlawful.

HCSC labels Questcor's and Mallinckrodt's investments in medical research and education as "thinly disguised bribes" to doctors in exchange for writing Acthar prescriptions (*id.* ¶¶ 14, 149-61) in an effort to state claims under 34 states' unfair and deceptive trade practices acts (Count V)

(*id.* ¶ 259) and the doctrine of common-law fraud (Count VI) (*id.* ¶¶ 272-73) on the ground that certifications of "compliance with law" made to HCSC were therefore false.  These allegations fail to support a claim for relief for two reasons.

(1)     Alleging the legal conclusion of bribery is insufficient to state a claim, *Doe*, 42 Cal. 4th at 551 n.5, and HCSC fails to allege "specific facts" to make that conclusion plausible, as it must under the applicable pleading standard, *Prakashpalan*, 223 Cal. App. 4th at 1120.  A pharmaceutical company can pay doctors to serve as speakers or researchers for its products, and the amount of those payments here was within the "industry standard," as HCSC admits (Cmplt. ¶¶ 14, 153).  The fact of these payments does not make HCSC's conclusion plausible.  *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) ("When considering plausibility, courts must also consider an 'obvious alternative explanation' for [a] defendant's behavior.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009))).

HCSC's reference to a settlement agreement between Mallinckrodt and the United States Department of Justice (*id.* ¶ 161) is equally insufficient.  A settlement is not factual matter supporting a reasonable inference of liability, Evid. Code § 1152(a) ("inadmissible to prove . . . liability"), and the allegation should be stricken from the Complaint, Civ. Proc. Code § 436(a); *e.g.*, *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (holding that consent judgment with the SEC must be struck from the complaint because it was "not the result of an actual adjudication of any of the issues" and would be inadmissible at trial).  Even if admitted, the DOJ's contention was that twelve Questcor sales representatives went too far when providing meals and entertainment to certain doctors between 2009 and 2013.  RJN Ex. H at 73.  The settlement would not support HCSC's claim for damages between 2014 and the present, and it should be stricken from the complaint as irrelevant matter, *Caliber Bodyworks*, 134 Cal. App. 4th at 385.

Finally, HCSC's reliance on a 2018 study finding a correlation between prescriptions and payments (Cmplt. ¶ 158) overlooks that Mallinckrodt would have good reasons to select Acthar prescribers to speak about its uses.  Thus, the study's authors admit that their findings do not support a causal connection: "[T]he temporal sequence between payments and prescriptions cannot be definitely established.  It is conceivable that the company preferentially sought out and supported

1    prominent prescribers of corticotrophin."   RJN Ex. I at 84.   The study, then, does not make

2    "plausible," *Prakashpalan*, 223 Cal. App. 4th at 1120, HCSC's use of the label "bribe."

3         (2)   HCSC's conclusory allegations that the payments and certifications of "compliance

4    with law" caused it injury are also entirely insufficient.   Causation is a necessary element of each

5    of HCSC's relevant causes of action.[9]   Thus, HCSC's "pleading must show a cause and effect

6    relationship between the fraud and damages sought; otherwise no cause of action is stated."

7    *Commonwealth Mortg. Assurance Co. v. Superior Court*, 211 Cal. App. 3d 508, 518 (1989).

8         However, as HCSC itself admits, Mallinckrodt's payments to doctors since 2013 have been

9    *publicly disclosed* (*id.* ¶ 158), and HCSC pre-reviewed for medical necessity every claim for

10   coverage of an Acthar prescription (*id.* ¶ 271).   HCSC of course knows which doctors prescribed

11   Acthar to its members and thus cannot plausibly allege to have relied on generic certifications of

12   compliance with law when covering Acthar prescriptions.   *Bldg. Permit Consultants, Inc. v. Mazur*,

13   122 Cal. App. 4th 1400, 1415 (2004) (holding that plaintiff was incapable of alleging damages

14   where even in the absence of the defendant's fraud the plaintiff would have suffered the same

15   injury); *Commonwealth Mortg. Assurance Co.*, 211 Cal. App. 3d at 518–21 (1989) (holding that

16   plaintiff failed to state a claim for fraud because it "fail[ed] to allege any causal connection between

17   the alleged representations . . . and [the plaintiff]'s decision to pay the claims submitted to it").

18        Moreover, HCSC does not allege that the doctors were writing medically unnecessary or

19   otherwise inappropriate prescriptions.   Thus, the doctors' exercise of independent medical judgment

20   to prescribe Acthar, along with HCSC's review of that judgment, are intervening factors breaking

21   the chain of causation as a matter of law.   *Health Care Serv. Corp. v. Olivares*, No. 2:10-cv-221,

22   2011 WL 4591913, at *1, 6-7 (E.D. Tex. Sept. 2, 2011), *report and recommendation adopted*, No.

23   2:10-cv-221, 2011 WL 4591915 (E.D. Tex. Sept. 30, 2011) (dismissing claims against

24   pharmaceutical manufacturer for alleged off-label promotion and bribes to doctors where plaintiff

25

26   _____

     [9]      Bob Cohen, *Right to Private Action Under State Consumer Protection Act—Preconditions

27   to Action*, 117 A.L.R.5th 155 § 2[a] (2004) (noting that "[a]ll reported decisions" on unfair and
     deceptive practices acts "require a causal connection between the statutory violation and the

28   plaintiff's loss or injury"); 10 *American Law of Torts* § 32:19 (2020) ("As in the case of torts in
     general, causation is a link in the chain of fraud and deceit.").

did not allege that the supposedly bribed physicians "relied on any Pfizer misrepresentation promoting an off-label use, as opposed to relying on the professional's own judgment and expertise, when prescribing the drugs"); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.,* 784 F. Supp. 2d 508, 529 (D.N.J. 2011) (rejecting payor's claims when the payor failed to allege "any instances where Defendants provided remuneration to a physician and thereby caused the physician to prescribe [the relevant drug] when it was not in the patient's best interests").

### D. HCSC's Allegations of Off-Label Promotion Lack the Particularity Necessary to Plead Fraud or Causation.

HCSC advances sweeping, general allegations that Questcor engaged in off-label promotion of Acthar to "prop up" demand (Cmplt. ¶¶ 121-48) in an effort to support its claims under 34 states' unfair and deceptive trade practices acts (Count V) (*id.* ¶ 259) and the doctrine of common-law fraud (Count VI) (*id.* ¶¶ 272-73).[10]  But HCSC deliberately avoids alleging that the off-label statements it describes are false, and truthful statements about Acthar are protected speech even if beyond the label, *U.S. v. Caronia*, 703 F.3d 149, 165-69 (2012).  These allegations fail to state a claim for two additional reasons.

(1)   They lack the specificity required to satisfy the heightened pleading standard applicable to fraud.  It is well-settled that, "[i]n California, fraud must be pled specifically; general and conclusory allegations do not suffice."  *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 645 (1996); *see Gutierrez v. Carmax Auto Superstores California*, 19 Cal. App. 5th 1234, 1261 (2018) (requiring "reasonable particularity" for UCL claims).  A complaint alleging fraud must "plead[] *facts* which show how, when, where, to whom, and by what means the representations were tendered," *Lazar*, 12 Cal. 4th at 645 (emphasis in original).  HCSC's generalized allegations regarding off-label

---

[10]     HCSC also includes, within its allegations, promotion for on-label uses that are entirely lawful.  HCSC complains, for example, that Questcor "made and aggressive push" and "heavily marketed" Acthar for a variety of conditions for which Acthar "ha[d] been FDA approved." (Cmplt. ¶¶ 147-48.)  No liability can arise from such promotion. *E.g.*, *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 680 (S.D.N.Y. 2017) (rejecting fraud claim against a pharmaceutical company's "dosing guidelines" for a drug, when the guidelines were "approved by the FDA as part of its review of [the drug's] labeling"), *aff'd sub nom. Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019).

marketing fail to satisfy this "strict requirement of pleading," *Stansfield v. Starkey*, 220 Cal. App. 3d 59, 73 (1990).

HCSC fails to "plead[] *facts* which show how, when, where, to whom, and by what means," *Lazar*, 12 Cal. 4th at 645, Questcor or Mallinckrodt allegedly marketed "off-label" use—such as the so-called Brod protocol (Cmplt. ¶¶ 134-46). Although the Complaint is replete with vague allegations that Acthar sales representatives were *educated* about the Brod protocol (Cmplt. ¶¶ 135-136, 144), the Complaint contains only a single allegation that Questcor representatives actually "*told* doctors, nurses, and other medical staff" they should implement the protocol (*id.* ¶ 145 (emphasis added)). Even that allegation is entirely conclusory, lacking any detail about who allegedly made such statements, to whom and when. Simply put, HCSC fails to carry its burden of alleging the particularities of any alleged fraud or that HCSC heard and relied on these statements when covering Acthar prescriptions, thereby requiring dismissal. *See Wash. Cty.*, 2020 WL 43016, at *11 (dismissing similar allegations that Questcor engaged in off-label promotion because "Plaintiff does not allege that Plaintiff actually spoke to or received any false information from KOLs or MSLs, rendering its conclusory assertions of reliance implausible"); *United States ex rel. Worsfold v. Pfizer Inc.*, No. 09-11522-NMG, 2013 WL 6195790, at *5 (D. Mass. Nov. 22, 2013) (finding "conclusory accusations" of marketing "'plans and schemes' [ ] insufficient" to satisfy heighted pleading requirements).

(2)   Any connection between Questcor's promotion and any doctor's decision to write a prescription for Acthar is too attenuated for HCSC to meet its burden of pleading facts establishing such a connection (*supra* at 20 & n. 9). Not only did HCSC pre-review each claim for an Acthar prescription (*id.* ¶ 271), doctors exercised their own independent judgment as to whether certain Acthar prescriptions were appropriate and medically necessary. Courts have held that the exercise of that independent judgment breaks the chain of causation required to establish fraud-based claims. *E.g.*, *Sidney Hillman Health Center v. Abbott Labs.*, 873 F.3d 574, 577 (7th Cir. 2017) (holding that where manufacturer promoted drug for ineffective purposes, a third-party payor's suit failed for lack of proximate cause, due to the need to "[d]isentagl[e] the effects of the improper promotions from the many other influences on physicians' prescribing practices"); *UFCW Local 1776 v. Eli Lilly &*

*Co.*, 620 F.3d 121, 134 (2d Cir. 2010) (holding that the "attenuated link between the alleged misrepresentation made to doctors and ultimate injury to the [third-party payors]" defeated proximate cause).

### E.   HCSC's Challenge to Questcor's Acquisition of Synacthen Rights Fails to State a Claim.

To succeed on its claims that Questcor's acquisition of the Synacthen "asset package" illegally maintained a monopoly (Count III) or otherwise unreasonably restrained trade (Count IV) under 32 states' antitrust laws,[11] HCSC must allege and prove, among other things, that (a) the acquisition had a "substantially adverse effect on competition in the relevant market," *Marsh*, 200 Cal. App. 4th at 495 (internal quotations omitted), and (b) as a result, HCSC suffered injury to its "business or property" from the reduction in competition.  Bus. & Prof. Code § 16750(a); *Chicago Title Ins. Co. v. Great Western Fin. Corp.*, 69 Cal. 2d 305, 317–18 (1968)  (quoting *Munter v. Eastman Kodak Co.*, 28 Cal. App. 660, 664–65 (1915)); RJN Ex. N (Table of Out of State Authorities IV).

"California requires a 'high degree of particularity' in the pleading of [antitrust] violations." *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 196 (1999) (citing *Motors, Inc. v. Times Mirror Co.*, 102 Cal App. 3d 735, 742 (1980)).  HCSC has failed to meet its pleading burden in two respects: (a) it fails to plead a relevant antitrust market in which Acthar competes, and (b) it has not plausibly alleged injury to its business or property.  Moreover, having waited over seven years to challenge this asset acquisition, HCSC's state law claims are barred by 32 applicable statutes of limitations.

---

[11]    In selecting a California state court as the forum to bring these claims, HCSC overlooked the wrinkle that neither the Cartwright Act, unlike federal and most other state antitrust laws, nor the Unfair Competition Law contains prohibitions against monopolization or applies to mergers or asset acquisitions.  *State of California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147, 1169 (1988) (interpreting Act to apply only to multi-firm trusts and combinations); *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 199-203 (1999); *but see Stop Youth Addiction v. Lucky Stores*, 17 Cal. 4th 553, 570 (1998) (questioning in *dictum* whether *Texaco* still applies to the UCL).  Reference to those acts under Counts III and IV (Cmplt. ¶ 245(b) & 253(b)) should stricken for this reason alone.  Mallinckrodt respectfully urges the Court to dismiss the remainder of these counts as well because, "in the interest of substantial justice," that part of this action "should be heard in a forum outside this state," Civ. Pro. Code § 410.30.

1

2

### 1.    HCSC Fails to Allege a Relevant Antitrust Market in which Acthar Competes.

3

4    A proposed relevant antitrust market must be defined to include not only the defendant's

5    specific product at issue (here Acthar), but also all "economic substitutes" for that product (*i.e.*,

6    those that have a "reasonable interchangeability of use" or sufficient "cross-elasticity of demand"

7    with the relevant product).  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see*

8    *also Redwood Theatres, Inc. v. Festival Enters., Inc.*, 200 Cal. App. 3d 687, 705 (1988) ("In antitrust

9    law, the interchangeability of products is usually considered in the definition of markets.").  In this

10   way, the relevant antitrust market "includes actual or potential competitors who may take business

11   away from each other."  *Lloyd Design Corp. v. Mercedes Benz of N. Am., Inc.*, 66 Cal. App. 4th

12   716, 724-25 (1998) (internal quotations omitted).  A properly pled and proven antitrust market is an

13   essential tool to be able to assess whether the challenged conduct constitutes a substantial harm to

14   competition.  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (internal quotation marks

     omitted); *see also In re Cipro Cases I & II*, 348 P.3d 845, 869 (2015).

15   HCSC alleges a product market consisting of only "ACTH drugs" (Cmplt. ¶ 198) and that

16   "Acthar represents 100% of the market" (*id.* ¶ 183).  Pleading a single-product market is a common

17   ploy by plaintiffs to overstate the effect on competition of the challenged conduct, and state and

18   federal courts alike dismiss antitrust claims when it is clear that the proposed market excludes

19   interchangeable products.  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–23 (9th Cir. 2018)

20   (affirming dismissal of antitrust claims where plaintiffs' proposed product market "fail[ed] to

21   include many reasonably interchangeable products" and was "contorted to meet their litigation

22   needs") (internal quotations omitted); *Lloyd Design Corp.*, 66 Cal. App. 4th at 721 (affirming

23   summary judgment where plaintiff "attempt[ed] to avoid defeat by pleading that the relevant product

24   market is 'custom floor mats sold to Mercedes dealers for new cars'" because "neither product is

25   unique but rather is one choice among many"); *Exxon Corp. v. Super. Ct.*, 51 Cal. App. 4th 1672,

26   1682 (1997) (rejecting plaintiff's purported single-brand gasoline market as a matter of law where

27   "the reasonable interchangeability for the purpose for which gasoline is produced (use in consumers'

28   motor vehicles) mandates the relevant market to be all gasoline . . .").

HCSC has failed to meet its burden on this element because it proposes a market that, by HCSC's own admission, excludes non-ACTH products that are interchangeable with Acthar for particular conditions that Acthar is used to treat. HCSC admits that a variety of cheaper, non-ACTH alternatives exist for the treatment of certain of Acthar's approved indications. *See, e.g.*, Cmplt. ¶ 6 ("[O]ther than for a handful of similarly rare conditions, Acthar is either a drug of last resort or not known to be clinically effective."); ¶ 58 (recognizing "ibuprofen and certain over-the-counter NSAIDs in pill form" can be used in lieu of Acthar "to combat inflammation"); ¶ 66 ("For most indications, there is also a lack of evidence to support Acthar's use over lower-cost synthetic corticosteroids."); ¶ 68 (recognizing that, except for certain indications, Acthar was "not known to be more effective than simpler, cheaper, and more widely available drugs"); ¶ 89 (recognizing that for MS "Acthar had many cheaper, more effective competitors in that market"); ¶ 186 (recognizing Sabril as an alternative FDA-approved drug for the treatment of infantile spasms).

This admission by HCSC mandates dismissal of its antitrust claims.[12] Indeed, the court in *Humana* recently dismissed the federal and state antitrust claims by another TPP based on the same purported ACTH-only market, citing similar contradictory allegations in Humana's complaint and finding that Humana failed to include in its market definition all non-ACTH drugs reasonably interchangeable with Acthar. *Humana* Order at 7. Likewise here, HCSC's proposed "ACTH drug" market inappropriately excludes admitted economic substitutes for Acthar and thus would distort any analysis of the effect the Synacthen acquisition had on competition or Mallinckrodt's market power.

### 2. HCSC Fails to Allege Injury to its Business or Property from any Reduction in Competition as a Result of the Synacthen Acquisition.

HCSC's theory of causation and injury is, as it must be,[13] that "but for" Questcor's acquisition, another firm would have purchased Synacthen and made it available in the United

---

[12]    *See Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) (dismissing antitrust claims against drug manufacturer because the plaintiff "[did] not plead facts demonstrating that there [were] no other . . . drugs available to treat . . . [premenstrual dysphoric disorder]").

[13]    *See e.g., Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008) ("A would-be purchaser suing an incumbent monopolist for excluding a potential competitor from which it might have bought a product at a lower price must prove the excluded firm was willing and able to supply

1  States, which would have forced the price of Acthar to fall.  (Cmplt. ¶¶ 202-03.)  HCSC also pleads

2  that its damages period begins in 2011 (*id.* ¶ 200), more than two years *before* the allegedly unlawful

3  acquisition, and alleges that "competition to Acthar would have begun prior to 2014 and would have

4  included Synacthen" (*id.* ¶ 203).

5        HCSC, however, fails to offer "specific facts" making this connection between the allegedly

6  anticompetitive conduct and injury plausible, which warrants dismissal of the claims, *see*

7  *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1120 (2014) (sustaining

8  demurrer for failure to plead causation).  Synacthen is not FDA approved for sale in the United

9  States.  "A plaintiff cannot be injured in fact by private conduct excluding [a competitive product]

10  from the market when a statute prevents the [product] from entering that market in any event."

11  Areeda & Hovenkamp, *Antitrust Law*, ¶ 338b (4th ed. 2020).  Thus, to plead a connection between

12  the alleged conduct and its injury, HCSC must plead facts showing whether and when Synacthen

13  would have gone through the extensive clinical trials to establish its safety and efficacy necessary

14  to gain FDA approval an enter the market, 21 U.S.C. §§ 355(b) & (d).  FDA approval would need

15  to include specific indications that Acthar is also approved for in order for the drug to be marketed

16  as a competitor to Acthar, and to cause injury, the approval would have to be for indications where

17  Acthar has market power.  The entrant would also have to win acceptance among doctors and payors

18  as an effective and reliable alternative therapy.  Only then would that product exert price pressure

19  on Acthar.

20        Against this backdrop, HCSC's failure to allege specific facts making plausible that FDA

21  would approve Synacthen, which indications FDA would approve it for, and on what timetable

22  those approvals would have occurred warrants dismissal of HCSC's antitrust claims.   *Compare*

23  *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 807–08, 815 (D.C. Cir. 2001) (upholding

24  dismissal of an antitrust claim because plaintiff failed to allege facts demonstrating that FDA

25  approval was probable) *and Brotech Corp. v. White Eagle Int'l Techs. Grp.*, No. 03-232, 2004 WL

26  1427136, at *6 (E.D. Pa. June 21, 2004) (dismissing complaint where plaintiff failed to allege facts

27

28      it but for the incumbent firm's exclusionary conduct."); *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013) (same).

**Ex. 28**
p. 338

showing timeframe for required FDA approval for product), *with Takeda Pharm. Co. Ltd. v. Zydus Pharm. (USA) Inc.*, 358 F. Supp. 3d 389, 398 (D.N.J. 2018) (holding that plaintiff had alleged antitrust injury by alleging that "the FDA indicated to Zydus that it was prepared to approve Zydus' [Abbreviated New Drug Application]"); *see also Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008) (citation omitted) (holding that drug purchaser did not show it suffered antitrust injury because it failed to show that "but for [the] alleged misuse of [a] patent, the FDA would have granted [a competitor] final approval" by a particular date).

At a minimum, HCSC's request for relief in the form of overcharge damages on each purchase of Acthar starting in 2011 or sometime prior to 2014 should be stricken from the Complaint. As HCSC admits, Mallinckrodt sublicensed rights to develop Synacthen in July 2017 to a third party approved by the FTC.[14] (Cmplt ¶ 176.) Yet HCSC has not alleged that Synacthen *even now* has FDA approval for sale in the United States, and it has not pleaded any facts about the sublicensee's progress or anticipated timeframe to secure FDA approval. The real world has conclusively rebutted HCSC's but-for world of competition from Synacthen prior to 2014.   As such, the allegation is easily rejected at the pleading stage. *See Clark v. Lesher*, 106 Cal. App. 2d 403, 408 (1951) (sustaining demurrer because "it is clear that the damage alleged occurred before the respondents had in the pursuit of their conspiracy arrived at a point where . . . they would be able to create and maintain restrictions [on competition in the market]").

### 3.    HCSC's Claims Are Barred by the Applicable Statutes of Limitations.

Having waited seven years to challenge Questcor's acquisition of rights to Synacthen, HCSC's state-law antitrust claims are time-barred. The limitation period for the Cartwright Act and all but four of the other relevant states' antitrust laws is four years, and the longest is six years. Bus. & Prof. Code § 16750(a) (establishing four-year period for claims under the Cartwright Act); RJN Ex. O (Table of Out of State Authorities V). A cause of action for an allegedly anticompetitive acquisition of assets accrues on the date of the acquisition. *Midwestern Mach. Co., Inc. v. Northwest*

---

[14]    HCSC's reference to Mallinckrodt's settlement with the FTC over Synacthen (Cmplt. ¶ 175) is inadmissible  and should be stricken from the Complaint. (*Supra* at 19.) In addition, the element of causation imposes a lower burden in a government enforcement than in private damages cases. *See United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001).

1   *Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004) (holding that, under federal antitrust law, an "action

2   challenging the initial acquisition of another company's stocks or assets accrues at the time of the

3   merger or acquisition"); *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1195 (2013) (holding

4   that federal antitrust law is instructive of law under the Cartwright Act).  Therefore, the limitation

5   periods on the claims asserted under California and all but four of the other relevant states' antitrust

6   laws expired no later than June 11, 2017, more than two and a half years before HCSC filed suit.

7           HCSC's attempt to invoke tolling doctrines does not save its claims.  HCSC's references to

8   "continuing" misconduct and harm (Cmplt. ¶ 181) are unavailing because once an acquisition is

9   completed "no overt acts can be undertaken to further that plan."  *Midwestern Mach.*, 392 F.3d at

10  271 ("Otherwise, every business decision could qualify as a continuing violation to restart the statute

11  of limitations as long as the firm continued to desire to be merged."); *Z Techs. Corp. v. Lubrizol*

12  *Corp.*, 753 F.3d 594, 599 (6th Cir. 2014) (rejecting continuing violations doctrine in Sherman Act

13  § 2 challenge to an acquisition and subsequent price increases).  HCSC's allegations of "fraudulent

14  concealment" fare no better because the acquisition was public (Cmplt. ¶¶ 165, 169–70).  *See*

15  *Midwestern Mach.*, 392 F.3d at 272 (reasoning that transactions "occur in the public eye and at a

16  reasonably certain date").  Similarly, HCSC's allegation that Mallinckrodt "falsely maintained that

17  it would develop and seek FDA approval of Synacthen" (Cmplt. ¶ 177) is no basis to toll the

18  limitation period because whether it secured FDA approval for Synacthen or not, Questcor's

19  acquisition of the right to decide not to price Synacthen in competition with Acthar would be the

20  basis for any theory of harm to competition.

21  **V.     CONCLUSION**

22          For the foregoing reasons, Mallinckrodt respectfully requests that the Court sustain its

23  demurrer to the Complaint and each of its causes of action, or in the alternative, that the Court grant

24  Mallinckrodt's motion to strike various substantively defective allegations from the Complaint.

25  ///

26  ///

27  ///

28  ///

Dated:  May 20, 2020

Respectfully Submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By:  _Sonia K. Pfaffenroth_

Sonia Kuester Pfaffenroth

*Attorneys for Defendant*
*Mallinckrodt ARD LLC  and*
*Mallinckrodt plc*

# EXHIBIT 29

**CM-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| D. Eric Shapland (SBN 193853)<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>777 South Figueroa Street, 44th Floor<br>Los Angeles, CA 90017-5844<br>TELEPHONE NO.:  (213) 243-4000 x4238    FAX NO. *(Optional):* (213) 243-4199<br>E-MAIL ADDRESS *(Optional):*  eric.shapland@arnoldporter.com<br>ATTORNEY FOR *(Name):*   Defendants | **ENDORSED**<br>**FILED**<br>**ALAMEDA COUNTY**<br><br>**MAY 28 2020**<br><br>CLERK OF THE SUPERIOR COURT<br>By _____<br>Jessica Flores    Deputy |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF **ALAMEDA** | |
|---|---|
| STREET ADDRESS:  1221 Oak Street<br>MAILING ADDRESS:  1221 Oak Street<br>CITY AND ZIP CODE:  Oakland, CA 94612<br>BRANCH NAME:  Oakland - Admin. Building | |

| PLAINTIFF/PETITIONER: Health Care Service Corp. | CASE NUMBER:<br>RG20056354 |
|---|---|
| DEFENDANT/RESPONDENT:  Mallinckrodt ARC LLC, et al. | JUDICIAL OFFICER:<br>Hon. Judge Stephen Kaus |
| **NOTICE OF RELATED CASE** | DEPT.:<br>19 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Humana Inc. v. Mallinckrodt ARD LLC, etc.

   b. Case number: 2:19-cv-06926-DSF-MRW

   c. Court: ☐   same as above

      ☒   other state or federal court *(name and address):* U.S. District Court, Central Dist. of California

   d. Department: 7D

   e. Case type: ☐   limited civil ☐   unlimited civil ☐   probate ☐   family law ☐   other *(specify):*

   f. Filing date: August 8, 2019

   g. Has this case been designated or determined as "complex?"   ☐   Yes ☐   No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐   involves the same parties and is based on the same or similar claims.

      ☒   arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐   involves claims against, title to, possession of, or damages to the same property.

      ☐   is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐   Additional explanation is attached in attachment 1h

   i. Status of case:

      ☒   pending

      ☐   dismissed ☐   with ☐   without prejudice

      ☐   disposed of by judgment

2. a. Title:

   b. Case number:

   c. Court: ☐   same as above

      ☐   other state or federal court *(name and address):*

   d. Department:

BY FAX

Page 1 of 3

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>*www.courtinfo.ca.gov*<br>American LegalNet, Inc.<br>www.Forms*WorkFlow*.com |
|---|---|---|

CM-015

| PLAINTIFF/PETITIONER: Health Care Service Corp. | CASE NUMBER:<br>RG20056354 |
|---|---|
| DEFENDANT/RESPONDENT: Mallinckrodt ARC LLC, et al. | |

2. *(continued)*

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 2h

   i. Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

3. a. Title:

   b. Case number:

   c. Court: ☐ same as above

      ☐ other state or federal court *(name and address):*

   d. Department:

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 3h

   i. Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached:_____

Date: May 20, 2020

D. Eric Shapland

(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)        ▶ *D E Sh___W*        (SIGNATURE OF PARTY OR ATTORNEY)

**NOTICE OF RELATED CASE**

CM-015

| PLAINTIFF/PETITIONER:   Health Care Service Corp. | CASE NUMBER: RG20056354 |
|---|---|
| DEFENDANT/RESPONDENT:   Mallinckrodt ARC LLC, et al. | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL

### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1.   I am at least 18 years old and **not a party to this action.** I am a resident of or employed In the county where the mailing took place, and my residence or business address is *(specify):*

2.   | served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

    a. ☐   deposited the sealed envelope with the United States Postal Service.

    b. ☐   placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3.   The *Notice of Related Case* was mailed:

    a.   on *(date):*

    b.   from *(city and state):*

4.   The envelope was addressed and mailed as follows:

    a.   Name of person served:              c.   Name of person served:

        Street address:                           Street address:

        City:                                    City:

        State and zip code:                State and zip code:

    b.   Name of person served:              d.   Name of person served:

        Street address:                           Street address:

        City:                                    City:

        State and zip code:                State and zip code:

☐   Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____ ▶ _____
(TYPE OR PRINT NAME OF DECLARANT)                                   (SIGNATURE OF DECLARANT)

American LegalNet, Inc.
www.FormsWorkflow.com

## PROOF OF SERVICE

1. I am over eighteen years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 777 South Figueroa Street, Forty-Fourth Floor, Los Angeles, California 90017-5844.

2. On **May 20, 2020**, I served the following document(s) with a hearing date and judicial assignment that were subsequently vacated, and on **May 28, 2020**, I served the same following documents with an updated hearing date and judicial assignment:

**NOTICE OF RELATED CASE**

3. I served the document(s) on the following person(s):

**[SEE ATTACHED SERVICE LIST]**

4. The documents were served by the following means:

☐ **By U.S. Mail**. I enclosed the document(s) in a sealed envelope or package addressed to the person(s) at the address(es) in Item 3 and **(check one)**:

☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

☐ placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California.

☐ **By Overnight Delivery/Express Mail**. I enclosed the documents and an unsigned copy of this declaration in a sealed envelope or package designated by **[name of delivery company or U.S. Postal Service for Express Mail]** addressed to the persons at the address(es) listed in Item 3, with **[Express Mail postage or, if not Express Mail, delivery fees]** prepaid or provided for. I placed the sealed envelope or package for collection and delivery, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for express delivery. On the same day the correspondence is collected for delivery, it is placed for collection in the ordinary course of business in a box regularly maintained by **[name of delivery company or U.S. Postal Service for Express Mail]** or delivered to a courier or driver authorized by **[name of delivery company]** to receive documents.

☐ **By Messenger Service**. I served the documents by placing them in an envelope or package addressed to the persons at the address(es) listed in Item 3 and providing them to a professional messenger service for service. (*See* attached Declaration(s) of Messenger.)

- 4 -

PROOF OF SERVICE

☐ **By Facsimile Transmission**.  Based on an agreement between the parties to accept service by facsimile transmission, which was confirmed in writing, I faxed the document(s) and an unsigned copy of this declaration to the person(s) at the facsimile numbers listed in Item 3 on **May 28, 2020**, at **[type time]**.  The transmission was reported as complete without error by a transmission report issued by the facsimile machine that I used immediately following the transmission.  A true and correct copy of the facsimile transmission report, which I printed out, is attached hereto.

☒ **By Electronic Service (E-mail)**.  Based on California Rule of Court 2.251(c)(3), or on a court order, or on an agreement of the parties to accept service by electronic transmission, I transmitted the document(s) to the person(s) at the electronic notification address(es) listed in Item 3 on **May 20, 2020 and May 28, 2020**.

☐ **Via Court Notice of Electronic Filing**.  The document(s) will be served by the court via NEF and hyperlink to the document(s).  On **May 28, 2020**, I checked the CM/ECF docket for this case or adversary proceeding and determined that the person(s) listed in Item 3 are on the Electronic Mail Notice List to receive NEF transmission at the email addresses indicated in Item 3 **[or on the attached service list, if applicable]**.

☐ **Via Electronic Notification**.  The document(s) will be served via electronic notification on **May 28, 2020** on the person(s) listed in Item 3 at the email addresses indicated in Item 3 **[or on the attached service list, if applicable]**.

☒ **STATE**:  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐ **FEDERAL**:  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Dated: **May 28, 2020**.            Signature: _____

                    Type or Print Name: Kathryn Jensen
                    E-Service Address:   kathryn.jensen@arnoldporter.com

- 5 -
PROOF OF SERVICE

**Ex. 29**

*Health Care Service Corp. v. Mallinckrodt ARD LLC,* etc., et al.
Alameda Superior Court Case No. RG20056354

<u>SERVICE LIST</u>

Todd M. Schneider                                    *Counsel for Plaintiff*
Jason H. Kim                                         *Health Care Service*
Matthew S. Weiler                                    *Corporation*
Kyle G. Bates
SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:     (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

Peter D. St. Phillip
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone:     (914) 997-0500
PStPhillip@lowey.com

Renee A. Nolan
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone:     (215) 399-4770
rnolan@lowey.com

# EXHIBIT 30

1 | ARNOLD & PORTER KAYE SCHOLER LLP
  | Matthew M. Wolf (*PHV* to be filed)
2 | Laura S. Shores (*PHV* to be filed)
  | Sonia Kuester Pfaffenroth (SBN 223984)
3 | Michael B. Bernstein (*PHV* to be filed)
4 | Adam M. Pergament (SBN 267557)
  | 601 Massachusetts Avenue, N.W.
5 | Washington, D.C. 20001-3743
  | Telephone:    (202) 942-5000
6 | Facsimile:    (202) 942-5999
7 | matthew.wolf@arnoldporter.com
  | laura.shores@arnoldporter.com
8 | sonia.pfaffenroth@arnoldporter.com
  | michael.b.bernstein@arnoldporter.com
9 | adam.pergament@arnoldporter.com

10 | D. Eric Shapland (SBN 193853)
11 | 777 South Figueroa Street, 44th Floor
   | Los Angeles, CA 90017-5844
12 | Telephone:    (213) 243-4000
   | Facsimile:    (213) 243-4199
13 | eric.shapland@arnoldporter.com

14 |
15 | *Attorneys for Defendants*
   | *Mallinckrodt ARD LLC and Mallinckrodt plc*

**ENDORSED FILED**
**ALAMEDA COUNTY**
MAY 28 2020
CLERK OF THE SUPERIOR COURT
By _____
                      Deputy

16 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

17 | COUNTY OF ALAMEDA

18 | HEALTH CARE SERVICE CORP.,                        | Case No. RG20056354

19 |                          Plaintiff,               | **PROOF OF SERVICE**

20 |              v.                                   | Date:   August 5, 2020
   |                                                   | Time:   3:00 p.m.
21 | MALLINCKRODT ARD LLC (f/k/a Mallinckrodt          | Dept:   19
22 | ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and | Judge: Hon. Stephen Kaus
   | MALLINCKRODT plc,                                 | Res. Nos. 2179414 & 2179416
23 |
   |                          Defendants.              | Action Filed:  February 27, 2020
24 |
25 |
26 |
27 |
28 |

167822425

PROOF OF SERVICE

BY FAX

Ex. 30
p. 350

**PROOF OF SERVICE**

1.    I am over eighteen years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 777 South Figueroa Street, Forty-Fourth Floor, Los Angeles, California  90017-5844.

2.    On May 20, 2020, I served the following document(s) with a hearing date and judicial assignment that were subsequently vacated, and on May 28, 2020, I served the same following documents with an updated hearing date and judicial assignment:

**THE DEFENDANT MALLINCKRODT ENTITIES' NOTICE OF DEMURRER AND DEMURRER TO HCSC'S COMPLAINT; SHAPLAND DECLARATION**

**DEFENDANT MALLINCKRODT ENTITIES' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS FROM PLAINTIFF HCSC'S COMPLAINT; SHAPLAND DECLARATION**

**THE DEFENDANT MALLINCKRODT ENTITIES' MEMORANDUM IN SUPPORT OF DEMURRER AND MOTION TO STRIKE**

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE**

**[PROPOSED] ORDER SUSTAINING THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER TO HCSC'S COMPLAINT**

**[PROPOSED] ORDER GRANTING DEFENDANT MALLINCKRODT ENTITIES' MOTION TO STRIKE ALLEGATIONS FROM PLAINTIFF HCSC'S COMPLAINT**

3.    I served the document(s) on the following person(s):

**[SEE ATTACHED SERVICE LIST]**

4.    The documents were served by the following means:

☐   **By U.S. Mail**.  I enclosed the document(s) in a sealed envelope or package addressed to the person(s) at the address(es) in Item 3 and **(check one)**:

    ☐    deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

    ☐    placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with this business' practice for collecting and processing correspondence for mailing.  On the same day the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am employed in the county where the mailing occurred.  The envelope or package was placed in the mail at Los Angeles, California.

☐ **By Overnight Delivery/Express Mail**.  I enclosed the documents and an unsigned copy of this declaration in a sealed envelope or package designated by **[name of delivery company or U.S. Postal Service for Express Mail]** addressed to the persons at the address(es) listed in Item 3, with **[Express Mail postage or, if not Express Mail, delivery fees]** prepaid or provided for.  I placed the sealed envelope or package for collection and delivery, following our ordinary business practices.  I am readily familiar with this business' practice for collecting and processing correspondence for express delivery.  On the same day the correspondence is collected for delivery, it is placed for collection in the ordinary course of business in a box regularly maintained by **[name of delivery company or U.S. Postal Service for Express Mail]** or delivered to a courier or driver authorized by **[name of delivery company]** to receive documents.

☐ **By Messenger Service**.  I served the documents by placing them in an envelope or package addressed to the persons at the address(es) listed in Item 3 and providing them to a professional messenger service for service.  (*See* attached Declaration(s) of Messenger.)

☐ **By Facsimile Transmission**.  Based on an agreement between the parties to accept service by facsimile transmission, which was confirmed in writing, I faxed the document(s) and an unsigned copy of this declaration to the person(s) at the facsimile numbers listed in Item 3 on **May 28, 2020**, at **[type time]**.  The transmission was reported as complete without error by a transmission report issued by the facsimile machine that I used immediately following the transmission.  A true and correct copy of the facsimile transmission report, which I printed out, is attached hereto.

☒ **By Electronic Service (E-mail)**.  Based on California Rule of Court 2.251(c)(3), or on a court order, or on an agreement of the parties to accept service by electronic transmission, I transmitted the document(s) to the person(s) at the electronic notification address(es) listed in Item 3 on **May 20, 2020 and May 28, 2020**.

☐ **Via Court Notice of Electronic Filing**.  The document(s) will be served by the court via NEF and hyperlink to the document(s).  On **May 28, 2020**, I checked the CM/ECF docket for this case or adversary proceeding and determined that the person(s) listed in Item 3 are on the Electronic Mail Notice List to receive NEF transmission at the email addresses indicated in Item 3 **[or on the attached service list, if applicable]**.

☐ **Via Electronic Notification**.  The document(s) will be served via electronic notification on **May 28, 2020** on the person(s) listed in Item 3 at the email addresses indicated in Item 3 **[or on the attached service list, if applicable]**.

☒ **STATE**:  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐ **FEDERAL**:  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Dated: **May 28, 2020**.                    Signature: _Kathryn Jensen_ _____

Type or Print Name: Kathryn Jensen
E-Service Address:
kathryn.jensen@arnoldporter.com

- 3 -

PROOF OF SERVICE

**Ex. 30**
**p. 352**

*Health Care Service Corp. v. Mallinckrodt ARD LLC,* etc., et al.
Alameda Superior Court Case No. RG20056354

<u>SERVICE LIST</u>

Todd M. Schneider                                    *Counsel for Plaintiff*
Jason H. Kim                                          *Health Care Service*
Matthew S. Weiler                                    *Corporation*
Kyle G. Bates
SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:     (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

Peter D. St. Phillip
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone:     (914) 997-0500
PStPhillip@lowey.com

Renee A. Nolan
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone:     (215) 399-4770
rnolan@lowey.com



**Superior Court of California**
*County of Alameda*

```
Superior Court of California, County of Alameda        Receipt Nbr: 922127
Rene C. Davidson Alameda County Courthouse             Clerk: jflores
1225 Fallon Street                                     Date: 05/29/2020
Oakland, CA  94612
```

| Type | Case Number | Description | Amount |
|------|-------------|-------------|--------|
| Filing | RG20056354 | Initial Appearance | $435.00 |
| Filing | RG20056354 | Complex Fee - Adverse Party | $1000.00 |
| Filing | RG20056354 | Initial Appearance | $435.00 |
| Filing | RG20056354 | Complex Fee - Adverse Party | $1000.00 |
| Filing | RG20056354 | Demurrer to Complaint | $60.00 |

```
        Total Amount Due:     $2,930.00
        Prior Payment:
        Current Payment:      $2,930.00
        Balance Due:              $.00
        Overage:
        Excess Fee:
        Change:

Payment Method:
        Cash:
        Check:                $2,930.00
```

# EXHIBIT 31

1   ARNOLD & PORTER KAYE SCHOLER LLP
    Matthew M. Wolf (*PHV* to be filed)
2   Laura S. Shores (*PHV* to be filed)
    Sonia Kuester Pfaffenroth (SBN 223984)
3   Michael B. Bernstein (*PHV* to be filed)
    Adam M. Pergament (SBN 267557)
4   601 Massachusetts Avenue, N.W.
    Washington, D.C. 20001-3743
5   Telephone:    (202) 942-5000
    Facsimile:    (202) 942-5999
6   matthew.wolf@arnoldporter.com
    laura.shores@arnoldporter.com
7   sonia.pfaffenroth@arnoldporter.com
    michael.b.bernstein@arnoldporter.com
8   adam.pergament@arnoldporter.com
9
10  D. Eric Shapland (SBN 193853)
11  777 South Figueroa Street, 44th Floor
    Los Angeles, CA 90017-5844
12  Telephone:    (213) 243-4000
    Facsimile:    (213) 243-4199
13  eric.shapland@arnoldporter.com
14
    *Attorneys for Defendants*
15  *Mallinckrodt ARD LLC and Mallinckrodt plc*

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                          COUNTY OF ALAMEDA

18  HEALTH CARE SERVICE CORP.,                  |  Case No. RG20056354
19              Plaintiff,                       |  **[PROPOSED] ORDER GRANTING**
                                                 |  **DEFENDANT MALLINCKRODT**
20      v.                                       |  **ENTITIES' MOTION TO STRIKE**
                                                 |  **ALLEGATIONS FROM PLAINTIFF**
21  MALLINCKRODT ARD LLC (f/k/a Mallinckrodt     |  **HCSC'S COMPLAINT**
    ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and
22  MALLINCKRODT plc,                            |  Date:   Aug. 5, 2020
                                                 |  Time:   3:00 p.m.
23              Defendants.                       |  Dept:   19
                                                 |  Judge: Hon. Stephen Kaus
24                                               |  Reservation No. R-2179416
25
26                                               |  Action Filed:  February 27, 2020
27
28

167837021

[PROP.] ORDER GRANTING MOT. TO STRIKE ALLEGATIONS FROM COMPLT.

1         This matter came for hearing on August 5, 2020 before the Honorable Judge Stephen Kaus

2    of the Superior Court of the State of California, County of Alameda.  Having reviewed and

3    considered all papers filed in support and in opposition, and having heard the oral argument of the

4    parties, the Court HEREBY ORDERS as follows:

5         The Court GRANTS Defendant Mallinckrodt ARD LLC and Mallinckrodt plc's Motion to

6    Strike Allegations from Plaintiff HCSC's Complaint.

7

8         **IT IS SO ORDERED.**

9

10   DATED:_____, 2020

11

12                                _____

13                                HON. JUDGE STEVEN KAUS
                                  OF THE SUPERIOR COURT

14                                FOR THE COUNTY OF ALAMEDA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROP.] ORDER GRANTING MOT. TO STRIKE ALLEGATIONS FROM COMPLT.

# EXHIBIT 32

MAY 2 8 2020

BY FAX

1  ARNOLD & PORTER KAYE SCHOLER LLP
2  Matthew M. Wolf (*PHV* to be filed)
   Laura S. Shores (*PHV* to be filed)
3  Sonia Kuester Pfaffenroth (SBN 223984)
   Michael B. Bernstein (*PHV* to be filed)
4  Adam M. Pergament (SBN 267557)
   601 Massachusetts Avenue, N.W.
5  Washington, D.C. 20001-3743
   Telephone:    (202) 942-5000
6  Facsimile:    (202) 942-5999
7  matthew.wolf@arnoldporter.com
   laura.shores@arnoldporter.com
8  sonia.pfaffenroth@arnoldporter.com
   michael.b.bernstein@arnoldporter.com
9  adam.pergament@arnoldporter.com

10
   D. Eric Shapland (SBN 193853)
11 777 South Figueroa Street, 44th Floor
   Los Angeles, CA 90017-5844
12 Telephone:    (213) 243-4000
   Facsimile:    (213) 243-4199
13 eric.shapland@arnoldporter.com

14
   *Attorneys for Defendants*
15 *Mallinckrodt ARD LLC and Mallinckrodt plc*

16           SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                        COUNTY OF ALAMEDA

18 HEALTH CARE SERVICE CORP.,                Case No. RG20056354

19           Plaintiff,                      **[PROPOSED] ORDER SUSTAINING
20      v.                                   THE DEFENDANT
                                             MALLINCKRODT ENTITIES'
21 MALLINCKRODT ARD LLC (f/k/a Mallinckrodt  DEMURRER TO HCSC'S
   ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and  COMPLAINT**
22 MALLINCKRODT plc,
                                             Date:   Aug. 5, 2020
23           Defendants.                     Time:   3:00 p.m.
24                                           Dept:   19
                                             Judge: Hon. Stephen Kaus
25                                           Reservation No. R-2179414
26                                           Action Filed:  February 27, 2020
27
28

167837049

           [PROP.] ORDER SUSTAINING DEMURRER TO COMPLAINT

This matter came for hearing on August 5, 2020 before the Honorable Judge Stephen Kaus of the Superior Court of the State of California, County of Alameda.  Having reviewed and considered all papers filed in support and in opposition, and having heard the oral argument of the parties, the Court HEREBY ORDERS as follows:

1.    The Court SUSTAINS Defendants Mallinckrodt ARD LLC and Mallinckrodt plc's Demurrer to Plaintiff's Complaint, and to each cause of action, without leave to amend.

2.    This action is DISMISSED with prejudice.

3.    JUDGMENT is hereby entered for Defendants Mallinckrodt ARD LLC and Mallinckrodt plc.

**IT IS SO ORDERED.**

DATED: _____, 2020

_____
HON. JUDGE STEVEN KAUS
OF THE SUPERIOR COURT
FOR THE COUNTY OF ALAMEDA

# EXHIBIT 33

1  ARNOLD & PORTER KAYE SCHOLER LLP
   Matthew M. Wolf (*PHV* to be filed)
2  Laura S. Shores (*PHV* to be filed)
   Sonia Kuester Pfaffenroth (SBN 223984)
3  Michael B. Bernstein (*PHV* to be filed)
   Adam M. Pergament (SBN 267557)
4  601 Massachusetts Avenue, N.W.
   Washington, D.C. 20001-3743
5  Telephone:    (202) 942-5000
   Facsimile:    (202) 942-5999
6  matthew.wolf@arnoldporter.com
   laura.shores@arnoldporter.com
7  sonia.pfaffenroth@arnoldporter.com
   michael.b.bernstein@arnoldporter.com
8  adam.pergament@arnoldporter.com
9
10 D. Eric Shapland (SBN 193853)
   777 South Figueroa Street, 44th Floor
11 Los Angeles, CA 90017-5844
   Telephone:    (213) 243-4000
12 Facsimile:    (213) 243-4199
   eric.shapland@arnoldporter.com
13
14 *Attorneys for Defendants*
15 *Mallinckrodt ARD LLC and Mallinckrodt plc*

ENDORSED
FILED
ALAMEDA COUNTY

MAY 28 2020

CLERK OF THE SUPERIOR COURT
By _____
                    Deputy

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                          COUNTY OF ALAMEDA

18 | HEALTH CARE SERVICE CORP., | Case No. RG20056354 |
   |---|---|
19 |              Plaintiff, | **REQUEST FOR JUDICIAL NOTICE** |
20 |              v. | **IN SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES'** |
21 | MALLINCKRODT ARD LLC (f/k/a Mallinckrodt | **DEMURRER AND MOTION TO STRIKE** |
22 | ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT plc, | |
23 |              Defendants. | Date:  August 5, 2020 |
24 | | Time:  3:00 p.m. |
   | | Dept:  19 |
25 | | Judge: Hon. Stephen Kaus |
   | | Res. Nos. 2179414 & 2179416 |
26 | | Action Filed:  February 27, 2020 |
27
28

167790036

RJN ISO DEMURRER & MOT. TO STRIKE

In support of its contemporaneously filed demurrer and motion to strike Plaintiff Health Care Services Corporation's Complaint, Defendants Mallinckrodt ARD LLC and Mallinckrodt plc respectfully request that the Court take judicial notice, pursuant to Cal. Evid. Code §§ 451-53, of the following documents:

| Exhibit | Document | Page |
|---|---|---|
| A | Publication of OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees ("2005 SAB"), 70 Fed. Reg. 70,623 (Nov. 22, 2005). | 7 |
| B | Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs ("2014 SAB"), 79 Fed. Reg. 31,120 (May 30, 2014). | 14 |
| C | Bill Alpert, *Too Close for Comfort*, BARRON'S, Oct. 19, 2013, *which is publicly available at* https://www.barrons.com/articles/too-close-for-comfort-1382170462. | 19 |
| D | Andrew Pollack, *Drug Maker's Donations to Co-Pay Charity Face Scrutiny*, N.Y. TIMES, Dec. 18, 2013, *which is publicly available at* https://www.nytimes.com/2013/12/19/business/shake-up-at-big-co-pay-fund-raises-scrutiny-on-similar-charities.html. | 25 |
| E | FDA Orphan Drug Designations and Approvals Search, H.P. Acthar Gel, *which is publicly available at* https://www.accessdata.fda.gov/scripts/opdlisting/oopd/detailedIndex.cfm?cfgridkey=168103. | 32 |
| F | Letter from Dir. Russel Katz, M.D., Div. of Neurology Products, Center for Drug Evaluation and Research, Dep't of Health and Human Services, to Questcor Pharmaceuticals, NDA Approval Letter for NDA 022432 (Oct. 15, 2010), *which is published publicly by the FDA at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432_hp_acthar_gel_toc.cfm, *and this direct link*, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432Orig1s000Approv.pdf. | 35 |
| G | Center for Drug Evaluation and Research, Labeling for H.P. Acthar Gel (Oct. 15, 2010), *which is published publicly by the FDA at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432_hp_acthar_gel_toc.cfm, *and this direct link*, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432Orig1s000LBL.pdf. | 45 |

| Exhibit | Document | Page |
|---------|----------|------|
| H | Press Release, Dep't of Justice, Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors (Sept. 4, 2019), *which is published publicly by the Department of Justice at* https://www.justice.gov/opa/pr/drug-maker-mallinckrodt-agrees-pay-over-15-million-resolve-alleged-false-claims-act-liability | 72 |
| I | Daniel M. Hartung, PharmD, MPH; Kirbee Johnston, MPH, David M. Cohen, MD, et al, Industry Payments to Physician Specialists Who Prescribe Repository Corticotropin (June 29, 2018), *which is publicly available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2686039. | 75 |
| J | *Humana Inc. v. Mallinckrodt ARD LLC*, No. CV 19-06926, split op. (C.D. Cal. Mar. 9, 2020) (Dkt. No. 57). | 89 |
| K | Table of Out of State Authorities I (Count VII—Relevant Insurance Fraud Statutes & Lack of Private Enforcement Mechanisms (or Legal Defenses in Lieu)). | 125 |
| L | Table of Out of State Authorities II (Counts III, IV & V—Relevant States' Authorities Adopting Standards for Analyzing Rule of Reason for Nonprice Vertical Restraints). | 132 |
| M | Table of Out of State Authorities III (Count V—Relevant State Unfair and Deceptive Trade Practices Acts & Limitations Periods (or Legal Defenses in Lieu)). | 139 |
| N | Table of Out of State Authorities IV (Count's III & IV—Relevant State Antitrust Acts Requirements re Injury). | 144 |
| O | Table of Out of State Authorities V (Counts III & IV—Relevant State Antitrust Acts & Limitations Periods). | 152 |

## SUPPORTING ARGUMENT

"When any ground for objection to a complaint . . . appears . . . from any matter of which the court is required to or may take judicial notice, the objection on that ground may be taken by a demurrer to the pleading." Civ. Proc. Code § 430.30(a).   Certain records must be judicially noticed. Evid. Code § 451.  Others may be judicially noticed.  Id. § 452.   In the latter case, notice becomes mandatory when (1) a party has given sufficient notice of its request "through the pleadings or otherwise, to enable [the] adverse party to prepare to meet the request" and (2) the party has "furnished the court with sufficient information to enable it to take judicial notice of the matter."

1  Cal. Evid. § 453; see Licudine v. Cedars-Sinai Med. Ctr., 3 Cal. App. 5th 881, 902 (Ct. App. 2016)

2  ("[T]he court's discretion to take judicial notice of these matters disappears—and the court becomes

3  obligated to judicially notice these matters—if the moving party gives adequate advance notice.").

4        This court must take judicial notice of documents filed on the Federal Register, both for the

5  fact of their publication and for their content.  Evid. Code § 451(b) ("Judicial notice shall be taken

6  of the following: any matter made a subject of judicial notice . . . by Section 1507 of Title 44 of the

7  United States Code."); 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially

8  noticed. . .").  The records indicated in Exhibits A and B are records to be noticed under this rule.

9        This court may take judicial notice of [o]fficial acts of the . . . executive . . . departments of

10  the United States."  Evid. Code § 452(c).  The records indicated in Exhibits E through H are such

11  executive records noticeable under this rule.  *Licudine v. Cedars-Sinai Med. Ctr.*, 3 Cal. App. 5th

12  881, 902 (Ct. App. 2016) ("[W]e can take judicial notice of official acts and public records. . .)

13  (quoting *In re Joseph H.*, 237 Cal. App. 4th 517, 541–42 (2015)).[1]  Exhibits E, F and G are offered

14  merely for official acts of the FDA in giving Acthar orphan drug status,  approving its indication

15  for infantile spasms, and approving all its current indications and labeling.  Exhibit H is merely

16  offered for the indisputable fact Department of Justice reports that its settlement with Mallinckrodt

17  over payments to doctors were for allegations that were limited to the conduct of "twelve Questcor

18  sales representatives" "from 2009 and 2013."  These acts are subject to mandatory judicial notice

19  as (1) this filing serves as sufficient notice to the plaintiff in this action and (2) the true and accurate

20  copies attached (and the internet addresses listed above) provide sufficient information to the Court

21  to satisfy Evid. Code § 453.

22        The court may notice "[f]acts and propositions that are not reasonably subject to dispute and

23  are capable of immediate and accurate determination by resort to sources of reasonably indisputable

24  accuracy."  Evid. Code § 452(h).  California courts take judicial notice of the existence and content

25  of newspaper articles and other documents published online.  *See Norgart v. Upjohn Co.*, 21 Cal.

26  4th 383, 408, n.6 (1999) (taking judicial notice under Evid. Code § 452(h) of *when* controversy

27
28
---
[1]    The comments by the Assembly Committee on Judiciary to Evid. Code § 452(c) note: "Under this provision, the California courts have taken judicial notice of a wide variety of administrative and executive acts, such as proceedings and reports . . . ."

about a pharmaceutical product had "arisen in the popular press" in the context of a grant of summary judgment on statute of limitations grounds); *Hurvitz v. Hoefflin*, 84 Cal. App. 4th 1232, 1235, 101 Cal. Rptr. 2d 558, 561 n.1 (2000) (taking judicial notice of "existence and contents of" various "press clippings"); *Ragland v. U.S. Bank Nat'l Assn.*, 209 Cal. App. 4th 182, 193 (2012) ("[W]e may take judicial notice of the existence of . . . [w]eb sites, and blogs."). The records indicated in Exhibits C, D and I reflect such facts noticeable under this rule.   As detailed in the demurrer, Defendants offer Exhibits C and D only for the indisputable facts that these articles were published by *Barron's* and *The New York Times* on October 19, 2013 and December 18, 2013, respectively, and that the articles detail concerns of misconduct around single-drug co-payment assistance funds and donations to such funds by Questcor in particular.  Equally, Defendants offer Exhibit I, originally cited by Plaintiffs at paragraph 158 of the Complaint, for the fact of the author's statements; not the truth of the study's conclusions or for any particular interpretations of the underlying facts.  *See Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 113 (2007) ("Although the existence of a document may be judicially noticeable, the truth of statements contained in the document and its proper interpretation are not subject to judicial notice if those matters are reasonably disputable.") (citing *StorMedia, Inc. v. Superior Court*, 20 Cal. 4th 449, 457, n.9 (1999)). Defendants respectfully suggest that the court must notice these laws as (1) this filing serves as sufficient notice to the plaintiffs and (2) the true and accurate copies attached  (and the internet addresses listed above) provide sufficient information to the Court to satisfy Cal. Evid. Code § 453.

    This Court may take judicial notice of "[r]ecords of (1) any court of this state or (2) any court of record of the United States or of any state of the United States." Evid. Code § 452(d).  The order provided at Exhibit J is a court record noticeable under this rule.  Defendants offer this record only for the "ruling and the basis for that ruling": that the *Humana* court issued an opinion on March 9, 2020 that ruled against similar plaintiffs on nearly identical facts.  Defendants do not offer these records for the court to accept "the truth of a prior court's factual findings."  *See Hart v. Darwish*, 12 Cal. App. 5th 218, 225 (Ct. App. 2017).  These documents are subject to mandatory judicial

notice as (1) this filing serves as sufficient notice to plaintiff and (2) the true and accurate copy attached provides sufficient information to the Court to satisfy Evid. Code § 453.

Finally, "[t]he decisional, constitutional, and statutory law of any state of the United States" may be judicially noticed by the Court. Evid. Code § 452.[2] The tables provided at Exhibits K through O reflect compilations of just such laws. These laws are subject to mandatory judicial notice as (1) this filing serves as sufficient notice to the plaintiff and (2) the citations in Exhibits J-M provide sufficient information to the Court to satisfy Evid. Code § 453. In the alternative, Defendants ask the court to take this request for judicial notice as a citation to published materials. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 46 n. 9 (1998), as modified (Sept. 23, 1998).

Dated: May 20, 2020

Respectfully Submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: _____
D. Eric Shapland

*Attorneys for Defendant*
*Mallinckrodt ARD LLC and*
*Mallinckrodt plc*

---

[2]   Evid. Code § 220 defines "state" in this circumstance as "any state, district, commonwealth, territory, or insular possession of the United States," which includes the District of Columbia and the territory of Puerto Rico.

# EXHIBIT A


it to the agency. Thus, each firm submitting a compliance extension request will need 5 hours of employee time to complete the request. Given that 56 businesses are expected to submit written requests in year one, the total burden hours for year one are 280.

In year two, FDA expects about one-half as many firms to request a labeling compliance extension. So for year two, 28 firms are expected to file a request for an extension to the labeling compliance date. Again, assuming that it will take 5 hours to complete each request, the total burden hours for year two will be 140.

Dated: November 14, 2005.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 05–23040 Filed 11–21–05; 8:45 am]

**BILLING CODE 4160–01–S**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

[Docket No. 2005N–0343]

### Agency Information Collection Activities; Announcement of Office of Management and Budget Approval; Guidance for Requesting an Extension to Use Existing Label Stock After the Trans Fat Labeling Effective Date of January 1, 2006

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing that a collection of information entitled ''Guidance for Requesting an Extension to Use Existing Label Stock after the *Trans* Fat Labeling Effective Date of January 1, 2006'' has been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (the PRA). Elsewhere in this issue of the **Federal Register**, FDA is publishing a notice announcing an opportunity for public comment on this collection of information. Since this collection received emergency approval that expires on January 1, 2006, FDA is following the normal PRA clearance procedures by issuing that notice.

**FOR FURTHER INFORMATION CONTACT:** Peggy Robbins, Office of Management Programs (HFA–250), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–1223.

**SUPPLEMENTARY INFORMATION:** In the **Federal Register** of September 1, 2005 (70 FR 52108), the agency announced that the proposed information collection

had been submitted to OMB for review and clearance under 44 U.S.C. 3507. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. OMB has now approved the information collection and has assigned OMB control number 0910–0571. The approval expires on January 31, 2006. A copy of the supporting statement for this information collection is available on the Internet at *http://www.fda.gov/ohrms/dockets.*

Dated: November 14, 2005.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 05–23041 Filed 11–21–05; 8:45 am]

**BILLING CODE 4160–01–S**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Health Resources and Services Administration

### Advisory Commission on Childhood Vaccines; Notice of Meeting

In accordance with section 10(a)(2) of the Federal Advisory Committee Act (Pub. L. 92–463), notice is hereby given of the following meeting:

*Name:* Advisory Commission on Childhood Vaccines (ACCV).

*Date and Time:* December 12, 2005, 9 a.m.—5 p.m., EST.

*Place:* Audio Conference Call and Parklawn Building, Conference Rooms G & H, 5600 Fishers Lane, Rockville, MD 20857.

The ACCV will meet on Monday, December 12, from 9 a.m. to 5 p.m. The public can join the meeting in person at the address listed above or by audio conference call by dialing 1–800–369–6048 on December 12 and providing the following information:

*Leader's Name:* Dr. Geoffrey Evans.

*Password:* ACCV.

*Agenda:* The agenda items for the December meeting will include, but are not limited to: A summary of the U.S. Court of Federal Claims' 18th Judicial Conference; a report from the ACCV Workgroup looking at proposed guidelines for future changes to the Vaccine Injury Table; and updates from the Division of Vaccine Injury Compensation (DVIC), Department of Justice, National Vaccine Program Office, Immunization Safety Office (Centers for Disease Control and Prevention), National Institute of Allergy and Infectious Diseases (National Institutes of Health), and Center for Biologics and Evaluation Research (Food and Drug Administration). Agenda items are subject to change as priorities dictate.

*Public Comments:* Persons interested in providing an oral presentation should submit a written request, along with a copy of their presentation to: Ms. Cheryl Lee, Principal Staff Liaison, DVIC, Healthcare Systems Bureau (HSB), Health Resources and Services

Administration (HRSA), Room 11C–26, 5600 Fishers Lane, Rockville, Maryland 20857 or e-mail *clee@hrsa.gov.* Requests should contain the name, address, telephone number, and any business or professional affiliation of the person desiring to make an oral presentation. Groups having similar interests are requested to combine their comments and present them through a single representative. The allocation of time may be adjusted to accommodate the level of expressed interest. DVIC will notify each presenter by mail or telephone of their assigned presentation time. Persons who do not file an advance request for a presentation, but desire to make an oral statement, may announce it at the time of the comment period. These persons will be allocated time as it permits.

*For Further Information Contact:* Anyone requiring information regarding the ACCV should contact Ms. Cheryl Lee, Principal Staff Liaison, DVIC, HSB, HRSA, Room 11C–26, 5600 Fishers Lane, Rockville, MD 20857; telephone (301) 443–2124 or e-mail *clee@hrsa.gov.*

Dated: November 15, 2005.

**Tina M. Cheatham,**

*Director, Division of Policy Review and Coordination.*

[FR Doc. 05–23042 Filed 11–21–05; 8:45 am]

**BILLING CODE 4165–15–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of Inspector General

### Publication of OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees

**AGENCY:** Office of Inspector General (OIG), HHS.

**ACTION:** Notice.

**SUMMARY:** OIG periodically develops and issues guidance, including Special Advisory Bulletins, to alert and inform the health care industry about potential problems or areas of special interest. This **Federal Register** notice sets forth the recently issued OIG Special Advisory Bulletin addressing patient assistance programs for Medicare Part D enrollees.

**FOR FURTHER INFORMATION CONTACT:** Darlene M. Hampton, Office of Counsel to the Inspector General, (202) 619–0335.

**SUPPLEMENTARY INFORMATION:**

### Special Advisory Bulletin: Patient Assistance Programs for Medicare Part D Enrollees (November 2005)

#### I. Introduction

Patient assistance programs (PAPs) have long provided important safety net assistance to patients of limited means

who do not have insurance coverage for drugs, typically serving patients with chronic illnesses and high drug costs. PAPs are structured and operated in many different ways. PAPs may offer cash subsidies, free or reduced price drugs, or both. Some PAPs offer assistance directly to patients, while others replenish drugs furnished by pharmacies, clinics, hospitals, and other entities to eligible patients whose drugs are not covered by an insurance program. Some PAPs are affiliated with particular pharmaceutical manufacturers; others are operated by independent charitable organizations (such as, for example, patient advocacy and support organizations) without regard to any specific donor or industry interests.

Many pharmaceutical manufacturers have historically sponsored PAPs that assist patients whose outpatient prescription drugs are not covered by an insurance program (including some Medicare beneficiaries), in obtaining the manufacturer's products for free or at greatly reduced cost. Beginning on January 1, 2006, Medicare Part D will offer Medicare beneficiaries who elect to enroll broad coverage for outpatient prescription drugs. Accordingly, Medicare beneficiaries who enroll in Part D will no longer qualify under traditional PAP eligibility criteria. Part D enrollees will incur cost-sharing obligations (including deductibles and copayments), although many low-income beneficiaries will qualify for subsidies that will reduce or eliminate their financial obligations.[1] Pharmaceutical manufacturers have expressed interest in continuing to assist Medicare Part D enrollees of limited means who do not qualify for the low-income subsidy.

OIG is mindful of the importance of ensuring that financially needy beneficiaries who enroll in Part D receive medically necessary drugs, and OIG supports efforts of charitable organizations and others to assist financially needy beneficiaries, as long as the assistance is provided in a manner that does not run afoul of the Federal anti-kickback statute or other laws.[2] We have been asked whether the

anti-kickback statute will be implicated if pharmaceutical manufacturer PAPs[3] continue to offer assistance to financially needy Medicare beneficiaries who enroll in Part D by subsidizing their cost-sharing obligations for covered Part D drugs. For the reasons set forth below and consistent with extant OIG guidance, we conclude that pharmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts present heightened risks under the anti-kickback statute. However, in the circumstances described in this Bulletin, cost-sharing subsidies provided by *bona fide*, independent charities unaffiliated with pharmaceutical manufacturers should not raise anti-kickback concerns, even if the charities receive manufacturer contributions. In addition, we believe other arrangements described in this Bulletin, if properly structured, may pose reduced risk. Thus, we believe lawful avenues exist for pharmaceutical manufacturers and others to help ensure that all Part D beneficiaries can afford medically necessary drugs.

Given the importance of ensuring continued access to drugs for beneficiaries of limited means and the expedited time frame for implementation of the Part D benefit, we are issuing this Special Advisory Bulletin to identify potentially abusive PAP structures, as well as methods of providing assistance that mitigate or vitiate the potential for fraud and abuse. This Special Advisory Bulletin draws on the government's prior fraud and abuse guidance and enforcement experience. However, because the Part D benefit has not yet begun, and any

assessment of fraud and abuse is necessarily speculative, this Bulletin cannot, and is not intended to, be an exhaustive discussion of relevant risks or beneficial practices.

At the outset, it is important to note the following:

• PAPs need not disenroll all Medicare beneficiaries from their existing PAPs to be compliant with the fraud and abuse laws. Enrollment in Part D is voluntary; therefore, existing PAPs may continue to provide free or reduced price outpatient prescription drugs to Medicare beneficiaries who have not yet enrolled in Part D. The Centers for Medicare & Medicaid Services (CMS) anticipates instituting procedures that will help PAPs determine if PAP clients have enrolled in Part D.

• Occasional, inadvertent cost-sharing subsidies provided by a pharmaceutical manufacturer PAP to a Part D enrollee should not be problematic under the anti-kickback statute (*e.g.*, where, despite due diligence, a pharmaceutical manufacturer PAP does not know and should not have known that a beneficiary has enrolled in Medicare Part D).

• Nothing in the Part D program or in any OIG laws or regulations prevents pharmaceutical manufacturers or others from providing assistance (*e.g.*, through cash subsidies or free drugs) to uninsured patients. Nothing in this Bulletin impacts programs that assist uninsured patients.

• Nothing in this guidance should be construed as preventing pharmacies from waiving cost-sharing amounts owed by a Medicare beneficiary on the basis of a good faith, individualized assessment of the patient's financial need (or failure of reasonable collection efforts), so long as the waiver is neither routine, nor advertised. Financial need-based waivers that meet these criteria have long been permitted.[4] However, a pharmacy has not waived a cost-sharing amount if the amount has been paid to the pharmacy, in cash or in kind, by a

---

[1] *See* 42 CFR 423.782.

[2] This Bulletin focuses on the application of the Federal anti-kickback statute. Other potential risk areas, including, for example, potential liability under the False Claims Act, 31 U.S.C. 3729–33, or other Federal or State laws, are not addressed here. Moreover, this Bulletin focuses on arrangements that involve pharmaceutical manufacturers directly or indirectly subsidizing Part D cost-sharing amounts. Programs that subsidize Part D premium amounts pose risks under the anti-kickback statute that are not addressed here. Similarly, PAPs established by health plans that subsidize cost

sharing or premium amounts under Part D raise different issues and may require a different analysis. While this Bulletin may provide some useful guidance for other kinds of PAP arrangements, such PAPs are not specifically considered here.

[3] For purposes of this Special Advisory Bulletin, a pharmaceutical manufacturer PAP includes any PAP that is directly or indirectly operated or controlled in any manner by a pharmaceutical manufacturer or its affiliates (including, without limitation, any employee, agent, officer shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)). Moreover, for purposes of an anti-kickback analysis, we would not consider a charitable foundation (or similar entity) formed, funded or controlled by a manufacturer or any of its affiliates (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) to be a *bona fide*, independent charity, because interposition of the entity would not sever the nexus between the patient subsidies and the manufacturer. Indeed, in most cases, the foundation would receive all of its funding from the pharmaceutical manufacturer (or its affiliates) and would provide subsidies only for the manufacturer's products.

[4] *See, e.g.*, section 1128A(i)(6)(A) of the Act; OIG Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries, August 2002, *http://oig.hhs.gov/fraud/docs/alertsandbulletins/SABGiftsandInducements.pdf.* The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) included a safe harbor specifically incorporating these criteria for waivers of cost-sharing amounts for Part D drugs. Additionally, the safe harbor protects cost-sharing waivers offered to individuals who qualify for the low income subsidy, even if the waivers are routine and do not follow an individualized determination of financial need, provided they are not advertised. *See* Section 1860D–42 of MMA, codified at 42 U.S.C. 1320a–7b(b)(3)(G).

third party (including, without limitation, a PAP).

## II. The Federal Anti-Kickback Statute

The Federal anti-kickback statute, section 1128B(b) of the Social Security Act (the Act),[5] makes it a criminal offense knowingly and willfully to offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any Federal health care program, including Medicare and Medicaid. Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated. By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction. For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind. The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. OIG may also initiate administrative proceedings to exclude a person from Federal health care programs or to impose civil money penalties for kickback violations under sections 1128(b)(7) and 1128A(a)(7) of the Act.[6]

A determination regarding whether a particular arrangement violates the anti-kickback statute requires a case-by-case evaluation of all of the relevant facts and circumstances, including the intent of the parties. For PAPs, the nature, structure, sponsorship, and funding of the particular PAP are necessarily relevant to the analysis.

## III. Patient Assistance Programs

As described more fully below, cost-sharing subsidies provided by pharmaceutical manufacturer PAPs pose a heightened risk of fraud and abuse under the Federal anti-kickback statute. However, there are non-abusive alternatives available. In particular, as discussed below, pharmaceutical manufacturers can donate to *bona fide* independent charity PAPs, provided appropriate safeguards exist. Moreover, this Bulletin discusses several other alternatives that may pose a reduced risk of fraud and abuse.

This section addresses in turn: pharmaceutical manufacturer PAPs, independent charity PAPs, manufacturer PAPs that operate "outside of Part D"; "coalition model" PAPs, and bulk replacement programs.

### A. Pharmaceutical Manufacturer PAPs

Analytically, pharmaceutical manufacturer PAPs raise two main issues in connection with the Part D program: (i) Whether subsidies they provide can count toward a Part D enrollee's true out-of-pocket costs (known as the TrOOP); and (ii) whether the subsidies implicate the Federal anti-kickback statute.[7]

As to the first issue, the Part D regulations make clear that beneficiaries may count toward their TrOOP assistance received from any source other than group health plans, other insurers and government funded health programs, and similar third party payment arrangements.[8] The preamble to the Part D regulations explains that cost-sharing assistance furnished by a PAP, including a manufacturer PAP, will count toward a beneficiary's TrOOP expenditures, even if the PAP does not comply with the fraud and abuse laws.[9] This approach relieves beneficiaries of the financial risk of accepting assistance from an entity that may be improperly structured or operated.

As to the second issue, the core question is whether the anti-kickback statute would be implicated if a manufacturer of a drug covered under Part D were to subsidize cost-sharing amounts (directly or indirectly through a PAP) incurred by Part D beneficiaries for the manufacturer's product. Consistent with our prior guidance addressing manufacturer cost-sharing subsidies in the context of Part B drugs,[10] we believe such subsidies for

Part D drugs would implicate the anti-kickback statute and pose a substantial risk of program and patient fraud and abuse.[11] Simply put, the subsidies would be squarely prohibited by the statute, because the manufacturer would be giving something of value (*i.e.*, the subsidy) to beneficiaries to use its product. Where a manufacturer PAP offers subsidies tied to the use of the manufacturer's products (often expensive drugs used by patients with chronic illnesses), the subsidies present all of the usual risks of fraud and abuse associated with kickbacks, including steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over competing drugs; and reducing beneficiaries= incentives to locate and use less expensive, equally effective drugs.

It is impossible to predict with certainty the way in which abuse may occur in a new benefit program that is not yet operational. The following are illustrative examples of some types of abuse that may occur:

ī  Increased costs to the program. We are concerned that a manufacturer might use beneficiary cost-sharing subsidies, which help beneficiaries meet their TrOOP requirement, to increase the number of beneficiaries using the manufacturer's product who reach the

---

from pharmaceutical manufacturer PAPs to subsidize Part B cost-sharing amounts. We note that the cost and utilization management features of the Part D program, while important, do not sufficiently mitigate the risks.

[11] Some in the industry have asserted that cost-sharing subsidies for Part D drugs differ from cost-sharing subsidies for Part B drugs so long as the subsidies are given to patients who are in a Part D "coverage gap" (*i.e.*, a benefit period during which the beneficiary pays 100% of the cost of the drugs). To support their position, they contend either that beneficiaries in the coverage gap are functionally "uninsured" or that the situation is comparable to providing free drugs to financially needy beneficiaries so long as no Federal health care program is billed for all or part of the drug, a practice we have previously permitted in the context of subsidies for Part B drugs. *See* OIG Advisory Opinion Nos. 02–13 and 03–3. Under Part D, a "coverage gap" is a period of insurance coverage. *See* CMS Frequently Asked Question ID 4855, *http://questions.cms.hhs.gov/cgi-bin/cmshhs.cfg/php/enduser/std_adp.php?p_faqid=4855* (regarding prescription drug benefit coordination of benefits and TrOOP). During the coverage gap, beneficiaries remain enrolled in their Part D plans and have a continuing obligation to pay Part D premiums; Part D plans continue to receive the monthly per-enrollee direct subsidy from the Medicare program. Moreover, subsidies during the coverage gap are not like furnishing free drugs where no Federal health care program is billed. Sufficient spending during the coverage gap qualifies the beneficiary to reach the catastrophic coverage portion of the Part D benefit, at which point the Medicare program resumes payment for most of the costs of the beneficiary's drugs. In this regard, the different structures of the Part B and Part D benefits are crucial to the analysis.

[5] 42 U.S.C. 1320a–7b(b).

[6] 42 U.S.C. 1320a–7(b)(7); 42 U.S.C. 1320a–7a(a)(7).

[7] In some cases, a subsidy for Part D cost-sharing obligations provided by a pharmaceutical manufacturer may also implicate the prohibition on offering inducements to beneficiaries, as set forth in section 1128A(a)(5) of the Act, if the subsidy is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier, such as a physician or pharmacy. We have interpreted "provider, practitioner, or supplier" to exclude pharmaceutical manufacturers unless they also own or operate pharmacies, pharmaceutical benefits management companies, or other entities that file claims for payment under the Medicare or Medicaid programs. *See* Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries, supra note 4.

[8] *See* 42 CFR 423.100; 42 CFR 423.464; 70 FR 4194, 4239 (January 28, 2005). We note that CMS is the proper agency to address questions about the mechanics of calculating TrOOP. In certain circumstances, knowing improper TrOOP calculations may give rise to liability under the False Claims Act, 31 U.S.C. 3729–33.

[9] *See* 70 FR 4194 at 4239.

[10] *See, e.g.*, OIG Advisory Opinion Nos. 02–13 and 03–3 (unfavorable opinions involving proposals

**Ex. 33**
p. 10 p. 371

catastrophic benefit in any given coverage year and to hasten the point during the coverage year at which beneficiaries reach the catastrophic benefit. This is of particular import because Medicare will make cost-based payments during the catastrophic coverage benefit.[12] We know from experience that cost-based reimbursement is inherently prone to abuse, including by vendors that sell products reimbursed on a cost basis. Similarly, we are concerned about the use of cost-sharing subsidies to shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices. Inflated prices could have a "spillover" effect on the size of direct subsidies, reinsurance payments, and risk corridor payments paid by Medicare to Part D plans in future years,[13] potentially resulting in higher costs to the Medicare program.

i̇  Beneficiary steering and anti-competitive effects. Subsidies provided by traditional pharmaceutical manufacturer PAPs have the practical effect of locking beneficiaries into the manufacturer's product, even if there are other equally effective, less costly alternatives (and even if the patient's physician would otherwise prescribe one of these alternatives). Subsidizing Medicare Part D cost-sharing amounts will have this same steering effect. Moreover, as we have previously noted in the Part B context, cost-sharing subsidies can be very profitable for manufacturers, providing additional incentives for abuse. So long as the manufacturer's sales price for the product exceeds its marginal variable costs plus the amount of the cost-sharing assistance, the manufacturer makes a profit. These profits can be considerable, especially for expensive drugs for chronic conditions. We are concerned that pharmaceutical manufacturers may seek improperly to maximize these profits by creating sham "independent" charities to operate PAPs; by colluding with independent charity programs to ensure that the manufacturer's contributions only or primarily benefit patients using its products (discussed in more detail below); or by manipulating financial need or other eligibility criteria to maximize the number of beneficiaries qualifying for cost-sharing subsidies.

These risks are necessarily illustrative, not exhaustive, of the potential risks presented by pharmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts.

Cost-sharing subsidies offered by a pharmaceutical manufacturer PAP to the dispensing supplier differ in two important respects from a provider's or supplier's unadvertised, non-routine waiver of cost-sharing amounts based on a patient's financial need, which has long been permitted. First, the subsidies result in the dispensing supplier receiving full payment for the product and avoiding the risk of non-collection, thus providing the supplier with an economic incentive to favor the subsidized product and a disincentive to recommend a lower-cost alternative, such as a generic. In addition, the availability of PAP assistance is typically advertised and may influence a beneficiary's choice of product (through the prescribing physician acting on behalf of the beneficiary). Moreover, once a beneficiary is enrolled in a pharmaceutical manufacturer PAP, the beneficiary is effectively locked into using the pharmaceutical manufacturer's product, since the beneficiary risks losing financial assistance if he or she switches products, even if an equally effective, but less expensive, product would be in his or her best medical interests.

A definitive conclusion regarding whether a particular manufacturer PAP violates the anti-kickback statute would require a case-by-case analysis of all of the relevant facts and circumstances, including the intent of the parties. However, for the reasons noted above, we believe that pharmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts raise substantial concerns under the anti-kickback statute.

B. Independent Charity PAPs

Long-standing OIG guidance makes clear that pharmaceutical manufacturers can effectively contribute to the pharmaceutical safety net by making cash donations to independent, *bona fide* charitable assistance programs.[14]

Under a properly structured program, donations from a pharmaceutical manufacturer to an independent, *bona fide* charity that provides cost-sharing subsidies for Part D drugs should raise few, if any, anti-kickback statute concerns, so long as:

(i) Neither the pharmaceutical manufacturer nor any affiliate of the manufacturer (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) exerts any direct or indirect influence or control over the charity or the subsidy program;

(ii) The charity awards assistance in a truly independent manner that severs any link between the pharmaceutical manufacturer's funding and the beneficiary (*i.e.*, the assistance provided to the beneficiary cannot be attributed to the donating pharmaceutical manufacturer);

(iii) The charity awards assistance without regard to the pharmaceutical manufacturer's interests and without regard to the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

(iv) The charity provides assistance based upon a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner; and [15]

(v) The pharmaceutical manufacturer does not solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products.[16]

---

[12] *See* 42 CFR 423.329. For purposes of calculating payments under catastrophic coverage, the cost of a beneficiary's drug is based in part on the plan's negotiated price (*i.e.*, a price that is set by the plan based on negotiations with pharmaceutical manufacturers and pharmacies).

[13] *See* 42 CFR 423.329; 42 CFR 423.336.

[14] In-kind donations of drugs to independent charity PAPs pose additional risks not yet directly addressed in prior OIG guidance, and we have insufficient experience with them to offer detailed guidance here. While in-kind donations have the potential benefit of increasing the value of donations (because marginal costs of drugs are generally low), they also have the effect of creating a direct correlation between the donation and use of a particular donor's product, thereby weakening important safeguards of an independent charity PAP arrangement. Moreover, there would appear to be difficult accounting and valuation issues raised by the use of in-kind product to subsidize Part D

cost-sharing obligations, both for purposes of calculating TrOOP and for purposes of determining the amount of in-kind drug that equals the Part D cost-sharing amount owed.

[15] We recognize that what constitutes an appropriate determination of financial need may vary depending on individual patient circumstances. We believe that independent charity PAPs should have flexibility to consider relevant variables beyond income. For example, PAPs may choose to consider the local cost of living; a patient's assets and expenses; a patient's family size; and the scope and extent of a patient's medical bills.

[16] We have previously approved a *bona fide* independent charity PAP arrangement that included only limited reporting of *aggregate* data to donors in the form of monthly or less frequent reports containing *aggregate* data about the number of all applicants for assistance in a disease category and the number of patients qualifying for assistance in that disease category. *See* OIG Advisory Opinion No. 02–1. No individual patient information may be conveyed to donors. Moreover, neither patients nor donors may be informed of the donation made to the PAP by others, although, as required by Internal Revenue Service regulations, the PAP's annual report and a list of donors may be publicly available. *See* OIG Advisory Opinion No. 04–15. Reporting of data that is not in the aggregate or that is patient specific would be problematic, as would reporting of any data, whether or not in the

Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices.[17]

We recognize that some *bona fide* independent charities reasonably focus their efforts on patients with particular diseases (such as cancer or diabetes) and that some of these charities permit donors to earmark their contributions generally for support of patients with a specific disease. In general, the fact that a pharmaceutical manufacturer's donations are earmarked for one or more broad disease categories should not significantly raise the risk of abuse. However, we are concerned that, in some cases, charities may artificially define their disease categories so narrowly that the earmarking effectively results in the subsidization of one (or a very few) of donor's particular products. For example, we would be concerned if disease categories were defined by reference to specific symptoms, severity of symptoms, or the method of administration of drugs, rather than by diagnoses or broadly recognized illnesses or diseases. This type of arrangement would present an elevated risk of fraud and abuse because of the increased likelihood that the PAP would function as an improper conduit for manufacturers to provide funds to patients using their specific drugs. To avoid this risk, pharmaceutical manufacturers should not influence, directly or indirectly, the identification of disease or illness categories,[18] and pharmaceutical manufacturers should limit their earmarked donations to PAPs that define categories in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of available products.[19]

---

aggregate, related to the identity, amount, or nature of subsidized drugs.

[17] For further guidance on establishing compliant independent charity PAPs, see OIG Advisory Opinion Nos. 04–15, 02–1, 98–17, and 97–1 (favorable opinions issued to *bona fide*, independent charities that accept industry funding).

[18] Nothing in this Bulletin should be construed as preventing a charity from obtaining educational materials from donors that the donors generally make available to practitioners or the general public (*e.g.*, clinical information about drug products).

[19] We recognize that, in rare circumstances, there may only be one drug covered by Part D for the diseases in a particular category or only one pharmaceutical manufacturer (including its affiliates) that makes all of the Part D covered drugs for the diseases in a particular category. In these unusual circumstances, the fact that a disease category only includes one drug or manufacturer would not, standing alone, be determinative of an anti-kickback statute violation. Such a determination could only be made on a case-by-case basis after examining all of the applicable facts and

## C. PAPs Operating Outside Part D

CMS has issued guidance stating that PAPs may elect to provide free drugs to financially needy Medicare Part D enrollees outside the Part D benefit.[20] In these circumstances, the beneficiary obtains drugs without using his or her Part D insurance benefit. Beginning when a beneficiary's assistance under a PAP became effective, no claims for payment for any covered outpatient prescription drug provided outside of the Part D benefit may be filed with a Part D plan or the beneficiary, and the assistance must not count toward the beneficiary's TrOOP or total Part D spending for any purpose. For the reasons noted in connection with pharmaceutical manufacturer PAPs discussed above, PAPs that provide assistance outside the Part D benefit only during the coverage gap (*i.e.*, ''wrapping around'' the Part D benefit) pose a heightened risk of abuse. However, while it is difficult to assess the application of the fraud and abuse laws to PAPs that operate outside Part D absent a specific set of facts, it would appear that PAPs that furnish free outpatient prescription drugs entirely outside the Part D benefit pose a reduced risk under the anti-kickback statute, provided that:

(i) The PAP includes safeguards that ensure that Part D plans are notified that the drug is being provided outside the Part D benefit so that no payment is made for the subsidized drug by any Part D plan and no part of the costs of the subsidized drug is counted toward any beneficiary's TrOOP;

(ii) The PAP provides assistance for the whole Part D coverage year (or the portion of the coverage year remaining after the beneficiary first begins receiving the Part D assistance);[21]

(iii) The PAP assistance remains available even if the beneficiary's use of the subsidized drug is periodic during the coverage year;

(iv) The PAP maintains accurate and contemporaneous records of the

---

circumstances, including the intent of the parties. We note that it would be important for the PAP program to cover additional products or manufacturers as they become available.

[20] *See* CMS Frequently Asked Question ID 6153, *http://questions.cms.hhs.gov/cgi-bin/cmshhs.cfg/php/enduser/std_adp.php?p_faqid=6153* (regarding PAPs providing assistance with Part D drug costs to Part D enrollees outside of the Part D benefit and without counting towards TrOOP).

[21] We note that our position that PAPs operating outside the Part D benefit should provide assistance for the remainder of the coverage year is consistent with our observation in several advisory opinions that manufacturers ''may provide free drugs to financially needy beneficiaries, so long as no Federal health care program is billed for all or part of the drugs.'' OIG Advisory Opinion Nos. 02–13 and 03–3.

subsidized drugs to permit the Government to verify the provision of drugs outside the Part D benefit;

(v) Assistance is awarded based on reasonable, uniform, and consistent measures of financial need and without regard to the providers, practitioners, or suppliers used by the patient or the Part D plan in which the patient is enrolled; and

(vi) The arrangement complies with any then-existing guidance from CMS.

In addition, to promote quality of care, we believe it would be important for PAPs that provide free drugs outside the Part D benefit to coordinate effectively with Part D plans so that the plans can undertake appropriate drug utilization review and medication therapy management program activities.

## D. ''Coalition Model'' PAPs

We are aware of nascent efforts by some in the industry to develop arrangements through which multiple pharmaceutical manufacturers would join together to offer financially needy Part D enrollees a card or similar vehicle that would entitle the enrollees to subsidies of their cost-sharing obligations for the manufacturers' products, typically in the form of discounts off the negotiated price otherwise available to the enrollee under his or her Part D plan. It is premature to offer definitive guidance on these evolving programs. Although these programs would operate so that the manufacturers effectively underwrite only the discounts on their own products, we observe that the risk of an illegal inducement potentially may be reduced if: (i) The program contains features that adequately safeguard against incentives for card holders to favor one drug product (or any one supplier, provider, practitioner, or Part D plan) over another; (ii) the program includes a large number of manufacturers, including competing manufacturers and manufacturers of both branded and generic products, sufficient to sever any nexus between the subsidy and a beneficiary's choice of drug; and (iii) each participating pharmaceutical manufacturer offers subsidies for *all* of its products that are covered by *any* Part D plan formulary. Other safeguards may also be needed to reduce the risk of an improper inducement. Moreover, a program under which Part D enrollees pay a portion of their drug costs out-of-pocket would tend to reduce the risk of abuse by preserving the beneficiary's incentive to locate and purchase equally effective, lower cost drugs.

## IV. Bulk Replacement Models

Bulk replacement'' or similar programs, pursuant to which pharmaceutical manufacturers (or their affiliated PAPs) provide in-kind donations in the form of free drugs to pharmacies, health centers, clinics, and other entities that dispense drugs to qualifying uninsured patients, are different from traditional PAPs that provide assistance directly to patients. These programs potentially implicate the Federal anti-kickback statute if the free drugs are given to a recipient that is in a position to generate Federal health care program business for the donor manufacturer. Whether a particular bulk replacement program complies with the fraud and abuse laws would require a case-by-case analysis. In undertaking any analysis, we would consider, among other factors, how the program is structured and whether there are safeguards in place: (i) To protect Federal health care program beneficiaries from being steered to particular drugs based on the financial interests of their health care providers or suppliers; (ii) to protect the Federal health care programs from increased program costs; and (iii) to ensure that bulk replacement drugs are not improperly charged to Federal health care programs. Additionally, bulk replacement as a means of subsidizing only the Medicare Part D cost-sharing amount potentially raises substantial risks related to accounting for the amount of replacement drug that would be equivalent to the cost-sharing amount owed by the beneficiary; properly attributing that amount to specific beneficiaries; and properly calculating TrOOP.

## V. Transitioning From Existing Pharmaceutical Manufacturer PAPs

OIG is mindful of the importance of a smooth, effective transition for beneficiaries who are currently participating in pharmaceutical manufacturer PAPs and elect to enroll in Medicare Part D. While most such enrollees are likely to qualify for the low-income subsidies available under Part D, we are concerned that there may not be sufficient independent charity PAPs available before the January 1, 2006 start date of the Part D program to accommodate beneficiaries of limited means who may need an alternative PAP arrangement. We recognize the importance of not unnecessarily burdening or alarming beneficiaries. We believe that manufacturers will play an important role in ensuring an effective transition.

With respect to pharmaceutical manufacturer PAPs that are in existence prior to the date of publication of this Special Advisory Bulletin, during the initial calendar year of the Part D benefit, OIG will take into consideration in exercising its enforcement discretion with respect to administrative sanctions arising under the anti-kickback statute whether the PAP is taking prompt, reasonable, verifiable, and meaningful steps to transition patients who enroll in Part D to alternative assistance models, such as independent charities.

In addition to taking steps to transition beneficiaries to other programs, pharmaceutical manufacturer PAPs can reduce their fraud and abuse exposure by taking one or more of the following steps: (i) Adjusting financial need criteria to reflect the lower drug costs incurred by Part D enrollees (*i.e.*, liability for premiums and cost-sharing amounts only, instead of the total cost of the drugs); (ii) where possible, subsidizing other drugs in the same class as the manufacturer's products covered by the PAP if a beneficiary's physician prescribes an alternate product; and (iii) checking CMS eligibility files, to the extent available, on a reasonably regular basis to determine whether PAP patients have enrolled in Part D and should be transitioned to other assistance programs. Occasional, inadvertent cost-sharing subsidies provided to a Part D enrollee should not be problematic (*e.g.*, where, despite due diligence, a pharmaceutical manufacturer PAP does not know and should not have known that a beneficiary has enrolled in Medicare Part D). Notwithstanding a pharmaceutical manufacturer's compliance with the foregoing, the Government will take enforcement action in cases where there is evidence of unlawful intent.

The potential variability of PAPs, the fact that the Part D program is not yet operational, and the fact that it is not possible to predict all future or potential fraud and abuse schemes with certainty, make it difficult to provide comprehensive general guidance on the application of the anti-kickback statute to PAPs for Part D enrollees at this time. We intend to monitor the situation closely and may issue further guidance, if needed. Nothing in this Bulletin should be construed as precluding any form of lawful assistance not described in this Bulletin.

## VI. OIG Advisory Opinion Process

OIG has an advisory opinion process that is available to individuals and entities, including pharmaceutical manufacturers, that want assurance that

they will not run afoul of the fraud and abuse laws.[22] OIG advisory opinions are written opinions that are legally binding on OIG, the Department, and the party that requests the opinion. To obtain an opinion, the requesting party must submit a detailed, written description of its existing or proposed business arrangement. The length of time that it takes for OIG to issue an opinion varies based upon a number of factors, including the complexity of the arrangement, the completeness of the submission, and how promptly the requestor responds to requests for additional information. Further information about the process, including frequently asked questions, can be found on the OIG Web page at *http://oig.hhs.gov/fraud/advisoryopinions.html*.

The Office of Inspector General (OIG) was established at the Department of Health and Human Services by Congress in 1976 to identify and eliminate fraud, abuse, and waste in the Department's programs and to promote efficiency and economy in departmental operations. OIG carries out this mission through a nationwide program of audits, investigations, and inspections. The Health Care Fraud and Abuse Control Program, established by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), authorized OIG to provide guidance to the health care industry to prevent fraud and abuse and to promote the highest level of ethical and lawful conduct. To further these goals, OIG issues Special Advisory Bulletins about industry practices or arrangements that potentially implicate the fraud and abuse authorities subject to enforcement by OIG.

**Daniel R. Levinson,**
*Inspector General.*
[FR Doc. 05–23038 Filed 11–21–05; 8:45 am]
**BILLING CODE 4150–04–P**

## DEPARTMENT OF HOMELAND SECURITY

[DHS–2005–0054]

## Office of State and Local Government Coordination and Preparedness; SAFER Grant Program

**AGENCY:** Office of State and Local Government Coordination and Preparedness, DHS.

**ACTION:** Notice and request for comment.

**SUMMARY:** Pursuant to the Paperwork Reduction Act, the Department of Homeland Security (DHS) solicited comments on the proposed collection of information in connection with the Staffing for Adequate Fire and Emergency (SAFER) Grant Application.

---

[22] Section 1128D(b) of the Act; 42 CFR part 1008.

# EXHIBIT B

recommended by a urologist based on current standard of care, before consideration of PROGENSA PCA3 ASSAY results. A PCA3 score <25 is associated with a decreased likelihood of a positive biopsy. Prostatic biopsy is required for diagnosis of cancer. Subsequent to this approval, the Patent and Trademark Office received a patent term restoration application for PROGENSA PCA3 ASSAY (U.S. Patent No. 7,008,765) from The Johns Hopkins University & The Stichting Katholieke Universiteit, The University Medical Centre Nijmegen, and the Patent and Trademark Office requested FDA's assistance in determining this patent's eligibility for patent term restoration. In a letter dated February 1, 2013, FDA advised the Patent and Trademark Office that this medical device had undergone a regulatory review period and that the approval of PROGENSA PCA3 ASSAY represented the first permitted commercial marketing or use of the product. Thereafter, the Patent and Trademark Office requested that the FDA determine the product's regulatory review period.

FDA has determined that the applicable regulatory review period for PROGENSA PCA3 ASSAY is 936 days. Of this time, 383 days occurred during the testing phase of the regulatory review period, while 553 days occurred during the approval phase. These periods of time were derived from the following dates:

1. *The date an exemption under section 520(g) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) (21 U.S.C. 360j(g)) involving this device became effective or if an exemption is not required, the date an institutional review board under section 520(g)(3) of the FD&C Act (21 U.S.C. 360j(g)(3)) approved the clinical investigation of the device in humans:* July 24, 2009. FDA has confirmed the applicant's claim that no investigational device exemption (IDE) was required under section 520(g) of the FD&C Act for human tests to begin. Institutional review board (IRB) approval was required under section 520(g)(3) of the FD&C Act and became effective on July 24, 2009.

2. *The date an application was initially submitted with respect to the device under section 515 of the FD&C Act (21 U.S.C. 360e):* August 10, 2010. FDA has verified the applicant's claim that the premarket approval application (PMA) for PROGENSA PCA3 ASSAY (PMA 100033) was initially submitted August 10, 2010.

3. *The date the application was approved:* February 13, 2012. FDA has verified the applicant's claim that PMA

P100033 was approved on February 13, 2012.

This determination of the regulatory review period establishes the maximum potential length of a patent extension. However, the Patent and Trademark Office applies several statutory limitations in its calculations of the actual period for patent extension. In its application for patent extension, this applicant seeks 745 days of patent term extension.

Anyone with knowledge that any of the dates as published are incorrect may submit to the Division of Dockets Management (see **ADDRESSES**) either electronic or written comments and ask for a redetermination by July 29, 2014. Furthermore, any interested person may petition FDA for a determination regarding whether the applicant for extension acted with due diligence during the regulatory review period by November 26, 2014. To meet its burden, the petition must contain sufficient facts to merit an FDA investigation. (See H. Rept. 857, part 1, 98th Cong., 2d sess., pp. 41–42, 1984.) Petitions should be in the format specified in 21 CFR 10.30.

Interested persons may submit to the Division of Dockets Management (see **ADDRESSES**) electronic or written comments and written or electronic petitions. It is only necessary to send one set of comments. Identify comments with the docket number found in brackets in the heading of this document. If you submit a written petition, two copies are required. A petition submitted electronically must be submitted to *http://www.regulations.gov,* Docket No. FDA–2013–S–0610. Comments and petitions that have not been made publicly available on *http://www.regulations.gov* may be viewed in the Division of Dockets Management between 9 a.m. and 4 p.m., Monday through Friday.

Dated: May 27, 2014.

**Leslie Kux,**

*Assistant Commissioner for Policy.*

[FR Doc. 2014–12562 Filed 5–29–14; 8:45 am]

**BILLING CODE 4160–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of Inspector General

### Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs

**AGENCY:** Office of Inspector General (OIG), HHS.

**ACTION:** Notice.

---

**SUMMARY:** This Supplemental Bulletin updates the OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees that published in the **Federal Register** on November 22, 2005 (70 FR 70623).

**SUPPLEMENTARY INFORMATION:**

## I. Introduction

Patients who cannot afford their cost-sharing obligations for prescription drugs may be able to obtain financial assistance through a patient assistance program (PAP). PAPs have long provided important safety net assistance to such patients, many of whom have chronic illnesses and high drug costs. Many PAPs also present a risk of fraud, waste, and abuse with respect to Medicare and other Federal health care programs. We issued a Special Advisory Bulletin regarding PAPs in 2005 [1] (the 2005 SAB) in anticipation of questions likely to arise in connection with the Medicare Part D benefit. In the 2005 SAB, we addressed different types of PAPs and stated that we believed lawful avenues exist for pharmaceutical manufacturers and others to help ensure that all Part D beneficiaries can afford medically necessary drugs.[2] We also noted in the 2005 SAB that we could only speculate on fraud and abuse risk areas, because the Part D benefit had not yet begun. This Supplemental Special Advisory Bulletin (Supplemental Bulletin) is based on experience we have gained in the intervening years; it is not intended to replace the 2005 SAB, nor does it replace other relevant guidance, such as the 2002 OIG Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries.[3]

We continue to believe that properly structured PAPs can help Federal health care program beneficiaries. This Supplemental Bulletin provides additional guidance regarding PAPs operated by independent charities (Independent Charity PAPs) that provide cost-sharing assistance for

---

[1] OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 FR 70623 (Nov. 22, 2005), available at: *http://oig.hhs.gov/fraud/docs/alertsandbulletins/2005/2005PAPSpecialAdvisoryBulletin.pdf.*

[2] The 2005 SAB focused on PAPs under the then-upcoming Part D program, but the guidance also referenced co-payment assistance programs for drugs covered under Medicare Part B. Although these Medicare programs differ, and the types of PAPs may differ, the principles set forth in the 2005 SAB and herein apply regardless of which Federal health care program (as defined in section 1128B(f) of the Social Security Act (the Act)) covers the drugs.

[3] The 2002 OIG Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries is available at: *http://oig.hhs.gov/fraud/docs/alertsandbulletins/SABGiftsandInducements.pdf.*

prescription drugs. To address some of the specific risks that have come to our attention in recent years, this guidance discusses problematic features of PAPs with respect to the anti-kickback statute, section 1128B(b) of the Act,[4] and the provision of the Civil Monetary Penalties Law prohibiting inducements to Medicare and Medicaid beneficiaries (Beneficiary Inducements CMP), section 1128A(a)(5) of the Act.[5] Other potential risk areas, including, for example, potential liability under the False Claims Act, 31 U.S.C. 3729–33, or other Federal or State laws, are not addressed here.

## II. The Anti-Kickback Statute and the Beneficiary Inducements CMP

The anti-kickback statute makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any Federal health care program, including Medicare and Medicaid. Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated. By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible ''kickback'' transaction. For purposes of the anti-kickback statute, ''remuneration'' includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind. The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to give or obtain money for the referral of services or to induce further referrals. Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to 5 years, or both. OIG may also initiate administrative proceedings to exclude a person from Federal health care programs or to impose civil monetary penalties for kickback violations under sections 1128(b)(7) and 1128A(a)(7) of the Act.[6]

Two remunerative aspects of PAP arrangements require scrutiny under the anti-kickback statute: donor contributions to PAPs (which can also be analyzed as indirect remuneration to patients) and PAPs' grants to patients. If a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items, the statute could be violated. Similarly, if a PAP's grant of

financial assistance to a patient is made to influence the patient to purchase (or to induce the patient's physician to prescribe) certain items, the statute also could be violated. A determination regarding whether a particular arrangement violates the anti-kickback statute requires an individualized evaluation of all of the relevant facts and circumstances, including the parties' intent. For PAPs, the nature, structure, sponsorship, and funding of the particular PAP are factors relevant to the analysis.

The Beneficiary Inducements CMP provides for the imposition of civil monetary penalties against any person that offers or transfers remuneration to a Medicare or State health care program (as defined under section 1128(h) of the Act) beneficiary that the benefactor knows or should know is likely to influence the beneficiary to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, by Medicare or a State health care program. OIG may initiate administrative proceedings to seek such CMPs and exclude such person from the Federal health care programs. A subsidy for cost-sharing obligations provided by a pharmaceutical manufacturer through a PAP may implicate the Beneficiary Inducements CMP, if the subsidy is likely to influence a Medicare or State health care program beneficiary's selection of a particular provider, practitioner, or supplier, such as by making eligibility dependent on the patient's use of certain prescribing physicians or certain pharmacies to dispense the drugs.

## III. Independent Charity PAPs

Longstanding OIG guidance, including the 2005 SAB, makes clear that pharmaceutical manufacturers can effectively contribute to the safety net by making cash donations to independent, *bona fide* charitable assistance programs. The 2005 SAB sets forth a number of factors that we continue to believe are fundamental to a properly structured Independent Charity PAP. *See* 70 FR 70626. Many of these factors relate to the independence of the charity, as discussed further below. In this Supplemental Bulletin, we expand on our previous guidance in that regard, focusing on three areas: Disease funds, eligible recipients, and the conduct of donors.

### A. Disease Funds

As we explained in the 2005 SAB, we recognize that *bona fide* independent charities may reasonably focus their

efforts on patients with particular diseases (such as cancer or diabetes) and that, in general, the fact that a pharmaceutical manufacturer's donations to an independent charity are earmarked for one or more broad disease funds should not significantly raise the risk of abuse. At the same time, however, we also expressed our concern that, in some cases, charities might define their disease funds so narrowly that the earmarking effectively results in a donor's subsidization of its own products. Over the past several years, we have become aware that some Independent Charity PAPs are, in fact, establishing narrowly defined disease funds and covering a limited number of drugs within those funds. To address this development, we discuss and expand on some of the safeguards that we originally set forth in the 2005 SAB to reduce the risk of abuse. We reiterate here that an Independent Charity PAP must not function as a conduit for payments or other benefits from the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices.

One of the points we made in the Independent Charity PAPs section of the 2005 SAB was that pharmaceutical manufacturers and their affiliates should not exert any direct or indirect influence or control over the charity or its assistance program. We also stated that donors should not influence the identification of disease funds [7] and that we would be concerned if disease funds were defined by reference to specific symptoms, severity of symptoms, or the method of administration of drugs. These were merely examples—not an exclusive list—of improperly narrow approaches to defining disease funds. For example, we also are concerned about disease funds defined by reference to the stages of a particular disease, the type of drug treatment, and any other ways of narrowing the definition of widely recognized disease states. A charity with narrowly defined disease funds may be subject to scrutiny if the disease funds result in funding exclusively or primarily the products of donors or if other facts and circumstances suggest that the disease fund is operated to induce the purchase of donors' products.[8]

---

[4] 42 U.S.C. 1320a–7b(b).

[5] 42 U.S.C. 1320a–7a(a)(5).

[6] 42 U.S.C. 1320a–7(b)(7) and 42 U.S.C. 1320a–7a(a)(7).

---

[7] The 2005 SAB used the term ''disease categories.'' Our experience since 2005 suggests that the term ''disease fund'' is more accurate in this context.

[8] This is true even if the charity has obtained a favorable advisory opinion, because favorable opinions related to PAPs typically are based upon the charity's certifications that: (1) No donor or affiliate of any donor has exerted or will exert any
Continued

We also are increasingly concerned about Independent Charity PAPs that choose to establish or operate disease funds that limit assistance to a subset of available products. Through our advisory opinion process, we have seen Independent Charity PAPs seeking to cover few drugs, such as by covering copayments only for expensive or specialty drugs. We are concerned that funds limited in this manner may not be beneficial to patients or Federal health care programs. Beneficiaries should not be tied to a particular product, or to a subset of available products, to receive or continue their assistance. Although we recognize that a patient prescribed an expensive drug may have a greater need for financial assistance than a patient prescribed a less expensive alternative, we are concerned that limiting PAP cost-sharing support to expensive products may steer patients in a manner that is costly to Federal health care programs and may even facilitate increases in drug prices. Moreover, whether a drug is "expensive" is a relative question that depends, in part, on the financial resources of the consumer; even a generic drug can be expensive for some patients. Finally, limiting assistance to certain drugs may steer patients away from potentially more beneficial products because assistance is available for one treatment and not another. Consequently, a fund will be subject to more scrutiny if it is limited to a subset of available products, rather than all products approved by the Food and Drug Administration (FDA) for treatment of the disease state(s) covered by the fund or all products covered by the relevant Federal health care program when prescribed for the treatment of the disease states (including generic or bioequivalent drugs).[9]

___

direct or indirect influence or control over the charity or any of the charity's programs; (2) the charity will define its disease funds in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of available products; and (3) the charity's disease funds will not be defined by reference to specific symptoms, severity of symptoms, or the method of administration of drugs. If the arrangement does not in practice comport with the facts presented in the advisory opinion, then the arrangement is not protected by the opinion. All of our advisory opinions are available on the OIG Web site at: *http://oig.hhs.gov/compliance/advisory-opinions/ index.asp.*

[9] An Independent Charity PAP is not required to provide assistance for drugs prescribed off-label. However, we would expect a truly independent charity to treat all its funds equally. Thus, if the Independent Charity PAP offered assistance for all drugs covered by Medicare in Fund A, but limited assistance offered for Fund B to FDA-approved uses, the funds could be subject to scrutiny to determine whether either coverage determination was made to benefit a donor.

The 2005 SAB acknowledged that, in rare circumstances, there may be only one drug covered by Part D for the disease(s) in a particular disease fund or only one pharmaceutical manufacturer (including its affiliates) that makes all of the Part D covered drugs for the disease(s) in a particular disease fund. The 2005 SAB noted that, in these unusual circumstances, the fact that a disease fund includes only one drug or drugs made by one manufacturer would not, standing alone, be determinative of an anti-kickback statute violation. A determination of an anti-kickback statute violation can be made only on a case-by-case basis after examining the applicable facts and circumstances, including the intent of the parties. Notwithstanding the need for an individualized analysis, a disease fund that covers only a single product, or the products made or marketed by only a single manufacturer that is a major donor to the fund, will be subject to scrutiny. When determining whether an anti-kickback violation occurred, we would consider, among other factors, whether the disease fund in question appears to be narrowly defined in a manner that favors any of the fund's donors.

While we understand that many charities have limited resources and seek to use them to assist patients with the greatest financial need, assessing a patient's financial need is a separate concern from determining which drugs to include in a disease fund. Narrowly defining disease funds or limiting disease funds to provide assistance only for expensive drugs can result in steering patients to the drugs for which assistance is available. This type of steering increases the likelihood that the donors could use the PAPs as improper conduits to provide a subsidy to patients who use the donors' own products. This potentially increases costs to the Federal health care programs in cases where a lower cost, equally effective drug is available. Moreover, the ability to subsidize copayments for their own products may encourage manufacturers to increase prices, potentially at additional cost to Federal health care programs and beneficiaries who are unable to obtain copayment support.

In short, disease funds should be defined in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of products; disease funds should not be defined for the purpose of limiting the drugs for which the Independent Charity PAP provides assistance.

*B. Eligible Recipients*

It has come to our attention that some Independent Charity PAPs have started operating, or seek to operate, funds that provide financial assistance only to Federal health care program beneficiaries. We do not believe that the mere fact that a fund serves only Federal health care program beneficiaries increases risk to the Federal health care programs. In fact, we issued a favorable advisory opinion to an Independent Charity PAP that intended to develop a fund to serve only Medicare beneficiaries.[10] The safeguards regarding defining disease funds and recipient eligibility described in the 2005 SAB and in this Supplemental Bulletin, when properly implemented, should sufficiently protect Federal health care programs.

Regardless of whether a fund is available to all patients or is limited to Federal health care program beneficiaries, the Independent Charity PAP must determine eligibility according to a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner. Some Independent Charity PAPs base their eligibility criteria on the poverty guidelines, which take into account family size, for determining financial need. As we explained in the 2005 SAB, Independent Charity PAPs also have the flexibility to consider relevant variables beyond income. Other variables Independent Charity PAPs may choose to consider, for example, are the local cost of living and the scope and extent of a patient's total medical bills. We are not recommending or requiring any particular method for assessing financial need. We do, however, want to emphasize that the cost of the particular drug for which the patient is applying for assistance is not an appropriate stand-alone factor in determining individual financial need; it is likely one of many obligations that affects the patient's financial circumstances. We also note that generous financial need criteria, particularly when a fund is limited to a subset of available drugs or the drugs of a major donor, could be evidence of intent to fund a substantial part of the copayments for a particular drug (or drugs) for the purpose of inducing the use of that drug (or those drugs), rather than for the purpose of supporting financially needy patients diagnosed with a particular disease.

___

[10] *See* Modification of OIG Advisory Opinion 07–06, available at: *http://oig.hhs.gov/fraud/docs/ advisoryopinions/2011/AdvOpn07-06_mod.pdf.*

## C. Conduct of Donors

Thus far, this Supplemental Bulletin has focused on the conduct of Independent Charity PAPs. Similarly, when we have issued favorable advisory opinions regarding Independent Charity PAPs, the focus has been on the charities that requested the opinions——not the donors.[11] In requesting an opinion, a charity certifies to actions it will take to ensure the independence of the PAP from the donors. The charity is not in a position to certify as to the actions of the donors with parties outside the arrangement. For example, an advisory opinion issued to an independent charity regarding the PAP it operates typically states that the charity has certified that it will provide donors only with reports including data such as the aggregate number of applicants for assistance, the aggregate number of patients qualifying for assistance, and the aggregate amount disbursed from the fund during that reporting period. Thus, the charity would not give a donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services or the volume of those products supported by the PAP. The procedures described in these certifications are a critical safeguard and a material fact upon which we have relied in issuing favorable advisory opinions regarding Independent Charity PAPs. These opinions do not address actions by donors to correlate their funding of PAPs with support for their own products. Such actions may be indicative of a donor's intent to channel its financial support to copayments of its own products, which would implicate the anti-kickback statute.

## IV. Conclusion

OIG continues to believe that properly structured, Independent Charity PAPs provide a valuable resource to financially needy patients. We also believe that Independent Charity PAPs raise serious risks of fraud, waste, and abuse if they are not sufficiently independent from donors. This Supplemental Bulletin reiterates and amplifies our guidance, based on practices and trends we have seen in the industry. We recognize that some charitable organizations with PAPs have received favorable advisory opinions

that may include features that are discouraged in this Supplemental Bulletin. We are writing to all Independent Charity PAPs that have received favorable opinions to explain how we intend to work with them to ensure that approved arrangements are consistent with our guidance. We anticipate that some opinions will need to be modified. We will post any such modifications on our Web site with the original opinions, consistent with our current practice. Favorable advisory opinions will continue to protect the arrangements described in the opinions until we issue any final notice of modification or termination to the requestors of those opinions. It is our intent that there be no disruption of patient care during this process. Should donors or PAPs continue to have questions about the structure of a particular organization or transaction, the OIG Advisory Opinion process remains available. Information about the process may be found at: *http://oig.hhs.gov/faqs/advisory-opinions-faq.asp*.

Dated: May 16, 2014.

**Daniel R. Levinson,**

*Inspector General.*

[FR Doc. 2014–11769 Filed 5–29–14; 8:45 am]

**BILLING CODE 4152–01–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[Docket No. DHS–2013–0065]**

**Agency Information Collection Activities: Submission for Review; Information Collection Request for the Department of Homeland Security (DHS), Science and Technology, National Capital Region Secure Delivery Technology Program**

**AGENCY:** Science and Technology Directorate, DHS.

**ACTION:** 30-Day notice and request for comment.

**SUMMARY:** The Department of Homeland Security (DHS), Science & Technology Directorate (S&T) invites the general public to comment on data collection forms for the National Capital Region (NCR) Secure Delivery Technology program. This is a new Paper Reduction Act collection without an OMB control number. Secure Delivery Technology is responsible for improving the efficiency and effectiveness of deliveries to General Services Administration (GSA) facilities in the NCR.

Information collected by Federal Protective Service (FPS) personnel to ensure secured deliveries in the NCR

includes the delivery driver's name and license number. The information collected is used by FPS personnel to verify the identity of the driver at the delivery central screening facility and final destination locations, along with providing an auditable trail for post-delivery analysis should an event occur that requires forensics.

DHS invites interested persons to comment on the "National Capital Region Secure Delivery Technology Driver Log" form and instructions (hereinafter "Forms Package") for the S&T NCR Secure Delivery Technology. Interested persons may receive a copy of the Forms Package by contacting the DHS S&T PRA Coordinator. This notice and request for comments is required by the Paperwork Reduction Act of 1995 (Pub. L. 104–13, 44 U.S.C. chapter 35).

**DATES:** Comments are encouraged and will be accepted until June 30, 2014.

**ADDRESSES:** Interested persons are invited to submit comments, identified by docket number DHS–2013–0065, by *one* of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov*. Please follow the instructions for submitting comments.

• *Email: Jonathan.Mcentee@hq.dhs.gov*. Please include docket number DHS–2013–0065 in the subject line of the message.

• *Mail:* Science and Technology Directorate, ATTN: National Capital Region Secure Delivery Technology Program, 245 Murray Drive, Mail Stop 0202, Washington, DC 20528.

**FOR FURTHER INFORMATION CONTACT:** Jonathan Mcentee, *Jonathan.Mcentee@hq.dhs.gov*, 202–254–6139. (Not a toll free number).

**SUPPLEMENTARY INFORMATION:** The Department is committed to improving its information collection and urges all interested parties to suggest how these materials can further reduce burden while seeking necessary information under the Paper Reduction Act.

DHS is particularly interested in comments that:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Suggest ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Suggest ways to minimize the burden of the collection of information

---

[11] An advisory opinion has no application to, and cannot be relied upon by, any individual or entity other than the requestor of the opinion. Thus, a donor is not protected by an advisory opinion issued only to the entity to which it donates. *See* section 1128D(b)(4)(A) of the Act (42 U.S.C. 1320a–7d(b)(4)(A)); 42 CFR 1008.53.

# EXHIBIT C

# BARRON'S

FEATURE

# Too Close for Comfort?

By Bill Alpert   October 19, 2013

Off-duty cops secured the meeting rooms at the Gaylord Texan Resort last month, as the Chronic Disease Fund held its yearly conference at the Dallas-area hotel. Days before, the medical charity had canceled the registrations of some would-be attendees and refunded their $1,500 donations. The uninvited then got threatening lawyers' letters from Questcor Pharmaceuticals, a drug company that's been a backer of the charity and a bug zapper for short sellers.

Questcor's letters said the barred guests must have bought tickets for the charity's fundraiser and conference to get nonpublic information and manipulate Questcor stock (ticker: QCOR). Those letters, which several Wall Street recipients showed to *Barron's,* told the interlopers to prepare for litigation and to stop contacting the Chronic Disease Fund and its affiliates.

How Questcor learned the registrants' identities is a mystery that neither it nor the charity would explain. The Plano, Texas-based CDF has quickly become one of the country's largest medical charities, its annual receipts surpassing those of better-known groups such as the Susan G. Komen Foundation, which is dedicated to the treatment of breast cancer, or the March of Dimes, which focuses on preventing birth defects. Regulatory filings suggest that Questcor and the CDF owe some of their success to one another.

From 2007 through 2012, the Chronic Disease Fund's tax returns show that it pulled in donations of more than $900 million, mostly from drug companies like Questcor. The CDF has made a rich man of the charity's founder and president—46-year-old Mike Banigan. Over the same stretch, the CDF paid more than $35 million for "data-processing" services to a firm that's one of many health-care companies that share offices with the charity and are owned by Banigan. In a section of its 2012 return not shown on its Website, the charity says that last year it bought the data-processing business outright from a Banigan-related trust, for an $18 million lump sum, plus monthly payments of $1 million that could add significantly to his take.

The Chronic Disease Fund is the largest of a half-dozen nonprofit "patient-assistance programs" that have emerged in recent years to help patients



Ex. 33
p. 20 p. 381

Questcor Collaboration to Medical Charity Draws Scrutiny - Barrons

President Obama's health-care law will expand the ranks of those with health insurance, but that may also increase the number of those enrolled in high-deductible health plans. Co-pay-assistance programs were pioneered by charities like the National Organization for Rare Disorders to improve access to expensive new therapies that can be the only effective treatments for some rare cancers and other dire illnesses.

CDF's Website shows that it works with numerous drug makers, from Roche's (ROG.Switzerland) Genentech to Novartis (NVS), but few companies would seem to need its co-pay programs as much as Questcor. The Anaheim, Calif., company's only marketed product, Acthar, is a 60-year-old, naturally derived substance that it acquired in 2001, raised in price by 1,000% and now sells mostly for illnesses that can also be treated with synthetic steroids like prednisone at 1/100th the price of a $6,000 Acthar injection. A risk for Questcor is that doctors and patients would abandon Acthar for generic alternatives without the CDF programs that defray the thousand-dollar co-pays.

Questcor spokesperson Janine McCargo said in an e-mail that the company's management is "disinclined to do interviews" and prefers to "let results themselves prove or disprove theories."

Questcor's collaboration with the CDF is one of many savvy moves in the past six years that helped lift its shares from pennies apiece to a recent price of $65.80. As shown in the chart "Percentage of Questcor's Gross Sales," Questcor also has increased Acthar sales in government-funded channels like the military health-care program Tricare, as well as Medicare and Medicaid.



It's easy to see why some folks like Questcor's stock. The company has grown sales and earnings lately at an annual rate above 60%. Still, the shares trade at less than 16 times the trailing 12 months' earnings of $4.17. Management returns cash to shareholders through buybacks and a recently raised dividend that amounts to a 2% yield. But it's also easy to see why some curmudgeons have shorted 25% of Questcor's free-trading float. Questcor has disclosed that its promotional practices have been under investigation since 2012 by federal prosecutors in Philadelphia, with whom the company's cooperating. Acthar sales could also take a hit from new initiatives to curb the high-priced drug's use within Tricare and Medicare. To date, the shorts have paid a big price for their skepticism: the stock has risen 4,000% in the past six years. *Barron's* was among the skeptics ("Medical Marvel," Feb. 7, 2011).

As successful as Questcor has been at helping patients obtain Acthar, the co-

BARRON'S ✕✕✕ Reliable Market Advice in Unreliable Times SUBSCRIBE NOW

Case 3:21-cv-00165-JSC   Document 1   Filed 01/09/21   Page 173 of 392

the CDF displays an advisory letter on its Website (cdfund.org) from the Office of the Inspector General of the Department of Health and Human Services, which discusses whether the financing of the co-pay program by drug companies constitutes kickbacks to induce doctors and patients to utilize drugs that are unnecessary or more expensive than equivalents. The OIG's September 2006 advisory letter said the agency wouldn't challenge the CDF's program, as long as drug-company donors didn't influence the charity's choice of targeted diseases and a drug maker's contributions weren't earmarked for its own products.

How well the CDF has abided by those commitments is a fair question, given that eight of the 37 disease states for which the CDF Website says it is enrolling patients are diseases for which Acthar is the only drug on the charity's list of approved therapies—even though branded and generic alternatives for those diseases are on the market.

Questcor spokesperson McCargo says the company donated $3.1 million to the CDF for co-pays in the June 2013 quarter. If patients averaged a 10% co-pay, that would correspond to about $125 million in annual retail sales. She says Questcor has also provided a total of $360 million worth of free Acthar through the National Organization for Rare Disorders. The company's never explained how it distributes all those free vials, which contain five doses and have a value of $30,000 each.

When Questcor raised the price of a vial of Acthar from $1,650 to $23,000 in 2007, the drug was mainly used to treat infantile spasm, a rare kind of seizure afflicting babies, for which Acthar is a standard treatment.

Infantile syndrome is now a small part of Acthar's value to Questcor. The drug label has 18 other disease indications. Questcor's net sales more than doubled last year, topping $500 million, while earnings grew 150%, to about $200 million, or $3.14 a share. At an investor conference last month, the company estimated that 10% of Acthar sales were for infantile spasm, 30% for multiple sclerosis, 40% for a kidney disease, and 18% for arthritis and related illnesses.

After the co-pay, a course of Acthar treatment for some of these ailments can cost insurers or the government hundreds of thousands of dollars.

Questcor doesn't disclose what portion of Acthar sales go to patients covered by commercial insurance or government programs like Medicaid, but in its financial statements it must reserve for the various price rebates the government is allowed. By analyzing these reserves, *Barron's* estimates that

BARRON'S    Reliable Market Advice in Unreliable Times

**Ex. 33**
p. 22 p. 383

before rebates) in the six months ended June 2013, up from about 40% in the corresponding year-earlier period.

There has also been a seemingly sharp recent rise in sales to patients covered by Medicaid and the military's Tricare. Tricare beneficiaries make up about 3% of Americans with health coverage, but Tricare sales seem to have risen this year to 5% of Questcor's total. Records of Tricare's Acthar claims, released pursuant to a Freedom of Information request, show the drug being prescribed by a South Carolina dentist and orthopedic surgeons (who didn't respond to our queries). The apparent jump in Acthar usage among the Medicaid population correlates with a reduction in the government's rebate that made Medicaid sales of Acthar profitable for the first time to Questcor.

It may become harder to boost Acthar sales through government channels. In a meeting last month, Tricare's medical advisory panel recommended that the program not cover Acthar for arthritis and to provide it for multiple sclerosis and kidney treatment only upon appeal.

Also in September, three of Medicare's 10 regional administrators excluded Acthar from coverage under the Medicare Part B program for outpatient medical services, because most patients administer the drug themselves. Yet Part B submissions totaled about a quarter of Medicare claims for Acthar, according to insurance-claims databases that *Barron's* reviewed.

Ever since Medicare added its Part D drug benefit, the program's guardians have worried about drug companies subsidizing a patient's co-payment to induce an expensive Medicare drug claim. In a 2005 advisory bulletin, the OIG warned co-pay charities against defining disease categories so narrowly that the earmarking effectively results in the subsidization of the donor's particular products. At the time that Questcor filings first mentioned the CDF, the charity already had a program for multiple sclerosis drugs. Still, the CDF launched a program for "acute exacerbations of multiple sclerosis"— language that echoes the label of Acthar, but not those of other drugs on the CDF's roster. CDF Executive Director Clorinda Walley in a Friday e-mail confirmed that the sole drug supplied under that co-pay program was Acthar.

"We follow the OIG guidelines," said the charity's outside counsel Tom Fox, of the Washington law firm Reed Smith. "There is no steering that takes place whatsoever."

**E-mail:** editors@barrons.com

**Ex. 33**
p. 23 p. 384

**If You Want a Quick Recovery, Forgive Debts**  BARRON'S

---

**Finding a Summer Internship Amid the Coronavirus Pandemic**  WALL STREET JOURNAL

---

**New York Yankees co-owner Hank Steinbrenner dies at 63**  MARKETWATCH

---

**QB Nick Foles Moving Out of Florida, Selling 'Dream Home' for $1.85M**  REALTOR.COM

---

**The Daily Shot: U.S. Crude Oil Trading Below $20, Near 18-Year Lows**  WALL STREET JOURNAL

# EXHIBIT D

The New York Times

https://nyti.ms/JCaFwF

# Drug Maker's Donations to Co-Pay Charity Face Scrutiny

**By Andrew Pollack**

Dec. 18, 2013

As drug prices have soared in recent years and insurers have increased co-payments, a new type of charity has blossomed to fill a vital niche — helping patients pay the steep out-of-pocket costs for their medicines.

But the largest of these co-payment assistance charities, the Chronic Disease Fund, is now in turmoil after questions have arisen about its relationship with a pharmaceutical company that is itself under investigation for its marketing practices.

The practice is casting light on what has long been an open secret: The bulk of the contributions to these charities come from the pharmaceutical companies. The foundations not only help hundreds of thousands of patients a year, they also raise drug company sales and profits.

After all, if a patient cannot afford out-of-pocket costs of $5,000 for a $100,000-a-year drug, the drug company gets nothing. But if the manufacturer or the charity pays the $5,000, the patient gets the drug and the company receives $95,000 from the patient's insurance company or Medicare.

The contributions — which also provide tax deductions to drug makers — are legal as long as a company does not require that the money it donates be used exclusively to pay for its own drugs.

But articles circulating in the investment world have suggested that the Chronic Disease Fund might be showing improper favoritism toward Questcor Pharmaceuticals, which sells an expensive drug for immune diseases. Moreover,

**Ex. 33**
p. 26 p. 387

the articles noted that the charity was purchasing millions of dollars a year in services from for-profit companies owned by the charity's founder and president, Michael Banigan.

Questcor and the charity have said they are victims of a campaign by short-sellers — investors who benefit from the decline of a stock's price.

Nonetheless, fearing defections from donors, the charity hired a Washington law firm, Venable, to evaluate its practices and recommend changes to ensure it was in compliance with legal requirements.

As a result, Mr. Banigan is leaving the charity and the entire board has been replaced. The charity is also revamping policies in a way that could eliminate co-pay assistance for certain drugs, according to Jeffrey S. Tenenbaum, the head of the nonprofit organizations practice at Venable.

"When an organization comes under great scrutiny like C.D.F. has come under, you have to make sure they are squeaky clean," Mr. Tenenbaum said in an interview. He said he thought the fund and Mr. Banigan had good intentions but "just didn't know some of the things they should be doing."

**Ex. 33**
p. 27 p. 388



Michael Banigan, founder of the Chronic Disease Fund, is
leaving the charity.

Mr. Tenenbaum said the charity was cooperating with a request for information in a
federal investigation of Questcor's marketing practices. He also said that the fund
itself was "absolutely not a target of that or any other investigation." Nonetheless,
he said, he had advised the fund that an investigation might be coming.

He said the controversy "definitely has gotten the drug companies' attention."
While no company has ended its donations, some were still considering what to do,
he said.

**Ex. 33**
p. 28 p. 389

Case 3:21-cv-00165-JSC   Document 1-6   Filed 01/08/21   Page 180 of 392

The Chronic Disease Fund, which is based in Plano, Tex., received $200 million in contributions in 2012, triple its 2007 total and ranking it among the 50 largest charities in the United States. It says it helped nearly 86,000 patients last year and more than 500,000 since its inception in 2003.

Critics say co-pay assistance helps keep drug prices high and circumvents efforts by insurers to control drug spending by making consumers bear part of the cost.

"These subsidies are unfortunately used to promote the overutilization of expensive brand-name drugs," said Wells Wilkinson, a lawyer at Community Catalyst, a consumer advocacy organization.

The charities counter that any benefit to the drug companies is secondary to helping patients.

"Look at the alternative," said Dana Kuhn, founder and president of Patient Services, one of the charities. "If they didn't donate their dollars, people would die."

Drug companies often directly subsidize the co-payments for privately insured patients. But they cannot do so for patients covered by federal programs like Medicare's Part D drug benefit, because that would be considered a kickback, an illegal inducement to use a drug.

So the drug companies donate to the co-pay assistance charities. A handful of charities specialize in providing such help. In addition, some patient advocacy groups like the Leukemia and Lymphoma Society have similar programs.

Some executives of these charities now worry about increased scrutiny.

"We could all get painted with the same brush," said Patrick McKercher, president of the Patient Access Network Foundation. Its contributions more than doubled in 2012 to $179 million. It expects to help more than 100,000 patients this year, an increase from 59,000 in 2012.

The charities are supposed to solicit donations from the public, not just drug companies. Still, 81 percent of the contributions to the Chronic Disease Fund in 2011 came from two pharmaceutical companies, according to its financial report for the year. The companies were not identified.

**Ex. 33**
p. 29 p. 390

Drug companies cannot contribute money specifically for their own drugs. Rather, they donate money to provide co-payment assistance for people with a specific disease, regardless of which drug is used. The Chronic Disease Fund, its website says, provides co-pay assistance for 78 drugs used to treat 46 diseases.

For 15 of those diseases there is only one drug available, however, meaning the manufacturer of that drug can be certain its contribution will be spent on co-pays for its product.

The articles raising questions about the fund were published in October in Barron's and on the investor website Seeking Alpha.

The latter was written by an anonymous short-seller of Questcor stock.

Questcor sells a drug called H.P. Acthar Gel, which was approved more than 60 years ago to treat a variety of immune-related conditions. The company, which acquired the drug in 2001, has raised its price since then from $40 to more than $28,000 a vial.

It has been gradually expanding the marketing of its drug to different diseases. And as it does so, it appears the Chronic Disease Fund has started co-pay assistance for those diseases.

For instance, although the fund already offered support for multiple sclerosis, it started a new program for "acute exacerbations of M.S.," which applies only to Acthar.

The fund does not provide co-pay assistance for an approved drug for lupus, but it does for "exacerbations of lupus," a use of Acthar.

Questcor's contributions for co-pay assistance are increasing even faster than sales of Acthar. Its contribution of $9 million in the first nine months of this year was 74 percent higher than the same period a year earlier. Its total 2012 contribution of $8 million was quadruple the level in 2011.

Don M. Bailey, Questcor's chief executive, said at an investor conference last week that the company was "doing exactly the same thing everybody else is doing" in contributing to the charity.

**Ex. 33**
p. 30 p. 391

Mr. Tenenbaum, the lawyer, said the fund would no longer provide co-pay assistance for diseases treatable by only a single drug, unless there was clearly a second drug in development. And he said the fund would sever all ties with companies owned by Mr. Banigan, its departing president.

Mr. Banigan declined to comment. But in an email the fund forwarded to donors last week, he wrote: "There are many things I still want to accomplish in my lifetime and with C.D.F. well positioned for the future, I believe this is the right time for me to step aside and let others carry the organization forward."

Clorinda Walley, the executive director, will now run the organization. She issued a letter last week calling the earlier articles misleading but wrote that the charity was nonetheless making changes to its structure and practices aimed at "not just meeting, but exceeding best practices for nonprofit charities."

**Ex. 33**
p. 31 p. 392

# EXHIBIT E



FDA Home[3] Developing Products for Rare Diseases & Conditions[4]

## Search Orphan Drug Designations and Approvals

| | |
|---|---|
| **Generic Name:** | repository corticotropin or adrenocorticotropic hormone |
| **Trade Name:** | H.P. Acthar Gel |
| **Date Designated:** | 05/21/2003 |
| **Orphan Designation:** | Treatment of infantile spasms |
| **Orphan Designation Status:** | Designated/Approved |
| **Marketing Approval Date:** | 10/15/2010 |
| **Approved Labeled Indication:** | To treat infantile spasms |
| **Exclusivity End Date:** | 10/15/2017 |
| **Exclusivity Protected Indication*:** | |
| **Sponsor:** | Questcor Pharmaceuticals, Inc. 26118 Research Road Hayward, California 94545 USA |

*The sponsor address listed is the last reported by the sponsor to OOPD.*

*Exclusivity Protected Indications are shown for approvals from Jan. 1, 2013, to the present.

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. http://www.fda.gov/ForIndustry/DevelopingProductsforRareDiseasesConditions/default.htm

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisye | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility Contact FDA Careers FDA Basics FOIA No FEAR Act Nondiscrimination Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA



For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

U.S. Department of Health & Human Services

Case 3:21-cv-00165-JSC   Document 1-6   Filed 01/08/21   Page 185 of 392

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. http://www.fda.gov/ForIndustry/DevelopingProductsforRareDiseasesConditions/default.htm

**Ex. 33**
p. 34 p. 395
2/2

# EXHIBIT F

# CENTER FOR DRUG EVALUATION AND RESEARCH

## __Approval Package for:__

## *APPLICATION NUMBER:*

# **022432Orig1s000**

*Trade Name:*     H.P. Acthar Gel

*Generic Name:*     Repository Corticotropin Injection

*Sponsor:*     Questcor Pharmaceuticals, Inc.

*Approval Date:*     October 15, 2010

*Indications:*     an adrenocorticotropic hormone (ACTH) analogue indicated as monotherapy for the treatment of infantile spasms in infants and children under 2 years of age;

                       Indicated for the treatment of exacerbations of multiple
sclerosis in adults;

                       May be used for the following disorders and diseases: rheumatic; collagen; dermatologic; allergic states; ophthalmic; respiratory; and edematous state

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*
# 022432Orig1s000

## CONTENTS

## Reviews / Information Included in this NDA Review.

| | |
|---|---|
| **Approval Letter** | **X** |
| **Other Action Letters** | |
| **Labeling** | **X** |
| **REMS** | **X** |
| **Summary Review** | **X** |
| **Officer/Employee List** | **X** |
| **Office Director Memo** | |
| **Cross Discipline Team Leader Review** | **X** |
| **Medical Review(s)** | **X** |
| **Chemistry Review(s)** | **X** |
| **Environmental Assessment** | |
| **Pharmacology Review(s)** | **X** |
| **Statistical Review(s)** | **X** |
| **Microbiology Review(s)** | |
| **Clinical Pharmacology/Biopharmaceutics Review(s)** | **X** |
| **Other Reviews** | **X** |
| **Risk Assessment and Risk Mitigation Review(s)** | **X** |
| **Proprietary Name Review(s)** | |
| **Administrative/Correspondence Document(s)** | **X** |

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*
## 022432Orig1s000

# <u>APPROVAL LETTER</u>



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring  MD  20993**

NDA 022432

**NDA APPROVAL**

Questcor Pharmaceuticals, Inc.
Attention: Sian Bigora, Pharm.D.
Vice President, Regulatory Affairs
3260 Whipple Road
Union City, CA 94587

Dear Dr. Bigora:

Please refer to your New Drug Application (NDA) dated June 16, 2006, received June 23, 2006, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for H.P. Acthar® Gel (repository corticotropin) Injection.

We acknowledge receipt of your amendments dated December 10, 2009, and January 19, April 1, 22, and 28, June 8, and August 10, 2010.

The December 10, 2009, submission constituted a complete response to our May 10, 2007, action letter.

This new drug application provides for the use of H.P. Acthar® Gel (repository corticotropin) to treat infantile spasms.

We have completed our review of this application, as amended, and it is approved, effective on the date of this letter, for use as recommended in the enclosed, agreed-upon labeling text.

We are waiving the requirements of 21 CFR 201.57(d)(8) regarding the length of Highlights of prescribing information.  This waiver applies to all future supplements containing revised labeling unless we notify you otherwise.

## CONTENT OF LABELING

As soon as possible, but no later than 14 days from the date of this letter, submit, via the FDA automated drug registration and listing system (eLIST), the content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format, as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm, that is identical to the enclosed labeling (text for the package insert and Medication Guide). Information on submitting SPL files using eLIST may be found in the guidance for industry titled "SPL Standard for Content of Labeling Technical Qs and As" at

NDA 022432
Page 2

http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

We request that the labeling approved today be available on your website within 10 days of receipt of this letter.

## CARTON AND IMMEDIATE CONTAINER LABELS

Submit final printed carton and container labels that are identical to the enclosed carton and immediate container labels, except with the revisions listed below, as soon as they are available, but no more than 30 days after they are printed.

1. Because H.P. Acthar Gel is a multiple-dose injectable product, the strength per total volume should be the primary and prominent expression on the principle display panel, followed in close proximity by the strength per mL enclosed by parenthesis per USP standards.  Please revise the strength expression on all labels and labeling to read as follows:

   400 USP units/5 mL
   (80 USP units/mL)

2. Relocate the strength expression immediately following the established name presentation in all labels and labeling.

Please submit these labels electronically according to the guidance for industry titled "Providing Regulatory Submissions in Electronic Format – Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications (June 2008)."  Alternatively, you may submit 12 paper copies, with 6 of the copies individually mounted on heavy-weight paper or similar material.  For administrative purposes, designate this submission "**Final Printed Carton and Container Labels for approved NDA 022432**."  Approval of this submission by FDA is not required before the labeling is used.

Marketing the product with FPL that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug.

## REQUIRED PEDIATRIC ASSESSMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

Because this drug product for this indication has an orphan drug designation, you are exempt

from this requirement.

## RISK EVALUATION AND MITIGATION STRATEGY REQUIREMENTS

Section 505-1 of the FDCA authorizes FDA to require the submission of a risk evaluation and mitigation strategy (REMS), if FDA determines that such a strategy is necessary to ensure that the benefits of the drug outweigh the risks [section 505-1(a)]. The details of the REMS requirements were outlined in our REMS notification letter dated September 27, 2010.

H.P. Acthar Gel (repository corticotrophin) was approved on April 29, 1952, for multiple indications.  The label was later expanded to include multiple sclerosis (MS) in 1972.  We are now adding the indication of infantile spasms in pediatric patients.  The known risks of infections and blood pressure elevation in MS patients have also been identified as risks in the pediatric population based on clinical trial data.  Additionally, the risk of adrenal insufficiency seen in other patient populations is an important potential serious adverse event in the pediatric population. The extension of the indication to pediatrics changes the risk benefit profile of H.P. Acthar Gel (repository corticotrophin) and is considered to be "new safety information" as defined in section 505-1(b)(3) of the FDCA.

Your proposed REMS, submitted on September 28, 2010, and appended to this letter, is approved.  The REMS consists of a Medication Guide and timetable for submission of assessments of the REMS.

The REMS assessment plan should include, but is not limited to, the following:

An evaluation of patients' understanding of the serious risks of H.P. Acthar® Gel (repository corticotropin).

Assessments of an approved REMS must also include, under section 505-1(g)(3)(B) and (C), information on the status of any postapproval study or clinical trial required under section 505(o) or otherwise undertaken to investigate a safety issue.  With respect to any such postapproval study, you must include the status of such study, including whether any difficulties completing the study have been encountered.  With respect to any such postapproval clinical trial, you must include the status of such clinical trial, including whether enrollment has begun, the number of participants enrolled, the expected completion date, whether any difficulties completing the clinical trial have been encountered, and registration information with respect to requirements under subsections (i) and (j) of section 402 of the Public Health Service Act.  You can satisfy these requirements in your REMS assessments by referring to relevant information included in the most recent annual report required under section 506B and 21 CFR 314.81(b)(2)(vii) and including any material or significant updates to the status information since the annual report was prepared.  Failure to comply with the REMS assessments provisions in section 505-1(g) could result in enforcement action.

We remind you that in addition to the assessments submitted according to the timetable included in the approved REMS, you must submit a REMS assessment and may propose a modification to the approved REMS when you submit a supplemental application for a new indication for use as described in section 505-1(g)(2)(A) of FDCA.

NDA 022432
Page 4

If you currently distribute or plan to distribute an authorized generic product under this NDA, you will also need to submit a REMS, REMS supporting document, and any required appended documents for that authorized generic, to this NDA. In other words, you must submit a complete proposed REMS that relates only to the authorized generic product. Review and approval of the REMS is required before you may market your product.

Prominently identify the submission containing the REMS assessments or proposed modifications with the following wording in bold capital letters at the top of the first page of the submission as appropriate:

> **NDA 008372 REMS ASSESSMENT**
>
> **NEW SUPPLEMENT FOR NDA 008372**
>     **PROPOSED REMS MODIFICATION**
>     **REMS ASSESSMENT**
>
> **NEW SUPPLEMENT (NEW INDICATION FOR USE)**
> **FOR NDA 008372**
>     **REMS ASSESSMENT**
>     **PROPOSED REMS MODIFICATION (if included)**

If you do not submit electronically, please send 5 copies of REMS-related submissions.

## PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling. To do so, submit, in triplicate, a cover letter requesting advisory comments, the proposed materials in draft or mock-up form with annotated references, and the package insert to:

> Food and Drug Administration
> Center for Drug Evaluation and Research
> Division of Drug Marketing, Advertising, and Communications
> 5901-B Ammendale Road
> Beltsville, MD 20705-1266

As required under 21 CFR 314.81(b)(3)(i), you must submit final promotional materials, and the package insert, at the time of initial dissemination or publication, accompanied by a Form FDA 2253. For instruction on completing the Form FDA 2253, see page 2 of the Form. For more information about submission of promotional materials to the Division of Drug Marketing, Advertising, and Communications (DDMAC), see http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm090142.htm.

NDA 022432
Page 5

## LETTERS TO HEALTH CARE PROFESSIONALS

If you decide to issue a letter communicating important safety-related information about this drug product (i.e., a "Dear Health Care Professional" letter), we request that you submit, at least 24 hours prior to issuing the letter, an electronic copy of the letter to this NDA to the following address:

> MedWatch Program
> Office of Special Health Issues
> Food and Drug Administration
> 10903 New Hampshire Ave
> Building 32, Mail Stop 5353
> Silver Spring, MD 20993

## REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

All 15-day alert reports, periodic (including quarterly) adverse drug experience reports, field alerts, annual reports, supplements, and other submissions should be addressed to the original **NDA 008372** for this drug product, not to this NDA. In the future, do not make submissions to this NDA except for the final printed labeling requested above.

If you have any questions, call Susan Daugherty, Regulatory Project Manager, at (301) 796-0878.

> Sincerely,
>
> *{See appended electronic signature page}*
>
> Russell Katz, M.D.
> Director
> Division of Neurology Products
> Office of Drug Evaluation I
> Center for Drug Evaluation and Research

ENCLOSURES:
>   Content of Labeling
>   Carton and Container Labeling
>   REMS

-------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

-------------------------------------------------------------------------------------------------

/s/

----------------------------------------------------

RUSSELL G KATZ

10/15/2010

# EXHIBIT G

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*
## 022432Orig1s000

## <u>LABELING</u>

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use H.P. Acthar Gel safely and effectively.  See full prescribing information for H.P. Acthar Gel.**
**H.P. Acthar Gel (repository corticotropin) INJECTION, GEL for INTRAMUSCULAR | SUBCUTANEOUS use**
**Initial U.S. Approval: 1952**

--------------------------RECENT MAJOR CHANGES--------------------------
- Indications and Usage, (1)                                              10/10
- Dosage and Administration, (2)                                         10/10
- Contraindications, Infantile Spasms (4)                                10/10
- Warnings and Precautions (5)                                           10/10

--------------------------INDICATIONS AND USAGE--------------------------
- H.P. Acthar Gel is an adrenocorticotropic hormone (ACTH) analogue indicated as monotherapy for the treatment of infantile spasms in infants and children under 2 years of age. (1.1)
- H.P. Acthar Gel is indicated for the treatment of exacerbations of multiple sclerosis in adults. (1.2)
- H.P. Acthar Gel may be used for the following disorders and diseases: rheumatic; collagen; dermatologic; allergic states; ophthalmic; respiratory; and edematous state; (1.3 to 1.9)

--------------------DOSAGE AND ADMINISTRATION--------------------
- In the treatment of infantile spasms, the recommended dose is 150 U/m$^2$ divided into twice daily intramuscular injections of 75 U/m$^2$.  After 2 weeks of treatment, dosing should be gradually tapered and discontinued over a 2-week period. (2.1)
- In the treatment of acute exacerbations of multiple sclerosis, daily intramuscular or subcutaneous doses of 80-120 units for 2-3 weeks may be administered. It may be necessary to taper the dose. (2.2)
- In the treatment of other disorders and diseases, dosing will need to be individualized depending on the disease under treatment and the medical condition of the patient.  It may be necessary to taper the dose. (2.3)

--------------------DOSAGE FORMS AND STRENGTHS--------------------
- 5 mL multi-dose vial containing 80 USP units per mL (3)

--------------------------CONTRAINDICATIONS--------------------------
- H.P. Acthar Gel should never be given intravenously.
- H.P. Acthar Gel is contraindicated in patients with scleroderma, osteoporosis, systemic fungal infections, ocular herpes simplex, recent surgery, history of or the presence of a peptic ulcer, congestive heart failure, uncontrolled hypertension, or sensitivity to proteins of porcine origin.
- Administration of live or live attenuated vaccines is contraindicated in patients receiving immunosuppressive doses of H.P Acthar Gel.
- H.P. Acthar Gel is contraindicated in children under 2 years of age with suspected congenital infections. (4)
- Treatment of conditions listed within the INDICATIONS section is contraindicated when they are accompanied by primary adrenocortical insufficiency or adrenocortical hyperfunction. (4)

--------------------WARNINGS AND PRECAUTIONS--------------------
- Infections: Increased susceptibility to new infection and increased risk of exacerbation, dissemination or reactivation of latent infections. Signs and symptoms of infection may be masked. (5.1)
- Adrenal Insufficiency after Prolonged Therapy: Monitor for effects of

hypothalamic-pituitary-axis suppression after stopping treatment. (5 2)
- Cushing's Syndrome: May occur after prolonged therapy.  Monitor for signs and symptoms. (5.2)
- Elevated Blood Pressure, Salt and Water Retention and Hypokalemia: Monitor blood pressure and sodium and potassium levels. (5.3)
- Vaccination: Do not administer live or attenuated vaccines to patients on immunosuppressive doses. (5.4)
- Masking of Symptoms of Other Underlying Disease/Disorders.  Monitor patients for signs of other underlying disease/disorders that may be masked. (5.5)
- Gastrointestinal Perforation and Bleeding: There is a risk for gastric ulcers and bleeding.   There is an increased risk of perforation in patients with certain GI disorders. Signs and symptoms may be masked. Monitor for signs of perforation and bleeding. (5.6)
- Behavioral and Mood Disturbances: May include euphoria, insomnia, mood swings, personality changes, severe depression and psychosis. Existing conditions may be aggravated (5.7)
- Comorbid Diseases: Symptoms of diabetes and myasthenia gravis may be worsened with treatment. (5.8)
- Ophthalmic Effects: Monitor for cataracts, infections and glaucoma. (5.9)
- Immunogenicity Potential: Neutralizing antibodies with chronic administration may lead to a loss of endogenous ACTH activity. (5.10)
- Use in Patients with Hypothyroidism or Liver Cirrhosis: May result in an enhanced effect. (5.11)
- Negative Effects on Growth and Physical Development: Monitor pediatric patients on long term therapy. (5.12)
- Decrease in Bone Density: Monitor for osteoporosis in patients on long term therapy. (5.13)
- Use in Pregnancy: Embryocidal effect. Apprise women of potential harm to the fetus. (5.14)

--------------------------ADVERSE REACTIONS--------------------------
- Common adverse reactions for Acthar Gel are similar to those of corticosteroids and include fluid retention, alteration in glucose tolerance, elevation in blood pressure, behavioral and mood changes, increased appetite and weight gain. (6)
- Specific adverse reactions resulting from drug use in children under 2 years of age are increased risk of infections, hypertension, irritability, Cushingoid symptoms, cardiac hypertrophy and weight gain. (6.1.1)
-

**To report SUSPECTED ADVERSE REACTIONS, contact Questcor Pharmaceuticals, Inc. at (800) 411-3065 or (510) 400-0700 or FDA at 1-800-FDA-1088 or** www.fda.gov/medwatch

--------------------------DRUG INTERACTIONS--------------------------
- H.P. Acthar Gel may accentuate the electrolyte loss associated with diuretic therapy. (7)

--------------------USE IN SPECIFIC POPULATIONS--------------------
- Pregnancy: H.P. Acthar Gel has been shown to have an embryocidal effect and should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus. (8.1)Pediatric Use: Prolonged use of H.P. Acthar Gel in children may inhibit skeletal growth.  If use is necessary, it should be given intermittently with careful observation. (5.12 and 8.3)

**See 17 for Patient Counseling Information and FDA-approved Medication Guide**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**FULL PRESCRIBING INFORMATION**
**1       INDICATIONS AND USAGE**
   1.1         Infantile spasms:
   1.2         Multiple Sclerosis:
   1.3         Rheumatic Disorders:
   1.4         Collagen Diseases:
   1.5         Dermatologic Diseases:
   1.6         Allergic States:
   1.7         Ophthalmic Diseases:
   1.8         Respiratory Diseases:
   1.9         Edematous State:
**2       DOSAGE AND ADMINISTRATION**

   2.1         Specific Recommended Dosage Regimen for Infantile Spasms in Infants and Children Under 2 Years of Age
   2.2         Recommended Dosage Regimen for the Treatment of Acute Exacerbations in Adults with Multiple Sclerosis.
   2.3         Recommended Dosage Regimen for Other Indications for Adults and Children Over 2 Years of Age
   2.4         Preparation
**3       DOSAGE FORMS AND STRENGTHS**
**4       CONTRAINDICATIONS**
**5       WARNINGS AND PRECAUTIONS**
   5.1         Infections
   5.2         Cushing's Syndrome and Adrenal Insufficiency Upon Withdrawal

| | | | | | |
|---|---|---|---|---|---|
| 5.3 | Elevated Blood Pressure, Salt and Water Retention and Hypokalemia | | 6.2.7 | Musculoskeletal | |
| | | | 6.2.8 | Neurological | |
| 5.4 | Vaccination | | 6.3 | Possible Additional Steroidogenic Effects | |
| 5.5 | Masking Symptoms of Other Diseases | | 6.3.1 | Dermatologic | |
| 5.6 | Gastrointestinal Perforation and Bleeding | | 6.3.2 | Endocrine | |
| 5.7 | Behavioral and Mood Disturbances | | 6.3.3 | Metabolic | |
| 5.8 | Comorbid Diseases | | 6.3.4 | Musculoskeletal | |
| 5.9 | Ophthalmic Effects | | 6.3.5 | Neurological | |
| 5.10 | Immunogenicity Potential | | 6.3.6 | Ophthalmic | |
| 5.11 | Use in Patients with Hypothyroidism or Liver Cirrhosis | | **7** | **DRUG INTERACTIONS** | |
| 5.12 | Negative Effects on Growth and Physical Development | | **8** | **USE IN SPECIFIC POPULATIONS** | |
| 5.13 | Decrease in Bone Density | | 8.1 | Pregnancy | |
| 5.14 | Use in Pregnancy | | 8.3 | Nursing Mothers | |
| **6** | **ADVERSE REACTIONS** | | 8.4 | Pediatric Use | |
| 6.1 | Clinical Studies Experience | | **10** | **OVERDOSAGE** | |
| 6.1.1 | Adverse Reactions in Infants and Children Under 2 Years of Age | | **11** | **DESCRIPTION** | |
| | | | **12** | **CLINICAL PHARMACOLOGY** | |
| 6.2 | Postmarketing Experience | | 12.1 | Mechanism of Action | |
| 6.2.1 | Allergic Reactions | | **13** | **NONCLINICAL TOXICOLOGY** | |
| 6.2.2 | Cardiovascular | | 13.1 | Carcinogenesis, Mutagenesis, Impairment of Fertility | |
| 6.2.3 | Dermatologic | | **14** | **CLINICAL STUDIES** | |
| 6.2.4 | Endocrine | | **16** | **HOW SUPPLIED / STORAGE AND HANDLING** | |
| 6.2.5 | Gastrointestinal | | **17** | **PATIENT COUNSELING INFORMATION** | |
| 6.2.6 | Metabolic | | | | |

*Sections or subsections omitted from the full prescribing information are not listed

## FULL PRESCRIBING INFORMATION

## 1   INDICATIONS AND USAGE

### 1.1   Infantile spasms:

H.P. Acthar Gel (repository corticotropin injection) is indicated as monotherapy for the treatment of infantile spasms in infants and children under 2 years of age.

### 1.2   Multiple Sclerosis:

H.P. Acthar Gel (repository corticotropin injection) is indicated for the treatment of acute exacerbations of multiple sclerosis in adults. Controlled clinical trials have shown H.P. Acthar Gel to be effective in speeding the resolution of acute exacerbations of multiple sclerosis. However, there is no evidence that it affects the ultimate outcome or natural history of the disease.

### 1.3   Rheumatic Disorders:

As adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in: Psoriatic arthritis, Rheumatoid arthritis, including juvenile rheumatoid arthritis (selected cases may require low-dose maintenance therapy), Ankylosing spondylitis.

### 1.4   Collagen Diseases:

During an exacerbation or as maintenance therapy in selected cases of: systemic lupus erythematosus, systemic dermatomyositis (polymyositis).

### 1.5   Dermatologic Diseases:

Severe erythema multiforme, Stevens-Johnson syndrome.

### 1.6   Allergic States:

Serum sickness.

### 1.7   Ophthalmic Diseases:

Severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as:  keratitis, iritis, iridocyclitis, diffuse posterior uveitis and choroiditis; optic neuritis; chorioretinitis; anterior segment inflammation.

### 1.8   Respiratory Diseases:

Symptomatic sarcoidosis

### 1.9   Edematous State:

To induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus.


## 2   DOSAGE AND ADMINISTRATION

### 2.1   Specific Recommended Dosage Regimen for Infantile Spasms in Infants and Children Under 2 Years of Age

In the treatment of infantile spasms, H.P. Acthar Gel must be administered intramuscularly.   The recommended regimen is a daily dose of 150 U/m$^2$ (divided into twice daily intramuscular injections of 75 U/m$^2$) administered over a 2-week period.  Dosing with H.P. Acthar Gel should then be gradually tapered over a 2-week period to avoid adrenal insufficiency.  The following is one suggested tapering schedule: 30 U/m$^2$ in the morning for 3 days; 15 U/m$^2$ in the morning for 3 days; 10 U/m$^2$ in the morning for 3 days; and 10 U/m$^2$ every other morning for 6-days.

H.P. Acthar Gel is typically dosed based on body surface area (BSA).  For calculation of body surface area, use the following formula

$$BSA(m^2) = \sqrt{\frac{weight \text{ (kg)} \times height \text{ (cm)}}{3600}}$$

### 2.2   Recommended Dosage Regimen for the Treatment of Acute Exacerbations in Adults with Multiple Sclerosis.

The recommended dose is daily intramuscular or subcutaneous doses of 80-120 units for 2-3 weeks for acute exacerbations.
Dosage should be individualized according to the medical condition of each patient.  Frequency and dose of the drug should be determined by considering the severity of the disease and the initial response of the patient.

Although drug dependence does not occur, sudden withdrawal of H.P. Acthar Gel after prolonged use may lead to adrenal insufficiency or recurrent symptoms which make it difficult to stop the treatment.  It may be necessary to taper the dose and increase the injection interval to gradually discontinue the medication.

### 2.3    Recommended Dosage Regimen for Other Indications for Adults and Children Over 2 Years of Age

Dosage should be individualized according to the disease under treatment and the general medical condition of each patient. Frequency and dose of the drug should be determined by considering severity of the disease and the initial response of the patient.

The usual dose of H.P. Acthar Gel is 40-80 units given intramuscularly or subcutaneously every 24-72 hours.

Although drug dependence does not occur, sudden withdrawal of H.P. Acthar Gel after prolonged use may lead to adrenal insufficiency or recurrent symptoms which make it difficult to stop the treatment.  It may be necessary to taper the dose and increase the injection interval to gradually discontinue the medication.

### 2.4    Preparation

H.P. Acthar Gel should be warmed to room temperature before using.

Caution should be taken not to over-pressurize the vial prior to withdrawing the product.

### 3    DOSAGE FORMS AND STRENGTHS

5 mL multi-dose vial containing 80 USP Units per mL.

### 4    CONTRAINDICATIONS

H.P. Acthar Gel is contraindicated for intravenous administration.

H.P. Acthar Gel is contraindicated where congenital infections are suspected in infants.

Administration of live or live attenuated vaccines is contraindicated in patients receiving immunosuppressive doses of H.P Acthar Gel.

H.P. Acthar Gel is contraindicated in patients with scleroderma, osteoporosis, systemic fungal infections, ocular herpes simplex, recent surgery, history of or the presence of a peptic ulcer, congestive heart failure, uncontrolled hypertension, primary adrenocortical insufficiency, adrenocortical hyperfunction or sensitivity to proteins of porcine origin.

# 5    WARNINGS AND PRECAUTIONS

The adverse effects of H.P. Acthar Gel are related primarily to its steroidogenic effects.  Not all of the adverse events described below have been seen after treatment with H.P. Acthar Gel, but might be expected to occur. [*see Adverse Reactions (6.3)*].

## 5.1    Infections

H.P. Acthar Gel may increase the risks related to infections with any pathogen, including viral, bacterial fungal, protozoan or helminthic infections. Patients with latent tuberculosis or tuberculin reactivity should be observed closely, and if therapy is prolonged, chemoprophylaxis should be instituted.

## 5.2    Cushing's Syndrome and Adrenal Insufficiency Upon Withdrawal

Treatment with H.P. Acthar Gel can cause hypothalamic-pituitary-axis (HPA) suppression and Cushing's syndrome. These conditions should be monitored especially with chronic use.

Suppression of the HPA may occur following prolonged therapy with the potential for adrenal insufficiency after withdrawal of the medication.  Patients should be monitored for signs of insufficiency such as weakness, hyperpigmentation, weight loss, hypotension and abdominal pain.

The symptoms of adrenal insufficiency in infants treated for infantile spasms can be difficult to identify. The symptoms are non-specific and may include anorexia, fatigue, lethargy, weakness, excessive weight loss, hypotension and abdominal pain. It is critical that parents and caregivers be made aware of the possibility of adrenal insufficiency when discontinuing Acthar Gel and should be instructed to observe for, and be able to recognize, these symptoms [*see Information for Patients (17)*]

The recovery of the adrenal gland may take from days to months so patients should be protected from the stress (e.g. trauma or surgery) by the use of corticosteroids during the period of stress.

The adrenal insufficiency may be minimized in adults and infants by tapering of the dose when discontinuing treatment.

Signs or symptoms of Cushing's syndrome may occur during therapy but generally resolve after therapy is stopped.  Patients should be monitored for these signs and symptoms such as deposition of adipose tissue in characteristics sites (e.g., moon face, truncal obesity), cutaneous striae, easy bruisability, decreased bone mineralization, weight gain, muscle weakness, hyperglycemia, and hypertension.

## 5.3    Elevated Blood Pressure, Salt and Water Retention and Hypokalemia

H.P. Acthar Gel can cause elevation of blood pressure, salt and water retention, and increased excretion of potassium and calcium. Dietary salt restriction and potassium supplementation may

be necessary. Caution should be used in the treatment of patients with hypertension, congestive heart failure, or renal insufficiency.

### 5.4   Vaccination

Administration of live or live attenuated vaccines is contraindicated in patients receiving immunosuppressive doses of H.P. Acthar Gel. Killed or inactivated vaccines may be administered; however, the response to such vaccines can not be predicted. Other immunization procedures should be undertaken with caution in patients who are receiving H.P. Acthar Gel, especially when high doses are administered, because of the possible hazards of neurological complications and lack of antibody response.

### 5.5   Masking Symptoms of Other Diseases

H.P. Acthar Gel often acts by masking symptoms of other diseases/disorders without altering the course of the other disease/disorder. Patients should be monitored carefully during and for a period following discontinuation of therapy for signs of infection, abnormal cardiac function, hypertension, hyperglycemia, change in body weight and fecal blood loss.

### 5.6   Gastrointestinal Perforation and Bleeding

Acthar Gel can cause GI bleeding and gastric ulcer. There is also an increased risk for perforation in patients with certain gastrointestinal disorders. Signs of gastrointestinal perforation, such as peritoneal irritation, may be masked by the therapy. Use caution where there is the possibility of impending perforation, abscess or other pyogenic infections, diverticulitis, fresh intestinal anastomoses, and active or latent peptic ulcer.

### 5.7   Behavioral and Mood Disturbances

Use of H.P. Acthar Gel may be associated with central nervous system effects ranging from euphoria, insomnia, irritability (especially in infants), mood swings, personality changes, and severe depression, to frank psychotic manifestations. Also, existing emotional instability or psychotic tendencies may be aggravated.

### 5.8   Comorbid Diseases

Patients with a comorbid disease may have that disease worsened. Caution should be used when prescribing H.P. Acthar Gel in patients with diabetes and myasthenia gravis.

### 5.9   Ophthalmic Effects

Prolonged use of H.P. Acthar Gel may produce posterior subcapsular cataracts, glaucoma with possible damage to the optic nerves and may enhance the establishment of secondary ocular infections due to fungi and viruses.

### 5.10   Immunogenicity Potential

H.P. Acthar Gel is immunogenic. Limited available data suggest that a patient may develop antibodies to H.P. Acthar Gel after chronic administration and loss of endogenous ACTH and H.P. Acthar Gel activity. Prolonged administration of H.P. Acthar Gel may increase the risk of hypersensitivity reactions. Sensitivity to porcine protein should be considered before starting therapy and during the course of treatment should symptoms arise.

### 5.11   Use in Patients with Hypothyroidism or Liver Cirrhosis

There is an enhanced effect in patients with hypothyroidism and in those with cirrhosis of the liver.

### 5.12   Negative Effects on Growth and Physical Development

Long-term use of H.P. Acthar Gel may have negative effects on growth and physical development in children. Changes in appetite are seen with H.P. Acthar Gel therapy, with the effects becoming more frequent as the dose or treatment period increases. These effects are reversible once H.P. Acthar Gel therapy is stopped. Growth and physical development of pediatric patients on prolonged therapy should be carefully monitored.

### 5.13   Decrease in Bone Density

Decrease in bone formation and an increase in bone resorption both through an effect on calcium regulation (i.e. decreasing absorption and increasing excretion) and inhibition of osteoblast function may occur. These, together with a decrease in the protein matrix of the bone (secondary to an increase in protein catabolism) and reduced sex hormone production, may lead to inhibition of bone growth in children and adolescents and to the development of osteoporosis at any age. Special consideration should be given to patients at increased risk of osteoporosis (i.e., postmenopausal women) before initiating therapy, and bone density should be monitored in patients on long term therapy.

### 5.14   Use in Pregnancy

H.P. Acthar Gel has been shown to have an embryocidal effect. Apprise women of potential harm to the fetus. [*see Use in Specific Populations (8.1)*]

## 6   ADVERSE REACTIONS

Please refer to *Adverse Reactions in Infants and Children Under 2 Years of Age (Section 6.1.1)* for consideration when treating patients with Infantile Spasms. The adverse reactions presented in Section 6.2 are primarily provided for consideration in use in adults and in children over 2 years of age, but these adverse reactions should also be considered when treating infants and children under 2 years of age.

H.P. Acthar Gel causes the release of endogenous cortisol from the adrenal gland. Therefore all the adverse effects known to occur with elevated cortisol may occur with H.P. Acthar Gel administration as well.  Common adverse reactions include fluid retention, alteration in glucose tolerance, elevation in blood pressure, behavioral and mood changes, increased appetite and weight gain.

## 6.1   Clinical Studies Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug, and may not reflect the rates observed in practice.

### 6.1.1   Adverse Reactions in Infants and Children Under 2 Years of Age

While the types of adverse reactions seen in infants and children under age 2 treated for infantile spasms are similar to those seen in older patients, their frequency and severity may be different due to the very young age of the infant, the underlying disorder, the duration of therapy and the dosage regimen. Below is a summary of adverse reactions specifically tabulated from source data derived from retrospective chart reviews and clinical trials in children under 2 years of age treated for infantile spasms.  The number of patients in controlled trials at the recommended dose was too few to provide meaningful incidence rates or to permit a meaningful comparison to the control groups.

**TABLE: Incidence (%) of Treatment Emergent Adverse Events Occurring in ≥ 2% of H.P. Acthar Gel (repository corticotropin injection) Infants and Children under 2 years of Age**

| System Organ Class | Recommended 75 U/m$^2$ bid n=122, (%) | 150 U/m$^2$ qd n=37 (%) |
|---|---|---|
| **Cardiac disorders** | | |
| Cardiac Hypertrophy | **3** | **0** |
| **Endocrine disorders** | | |
| Cushingoid | 3 | 22 |
| **Gastrointestinal disorders** | | |
| Constipation | 0 | 5 |
| Diarrhea | 3 | 14 |
| Vomiting | 3 | 5 |
| **General disorders and administration site conditions** | | |
| Irritability | 7 | 19 |
| Pyrexia | 5 | 8 |
| **Infections and infestations** | | |
| Infection [1] | 20 | 46 |

| System Organ Class | Recommended 75 U/m$^2$ bid n=122, (%) | 150 U/m$^2$ qd n=37 (%) |
|---|---|---|
| **Investigations** | | |
| Weight gain | 1 | 3 |
| **Metabolism and nutrition disorders** | | |
| Increased appetite | 0 | 5 |
| Decreased appetite | 3 | 3 |
| **Nervous system disorders** | | |
| Convulsion[2] | 12 | 3 |
| **Respiratory, thoracic and mediastinal disorders** | | |
| Nasal Congestion | 1 | 5 |
| **Skin and subcutaneous tissue disorders** | | |
| Acne | 0 | 14 |
| Rash | 0 | 8 |
| **Vascular disorders** | | |
| Hypertension | 11 | 19 |

[1] Specific infections that occurred at ≥2% were candidiasis, otitis media, pneumonia and upper respiratory tract infections. [2] In the treatment of Infantile Spasms, other types of seizures/convulsions may occur because some patients with infantile spasms progress to other forms of seizures (for example, Lennox-Gastaut Syndrome). Additionally the spasms sometimes mask other seizures and once the spasms resolve after treatment, the other seizures may become visible.

These adverse reactions may also be seen in adults and children over 2 years of age when treated for other purposes and with different doses and regimens.

## 6.2   Postmarketing Experience

The following adverse reactions associated with the use of H.P. Acthar Gel have been identified from postmarketing experience with H.P. Acthar Gel.  Only adverse events that are not listed above as adverse events reported from retrospective chart reviews and non-sponsor conducted clinical trials and those not discussed elsewhere in labeling, are listed in this section.  Because the adverse reactions are reported voluntarily from a population of uncertain size, it is not always possible to estimate their frequency or establish a causal relationship to use with H.P. Acthar Gel. Events are categorized by system organ class.  Unless otherwise noted these adverse events have been reported in infants, children and adults.

### 6.2.1   Allergic Reactions

Allergic responses have presented as dizziness, nausea and shock (adults only).

### 6.2.2   Cardiovascular

Necrotizing angitis (adults only) and congestive heart failure.

### 6.2.3   Dermatologic

Skin thinning (adults only), facial erythema and increased sweating (adults only).

### 6.2.4   Endocrine

Decreased carbohydrate tolerance (infants only) and hirsutism.

### 6.2.5   Gastrointestinal

Pancreatitis (adults only), abdominal distention and ulcerative esophagitis.

### 6.2.6   Metabolic

Hypokalemic alkalosis (infants only).

### 6.2.7   Musculoskeletal

Muscle weakness and vertebral compression fractures (infants only).

### 6.2.8   Neurological

Headache (adults only), vertigo (adults only), subdural hematoma, intracranial hemorrhage (adults only), and reversible brain shrinkage (usually secondary to hypertension) (infants only).

### 6.3   Possible Additional Steroidogenic Effects

Based on steroidogenic effects of H.P. Acthar Gel certain adverse events may be expected due to the pharmacological effects of corticosteroids.  The adverse events that may occur but have not been reported for H.P. Acthar Gel are:

### 6.3.1   Dermatologic

Impaired wound healing, abscess, petechiae and ecchymoses, and suppression of skin test reactions.

### 6.3.2   Endocrine

Menstrual irregularities.

### 6.3.3   Metabolic

Negative nitrogen balance due to protein catabolism.

### 6.3.4   Musculoskeletal

Loss of muscle mass and aseptic necrosis of femoral and humeral heads.

### 6.3.5   Neurological

Increased intracranial pressure with papilledema, (pseudo-tumor cerebri) usually after treatment, and subdural effusion.

### 6.3.6   Ophthalmic

Exophthalmos.

## 7   DRUG INTERACTIONS

Formal drug-drug interaction studies have not been performed.

H.P. Acthar Gel may accentuate the electrolyte loss associated with diuretic therapy.

## 8   USE IN SPECIFIC POPULATIONS

### 8.1   Pregnancy

Pregnancy Class C: H.P. Acthar Gel has been shown to have an embryocidal effect. There are no adequate and well-controlled studies in pregnant women. H.P. Acthar Gel should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

### 8.3   Nursing Mothers

It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from H.P. Acthar Gel, when treating a nursing mother, a decision should be made whether to discontinue nursing or to discontinue the drug, considering the risk and benefit to the mother.

### 8.4   Pediatric Use

H.P. Acthar Gel is indicated as monotherapy for the treatment of infantile spasms in infants and children less than 2 years of age. Both serious and other adverse reactions in this population are discussed in Warnings and Adverse Reactions in Infants and Children Under 2 Years of Age [*see Sections 5 and 6.1.1*].

The efficacy of H.P. Acthar Gel for the treatment of infantile spasms in infants and children less than 2 years of age was evaluated in a randomized, single blinded (video EEG interpreter

blinded) clinical trial and an additional active control supportive trial [*see Clinical Studies (14)*]. A responding patient was defined as having both complete cessation of spasms and elimination of hypsarrhythmia.

Safety in the pediatric population for infantile spasms was evaluated by retrospective chart reviews and data from non-sponsor conducted clinical trials [*see Adverse Reactions (6.1.1)*]. While the types of adverse reactions seen in infants and children under 2 years of age treated for infantile spasms are similar to those seen in older patients, their frequency and severity may be different due to the very young age of the infant, the underlying disorder, the duration of therapy and the dosage regimen. Effects on growth are of particular concern [*see Warnings and Precautions (5.12)*].   Serious adverse reactions observed in adults may also occur in children [*see Warnings and Precautions (5)*].


## 10 OVERDOSAGE

While chronic exposure to H.P. Acthar Gel at high doses can be associated with a variety of potential serious adverse effects, it is not expected that a single high dose, or even several large doses, has the potential for serious adverse effects compared to a standard dose. There have been no reports of death or acute overdose symptoms from H.P. Acthar Gel in clinical studies or in the published literature.

The intramuscular route of administration makes it unlikely that an inadvertent acute overdose will occur. The typical daily dose of H.P. Acthar Gel to treat an infant that has a BSA of 0.4 $m^2$ would be 60 U/day. Using the 1-cc syringe supplied with H.P. Acthar Gel, the maximum amount that can be injected is 80 U/injection, which is a well-tolerated single dose.


## 11  DESCRIPTION

H.P. Acthar Gel is a highly purified sterile preparation of the adrenocorticotropic hormone in 16% gelatin to provide a prolonged release after intramuscular or subcutaneous injection. Also contains 0.5% phenol, not more than 0.1% cysteine (added), sodium hydroxide and/or acetic acid to adjust pH and water for injection.

ACTH is a 39 amino acid peptide with the following chemical formula:

| H- | Ser- | Tyr- | Ser- | Met- | Glu- | His- | Phe- | Arg- | Trp- | Gly- |
|----|------|------|------|------|------|------|------|------|------|------|
|    | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|    | Lys- | Pro- | Val- | Gly- | Lys- | Lys- | Arg- | Arg- | Pro- | Val- |
|    | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|    | Lys- | Val- | Try- | Pro- | Asp- | Gly- | Ala- | Glu- | Asp- | Gln- |
|    | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|    | Leu- | Ala- | Glu- | Ala- | Phe- | Pro- | Leu- | Glu- | Phe- | OH |
|    | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 |    |

## 12   CLINICAL PHARMACOLOGY

### 12.1   Mechanism of Action

The mechanism of action of H.P. Acthar Gel in the treatment of infantile spasms is unknown.

H.P. Acthar Gel and endogenous ACTH stimulate the adrenal cortex to secrete cortisol, corticosterone, aldosterone, and a number of weakly androgenic substances.  Prolonged administration of large doses of H.P. Acthar Gel induces hyperplasia and hypertrophy of the adrenal cortex and continuous high output of cortisol, corticosterone and weak androgens. The release of endogenous ACTH is under the influence of the nervous system via the regulatory hormone released from the hypothalamus and by a negative corticosteroid feedback mechanism. Elevated plasma cortisol suppresses ACTH release.

H.P. Acthar Gel is also reported to bind to melanocortin receptors.

The trophic effects of endogenous ACTH and H.P. Acthar Gel on the adrenal cortex are not well understood beyond the fact that they appear to be mediated by cyclic AMP.

ACTH rapidly disappears from the circulation following its intravenous administration; in people, the plasma half-life is about 15 minutes. The pharmacokinetics of H.P. Acthar Gel have not been adequately characterized.

The maximal effects of a trophic hormone on a target organ are achieved when optimal amounts of hormone are acting continuously. Thus, a fixed dose of H.P. Acthar Gel will demonstrate a linear increase in adrenocortical secretion with increasing duration for the infusion.

## 13   NONCLINICAL TOXICOLOGY

### 13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility

Adequate and well-controlled studies have not been done in animals. Human use has not been associated with an increase in malignant disease. [*see Warnings and Precautions (5.14) and Use in Specific Populations (8.1)*].

## 14   CLINICAL STUDIES

The effectiveness of H.P. Acthar Gel as a treatment for infantile spasms was demonstrated in a single blinded (video EEG interpreter blinded) clinical trial in which patients were randomized to receive either a 2 week course of treatment with H.P. Acthar Gel (75 U/m$^2$ intramuscular twice daily) or prednisone (1 mg/kg by mouth twice daily).  The primary outcome was a comparison of the number of patients in each group who were treatment responders, defined as a patient having complete suppression of both clinical spasms and hypsarrhythmia on a full sleep cycle video EEG performed 2 weeks following treatment initiation, rated by an investigator blinded to treatment. Thirteen of 15 patients (86.7%) responded to Acthar Gel as compared to 4 of 14

patients (28.6%) given prednisone (p<0.002). The 2-week treatment was followed by a 2-week period of taper. Nonresponders to the prednisone treatment were eligible to receive H.P. Acthar Gel treatment.  Seven of 8 patients (87.5%) responded to H.P Acthar Gel after not responding to prednisone.  Similarly, the 2 nonresponder patients from the H.P. Acthar Gel treatment were eligible to receive treatment with prednisone.  One of the 2 patients (50%) responded to the prednisone treatment after not responding to Acthar.

A supportive single-blind, randomized clinical trial comparing high-dose, long-duration treatment (150 U/m$^2$ once daily for 3 weeks, n=30) of H.P. Acthar Gel with low-dose, short-duration treatment (20 U once daily for 2 weeks, n=29) for the treatment of infantile spasms was also evaluated in infants and children less than 2 years of age.  Nonresponders (defined as in the previously described study) in the low-dose group received a dose escalation at 2 weeks to 30 U once daily.  Nominal statistical superiority of the high dose treatment, as compared to the low dose treatment, was observed for cessation of spasms but not for the resolution of hypsarrhythmia.

## 16   HOW SUPPLIED / STORAGE AND HANDLING

H.P. Acthar Gel (repository corticotropin injection) is supplied as 5 mL multi-dose vial (63004-7731-1) containing 80 USP Units per mL. H.P. Acthar Gel (repository corticotropin injection) should be warmed to room temperature before using. Do not over pressurize the vial prior to withdrawing the product.

Store H.P. Acthar Gel (repository corticotropin injection) under refrigeration between 2°-8°C (36°-46°F). Product is stable for the period indicated on the label when stored under the conditions described.

## 17   PATIENT COUNSELING INFORMATION

Caretakers of patients with infantile spasms should be informed of the availability of a Medication Guide, and they should be instructed to read the Medication Guide prior to administering H.P Acthar Gel. Patients should be instructed to take H.P. Acthar Gel only as prescribed. They should not stop treatment suddenly unless instructed by their physician to do so.

Patients, their caregivers and families should be advised as to the importance of the need for careful monitoring while on and during titration from H.P. Acthar Gel treatment and the importance of not missing and scheduled doctor's appointments.

Patients, their caregivers and families should be advised that if the patient develops an infection or fever they should contact their physician. They should be educated that a fever may not necessarily be present during infection.  The patient should also try to limit contact with other people with infections to minimize the risk of infection while taking H.P. Acthar Gel. [*see Warnings and Precautions (5.1) and Adverse Reactions (6.1.1)*]

Patients, their caregivers and families should be advised that if the patient experiences an increase in blood pressure they should contact their physician. [*see Warnings and Precautions (5.3) and Adverse Reactions (6.1.1)*]

Patients, their caregivers and families should be advised that if the patient or the caregiver notices blood or a change in color of the patient's stool they should contact their physician. [*see Warnings and Precautions (5.6)*].

Caregivers and families of infants and children treated with H.P. Acthar Gel should be informed that the patient may show signs of irritability and sleep disturbances. These effects are reversible once H.P. Acthar Gel therapy is stopped. [*see Warnings and Precautions (5.7) and Adverse Reactions (6.1.1)*].

Patients, their caregivers and families should be advised that changes in appetite, most often leading to weight gain, are seen with H.P. Acthar Gel therapy, becoming more frequent as the dose or treatment period increases. These effects are reversible once H.P. Acthar Gel therapy is stopped. [*see Warnings and Precautions (5.12) and Adverse Reactions (6.1.1)*].

Patients, their caregivers and families should be advised that the patient may be monitored for signs of adrenal insufficiency such as weakness,  fatigue, lethargy, anorexia, weight loss, hypotension, abdominal pain or hyperpigmentation (adults only) after treatment has stopped. Since the recovery of the adrenal gland varies from days to months, patients may need to be protected from the stress of trauma or surgery by the use of corticosteroids during the period of stress.  [*see Warnings and Precautions (5.2)*].

Patients should be advised not to be vaccinated with live or live attenuated vaccines during treatment with H.P. Acthar Gel.  Additionally, other immunization procedures in patients or in family members who will be in contact with the patient should be undertaken with caution while the patient is taking H.P. Acthar Gel. [*see Warnings and Precautions (5.4)*].

Patients, their caregivers and families should be advised that prolonged use of H.P. Acthar Gel in children may result in Cushing's syndrome and associated adverse reactions, may inhibit skeletal growth, and may cause osteoporosis and decreased bone density. If prolonged use is necessary, H.P. Acthar Gel should be given intermittently along with careful observation. [*see Warnings and Precautions (5.2), (5.12), and (5.13) and Adverse Reactions (6.1.1)*].

Patients, their caregivers and families should be informed that H.P. Acthar may mask symptoms of other diseases/disorders without altering the course of the other disease/disorder.  The patient will need to be monitored carefully during and for a period following discontinuation of therapy for signs of infection, abnormal cardiac function, hypertension, hyperglycemia, change in body weight, and fecal blood loss. [*see Warnings and Precautions (5.5)*].

In the treatment of Infantile Spasms, other types of seizures may occur because some patients with infantile spasms progress to other forms of seizures (for example, Lennox-Gastaut Syndrome).  Additionally the spasms sometimes mask other seizures and once the spasms resolve after treatment with H.P. Acthar gel, the other seizures may become visible.  Parents and caregivers should inform their physician of any new onset of seizures so that appropriate management can then be instituted. [*see Adverse Reactions (6.1.1)*].

H.P. Acthar® Gel
(repository corticotropin injection)

**Manufactured for Questcor Pharmaceuticals, Inc.**

 Q U E S T C O R®
Questcor Pharmaceuticals, Inc.
3260 Whipple Road
Union City, CA 94587 USA
phone  (800) 411-3065
        (510) 400-0700
fax     (510) 400-0799

PL065/Rev. 02                    No. 1350
Issued: 10/2010

**MEDICATION GUIDE**

**H.P. Acthar® Gel (H P AK-thar jel)**
**(repository corticotropin)**
**Injection**

**This Medication Guide provides information only about the use of H.P. Acthar Gel for the treatment of Infantile Spasms.** If your doctor prescribes H.P. Acthar Gel for you or your child for any other reason, talk to your doctor for information about how this medicine is used to treat your medical condition.

Read this Medication Guide before your child receives H.P Acthar Gel and each time you refill your child's prescription. There may be new information. This Medication Guide does not take the place of talking with your doctor about your child's medical condition or treatment.

**What is the most important information I should know about H.P. ACTHAR GEL?**

**H.P. Acthar Gel can cause serious side effects including:**

1. **Increased risk of infections.** H.P Acthar Gel is a medicine that can affect your child's immune system. When your child is taking H.P. Acthar Gel, it can lower the ability of your child's immune system to fight infections. H.P. Acthar Gel may:
   - make your child more likely to get new infections
   - worsen an infection that your child already has
   - cause an inactive infection to become active, such as tuberculosis (TB)

   Before starting H.P. Acthar Gel, tell your doctor if your child has:
   - an infection or signs of an infection, such as:
     - fever
     - cough
     - vomiting
     - diarrhea
     - other signs of illness or flu
   - a family member with an infection or signs of an infection

   While taking H.P. Acthar Gel, your child should:
   - stay away from people who are sick or who have infections
   - tell your doctor right away if your child has any sign of infection such as:
     - fever (but your child may not have a fever with an infection)
     - cough
     - vomiting
     - diarrhea or

- other signs of illness or flu and
- any open cuts or sores on his or her body

## 2.  Effects on the adrenal gland after stopping H.P. Acthar Gel.

When your child stops taking H.P. Acthar Gel, his or her body may not produce enough of a hormone called cortisol on its own (adrenal insufficiency).  Your child may need to take steroid medicine to protect the body until the adrenal gland recovers and is working well again, especially to protect the body if they have surgery or trauma. **Do not stop giving your child injections of H.P. Acthar Gel without talking to your doctor first.** Your doctor will tell you when and how to slowly stop giving the injections to avoid serious side effects.

**While slowly stopping your child's injections of H.P. Acthar Gel or after you stop giving the injections, call your doctor right away if your child has any of the following:**
- appears weak
- loses weight or has a decrease in appetite
- appears tired or lacking energy
- appears pale
- has stomach pain
- appears sick or is with a fever

## 3.  Effects on the adrenal gland while taking H.P. Acthar Gel

When your child is taking H.P. Acthar Gel, his or her adrenal gland may produce too much cortisol. This can cause symptoms of Cushing's syndrome. Cushing's syndrome is more common in children who take H.P. Acthar Gel for a long time.

Symptoms of Cushing's syndrome include:

- increased upper body fat around the neck, but not the arms and legs
- weight gain
- rounded or "moon" face
- thin skin, easy bruising, and stretch marks on thighs, belly and trunk
- slowed growth rates in children
- weak bones (osteoporosis)

While receiving treatment with H.P. Acthar Gel other side effects can happen that are like side effects that happen due to treatment with steroid medicines. The risk of getting side effects may increase the longer your child is treated with H.P. Acthar Gel. Side effects may include:

- **increased blood pressure.**  Your doctor may check your child's blood pressure during treatment. If your child's blood pressure increases, your doctor may talk with you about possible treatment choices.

- **too much water in the body (water retention), increased amount of body salts, and low potassium in the blood.**  H.P. Acthar Gel may cause your child to have an increased amount of body salts and water that stays in the body, and may lower the amount of potassium in your child's blood. Follow your doctor's instructions about if you need to decrease your child's salt intake or if you need to feed your child foods high in potassium.

4. **Your child should not receive certain vaccines during treatment with H.P. Acthar Gel.**  Your child may receive killed or inactivated vaccines while receiving Acthar Gel.  Before your child receives any vaccines, talk to your doctor about which vaccines are safe for your child. Certain vaccines could cause your child to have serious side effects, or the vaccine may not be effective.

5. **Hiding (masking) symptoms of other conditions or diseases.**  It may be more difficult for your doctor to diagnose other conditions or diseases in your child during treatment with H.P. Acthar Gel. During treatment and after treatment ends, tell your doctor if your child has:
   - any signs or symptoms of infection.  See number 1 of this section in the Medication Guide.
   - changes in body weight
   - bloody or black tarry stool
   - vomiting
   - stomach pain
   - excessive tiredness
   - increased thirst
   - fast heart rate
   - difficulty breathing

6. **Stomach and intestinal problems.  H.P. Acthar Gel may cause bleeding of the stomach or intestine.**  Your child has an increased risk for bleeding from the stomach or having a stomach ulcer. .  Tell your doctor if your child has any pain in the stomach area (abdominal pain), vomits blood, or has bloody or black stools.

7. **Changes in mood and behavior.**  During treatment with H.P. Acthar Gel your child may be irritable, have rapid changes in his or her mood, be depressed, have other changes in his or her behavior, or have trouble sleeping.

**Tell your doctor if your child has any of the side effects or symptoms listed above.**

**What is H.P. ACTHAR GEL?**
H.P. Acthar Gel is a prescription medicine that is used to treat infantile spasms in infants and children under 2 years of age.

**What should I tell my doctor before my child takes H.P. ACTHAR GEL?**

Before your child takes H.P. Acthar Gel, read the section above "What is the most important information I should know about H.P. Acthar Gel?" and tell your doctor if your child has:
- an infection
- Diabetes
- heart problems
- kidney problems
- stomach or intestinal problems
- thyroid problems
- liver  problems
- neuromuscular problems
- convulsions or seizures
- had exposure to someone with Tuberculosis (TB)
- a previous allergic reaction such as hives, itching or trouble breathing, to H.P. Acthar Gel or pork products
- had recent surgery
- had a recent vaccination or is scheduled to receive a vaccination
- a family member who is receiving vaccinations

Tell your doctor about all the medicines your child takes, including prescription and non-prescription medicines, vitamins and herbal supplements. Do not start giving a new medicine to your child without first speaking to your doctor.

**How should I give H.P. Acthar Gel to my child?** H.P. Acthar Gel is given as an injection into the muscle.  Do not inject it under the skin, into a vein, or give it to your child by mouth.
- Inject H.P. Acthar Gel exactly as your doctor tells you. Your doctor will tell you where to give the injection, how much to give, how often and when to give it to your child.
- Do not use H.P. Acthar Gel until your doctor has taught you how to give the injection to your child.
- To give H.P. Acthar Gel:
  - Take the bottle from the refrigerator. Do not open the bottle or pry the cap (rubber stopper) off.
  - Warm the contents by rolling the bottle between your hands for a few minutes.
  - Wash your hands.

- o Prepare the skin where you are going to give the injection by wiping it with a new sterile alcohol wipe. Before giving the injection, look at the site prepared for the injection and make sure that it no longer looks wet.  A wet site can cause burning.
- o Wipe the top of the vial rubber stopper with a new sterile alcohol wipe.
- o Use a new sterile needle and syringe to draw up the amount of H.P. Acthar Gel the doctor has told you to use.
- o Give the injection the way the doctor has instructed you.
- o Return the bottle to the refrigerator as soon as possible.

- **Keep all of your child's follow-up appointments with your doctor**

- It is important for you to tell your doctor if your child's spasms continue or change in any way during treatment or after treatment has stopped so that they can monitor your child's progress.

  **Infantile Spasms sometimes hides (masks) other seizures your child or infant may have. Once treated with H.P. Acthar Gel, the Infantile Spasms symptoms may disappear.  This may allow the other seizures to become visible for the first time. Tell your child's doctor right away if you see a change in your child's seizures/spasms.**


**What are the possible side effects of H.P. Acthar Gel?**

**H.P Acthar Gel can cause serious side effects.**
- **See "What is the most important information I should know about Acthar Gel."**

- **H.P. Acthar Gel may make certain other medical conditions worse, such as diabetes (may increase blood sugar).**

- **Eye problems**.  Your child can get cataracts, increased pressure in the eye (glaucoma), and possible damage to the optic nerve if treated with H.P. Acthar Gel for a long time.

- **Allergic reactions to H.P. Acthar Gel.** Your child may have an allergic reaction to H.P. Acthar Gel.  Allergic reactions may not happen until your child has received several injections of H.P. Acthar Gel. Tell your doctor right away if your child has any of the following  signs of an allergic reaction:
  - skin rash
  - swelling of the face, tongue, lips, or throat
  - trouble breathing

- **Changes in growth and physical development.** H.P. Acthar Gel may affect your child's growth and physical development and may weaken his or her bones.  This is more likely to happen with long term use of Acthar Gel.

- **Enlarged heart.**  H.P. Acthar Gel may cause an increase in the size of your child's heart. This is more likely to happen with long term use of Acthar Gel but usually goes away after H.P. Acthar Gel is stopped.

**Common side effects of Acthar Gel may include:**
- infections
- increased blood pressure
- irritability and changes in behavior
- changes in appetite and weight
- diarrhea
- vomiting

These are not all the possible side effects of H.P. Acthar Gel. Tell your doctor if your child has any side effect that bothers them or does not go away. For more information ask your child's doctor or pharmacist.

Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**How should I store H.P. ACTHAR GEL?**
- Store vials of H.P. Acthar Gel in the refrigerator between $36^0$F to $46^0$F ($2^0$C to $8^0$C).
- Throw away any vials after the expiration date printed on the label.

**Keep H.P. Acthar Gel and all other medicines out of the reach of children**

**General information About H.P. Acthar Gel**
Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. Do not use H.P. Acthar Gel for a condition for which it has not been prescribed. Do not give H.P. Acthar Gel to other people, even if they have the same symptoms. It may harm them.

This Medication Guide summarizes the most important information about H.P. Acthar Gel. If you would like more information, talk with your child's doctor. You can ask your child's doctor or pharmacist for information about H.P. Acthar Gel that is written for healthcare professionals. For more information, go to www.acthar.com or call 1-800-465-9217.

**What are the ingredients in H.P. Acthar Gel?**
**Active ingredient:**  Corticotropin

**Inactive ingredients:** gelatin, phenol, cysteine, sodium hydroxide and/or acetic acid to adjust pH, and water for injection

Manufactured for:
Questcor Pharmaceuticals, Inc.
3260 Whipple Road
Union City, CA 94587 USA

PL122/ Rev. 00
 Issued: 10/2010

This Medication Guide has been approved by the U.S. Food and Drug Administration.

H.P. Acthar® Gel is a registered trademark of Questcor Pharmaceuticals, Inc.



No. 1350    PL063/Rev. 04

Warm before using.
Directions for use: see insert.
Each mL contains: 80 USP units
corticotropin, 16% gelatin, 0.5%
phenol, not more than 0.1%
cysteine (added), sodium hydroxide
and/or acetic acid to adjust pH,
and water for injection, q.s.

5 mL multiple dose vial                      **NDC 63004 7731 1**

**H.P.\* Acthar® Gel**
(repository corticotropin injection)
**80** USP UNITS PER mL
FOR INTRAMUSCULAR OR SUBCUTANEOUS USE
Dispense the enclosed Medication Guide to each patient
Store in refrigerator, 2°-8°C (36°-46°F).
Rx only    **\*HIGHLY PURIFIED**
Questcor Pharmaceuticals, Inc.
Union City, CA 94587 USA

17500-03

LOT # 1564-XX
EXP MM/YYYY

**Ex. 33**

p. 70 p. 431

(b) (4)



(b) (4)

(b) (4)

Lot No.: 1564-XX
Exp. Date: MM/YYYY

H.P.* Acthar®
Gel
80 mL
(repository corticotropin
injection) in 16% gelatin

10805

10805

H.P.* Acthar®
Gel
(repository corticotropin
injection) in 16% gelatin

5 mL multiple-dose
vial

80 USP UNITS
PER mL

Contains 0.5% Phenol

℞ only

7392

Store in a refrigerator
2 to 8°C (36 to 46°F).

WARM BEFORE USING

Directions for use:
see insert.

For intramuscular or
subcutaneous use.

**Keep out of the reach of
children.**

QUESTCOR

Manufactured for Questcor
Pharmaceuticals, Inc.
Union City, CA 94587 USA

NDC 63004-7731-1

H.P.* Acthar®
Gel
(repository corticotropin
injection) in 16% gelatin

Dispense the enclosed
Medication Guide to each
Infantile Spasm patient

5 mL multiple-
dose vial

80 USP UNITS
PER mL

℞ only          *HIGHLY PURIFIED

No. 1350          PL064/Rev. 04

Each mL contains:
80 USP units corticotropin,
16% gelatin, 0.5% phenol,
not more than 0.1% cysteine
(added), sodium hydroxide
and/or acetic acid to adjust pH,
and water for injection, q.s.

N
3   63004-7731-1   1

**Ex. 33**
p. 71 p. 432

# EXHIBIT H

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                    Wednesday, September 4, 2019

## Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors

Pharmaceutical company Mallinckrodt ARD LLC (formerly known as Mallinckrodt ARD Inc. and previously Questcor Pharmaceuticals Inc. "Questcor"), has agreed to pay $15.4 million to resolve claims that Questcor paid illegal kickbacks to doctors, in the form of lavish dinners and entertainment, to induce prescriptions of the company's drug, H.P. Acthar Gel (Acthar) from 2009 through 2013.

The Federal Anti-Kickback Statute prohibits a pharmaceutical company from offering or paying, directly or indirectly, any remuneration — which includes money or any other thing of value — with the intent to induce a health care provider to prescribe a drug reimbursed by a federal health care program, including Medicare. This prohibition extends to such practices as "wining and dining" doctors to induce them to write Medicare prescriptions of a company's products.

The government alleged that, from 2009 to 2013, twelve Questcor sales representatives marketing Acthar provided illegal remuneration to health care providers in the form of lavish meals and entertainment expenses.  The company paid this remuneration, the government alleges, with the intent to induce Acthar Medicare referrals from those health care providers, resulting in a violation of the Anti-Kickback Statute and the submission of false claims to Medicare.

"The Department of Justice will hold companies accountable for the payment of illegal kickbacks in any form," said Assistant Attorney General Jody Hunt of the Department of Justice's Civil Division. "Improper inducements have no place in our federal healthcare system, which depends on physicians making decisions based on the healthcare needs of their patients and not on or influenced by personal financial considerations."

"When companies buy off doctors, patients suffer.  My Office is committed to rooting out this type of behavior and the Anti-Kickback Statute is a critical tool in that fight," said U.S. Attorney McSwain.  "We will continue to protect the integrity of our healthcare system by holding drug companies accountable for their conduct."

"Paying kickbacks to win business, as contended in this case, cheats taxpayers and the patients who rely on government health care programs for essential care," said Maureen R. Dixon, Special Agent in Charge for the Office of Inspector General of the U.S. Department of Health and Human Services.  "We will continue working with our law enforcement partners to hold accountable entities paying such kickbacks."

The allegations that are the subject of yesterday's settlement were originally alleged in two cases filed under the whistleblower, or qui tam, provision of the False Claims Act.  The act permits private parties to sue for fraud on behalf of the United States and to share in any recovery.  The act also permits the government to intervene in such actions, as the government previously did in the two whistleblower cases.

**Ex. 33**
p. 73 p. 434

The whistleblowers will receive approximately $2.926 million of the settlement.  The government is continuing to pursue claims in these two matters alleging that Mallinckrodt violated the False Claims Act by using a foundation as a conduit to pay illegal kickbacks in the form of copay subsidies for Acthar.  These claims are not being resolved by the settlement.

The government's pursuit of these matters illustrates the government's emphasis on combating healthcare fraud.  One of the most powerful tools in this effort is the False Claims Act.  Tips and complaints from all sources about potential fraud, waste, abuse, and mismanagement can be reported to the Department of Health and Human Services, at 800-HHS-TIPS (800-447-8477).

This matter is being handled by the Civil Division's Commercial Litigation Branch and the U.S. Attorney's Office for the Eastern District of Pennsylvania, with assistance from the U.S. Department of Health and Human Services Office of Inspector General.  The two lawsuits are captioned *United States of America ex rel. Strunck et al. v. Mallinckrodt ARD, Inc.*, No. 12-CV-0175 (E.D. Pa.) and *United States of America ex rel. Clark v. Questor Pharmaceuticals, Inc.*, No. 13-CV-1776 (E.D. Pa.).

The claims resolved by this settlement are allegations only and there has been no determination of liability.

---

**Topic(s):**
False Claims Act

**Component(s):**
Civil Division
USAO - Pennsylvania, Eastern

**Press Release Number:**
19-928

*Updated September 4, 2019*

# EXHIBIT I




Original Investigation | Health Policy

# Industry Payments to Physician Specialists Who Prescribe Repository Corticotropin

Daniel M. Hartung, PharmD, MPH; Kirbee Johnston, MPH; David M. Cohen, MD; Thuan Nguyen, MD, PhD; Atul Deodhar, MD; Dennis N. Bourdette, MD

## Abstract

**IMPORTANCE**  Despite great expense and little evidence supporting use over corticosteroids, prescriptions for repository corticotropin (H. P. Acthar Gel; Mallinckrodt Pharmaceuticals) have increased markedly. Aggressive sales tactics and payments from the manufacturer may influence prescribing behavior for this expensive medication.

**OBJECTIVE**  To characterize industry payments to physician specialists who prescribe corticotropin in the Medicare program.

**DESIGN, SETTING, AND PARTICIPANTS**  This study was a cross-sectional analysis of Centers for Medicare & Medicaid Services 2015 Part D prescribing data linked to 2015 Open Payments data. Nephrologists, neurologists, and rheumatologists with more than 10 corticotropin prescriptions (frequent prescribers) in 2015 were included.

**EXPOSURES**  Frequency, category, and magnitude of corticotropin-related payments from Mallinckrodt recorded in the Open Payments database.

**MAIN OUTCOMES AND MEASURES**  Frequency, category, and magnitude of corticotropin-related payments from Mallinckrodt, as well as corticotropin prescriptions and expenditures for Medicare beneficiaries.

**RESULTS**  Of the 235 included physicians, 65 were nephrologists; 59, neurologists; and 111, rheumatologists. A majority of frequent corticotropin prescribers (207 [88%]) received corticotropin-related payments from Mallinckrodt. The median (range) total payment for 2015 was $189 ($11-$138 321), with the highest payments ranging from $56 549 to $138 321 across the specialties. More than 20% of frequent prescribers received more than $10 000 and the top quartile of recipients received a median (range) of $33 190 ($9934-$138 321) in total payments per prescriber. Payments for compensation for services other than consulting contributed the most to the total amount. Mallinckrodt payments were positively associated with greater Medicare spending on corticotropin ($\beta$ = 1.079; 95% CI, 1.044-1.115; $P$ < .001), with every $10 000 in payments associated with a 7.9% increase (approximately $53 000) in Medicare spending on corticotropin. There was no association between corticotropin-related payments and spending on prescriptions for synthetic corticosteroids.

**CONCLUSIONS AND RELEVANCE**  In this study, most nephrologists, neurologists, and rheumatologists who frequently prescribe corticotropin received corticotropin-related payments from Mallinckrodt. These findings suggest that financial conflicts of interest may be driving use of corticotropin in the Medicare program.

### Key Points

**Question**  What is the association of industry payments to physicians and prescriptions for repository corticotropin (H. P. Acthar Gel; Mallinckrodt Pharmaceuticals)?

**Findings**  In this cross-sectional study of 235 specialist physicians who frequently prescribe corticotropin to Medicare beneficiaries, 207 (88%) received a monetary payment from the drug's maker, with more than 20% of frequent prescribers receiving more than $10 000. There was a significant association between higher dollar amounts paid to these prescribers and greater Medicare spending on their corticotropin prescriptions.

**Meaning**  Financial conflicts of interest among physicians may be driving corticotropin expenditures for the Medicare program.

+ **Supplemental content**

Author affiliations and article information are listed at the end of this article.

*JAMA Network Open.* 2018;1(2):e180482. doi:10.1001/jamanetworkopen.2018.0482

🔓 **Open Access.** This is an open access article distributed under the terms of the CC-BY License.

Ex. 33
p. 76 p. 437

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

## Introduction

It is well documented that the pharmaceutical industry spends a substantial amount of money to influence the decisions of physicians who use their products.[1,2] In 2016, pharmaceutical, biotechnology, and device manufacturers paid 631 000 physicians more than $2 billion in food and beverages, gifts, educational materials, and speaker and consulting services.[3] Although physicians often deny these payments affect their prescribing decisions, the evidence suggests the contrary.[4-11] Studies consistently demonstrate pharmaceutical industry payments are associated with more prescriptions, greater prescription costs, and higher branded drug prescribing.[5,9,11,12] Furthermore, several well-designed studies have demonstrated association specificity and a response gradient (higher payments associated with greater prescribing), suggesting the association is causal.[5,7,10]

As high-priced therapies become the norm for many conditions, it is imperative that prescribing decisions are evidence based and free from undue commercial influence. Expensive therapies with uncertain or insufficient evidence supporting their use should be particularly scrutinized. A prime example of such a treatment is repository corticotropin (H. P. Acthar Gel; Mallinckrodt Pharmaceuticals). Originally approved by the US Food and Drug Administration (FDA) in 1952, corticotropin has received considerable attention in recent years because of the dramatic increase in its cost. Corticotropin is a porcine-derived biologic preparation with a proprietary manufacturing process and for decades was available for less than $50 per vial. In 2007, Questcor Pharmaceuticals, who acquired the license for corticotropin in 2001 for $100 000, raised the acquisition price for a 5-mL vial from $1650 to $23 269 (a 14-fold increase).[13] Mallinckrodt Pharmaceuticals, which acquired Questcor in 2014, has continued to raise the price to its current acquisition cost of $38 892.[14]

There is a lack of evidence supporting the use of corticotropin for most indications.[15] Corticotropin was approved prior to the 1962 Kefauver-Harris Amendment to the US Food, Drug, and Cosmetics Act, which added the requirement of evidence of efficacy to the FDA approval process.[16] As a consequence, corticotropin's original label lacked evidence derived from controlled clinical trials that meet current standards for FDA approval for any indication. Over the ensuing years, corticotropin's label has been revised several times, first as part of the FDA's Drug Efficacy Study Implementation review in 1971, and then with the addition of indications for the treatment of relapses of multiple sclerosis in 1979 and infantile spasms in 2010.[17] The only randomized clinical trials of corticotropin to treat relapses of multiple sclerosis show it to be more effective than placebo (n = 197) but no better than methylprednisolone (n = 61).[18,19] The use of corticotropin for infantile spasms is supported by 5 controlled clinical trials of between 24 and 50 (mean, 34) participants.[20-24] Corticotropin is also indicated and promoted on its website for systemic lupus erythematosus, proteinuria in nephrotic syndrome, dermatomyositis and polymyositis, rheumatoid arthritis, symptoms of sarcoidosis, and inflammatory conditions of the eye, such as uveitis. With the exception of a small placebo-controlled trial of 38 individuals with systemic lupus erythematosus demonstrating equivocal efficacy compared with placebo,[25] the clinical evidence supporting the efficacy of corticotropin for these indications generally consists of small (n < 25) uncontrolled trials and case reports.[26]

Because of its very high price, corticotropin is a major expenditure for public insurance programs in the United States. From 2011 to 2015, spending on corticotropin in the US Medicare program increased 10-fold, totaling more than $1 billion during this period.[27] In 2015 alone, Medicare spent more than $500 million on corticotropin, making it one of the most expensive drugs paid for by the program.[28] The continued growth in corticotropin use is peculiar given its very high cost, widespread negative media coverage, and notable lack of evidence supporting its use over lower-cost synthetic corticosteroids.[29,30] Our experience suggests aggressive marketing of the drug partly accounts for increasing use. While media reports also indicate that industry payments to corticotropin prescribers may have a role, the prevalence, magnitude, and effect of corticotropin-related payments have not been systematically described.[30] The goal of this research was to

JAMA Network Open. 2018;1(2):e180482. doi:10.1001/jamanetworkopen.2018.0482

Ex. 33
p. 77 p. 438

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

characterize payments to physicians who frequently prescribe corticotropin to Medicare beneficiaries and determine whether payment amounts are positively correlated with prescribing intensity.

## Methods

### Study Sample and Data Sources

Using several publicly accessible databases provided by the Centers for Medicare & Medicaid Services (CMS), we conducted a cross-sectional study to describe pharmaceutical industry payments to nephrologists, neurologists, and rheumatologists who frequently prescribe corticotropin in the Medicare Part D program. To identify Medicare prescribers of corticotropin, we used Medicare Part D Public Use Files (PUFs) from 2015.[31] Medicare Part D PUFs contain prescription information aggregated at different levels for drugs paid for by Medicare Part D stand-alone plans and Medicare Advantage plans and include data for 71% of all 56 million Medicare beneficiaries.[28] The Detailed Prescriber PUF summarizes total prescriptions and costs for every drug with more than 10 prescriptions by a prescriber. We used the Detailed Prescriber PUF to identify and determine the specialty of physicians who prescribed corticotropin in 2015. Drugs with 10 or fewer prescriptions per prescriber are suppressed by CMS to protect patient confidentiality. We focused on rheumatology, neurology, and nephrology specialists, who are the largest prescribers of corticotropin.[27] Because this study used publicly available data, the Oregon Health & Science University institutional review board deemed it exempt from review. Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) reporting guidelines were followed.

To summarize characteristics of these frequent corticotropin prescribers, we used the Medicare Part D Prescriber PUF and data from CMS Physician Compare. The Part D Prescriber PUF contains drug utilization data (eg, total prescriptions, beneficiaries, and expenditures for Medicare) for all participating Part D prescribers. We used the CMS Physician Compare data set to characterize other practice-related data, such as year of graduation from medical school and practice size. The CMS Physician Compare data set contains general demographic, training, and practice site information for all health care professionals who provide Medicare services. For comparison, we also summarized Part D prescribing and practice characteristics for all other neurologists, rheumatologists, and nephrologists who provide Medicare services.

To obtain information on industry payments, we used 2015 calendar year files from the Open Payments website. The Open Payments program began collecting information about payments from drug and device companies to physicians and teaching hospitals in 2013.[32] Reported payments include consulting fees, honoraria, gifts, entertainment, food and beverage, travel, and research payments and ownership interests.[33] All payments with a cash value of at least $10, or $100 in aggregate in 1 calendar year, must be reported. The payment data also report the specific product (eg, drugs, devices, biologics) to which the payment was related.

For corticotropin prescribers identified in the Medicare Part D PUF, we manually reviewed his or her Open Payments physician demographic characteristics record to verify concordance. While PUFs are indexed by each prescriber's National Prescriber Identifier, Open Payments only includes name and location as identifiers. If prescriber specialty differed between the Medicare Part D PUF and Open Payments data, we used CMS Physician Compare data to verify the physician's specialty. If a prescriber was not found within Open Payments, we verified their specialty in Physician Compare and considered them to not have received any industry payments. Only 1 prescriber's specialty designation was misclassified in the Medicare PUF.

After we verified the linkage between each corticotropin prescriber and his or her Open Payments record, we extracted information from the Open Payments data on total payment amounts, number of transactions, and types of payments from Mallinckrodt Pharmaceuticals in 2015. We only included Mallinckrodt payments if the payment indicated it was for corticotropin. Our analysis included general payments (eg, honoraria or consulting), research payments, and ownership

**Ex. 33**
p. 78 p. 439

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

JAMA Network Open | Health Policy
Industry Payments to Specialists Who Prescribe Repository Corticotropin

payments. We also extracted and summarized payments from Mallinckrodt unrelated to corticotropin and all other companies.

### Statistical Analysis

We analyzed the prevalence, frequency, category, and monetary amount of corticotropin-related payments by Mallinckrodt. Physician and payment characteristics were summarized with descriptive statistics as appropriate depending on their nature and distribution.

We evaluated the association between payment amounts and Medicare expenditures on corticotropin in 2 ways. First, we grouped prescribers into categories by the total dollar amounts of corticotropin-related payments received from Mallinckrodt and examined the trend in total corticotropin prescriptions and expenditures using the Kendall rank correlation coefficient statistic (Kendall τ). We also conducted multivariable linear regression analyses to evaluate whether payment amounts were positively correlated with corticotropin Medicare expenditures. Our dependent variable was the dollar amount that Medicare spent on corticotropin. The primary independent variable was the total Mallinckrodt corticotropin-related payment to these specialists. Similar to DeJong et al,[7] we controlled for the following covariates: physician specialty, sex, group practice size, years since graduation from medical school, and geographic region. To adjust for differences in other prescribing behaviors, we included covariates measuring the number of noncorticotropin prescriptions per beneficiary and the cost of noncorticotropin prescriptions per claim. We also adjusted for total payments unrelated to corticotropin from industry (eg, payments from other companies) to control for differences in engagement with other companies. For our primary analysis, we transformed the dependent variable with natural logarithmic transformation because Medicare spending data were right skewed. Relative to an untransformed model, using a logarithmic-transformed dependent variable resulted in improved model fit and diagnostic performance.

Finally, to assess the specificity of the association between corticotropin-related payments and corticotropin spending, we conducted a falsification test to evaluate the association between corticotropin-related payments and synthetic corticosteroid spending. Using the same modeling approach, we tested the association between corticotropin-related payments and spending for prednisone, methylprednisolone, prednisolone, dexamethasone, and cortisone. A positive relationship between corticotropin-related payments and corticosteroid spending would suggest any observed association between corticotropin-related payments and corticotropin spending may be confounded by other factors, such as patient severity of illness. For prescribers with no recorded corticosteroid spending, we imputed 0.001 before performing log transformation.

Analyses were conducted using SAS statistical software, version 9.4 (SAS Institute), and R statistical software, version 3.3.3 (R Foundation for Statistical Computing). All tests were 2-sided and $P$ values less than .05 were considered statistically significant.

### Results

In 2015, Medicare spent $504 million for 11 209 corticotropin prescriptions written by 1743 prescribers. More than half of this expenditure ($266 197 661) was attributable to 300 prescribers (17.2%) with more than 10 corticotropin prescriptions. Most of these prescribers (n = 235) were identified, and verified, as rheumatologists (n = 111), neurologists (n = 59), or nephrologists (n = 65). Of the remaining 65 frequent prescribers, 24 were listed as internists, 19 were pulmonologists, 8 had other specialty designations (1 each for allergy and immunology, dermatology, diagnostic radiology, emergency medicine, family practice, neurosurgery, ophthalmology, and pain management), and 14 were other midlevel practitioners (9 nurse practitioners and 5 physician assistants).

The characteristics of the 235 frequent corticotropin prescribers and all other Medicare prescribers in their specialty groups (n = 26 046) are summarized in **Table 1**. In 2015, Medicare spent a total of $203 255 335 for corticotropin prescribed by these 235 physicians (median [interquartile range], $678 706 [$465 974-$984 020] per prescriber). Expenditures for corticotropin among

JAMA Network Open. 2018;1(2):e180482. doi:10.1001/jamanetworkopen.2018.0482

Ex. 33
p. 79 p. 440

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

JAMA Network Open | Health Policy

Industry Payments to Specialists Who Prescribe Repository Corticotropin

**Table 1. Characteristics of Frequent Prescribers of Repository Corticotropin in the Medicare Program in 2015**

| Characteristic | Nephrology Frequent Corticotropin Prescribers (n = 65) | Nephrology Other Prescribers (n = 8213) | Neurology Frequent Corticotropin Prescribers (n = 59) | Neurology Other Prescribers (n = 13 325) | Rheumatology Frequent Corticotropin Prescribers (n = 111) | Rheumatology Other Prescribers (n = 4508) | All 3 Specialties Frequent Corticotropin Prescribers (n = 235) | All 3 Specialties Other Prescribers (n = 26 046) |
|---|---|---|---|---|---|---|---|---|
| Male, No. (%) | 50 (76.9) | 6085 (74.1) | 41 (69.5) | 9305 (69.8) | 74 (66.7) | 2626 (58.3) | 165 (70.2) | 18 016 (69.2) |
| Group practice size, No. (%) | | | | | | | | |
| 1 | 12 (18.5) | 1068 (13.0) | 22 (37.3) | 2647 (19.9) | 33 (29.7) | 965 (21.4) | 67 (28.5) | 4680 (18.0) |
| 2-10 | 22 (33.8) | 1999 (24.3) | 9 (15.3) | 1509 (11.3) | 35 (31.5) | 735 (16.3) | 66 (28.1) | 4243 (16.3) |
| 11-50 | 18 (27.7) | 1747 (21.3) | 8 (13.6) | 1252 (9.4) | 10 (9.0) | 389 (8.6) | 36 (15.3) | 3388 (13.0) |
| >50 | 13 (20.0) | 3399 (41.4) | 20 (33.9) | 7917 (59.4) | 33 (29.7) | 2419 (53.7) | 66 (28.1) | 13 735 (52.7) |
| Time since graduation, mean (SD), y[a] | 23.5 (10.5) | 22.9 (11.2) | 26.6 (9.4) | 23.4 (12.1) | 26.6 (10.5) | 24.4 (12.1) | 25.7 (10.3) | 23.4 (11.8) |
| US geographic region, No. (%) | | | | | | | | |
| Northeast | 13 (20.0) | 1720 (20.9) | 9 (15.3) | 3267 (24.5) | 25 (22.5) | 1083 (24.0) | 47 (20.0) | 6070 (23.3) |
| Midwest | 10 (15.4) | 1723 (21.0) | 12 (20.3) | 2885 (21.7) | 24 (21.6) | 956 (21.2) | 46 (19.6) | 5564 (21.4) |
| South[b] | 33 (50.8) | 3118 (38.0) | 24 (40.7) | 4478 (33.6) | 42 (37.8) | 1563 (34.7) | 99 (42.1) | 9159 (35.2) |
| Pacific West | 7 (10.8) | 1117 (13.6) | 8 (13.6) | 1896 (14.2) | 14 (12.6) | 658 (14.6) | 29 (12.3) | 3671 (14.1) |
| Mountain West | 2 (3.1) | 535 (6.5) | 6 (10.2) | 799 (6.0) | 6 (5.4) | 248 (5.5) | 14 (6.0) | 1582 (6.1) |
| Corticotropin prescribing | | | | | | | | |
| Total corticotropin expenditure, $ | 41 665 749 | NR | 41 056 933 | NR | 120 532 653 | NR | 203 255 335 | NR |
| Corticotropin expenditure per prescriber, median (IQR), $ | 506 718 (420 884-659 918) | NR | 614 760 (443 558-737 420) | NR | 824 545 (591 100-1 172 163) | NR | 678 706 (465 974-984 020) | NR |
| Corticosteroid prescribing[c] | | | | | | | | |
| Count of frequent prescribers, No. (%) | 49 (75.4) | 4375 (53.2) | 37 (62.7) | 3890 (29.2) | 111 (100) | 4378 (97.1) | 197 (83.8) | 12 643 (48.5) |
| Total corticosteroid expenditure, $ | 24 782 | 1 802 668 | 62 551 | 1 774 892 | 1 145 859 | 23 071 018 | 1 233 192 | 26 648 578 |
| Corticosteroid expenditure per prescriber, median (IQR), $ | 273 (146-273) | 241 (140-440) | 825 (313-1856) | 279 (161-516) | 6043 (3210-6043) | 3607 (1660-6470) | 2444 (460-6899) | 450 (199-2113) |
| All medication prescribing | | | | | | | | |
| Total expenditure, $ | 75 789 407 | 2 531 033 434 | 197 296 370 | 6 974 756 737 | 275 778 740 | 3 444 695 122 | 548 864 517 | 12 950 485 292 |
| Expenditure per prescriber, median (IQR), $ | 1 035 563 (702 181-1 335 092) | 220 798 (84 500-412 292) | 3 000 411 (2 002 159-3 990 935) | 245 589 (43 037-662 864) | 2 299 877 (1 556 368-3 070 141) | 584 817 (252 536-1 037 950) | 1 932 495 (1 168 339-3 008 416) | 275 396 (77 177-639 819) |
| Prescriptions per prescriber, median (IQR), No. | 2373 (1604-3607) | 1432 (642-2532) | 3803 (2152-6630) | 999 (278-2266) | 3801 (2520-5501) | 1967 (910-3593) | 3377 (2105-5501) | 1301 (451-2584) |
| Expenditure per prescription, median (IQR), $ | 380 (305-530) | 144 (93-213) | 677 (450-1322) | 210 (113-358) | 604 (436-758) | 285 (196-396) | 530 (378-823) | 195 (113-321) |

Abbreviations: IQR, interquartile range; NR, not reported.

[a] Graduation year missing for 4.3% of corticotropin prescribers and 6.2% of other prescribers.

[b] One physician from Puerto Rico was categorized into South.

[c] Corticosteroids include prednisone, methylprednisolone, prednisolone, dexamethasone, and cortisone.

Ex. 33
p. 80 p. 441

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

frequent prescribers accounted for 37% of their total Part D expenditures, but ranged from 21% for neurologists to 54% for nephrologists. Frequent corticotropin prescribers were more likely to practice in smaller practices, write more prescriptions, and prescribe more expensive drugs than their specialty peers. Frequent corticotropin prescribers also prescribed more synthetic corticosteroids than their peers. Of these 235 physician prescribers of corticotropin, 25 (11%) practiced within an academic medical center.

In 2015, Mallinckrodt paid $11 442 866 ($7 325 957 in general payments and $4 116 908 in research payments) to 10 491 physicians for corticotropin (10 452 for general payments and 97 for research payments). Among frequent corticotropin prescribers in our study, Mallinckrodt made a total of 5315 corticotropin-related payments to 207 prescribers (88% of frequent corticotropin specialist prescribers), totaling $2 213 727 ($1 986 926 in general payments and $226 801 in research payments). **Table 2** summarizes the distribution and types of corticotropin-related payments made by Mallinckrodt to these frequent prescribers. Most nephrologists and nearly all neurologists and rheumatologists received at least 1 corticotropin-related payment from Mallinckrodt. Overall, while the median (range) total payment amounts during the year were modest at $189 ($11-$138 321), maximum total payment amounts were as high as $56 549 for nephrology, $120 387 for neurology, and $138 321 for rheumatology. The median (range) total payment for the top quartile of the 207 prescribers who received at least 1 payment was $33 190 ($9934-$138 321) overall, but ranged from $5249 for nephrologists to $41 405 for neurologists. Neurologists were the most likely to receive a payment (93.2% vs 78.5% for nephrologists and 91.0% for rheumatologists), had the greatest number of transactions (20 vs 5 for nephrologists and 13 for rheumatologists), and received the highest median total dollar amount over the year ($476 vs $118 for nephrologists and $207 for rheumatology). Differences in total payments were driven by a higher likelihood of consulting,

**Table 2. Repository Corticotropin–Related Payments to Frequent Physician Prescribers of Corticotropin From Mallinckrodt in 2015**

| Payments | Nephrology (n = 65) | Neurology (n = 59) | Rheumatology (n = 111) | Total (n = 235) |
|---|---|---|---|---|
| Any payment type | | | | |
| Prescribers, No. (%) | 51 (78.5) | 55 (93.2) | 101 (91.0) | 207 (88.1) |
| Total payments, $ | 180 621 | 878 069 | 1 155 038 | 2 213 727 |
| Total payments per prescriber, median (range), $ | 118 (12-56 549) | 476 (11-120 387) | 207 (12-138 321) | 189 (11-138 321) |
| Total transactions, No. | 517 | 2219 | 2579 | 5315 |
| Transactions per prescriber, median (range), No. | 5 (1-86) | 20 (1-236) | 13 (1-199) | 11 (1-236) |
| Payment per transaction, median (range), $ | 22 (12-767) | 28 (6-722) | 22 (5-3671) | 23 (5-3671) |
| Specific payment category | | | | |
| Compensation for services other than consulting | | | | |
| Prescribers, No. (%) | 7 (10.8) | 24 (40.7) | 32 (28.8) | 63 (26.8) |
| Total payments per prescriber, median (range), $ | 12 900 (2200-37 450) | 15 865 (1990-91 400) | 14 100 (650-70 650) | 14 700 (650-91 400) |
| Travel | | | | |
| Prescribers, No. (%) | 6 (9.2) | 21 (35.6) | 33 (29.7) | 60 (25.5) |
| Total payments per prescriber, median (range), $ | 5579 (62-14 690) | 4253 (183-29 508) | 2034 (10-28 061) | 3213 (10-29 508) |
| Consulting | | | | |
| Prescribers, No. (%) | 4 (6.2) | 20 (33.9) | 26 (23.4) | 50 (21.3) |
| Total payments per prescriber, median (range), $ | 2863 (1500-7500) | 2700 (400-7400) | 2680 (2500-15 860) | 2700 (400-15 860) |
| Research | | | | |
| Prescribers, No. (%) | 2 (3.1) | 6 (10.2) | 4 (3.6) | 12 (5.1) |
| Total payments per prescriber, median (range), $ | 4833 (4010-5656) | 407 (407-819) | 53 208 (32 865-75 000) | 2415 (407-75 000) |
| Food | | | | |
| Prescribers, No. (%) | 51 (78.5) | 55 (93.2) | 101 (91.0) | 207 (88.1) |
| Total payments per prescriber, median (range), $ | 118 (12-1184) | 273 (11-2068) | 206 (12-2773) | 183 (11-2773) |
| Education | | | | |
| Prescribers, No. (%) | 11 (16.9) | 16 (27.1) | 25 (22.5) | 52 (22.1) |
| Total payments per prescriber, median (range), $ | 5 (1-18) | 5 (1-41) | 8 (3-78) | 7 (1-78) |

JAMA Network Open. 2018;1(2):e180482. doi:10.1001/jamanetworkopen.2018.0482

Ex. 33
p. 81 p. 442

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

JAMA Network Open | Health Policy

Industry Payments to Specialists Who Prescribe Repository Corticotropin

travel, and compensation for services other than consulting. Payments to neurologists for services other than consulting contributed the most to this difference (median [range] total payment amount, $15 865 [$1990-$91 400]). Research-related payments totaled $226 801 for 12 prescribers (5.1%). They were particularly high for 4 rheumatologists, who received a total of $214 281 (median [range], $53 208 [$32 865-$75 000]) during the year. No prescribers received ownership-related payments. As shown in eTable 1 in the Supplement, payments to these prescribers unrelated to corticotropin were also common and substantial.

In Table 3 and the Figure, we summarize corticotropin use by corticotropin-related payment amount categories. Among the 50 prescribers (21.3%) who received more than $10 000 in payments during the year, corticotropin expenditures per prescriber (mean [SD], $1 304 884 [$1 022 937]) were more than double that of the 45 prescribers (19.2%) who received $25 dollars or less (mean [SD], $594 976 [$256 357]). There were 4 prescribers who received more than $100 000 in payments from Mallinckrodt. There were significant associations between payment amount category and corticotropin expenditures (Kendall τ = 0.29; P < .001) and payment amount category and number of prescriptions (Kendall τ = 0.252; P < .001) among these frequent prescribers.

Our multivariable regression analysis is summarized in Table 4 and shows that Medicare spending on corticotropin increased by 7.9% (approximately $53 000) for every $10 000 increase in payments to prescribers (β = 1.079; 95% CI, 1.044-1.115; P < .001). The only other significant predictors of Medicare spending on corticotropin were prescriber specialty and sex. In contrast, there was no association between corticotropin-related payments and Medicare spending on corticosteroids (eTable 2 in the Supplement).

## Discussion

In our study, 207 of 235 frequent corticotropin prescribers (88%) received a corticotropin-related payment from Mallinckrodt. In 2015, Mallinckrodt made a total of $7 325 957 in general



Table 3. Medicare Repository Corticotropin Use by Corticotropin-Related Payment Level[a]

| Total Payments From Mallinckrodt, $ | Prescribers, No. (%) | Corticotropin Prescriptions, No. | Corticotropin Prescriptions per Prescriber, Mean (SD), No. | Total Corticotropin Expenditures, $ | Corticotropin Expenditures per Prescriber, Mean (SD), $ |
|---|---|---|---|---|---|
| ≤25 | 45 (19.2) | 700 | 15.6 (5.9) | 26 773 924 | 594 976 (256 357) |
| 26-100 | 41 (17.5) | 644 | 15.7 (6.0) | 26 854 807 | 654 995 (337 798) |
| 101-1000 | 80 (34.0) | 1458 | 18.2 (8.5) | 61 828 987 | 772 862 (363 721) |
| 1001-10 000 | 19 (8.1) | 527 | 27.7 (24.1) | 22 553 434 | 1 187 023 (1 038 448) |
| >10 000 | 50 (21.3) | 1433 | 28.7 (21.6) | 65 244 183 | 1 304 884 (1 022 937) |

[a] Significant associations between payment level and mean corticotropin prescriptions (Kendall τ = 0.252; P < .001) and between payment level and mean corticotropin expenditures (Kendall τ = 0.29; P < .001).

Figure. Medicare Spending on Repository Corticotropin by Mallinckrodt Payment Amount



The horizontal line in the middle of each box indicates median corticotropin spending per prescriber; bottom and top borders of the box, 25th and 75th percentiles, respectively; whiskers below and above the box, 10th and 90th percentiles; solid circle, mean corticotropin spending per prescriber; and open circles, outliers.

Ex. 33
p. 82 p. 443

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

non–research-related corticotropin payments to 10 452 physicians. Of this amount, $1 986 926 (27%) was paid to the 207 frequent corticotropin prescribers (2% of all physicians receiving Mallinckrodt payments for corticotropin) in our study. In contrast, a recent population-based study found that among all specialists, only 35% receive payments from industry.[34] Although the median total payment for the year was only $189, more than 20% of prescribers received more than $10 000, the top quartile of prescribers received more than $30 000, and several physicians received more than $100 000. The larger dollar amounts given to neurologists were attributable to a higher prevalence of consulting payments or compensation for services other than consulting among these specialists. In general, the category of compensation for services other than consulting had the largest dollar amount per transaction. This category is defined by CMS as "payments made to physicians for speaking, training, and education engagements that are not for continuing education."[3] Although precise definitions of reporting categories are not provided, this category likely includes serving on industry speakers' bureaus and other activities that involve giving talks to physician groups. Finally, we found a significant association between the magnitude of payments and total corticotropin expenditures. Our analysis suggests that every $10 000 spent by Mallinckrodt for payments to physicians is associated with a 7.9% increase in Medicare spending on corticotropin. Based on a median Medicare expenditure per prescriber of $678 706, we would expect a $10 000 increase in payments to yield approximately $53 000 in additional Medicare spending.

Our findings are consistent with other research that examines both the prevalence and extent of influence of pharmaceutical industry payments on physicians. Three large cross-sectional studies that used a similar approach for other medications found that industry payments were positively correlated with increased drug-specific prescribing.[7-9] These studies provide evidence that even small payments, such as meals, are consistently associated with increased prescribing behavior.

Table 4. Multivariable Regression Model of Cumulative Repository Corticotropin–Related Payments (Scaled to $10 000) and Log-Transformed Medicare Spending on Corticotropin

| Variable | Coefficient (95% CI) | P Value |
|---|---|---|
| Payment amount[a] | 1.0787 (1.0435-1.1152) | <.001 |
| Specialty | | |
| Nephrology | 1 [Reference] | |
| Neurology | 0.9600 (0.7721-1.1936) | <.001 |
| Rheumatology | 1.4378 (1.2223-1.6913) | |
| Female | 0.8554 (0.7422-0.9858) | .03 |
| Practice size | | |
| 1 | 1 [Reference] | |
| 2-10 | 1.1082 (0.9225-1.3314) | |
| 11-50 | 0.9220 (0.7438-1.1429) | .31 |
| >50 | 1.0645 (0.8871-1.2773) | |
| Time since graduation, y | | |
| ≤10 | 1 [Reference] | |
| 11-30 | 1.1773 (0.8781-1.5786) | |
| >30 | 1.1906 (0.8744-1.6212) | .49 |
| Not reported | 1.4069 (0.9091-2.1772) | |
| Region | | |
| Northeast | 1 [Reference] | |
| Midwest | 0.9585 (0.7814-1.1756) | |
| South | 0.9045 (0.762-1.0736) | |
| Pacific West | 1.0532 (0.8356-1.3275) | .35 |
| Mountain West | 0.8003 (0.596-1.0748) | |
| Total noncorticotropin payments from industry[a] | 0.9972 (0.9999-1.0003) | .16 |
| No. of noncorticotropin prescriptions per beneficiary | 1.0060 (0.9901-1.0221) | .46 |
| Cost of noncorticotropin prescriptions per claim | 1.0001 (0.9934-1.0011) | .40 |

[a] Scaled to $10 000.

JAMA Network Open. 2018;1(2):e180482. doi:10.1001/jamanetworkopen.2018.0482

Ex. 33
p. 83 p. 444

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

Additionally, studies focusing on payments by specific manufacturers in several medical specialties report results similar to our own. Two studies evaluating the use of anti–vascular endothelial growth factor injections for eye diseases found payments by Regeneron Pharmaceuticals and Genentech were associated with a higher likelihood of using aflibercept or ranibizumab, respectively, vs lower cost, off-label bevacizumab.[10,35] Studies of the impact of industry payments on urologists or oncologists treating prostate cancer reveal similar patterns.[6,36,37]

Our findings contrast with the prior literature arising from Open Payments data in several ways. First, about 90% of physicians who frequently prescribed corticotropin received at least 1 payment from Mallinckrodt. Among the ophthalmologists,[10] urologists,[37] and oncologists[36] examined in recent studies of other expensive medications, only 34% to 57% of identified drug prescribers received a manufacturer-related payment. Additionally, payments by Mallinckrodt in the present study appear to be larger than the amounts reported in other studies. In this report, almost a third of frequent prescribers received more than $1000 from Mallinckrodt. In contrast, only 3.8% of prescribers of anti–vascular endothelial growth factor received more than $1000 from the associated manufacturer.[10] While the reasons for this discrepancy are unclear, it may be attributable to the extent to which Mallinckrodt's product portfolio depends on corticotropin, which accounted for more than a third of total sales in 2016.[38] Alternatively, a higher-stakes sales approach may be required to compensate for the lack of compelling evidence justifying corticotropin use over standard synthetic steroids. The most common prescribers of corticotropin are rheumatologists, neurologists, and nephrologists,[27] suggesting the use of corticotropin in individuals with rheumatic disorders, multiple sclerosis, and nephrotic syndrome. Among these conditions, controlled clinical trial data only support corticotropin use to treat exacerbations of multiple sclerosis,[18,19] although it is no more effective than methylprednisolone. The use of corticotropin for rheumatoid arthritis,[39] dermatomyositis and polymyositis,[40-42] systemic lupus erythematosus,[25,43] and nephrotic syndrome[44-48] is largely supported by small uncontrolled studies or case series.

## Limitations

Our study has several limitations. First, CMS suppresses prescription information for drugs that have 10 or fewer prescriptions in the Medicare PUF files. Although frequent corticotropin prescribers account for more than half of all corticotropin expenditures by Medicare, it is unclear to what extent our observations generalize to the other 1443 corticotropin prescribers who cannot be identified in the data set. Another issue relates to the accuracy of the Open Payments and Medicare PUF data sets. The Centers for Medicare & Medicaid Services allows and recommends that physicians review payment data and dispute any errors in their records. However, residual inaccuracies may persist. Additionally, Medicare expenditure data do not include any proprietary discounts or rebates, and are therefore likely an overestimate of the net cost to Medicare. Rebates for corticotropin for Medicare are less than federal Medicaid mandatory rebates and are likely around 10%.[32] Finally, although these data may indicate a causal association between Mallinckrodt payments and corticotropin prescriptions, our study was cross-sectional and the temporal sequence between payments and prescriptions cannot be definitely established. It is conceivable that the company preferentially sought out and supported prominent prescribers of corticotropin.

## Conclusions

Corticotropin is an expensive drug of questionable clinical value that is a large and growing expense for the Medicare program, and perhaps other payers. Our results show that most frequent prescribers of corticotropin in the Medicare program received financial payments from Mallinckrodt, the drug's maker. Furthermore, we observed a positive association between the amount of money paid to these prescribers, their prescribing intensity, and corticotropin expenditures in the Medicare program with a return on investment for Mallinckrodt of about 5:1. Transparency remains a necessary part of conflict of interest management, and we advocate that physicians who receive significant

Ex. 33
p. 84 p. 445

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

payments from Mallinckrodt disclose this to patients before prescribing corticotropin for them or consider not receiving any payments from Mallinckrodt. However, disclosure alone may not be sufficient. While academic medical institutions[49] have implemented conflict of interest policies intended to limit many of the activities observed in this study, those in private practice, like most prescribers in this study, are subject to little oversight. Given the financial consequences for many expensive therapies (both new and old), other stakeholders, including payers, may need to explore other strategies to manage these conflicts.

---

## ARTICLE INFORMATION

**Accepted for Publication:** March 30, 2018.

**Published:** June 29, 2018. doi:10.1001/jamanetworkopen.2018.0482

**Open Access:** This is an open access article distributed under the terms of the CC-BY License. © 2018 Hartung DM et al. *JAMA Network Open*.

**Corresponding Author:** Daniel M. Hartung, PharmD, MPH, OSU/OHSU College of Pharmacy, Oregon Health & Science University, Collaborative Life Sciences Bldg (CLSB), 2730 SW Moody Ave, CL5CP, Portland, OR 97201-5042 (hartungd@ohsu.edu).

**Author Affiliations:** College of Pharmacy, Oregon State University, Corvallis (Hartung, Johnston); Oregon Health & Science University, Portland (Hartung, Johnston); Division of Nephrology & Hypertension, Department of Medicine, Oregon Health & Science University, Portland (Cohen); School of Public Health, Oregon Health & Science University, Portland (Nguyen); Division of Arthritis & Rheumatic Diseases, Department of Medicine, Oregon Health & Science University, Portland (Deodhar); Department of Neurology, Oregon Health & Science University, Portland (Bourdette).

**Author Contributions:** Dr Hartung had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.

*Concept and design:* Hartung, Bourdette.

*Acquisition, analysis, or interpretation of data:* Hartung, Johnston, Cohen, Nguyen, Deodhar.

*Drafting of the manuscript:* Hartung, Johnston, Nguyen.

*Critical revision of the manuscript for important intellectual content:* Hartung, Cohen, Nguyen, Deodhar, Bourdette.

*Statistical analysis:* Hartung, Johnston, Nguyen.

*Obtained funding:* Hartung.

*Administrative, technical, or material support:* Hartung, Bourdette.

*Supervision:* Hartung, Cohen, Nguyen, Deodhar.

**Conflict of Interest Disclosures:** Dr Hartung reported grants from the National Multiple Sclerosis Society during the conduct of the study. Ms Johnston reported grants from the National Multiple Sclerosis Society during the conduct of the study. Dr Deodhar reported grants and personal fees from AbbVie, Eli Lilly, Janssen, Novartis, Pfizer, and UCB as well as grants from Sun Pharma outside the submitted work. No other disclosures were reported.

**Funding/Support:** Drs Hartung and Bourdette and Ms Johnston received funding for this project from the National Multiple Sclerosis Society.

**Role of the Funder/Sponsor:** The National Multiple Sclerosis Society had no role in design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**Additional Contributions:** Luke Middleton, BS, Oregon State University College of Pharmacy, assisted with data management. Mr Middleton received no compensation for his contributions.

## REFERENCES

**1.** Marshall DC, Jackson ME, Hattangadi-Gluth JA. Disclosure of industry payments to physicians: an epidemiologic analysis of early data from the open payments program. *Mayo Clin Proc*. 2016;91(1):84-96. doi:10.1016/j.mayocp.2015.10.016

**2.** Wazana A. Physicians and the pharmaceutical industry: is a gift ever just a gift? *JAMA*. 2000;283(3):373-380. doi:10.1001/jama.283.3.373

**3.** Centers for Medicare & Medicaid Services. Open payments data website. https://openpaymentsdata.cms.gov/summary. Published January 17, 2018. Accessed March 9, 2018.

Ex. 33
p. 85 p. 446

**Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019**

**4**. Dana J, Loewenstein G. A social science perspective on gifts to physicians from industry. *JAMA*. 2003;290(2): 252-255. doi:10.1001/jama.290.2.252

**5**. Wood SF, Podrasky J, McMonagle MA, et al. Influence of pharmaceutical marketing on Medicare prescriptions in the District of Columbia. *PLoS One*. 2017;12(10):e0186060. doi:10.1371/journal.pone.0186060

**6**. Bandari J, Turner RM II, Jacobs BL, Canes D, Moinzadeh A, Davies BJ. The relationship of industry payments to prescribing behavior: a study of degarelix and denosumab. *Urol Pract*. 2017;4(1):14-20. doi:10.1016/j.urpr. 2016.03.007

**7**. DeJong C, Aguilar T, Tseng CW, Lin GA, Boscardin WJ, Dudley RA. Pharmaceutical industry-sponsored meals and physician prescribing patterns for Medicare beneficiaries. *JAMA Intern Med*. 2016;176(8):1114-1122. doi:10.1001/ jamainternmed.2016.2765

**8**. Fleischman W, Agrawal S, King M, et al. Association between payments from manufacturers of pharmaceuticals to physicians and regional prescribing: cross sectional ecological study. *BMJ*. 2016;354:i4189. doi:10. 1136/bmj.i4189

**9**. Qian J, Hansen RA, Surry D, Howard J, Kiptanui Z, Harris I. Disclosure of industry payments to prescribers: industry payments might be a factor impacting generic drug prescribing. *Pharmacoepidemiol Drug Saf*. 2017;26 (7):819-826. doi:10.1002/pds.4224

**10**. Taylor SC, Huecker JB, Gordon MO, Vollman DE, Apte RS. Physician-industry interactions and anti-vascular endothelial growth factor use among US ophthalmologists. *JAMA Ophthalmol*. 2016;134(8):897-903. doi:10.1001/ jamaophthalmol.2016.1678

**11**. Yeh JS, Franklin JM, Avorn J, Landon J, Kesselheim AS. Association of industry payments to physicians with the prescribing of brand-name statins in Massachusetts. *JAMA Intern Med*. 2016;176(6):763-768. doi:10.1001/ jamainternmed.2016.1709

**12**. Perlis RH, Perlis CS. Physician payments from industry are associated with greater Medicare Part D prescribing costs. *PLoS One*. 2016;11(5):e0155474. doi:10.1371/journal.pone.0155474

**13**. Pollack A. Questcor finds profits, at $28,000 a vial. *New York Times*. December 29, 2012. https://www.nytimes. com/2012/12/30/business/questcor-finds-profit-for-acthar-drug-at-28000-a-vial.html. Accessed April 15, 2018.

**14**. First DataBank. FDB MedKnowledge. https://www.fdbhealth.com/fdb-medknowledge/. Accessed February 1, 2018.

**15**. Metersky ML. Is there any reliable clinical evidence to suggest that Acthar is more effective than other forms of corticosteroids in treating sarcoidosis and other diseases it is being marketed to treat? *Chest*. 2016;149(3):886. doi:10.1016/j.chest.2015.11.027

**16**. Greene JA, Podolsky SH. Reform, regulation, and pharmaceuticals—the Kefauver-Harris Amendments at 50. *N Engl J Med*. 2012;367(16):1481-1483. doi:10.1056/NEJMp1210007

**17**. Center for Drug Evaluation and Research, US Food and Drug Administration. New Drug Application for the use of H.P. Acthar Gel in the treatment of Infantile Spasms. Application No. 022432. https://www.accessdata.fda.gov/ drugsatfda_docs/nda/2010/022432Orig1s000AdminCorres.pdf. Submitted June 23, 2006. Accessed April 16, 2018.

**18**. Rose AS, Kuzma JW, Kurtzke JF, Namerow NS, Sibley WA, Tourtellotte WW. Cooperative study in the evaluation of therapy in multiple sclerosis. ACTH vs. placebo—final report. *Neurology*. 1970;20(5):1-59.

**19**. Thompson AJ, Kennard C, Swash M, et al. Relative efficacy of intravenous methylprednisolone and ACTH in the treatment of acute relapse in MS. *Neurology*. 1989;39(7):969-971. doi:10.1212/WNL.39.7.969

**20**. Baram TZ, Mitchell WG, Tournay A, Snead OC, Hanson RA, Horton EJ. High-dose corticotropin (ACTH) versus prednisone for infantile spasms: a prospective, randomized, blinded study. *Pediatrics*. 1996;97(3):375-379.

**21**. Hrachovy RA, Frost JD Jr, Glaze DG. High-dose, long-duration versus low-dose, short-duration corticotropin therapy for infantile spasms. *J Pediatr*. 1994;124(5 Pt 1):803-806. doi:10.1016/S0022-3476(05)81379-4

**22**. Hrachovy RA, Frost JD Jr, Kellaway P, Zion TE. Double-blind study of ACTH vs prednisone therapy in infantile spasms. *J Pediatr*. 1983;103(4):641-645. doi:10.1016/S0022-3476(83)80606-4

**23**. Vigevano F, Cilio MR. Vigabatrin versus ACTH as first-line treatment for infantile spasms: a randomized, prospective study. *Epilepsia*. 1997;38(12):1270-1274. doi:10.1111/j.1528-1157.1997.tb00063.x

**24**. Yanagaki S, Oguni H, Hayashi K, et al. A comparative study of high-dose and low-dose ACTH therapy for West syndrome. *Brain Dev*. 1999;21(7):461-467. doi:10.1016/S0387-7604(99)00053-4

**25**. Furie R, Mitrane M, Zhao E, Das M, Li D, Becker PM. Efficacy and tolerability of repository corticotropin injection in patients with persistently active SLE: results of a phase 4, randomised, controlled pilot study. *Lupus Sci Med*. 2016;3(1):e000180. doi:10.1136/lupus-2016-000180

Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019

**26**. Philbin M, Niewoehner J, Wan GJ. Clinical and economic evaluation of repository corticotropin injection: a narrative literature review of treatment efficacy and healthcare resource utilization for seven key indications. *Adv Ther*. 2017;34(8):1775-1790. doi:10.1007/s12325-017-0569-9

**27**. Hartung DM, Johnston K, Van Leuven S, Deodhar A, Cohen DM, Bourdette DN. Trends and characteristics of US Medicare spending on repository corticotropin. *JAMA Intern Med*. 2017;177(11):1680-1682. doi:10.1001/jamainternmed.2017.3631

**28**. Centers for Medicare & Medicaid Services. 2015 Medicare drug spending data. https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Information-on-Prescription-Drugs/2015MedicareData.html. Updated December 7, 2016. Accessed December 14, 2017.

**29**. Ornstein C. The obscure drug with a growing Medicare tab. *ProPublica*. https://www.propublica.org/article/the-obscure-drug-with-a-growing-medicare-tab. Published August 4, 2014. Accessed April 15, 2018.

**30**. Ornstein C. Top Acthar prescribers in Medicare have ties to its maker. *ProPublica*. https://www.propublica.org/article/top-acthar-prescribers-in-medicare-have-ties-to-its-maker. Published August 4, 2014. Accessed April 15, 2018.

**31**. Centers for Medicaid & Medicaid Services. Research, statistics, data & systems. https://www.cms.gov/Research-Statistics-Data-and-Systems/Research-Statistics-Data-and-Systems.html. Accessed February 23, 2017.

**32**. Rosenthal MB, Mello MM. Sunlight as disinfectant—new rules on disclosure of industry payments to physicians. *N Engl J Med*. 2013;368(22):2052-2054. doi:10.1056/NEJMp1305090

**33**. Centers for Medicare & Medicaid Services. Medicare, Medicaid, Children's Health Insurance Programs; transparency reports and reporting of physician ownership or investment interests. Final rule. *Fed Regist*. 2013;78 (27):9457-9528.

**34**. Tringale KR, Marshall D, Mackey TK, Connor M, Murphy JD, Hattangadi-Gluth JA. Types and distribution of payments from industry to physicians in 2015. *JAMA*. 2017;317(17):1774-1784. doi:10.1001/jama.2017.3091

**35**. Singh N, Chang JS, Rachitskaya AV. Open payments database: anti-vascular endothelial growth factor agent payments to ophthalmologists. *Am J Ophthalmol*. 2017;173:91-97. doi:10.1016/j.ajo.2016.09.026

**36**. Bandari J, Ayyash OM, Turner RM II, Jacobs BL, Davies BJ. The lack of a relationship between physician payments from drug manufacturers and Medicare claims for abiraterone and enzalutamide. *Cancer*. 2017;123(22): 4356-4362. doi:10.1002/cncr.30914

**37**. Maruf M, Sidana A, Fleischman W, et al. Financial relationships between urologists and industry: an analysis of open payments data [published online April 7, 2017]. *Urol Pract*. doi:10.1016/j.urpr.2017.03.012

**38**. Mallinckrodt Pharmaceuticals. Mallinckrodt PLC Annual Report. Form 10-K. 2016; http://www.mallinckrodt.com/investors/sec-filings. Accessed December 14, 2017.

**39**. Gillis TM, Crane M, Hinkle C, Wei N. ABO502 H.P. Acthar® Gel (repository corticotropin injection) as adjunctive therapy in patients with rheumatoid arthritis who have failed at least three biologic therapies with different modes of action. *Ann Rheum Dis*. 2015;74:1066. doi:10.1136/annrheumdis-2015-eular.2092

**40**. Patel A, Seely G, Aggarwal R. Repository corticotropin injection for treatment of idiopathic inflammatory myopathies. *Case Rep Rheumatol*. 2016;2016:9068061. doi:10.1155/2016/9068061

**41**. Levine T. Treating refractory dermatomyositis or polymyositis with adrenocorticotropic hormone gel: a retrospective case series. *Drug Des Devel Ther*. 2012;6:133-139. doi:10.2147/DDDT.S33110

**42**. Aggarwal R, Marder G, Koontz DC, Nandkumar P, Qi Z, Oddis CV. Efficacy and safety of adrenocorticotropic hormone gel in refractory dermatomyositis and polymyositis [published online December 13, 2017]. *Ann Rheum Dis*. doi:10.1136/annrheumdis-2017-212047

**43**. Fiechtner JJ, Montroy T. Treatment of moderately to severely active systemic lupus erythematosus with adrenocorticotropic hormone: a single-site, open-label trial. *Lupus*. 2014;23(9):905-912. doi:10.1177/0961203314532562

**44**. Madan A, Mijovic-Das S, Stankovic A, Teehan G, Milward AS, Khastgir A. Acthar gel in the treatment of nephrotic syndrome: a multicenter retrospective case series. *BMC Nephrol*. 2016;17:37. doi:10.1186/s12882-016-0241-7

**45**. Hogan J, Bomback AS, Mehta K, et al. Treatment of idiopathic FSGS with adrenocorticotropic hormone gel. *Clin J Am Soc Nephrol*. 2013;8(12):2072-2081. doi:10.2215/CJN.02840313

**46**. Hladunewich MA, Cattran D, Beck LH, et al. A pilot study to determine the dose and effectiveness of adrenocorticotrophic hormone (H.P. Acthar® Gel) in nephrotic syndrome due to idiopathic membranous nephropathy. *Nephrol Dial Transplant*. 2014;29(8):1570-1577. doi:10.1093/ndt/gfu069

**47**. Bomback AS, Tumlin JA, Baranski J, et al. Treatment of nephrotic syndrome with adrenocorticotropic hormone (ACTH) gel. *Drug Des Devel Ther*. 2011;5:147-153. doi:10.2147/DDDT.S17521

*JAMA Network Open*. 2018;1(2):e180482. doi:10.1001/jamanetworkopen.2018.0482

Ex. 33
p. 87 p. 448

**Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019**

**48**. Bomback AS, Canetta PA, Beck LH Jr, Ayalon R, Radhakrishnan J, Appel GB. Treatment of resistant glomerular diseases with adrenocorticotropic hormone gel: a prospective trial. *Am J Nephrol*. 2012;36(1):58-67. doi:10.1159/000339287

**49**. Chimonas S, Evarts SD, Littlehale SK, Rothman DJ. Managing conflicts of interest in clinical care: the "race to the middle" at U.S. medical schools. *Acad Med*. 2013;88(10):1464-1470. doi:10.1097/ACM.0b013e3182a2e204

**SUPPLEMENT.**
**eTable 1.** Non-Repository Corticotropin (ACTH)-Related Payments to Frequent ACTH Prescribers From all Pharmaceutical Companies, Including Mallinckrodt, in 2015
**eTable 2.** Multivariable Regression Model of Cumulative Repository Corticotropin (ACTH)-Related Payments (Scaled to $10,000) and Log-Transformed Medicare Spending on Corticosteroids

Ex. 33
p. 88 p. 449

**Downloaded From: https://jamanetwork.com/ by a Arnold & Porter Kaye Scholer, LLP User  on 09/16/2019**

# EXHIBIT J

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| HUMANA INC., Plaintiff, <br><br> v. <br><br> MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), Defendant. | CV 19-06926 DSF (MRW) <br><br> Order GRANTING in part and DENYING in part Defendant's Motion to Dismiss and DENYING Defendant's Motion to Strike (Dkt. 47) |

Defendant Mallinckrodt ARD LLC moves to dismiss Plaintiff Humana Inc.'s First Amended Complaint (FAC) in its entirety.  Dkt. 47-1 (Mot.).  Plaintiff opposes the Motion.  Dkt. 51 (Opp'n).  The Court deems this matter appropriate for decision without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7-15.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Defendant produces H.P. Acthar Gel (Acthar), a drug that was invented in 1948 and first approved by the FDA in 1952.  Dkt. 46 (FAC) ¶¶ 2, 4, 42, 44.  Plaintiff operates or administers Medicare Part D plans on behalf of federal and state governments and provides coverage for prescription drugs, including Acthar, through other plans.  Id. ¶ 39. Acthar is an adrenocorticotropic hormone (ACTH) used as an anti-inflammatory.  Id. ¶ 41.  Acthar is the only ACTH drug approved for sale in the United States.  Id. ¶ 57.  Another ACTH drug, Synacthen, is approved for sale outside of the United States.  Id. ¶ 62.  Acthar is approved to treat exacerbations of multiple sclerosis (MS) as well as other diseases and disorders.  Id. ¶ 41.  However, for many of these

conditions, Acthar is not the "first-line treatment." Id. ¶ 46. Cheaper non-ACTH drugs are used to treat the same indications. Id. ¶¶ 57, 84. In 2010, the FDA approved Acthar for infantile spasms, the only condition for which Acthar is the "first-line treatment." Id. ¶ 48. The only other FDA-approved drug for infantile spasms costs four times less than Acthar, although it is prescribed for a smaller set of patients. Id. ¶ 58.

Until 2001, when Defendant's predecessor, Questcor, acquired worldwide rights to sell and manufacture Acthar for $100,000, plus royalties, Acthar was priced competitively with other anti-inflammatory drugs. Id. ¶ 49. At that time, because Acthar was expensive to produce and not the first-line treatment for most conditions, the prior manufacturer considered discontinuing production. Id. However, as soon as Questcor acquired the rights to sell Acthar, it increased the price from approximately $40 per vial to nearly $750 per vial. Id. ¶ 51. On August 27, 2007, Questcor further increased the price from $1,650 to $23,269 per vial. Id. ¶ 52. By 2018, the price has been further increased to $38,892. Id. ¶ 53. Between 2011 and 2015, net sales of Acthar increased from $218 million to more than $1 billion, and Medicare spending on Acthar increased from $50 million to $500 million. Id. ¶¶ 54-55. Humana itself paid more than $700 million for Acthar since 2001. See id. ¶ 78.

In June 2007, Defendant "vertically integrated its sales by distributing Acthar exclusively through the specialty pharmacy CuraScript," a subsidiary of Express Scripts. Id. ¶¶ 11, 24-25. CuraScript "is paid a fixed fee for each vial of Acthar" and has the right to return to Defendant any inventory "which goes unsold before its expiration date. Id. ¶ 76.

In 2010, Questcor established an MS Acute Exacerbation Fund (MS Fund) with Chronic Disease Fund, Inc. (CDF), a Texas-based charity. Id. ¶¶ 29, 88-89. The MS Fund helped patients with government insurance, such as Medicare, with co-pays for Acthar. Id. ¶ 89. Although the donation agreement stated that the donated funds were generally for the treatment of patients with acute exacerbations of

Ex. 33
p. 91 p. 452

MS, in reality it did not provide co-pay assistance to purchase any other drugs. Id. In 2011, Questcor established a Lupus Exacerbation Fund (Lupus Fund) that was purportedly to provide co-pay assistance for "any medically appropriate therapy," but in fact was used only to provide assistance for Acthar. Id. ¶ 91. In 2012, Questcor created a similar fund for rheumatoid arthritis (RA Fund). Id. ¶ 92. Between 2010 and 2013, Acthar sales for MS treatment nearly quadrupled. Id. ¶ 99.

Between 2013 and 2016, Questcor and then Defendant paid doctors nearly $27.5 million purportedly for "consulting, promotional speaking, and other services related to Acthar." Id. ¶ 107. About 35% of specialists receive payments from drug companies for similar services. Id. ¶ 106. Many of the doctors who prescribed Acthar the most were those who received substantial fees from Defendant. Id. ¶¶ 107-108.

In late 2012 and early 2013, Novartis, the company that manufactured Synacthen abroad, sought bids from companies who wanted to acquire the rights to seek FDA approval and sell Synacthen in the United States. Id. ¶¶ 65-68. Questcor and three other companies submitted serious bids. Id. The three other companies intended to develop Synacthen to compete with Acthar; Questcor had "inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer." Id.¶ 68. However, Questcor's bid was the highest, at a minimum of $135 million. Id. ¶¶ 69-70. However, neither Questcor nor Defendant "made more than superficial efforts to pursue commercialization of Synacthen . . . to protect Acthar monopoly pricing." Id. ¶ 73. In July 2017, the FTC approved a sublicense granting another company the rights to develop and market Synacthen in the United States. Id. ¶ 74.

## II. LEGAL STANDARD

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual

3

allegations contained in the complaint." <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam). However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557) (alteration in original) (citation omitted). A complaint must "state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . and factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" <u>Iqbal</u>, 556 U.S. at 679 (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

As a general rule, leave to amend a complaint that has been dismissed should be freely granted. Fed. R. Civ. P. 15(a).

### III. DISCUSSION

Plaintiff brings claims against Defendant for violations of federal and state antitrust laws, the RICO Act, state unfair competition laws, consumer fraud and deceptive trade practice laws, and insurance fraud laws, as well as tortious interference with contractual relations, and unjust enrichment.

## A. Antitrust Claims (Counts One through Three)

Plaintiff alleges that Defendant has monopoly power in the market for "ACTH drugs in the United States" and that Questcor's acquisition of the rights to develop and market Synacthen in the United States "restrained trade" in the relevant market and "eliminated [a] potential competitive threat" in order to "maintain its monopoly" so it can "stabilize or raise the price of Acthar to a higher level" than in a competitive market. FAC ¶¶ 131-133, 137-139. This conduct purportedly violates Sections 1 and 2 of the Sherman Antitrust Act and corresponding state antitrust laws.

"In order to state a Section 1 claim . . . plaintiffs must plead facts which, if true, will prove '(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition'" and "(4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny.'" Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012) (first quoting Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1046 (9th Cir. 2008); then quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990)). Section 2 "targets 'the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 448 (2009) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570 (1966)). "Simply possessing monopoly power and charging monopoly prices does not violate § 2." Id. at 447-48.

Both Section 1 and Section 2 claims depend on whether Plaintiff has sufficiently alleged Defendant has market power in a relevant antitrust market. Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the Act, meaning that the requirements apply identically to" both

Section 1 and Section 2 claims and plaintiff's "market allegations are either sufficient or insufficient for all [antitrust] claims."). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." Id. at 1045. One such fatal defect is the failure of the alleged market to "encompass . . . all economic substitutes for the product." Id.

Plaintiff alleges that the relevant market is the market for "the sale of ACTH drugs in the United States." FAC ¶¶ 131 (Section 2), 138 (Section 1). Plaintiff further alleges that Defendant's product, Acthar, "represents 100% of th[at] market." Id. ¶ 57. Defendant contends that this alleged market fails to include "all economic substitutes for the product," including non-ACTH drugs. Mot. at 7 (quoting Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1120 (9th Cir. 2018)). The Court agrees. Not only has Plaintiff failed to allege that non-ACTH drugs do not compete with ACTH drugs, but Plaintiff has specifically alleged such competition. See, e.g., FAC ¶ 6 ("The advent of these safe, cheap alternative treatments in pill form reduced the need for an injectable drug derived from the pituitary gland of pigs"); id. ("But other than [infantile spasms] and a handful of similarly rare conditions, Acthar is . . . either a drug of last resort or not known to be clinically effective"); id. ¶ 13 ("doctors would not otherwise be inclined to prescribe what for most purposes is an antiquated and expensive drug that requires refrigeration and injection when cheaper, more effective pills and remedies were available"); id. ¶ 43 (Describing the development of "corticosteroids, a class of steroids that can also be used to fight inflammation" and "ibuprofen and certain over-the-counter NSAIDs in form that are also used to combat inflammation"); id. ¶ 46 ("For many of [the] conditions [for which Acthar is approved for treatment], Acthar is not considered the first-line treatment" and there "remains a lack of evidence to support the use of Acthar for most indications"); id. ¶ 47 ("For most indications, there is also a lack of evidence to support Acthar's use over lower-cost synthetic corticosteroids"); id. ¶ 49 (Acthar was "expensive to produce, difficult to apply, and (except for certain indications such as infantile spasms) not known to be more effective

6

than simpler, cheaper, and more widely available drugs"); id. ¶ 57 ("Acthar is priced substantially higher than non-ACTH drugs used to treat the same indications"); id. ¶ 58 (describing Sabril, "the only other FDA-approved drug for the treatment of infantile spasms"); id. ¶ 84 ("Questcor knew that it might have priced itself out of the MS market because Acthar had many cheaper, effective competitors in that market"); id. ¶ 147 ("Mallinckrodt subsidized co-pays through CDF, and paid the Prescribing Doctors, in exchange for an increased rate of prescriptions of Acthar in lieu of less expensive alternative treatment."); id. ¶ 151 ("Mallinckrodt has asserted control over the Acthar Enterprise by issuing payments to doctors who prescribed Acthar as treatment for conditions for which more affordable alternative treatments were readily available.").[1]

The product market must include all drugs that are reasonably interchangeable. See Hicks, 897 F.3d at 1120 ("Economic substitutes have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product"); see also Kaiser Found. v. Abbott Labs., No. CV 02-2443-JFW (FMOx), 2009 WL 3877513, at *8 (C.D. Cal. Oct. 8, 2009) (granting summary judgment where the proposed product market "excluded other alpha-blockers," which are "reasonably interchangeable" with defendant's drug); Bayer Schering Pharma AG v. Sandoz, Inc., 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) (alleged product market is implausible where complaint fails to allege that "there is no combination of drugs that can serve as a functional substitute" to drugs in the proposed market). Plaintiff has failed to allege sufficiently that non-ACTH drugs are not reasonably interchangeable with ACTH drugs.[2]

---

[1] Plaintiff's conclusory allegation that there is an "absence of competition" including a "lower-cost substitute" because of "the unavailability of Synacthen," FAC ¶ 59, is belied by all of these other paragraphs describing a number of lower-cost substitutes.

[2] To the extent Plaintiff contends that lower-cost competitors are not in the relevant product market because they are not identical to Acthar, see FAC ¶ 58 (Sabril "has a different molecular structure, works differently, and is

In defense of its proposed market, Plaintiff argues that an "economic definition of a 'market,'" rather than a "medical" one should apply. Opp'n at 6. However, Plaintiff does not explain the effect of using an "economic definition" rather than a "medical" one. Plaintiff's citation to <u>Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.</u>, 924 F.2d 1484 (9th Cir. 1991) does not provide any additional clarity. In <u>Morgan</u>, the plaintiff "contend[ed] that the relevant market [wa]s 'referrals' to Tucson non[-]university medical radiologists." <u>Id.</u> at 1489. On summary judgment, however, the plaintiff failed to include evidence that providers of radiologists' services outside of the definition (university radiologists, osteopathic radiologists, or non-radiologist physicians) could not compete with providers covered by the definition. <u>Id.</u> The Ninth Circuit held that the proposed product market was too narrow because it improperly defined the market by "the producers' institutional associations rather than by the products' characteristics." <u>Id.</u> The court said nothing about a "medical" definition versus an "economic" one. As Defendant points out, in addressing the geographic market, as opposed to the product market, the court did note that it would "give little weight" to the doctors' "conclusory assertion[s]" that the "relevant geographic market is Tucson" because there was "no evidence that [they] were experts qualified to opine on a highly

---

prescribed for a smaller set of patients than Acthar" and Rituxan, a drug used to treat severe idiopathic membranous nephropathy, "operate[s] differently than Acthar does"), it is wrong. <u>See Hicks</u>, 897 F.3d at 1122 ("claims of increased effectiveness" of products in the proposed submarket does not "place" those products "in a distinct market"); <u>cf. United States v. Cont'l Can Co.</u>, 378 U.S. 441, 450, 457 (1964) (in discussing a product market for a claim under section 7 of the Clayton Act, noting that although "glass and metal containers have different characteristics which may disqualify one or the other, at least in their present form, from this or that particular use . . . . interindustry competition between glass and metal containers is sufficient to warrant treating as a relevant product market the combined glass and metal container industries and all end uses for which they compete"). Plaintiff also concedes this point. <u>See</u> Opp'n at 6-7 n.4 ("products need not be physically identical in order to be in the same relevant market").

technical economic question." Id. at 1490. This does not mean testimony on which doctors are qualified to opine, namely, what types of drugs are used to treat certain conditions, should not be considered. Nothing in Morgan indicates that medical substitutes are somehow not relevant to the determination of a drug product market. In fact, it holds the contrary to be true. Id. at 1489 (product market insufficient where it "exclude[s] University and osteopathic radiologists' services" without "[]sufficient evidence for a jury to conclude that University and osteopathic radiologists cannot compete with private medical radiologists").

To further support its argument, Plaintiff cites to a district court case denying a motion to dismiss Sherman Act claims brought against Defendant relying on the same proposed product market. Opp'n at 7 (citing City of Rockford v. Mallinckrodt ARD, Inc., 360 F. Supp. 3d 730 (N.D. Ill. 2019), reconsideration denied, No. 17 C 50107, 2019 WL 2763181 (N.D. Ill. May 3, 2019)). The Court is not bound to follow the conclusions reached by another district court. Further, in that case, plaintiffs alleged that "[b]y 2013, the only significant alternative to Acthar was Synacthen" and "Acthar was and continues to be the only viable product in ***the market for infantile spasms and certain other conditions***." City of Rockford, 360 F. Supp. 3d at 745 (emphasis added). No such allegations appear here. Moreover, the court in City of Rockford simply assumed that the ACTH drug market was an appropriate product market and did not undertake an analysis of whether the plaintiff's alleged product market was facially sustainable.[3]

---

[3] The FAC also refers to Defendant's settlement with the FTC relating to its acquisition of the rights to Synacthen that required Defendant to "grant a license to develop Synacthen to treat infantile spasms and nephrotic syndrome to a licensee approved by the FTC." FAC ¶ 74. This does not save Plaintiff's complaint from the deficiencies in its alleged product market (and, if anything, highlights the flaws in a market definition untethered to drugs that are reasonably interchangeable for a given condition). And while "[t]he FTC settlement is not admissible to establish liability," the FAC's reference

Plaintiff also contends that because Defendant concedes that "[r]ather than pricing this hard-to-manufacture drug to compete with low-cost alternatives for many common types of inflammation, Questcor legitimately could choose an 'orphan drug' pricing strategy (one for a low-volume, high-cost drug to treat rare and catastrophic diseases) to ensure the viability of the product," Mot. at 5, it somehow admitted Plaintiff's market definition, Opp'n at 7. However, one does not follow from the other. Defendant merely states that it chose to raise its price and focus on "rare and catastrophic diseases" instead of "common types of inflammation." Mot. at 5. This says nothing about an ACTH market or reasonable substitutes for Acthar.

Plaintiff next contends that "there is nothing inconsistent or implausible about Acthar competing in more than one kind of market." Opp'n at 7. This is certainly true and is undisputed by Defendant. See Reply at 3. But that there is a broad market for drugs, and submarkets for certain indications, does not establish a product market for ACTH drugs.[4] "To plead an antitrust claim based on a submarket, 'the

---

to it is not a "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Defendant's motion to strike, Mot. at 2, 10, is DENIED.

[4] The FTC amicus curiae brief cited by Plaintiff, Opp'n at 7, does not compel a different conclusion. In the FTC's brief, it argued that "when multiple types of anticompetitive harm are alleged (as here), multiple [product] markets may be relevant." Staley v. Gilead Sciences, Inc., No. 3:19-cv-02573-EMC (N.D. Cal.), Dkt. 180-1 at 2. Specifically, because the complaint alleged two types of harm (preventing competition from generics and reducing competition among branded HIV medications), "the case may implicate multiple relevant markets." Id. at 1, 10. However, the FTC did not take a "position on whether the complaint contain[ed] sufficient facts supporting the alleged product markets." Id. at 11. It merely noted that the fact that products "compete[] to some degree in broader spheres as well . . . d[oes] not preclude defining more narrow relevant antitrust markets when assessing the specific alleged anticompetitive effects at issue." Id. at 5. For example, the FTC noted that "the relevant market might consist of an entire therapeutic class of drugs when the anticompetitive effects are likely to manifest among that entire class, such as in a merger between two branded

---

plaintiff must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market.'" Hicks, 897 F.3d at 1121. A plaintiff can do so by alleging "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)). Here, the FAC contains no allegations tending to show these factors indicate an ACTH submarket, with the possible exception of distinct prices. And to the contrary, as explained above, the FAC contains allegations tending to show that other drugs have similar characteristics (e.g., anti-inflammation), similar uses (e.g., MS, Lupus, rheumatoid arthritis), similar customers (e.g., Medicare recipients with certain conditions), and even sensitivity to price change (i.e. the purported impetus for the alleged bribes and co-pay funds), see FAC ¶ 96 ("Questcor conducted research and discovered that price was an obstacle to more prescriptions . . . ."). Therefore, Plaintiff's antitrust claims fail not because Acthar cannot be a participant in multiple markets (it can), but because Plaintiff has failed to plead sufficient facts to support an ACTH market in particular.

Plaintiff additionally argues that Defendant was able to raise its prices exponentially "without losing sales []to corticosteroids or any other non-ACTH drug." Opp'n at 6 (citing FAC ¶¶ 2, 8, 51–55, 72). However, none of those cited paragraphs contains allegations supporting such a claim. That "Acthar net sales increased," "Medicare spending on Acthar increased," and "the number of Medicare Part D claims" increased, see id. ¶¶ 54-55, does not show that Defendant did

---

manufacturers," while "[i]n other circumstances, the relevant market might be limited to only a subset of a therapeutic class" or even to "the brand and generic versions of that product." Id. at 8-9. However, that a more specific market might exist does not mean that any proposed "submarket" is sufficient. A complaint must still "plead sufficient facts to support [the] alleged relevant markets." See id. at 10. Plaintiff has failed to do so here.

not lose sales to its competitors.  Further, the largest increase (1300%) occurred in 2007, see id. ¶ 52, years before Defendant acquired the rights to Synacthen and before Acthar was approved for infantile spasms, the indication for which it is the first-line treatment.  And importantly, Plaintiff alleges that its sales increased in large part during the relevant time period because of Defendant's illegal actions to increase demand, not because of its market power in the ACTH market. See, e.g., FAC ¶ 99 (The co-pay funds "worked as planned" as "MS sales nearly quadrupled between the third quarter of 2010 (when Questcor established the MS 'acute exacerbation' fund) and the third quarter of 2013."); id. ¶ 104 ("Mallinckrodt's co-pay subsidies were one way to prop up demand and receive payment from third-party payors such as Humana."); id. ¶ 105 ("In the several decades prior [to 2014], Acthar had not been prescribed in large quantities for these conditions [rheumatology, pulmonology, ophthalmology, dermatology, and kidney disease] despite having been FDA approved for such treatments."); id. ¶ 108 ("In order to increase the prescription rates of Acthar, the Prescribing Doctors would need to prescribe Acthar in situations in which it was not called for and in lieu of considerably more cost-effective medications."); id. ¶ 147 ("Mallinckrodt subsidized co-pays through CDF, and paid the Prescribing Doctors, in exchange for an increased rate of prescriptions of Acthar in lieu of less expensive alternative treatment.").

Perhaps acknowledging the weakness in its product market definition, Plaintiff asserts that it can alternatively show direct proof of market power.  Opp'n at 6.  However, Plaintiff's allegations on this point also fail.  "Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices." Forsyth v. Humana, Inc., 114 F.3d 1467, 1475 (9th Cir. 1997), aff'd, 525 U.S. 299 (1999), and overruled on other grounds by Lacey v. Maricopa Cty., 693 F.3d 896 (9th Cir. 2012).  Plaintiff has certainly alleged that Defendant charges supracompetitive prices.  FAC ¶¶ 2-3, 8, 47, 51-53, 58.  But, it fails to allege Defendant restricted output.  Forsyth, 114 F.3d at 1476 (plaintiffs "failed to present direct evidence of market power" where they "submitted evidence that [defendant] routinely charged higher

prices than other hospitals while reaping high profits" but failed to make a "showing of restricted output"); cf. Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1436 (9th Cir. 1995) (the existence of a price differential or prices that are not closely correlated is insufficient, by itself, to exclude products from a market).  To the contrary, Plaintiff has alleged that "the number of Medicare Part D claims for Acthar has grown by more than 700% from 2011 to 2016."  FAC ¶ 55.

Because the Court finds Plaintiff has failed to allege a facially sustainable product market definition, or sufficiently allege direct proof of market power, the Court does not address Defendant's arguments about antitrust injury.

The First through Third Counts are DISMISSED with leave to amend.

## B.  RICO (Counts Four and Five)

To state a RICO claim, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Odom v. Microsoft Corp., 486 F.3d 541, 547 (9th Cir. 2007) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).  "[T]he conduct must be (5) the proximate cause of harm to the victim."  Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 997 (9th Cir. 2014).  Racketeering activity "encompass dozens of state and federal offenses, known in RICO parlance as predicates."  RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2096 (2016).  There is a pattern of racketeering activity where there is "a series of related predicates that together demonstrate the existence or threat of continued criminal activity."  Id. at 2096-97.  "[F]ailure to adequately plead a substantive violation of RICO precludes a claim for conspiracy."  Howard v. Am. Online Inc., 208 F.3d 741, 751 (9th Cir. 2000).

Plaintiff alleges the "Acthar Enterprise," consisting of Defendant, Express Scripts (and its subsidiaries), CDF, and the prescribing doctors, was "used as a tool to effectuate a pattern of racketeering activity."  FAC ¶ 146.  Specifically, Defendant 1) made allegedly false statements, including that Defendant was in compliance with the laws,

which constituted mail and wire fraud, as well as use of interstate facilities to conduct unlawful activity, and 2) subsidized co-pays through CDF and made payments to the prescribing doctors which "violated state commercial bribery statutes." Id. ¶¶ 147-49, 153.

### 1. Conduct of an Enterprise

Plaintiff alleges that the Acthar Enterprise is an association-in-fact enterprise that was ongoing and functioned as a continuing unit. FAC ¶ 146. "[A]n associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" Odom, 486 F.3d at 552 (citing United States v. Turkette, 452 U.S. 576, 583 (1981)). "To establish the existence of such an enterprise, a plaintiff must provide both 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'" Id. (citing Turkette, 452 U.S. at 583). Defendant only challenges whether Plaintiff sufficiently alleged a common purpose. See Mot. at 20-22.

Plaintiff alleges that "Mallinckrodt designed and coordinated" the Acthar Enterprise for the purpose of "charg[ing] and maintain[ing] inflated prices for Acthar." FAC ¶ 83; see also id. ¶ 147 (Defendant "established the Acthar Enterprise to fraudulently increase its sales of Acthar"). Plaintiff also alleges that "[t]he purpose and effect of the conspiracy was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct." Id. ¶ 165.[5] Defendant contends

---

[5] In opposition, Plaintiff argues that the Acthar Enterprise acts "for the common purpose of defrauding payors for their own financial benefit." Opp'n at 11 (citing FAC ¶ 146). That paragraph of the FAC states only that "[t]he Acthar Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity," it does not state a common purpose of defrauding payors for their own financial benefit. Nevertheless, that asserted common purpose is apparent from the allegations in the FAC, even if not alleged in those exact words.

that Plaintiff has not pleaded "any facts plausibly suggesting that" anyone other than Defendant "shared such purposes," and to the contrary Plaintiff alleged that CuraScript received a "fixed fee for each vial of Acthar" and therefore would not have an incentive to raise Acthar's price. Mot. at 20. Defendant's argument is not convincing.

Plaintiff has plausibly alleged the conduct of an enterprise based on Ninth Circuit law as set out in <u>Odom</u> and <u>River City Markets, Inc. v. Fleming Foods W., Inc.</u>, 960 F.2d 1458 (9th Cir. 1992). In <u>Odom</u>, plaintiff brought RICO claims against Microsoft and Best Buy based on an agreement between them where Microsoft invested in, and promoted, Best Buy and Best Buy promoted Microsoft's MSN internet access service and other Microsoft products. 486 F.3d at 543. Plaintiff alleged that when a customer purchased a laptop or phone from Best Buy, Best Buy would provide the customer with an MSN trial CD and would pass the customer's credit card information to Microsoft, which would bill the person for MSN if he did not cancel the trial. <u>Id.</u> The Ninth Circuit held that the complaint sufficiently alleged a common purpose of "increasing the number of people using [MSN], and doing do by fraudulent means." <u>Id.</u> at 552. Similarly here, Plaintiff has alleged a common purpose of increasing the number of people using Acthar, and doing so by fraudulent means, including allegedly illegal bribes and co-pay subsidies. Further, the Ninth Circuit in <u>Odom</u> found there was still a common purpose even though Best Buy did not directly benefit from the improper billing for MSN—there were no allegations that Best Buy received a kickback. Here, while the CDF may not directly receive a kickback from the scheme, the CDF presumably benefits indirectly through Defendant's donations and referrals, which are alleged to be tied directly to Defendant's need to "confirm the amount of future payments to CDF necessary to keep paying Acthar co-pay subsidies smoothly." FAC ¶ 98.

In <u>River City</u>, plaintiffs brought RICO claims against a grocery store chain for engaging in "a fraudulent scheme to unload unprofitable properties on unsuspecting purchasers." 960 F.2d at 1459. Plaintiffs had alleged that the defendants "jointly induced the plaintiffs to purchase certain [grocery] stores" and then one defendant (Alpha Beta)

"destroyed the business value of the stores" between "the acceptance of plaintiffs' bids and the transfer of the stores." Id. at 1460. The Ninth Circuit found these allegations sufficient to survive a motion to dismiss. Id. However, the Circuit also considered whether the plaintiffs' claims could survive summary judgment and found they could not. Id. at 1463. There was simply no evidence that "the agreement . . . would, if carried out according to its terms, violate any federally protected rights of the plaintiffs" or any "evidence of any contemplated overreaching, deceit, nondisclosure, manipulation of inventory, or any other unethical conduct." Id. at 1463. While there was evidence of Alpha Beta's wrongdoing, there was a lack of evidence as to the other defendant, Fleming. Id. at 1464. The evidence showed that, at most, Fleming knew about Alpha Beta's alleged wrongdoing for no more than a month—an insufficient length of time to establish a pattern of racketeering activity. Id. The Ninth Circuit did not address the "conduct of the enterprise" element in its summary judgment discussion. Regardless, here, unlike in River City, Plaintiff alleges facts supporting that at least CDF and the allegedly bribed doctors were aware of the allegedly fraudulent scheme. See FAC ¶¶ 89, 91, 98, 108, 147, 151.

Defendant contends that "numerous district courts in the Ninth Circuit have dismissed RICO claims that are, like those asserted by Humana here, based on (a) alleged associations in fact among entities with business relationships, and (b) alleged racketeering activity advancing only the particular interests of one member of the alleged associations." Mot. at 20 & n.9. However, the cases cited by Defendant are distinguishable. For example, in Woodell v. Expedia Inc., No. C19-0051JLR, 2019 WL 3287896 (W.D. Wash. July 22, 2019), plaintiff alleged that Expedia (and its subsidiaries) and Reservations.com had the common purpose of "obtaining tax overpayments from consumers." Id. at *7. However, the Court found that while the complaint alleged Expedia improperly charged "Taxes & Fees" that covered more than money owed to the government on Reservations.com's website, there were "no specific factual allegations that any other Defendant acted with an objective unrelated to ordinary business aims." Id. To the

contrary, the plaintiff had conceded that Reservations.com was "not involved in the collection of the . . . charge at issue . . . or the remission process," and had not alleged "any communication, meeting, agreement, or moment in time when Defendants and Reservations.com agreed to coordinate regarding representations about the 'Taxes & Fees' charge that appears on the Reservations.com website." Id. at *2, *3. The only allegation tying Reservations.com to the alleged conduct of the enterprise was that, on information and belief, Reservations.com was a knowing and willing participant. Id. at *2. Here, there is more than a conclusory allegation as to the other parties' involvement in, and knowledge of, the alleged fraud. There are specific allegations that CDF and the prescribing doctors acted in ways unrelated to ordinary business aims. As Plaintiff points out, CDF knowingly established co-pay subsidy funds outside of its normal programs solely funded by Defendant and solely used to pay patients who are prescribed Defendant's drug, and the doctors accepted bribes. Opp'n at 12.[6]

---

[6] In each of the other cases, the other alleged members of the enterprise were unaware of the defendant's (or other alleged enterprise member's) fraudulent activity. See, e.g., Gomez v. Guthy-Renker, LLC, No. EDCV 14-01425 JGB (KKx), 2015 WL 4270042, at *2, *5, *11 (C.D. Cal. July 13, 2015) (dismissing RICO claim for failing to adequately allege an enterprise between an allegedly fraudulent sales business and the payment processors and customer service companies the business utilized, where there was no evidence that anyone other than defendant was aware of the alleged fraud); Hilton v. Apple Inc., No. CV 13-7674 GAF (AJWx), 2014 WL 12597143, at *8 (C.D. Cal. Jan. 9, 2014) (dismissing RICO claim for failing to adequately allege an enterprise between Apple and AT&T where plaintiff alleged nothing more than "a garden variety, run-of-the-mill business relationship, along with Apple's allegedly undisclosed decision to commit fraud."); Missaghi v. Apple Inc., No. CV 13-02003 GAF (AJWx), 2013 WL 12200086, at *7 (C.D. Cal. Nov. 1, 2013) (same); In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., No. 2:11-CV-07166-MRP, 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012) (dismissing a claim under the Ohio Corrupt Activities Act (Ohio's RICO analogue) for failing to allege an enterprise between the defendant and third parties who provided the defendant with services where plaintiff pleaded no facts that the purpose of those business relationships was to profit illegally); In re Jamster

Defendant also cites <u>United Food & Commercial Workers Unions</u> <u>& Employers Midwest Health Benefits Fund v. Walgreen Co.</u>, 719 F.3d 849 (7th Cir. 2013). Plaintiff contends that this case "improperly narrows Ninth Circuit law" and therefore the standard set in that case "does not apply. <u>See</u> Opp'n at 12. Even if the Court were to follow <u>Walgreen</u>, it is distinguishable from this case. In <u>Walgreen</u>, the Seventh Circuit held that conduct of an enterprise had not been sufficiently alleged where the complaint did not include allegations that "officials from either company involved themselves in the affairs of the other" or that "profits from the illegal drug-switching scheme were siphoned off to the . . . enterprise or to individual enterprise members." 719 F.3d at 854-55. The complaint had alleged only that the drug manufacturer and the pharmacy communicated, and that the pharmacy implemented an "illegal dosage-form-switching program using [the drug manufacturer's] pills." <u>Id.</u> at 854. However, the Seventh Circuit noted that "[a] corporation, after all, is perfectly capable of breaking the law on its own behalf. The complaint describes conduct that might plausibly state a claim for fraud (among other things) against either defendant, but RICO does not penalize parallel, uncoordinated fraud." <u>Id.</u> at 855.

Here, as for the doctors, the alleged bribes clearly fall outside of a legitimate commercial relationship. <u>See id.</u> at 855 (That the pharmacy "purchased its generic [drugs] from [the manufacturer] . . . shows only that the defendants had a commercial relationship"). And unlike in <u>Walgreen</u>, Plaintiff has alleged that Defendant was very involved in the operations of CDF. For example, Plaintiff alleges that "[t]hough CDF already had a fund for MS patients . . . Questcor and CDF established a

---

Mktg. Litig., No. 05CV0819 JM (CAB), 2009 WL 1456632, at *5-*7 (S.D. Cal. May 22, 2009) (dismissing RICO claim for failing to allege an enterprise between wireless providers and companies that sell ring tones and wallpapers (content providers), where the wireless providers made money from content sales, but there were no allegations that the wireless provides were in any way involved in the content providers' allegedly deceptive advertising).

**Ex. 33**
p. 107 p. 468

new 'MS Acute Exacerbation Fund" just for patients with government insurance . . . and just for the co-pays of Acthar but no other drugs," funded entirely by Defendant.  FAC ¶¶ 88-89.  In addition, Plaintiff alleged that Questcor "sent patients to CDF through Questcor's 'reimbursement hub' for Acthar," called the ASAP program, and that "[t]he ASAP program referred over 98 percent of the patients who received co-pay subsidies from the . . . funds at CDF.  Id. ¶¶ 90, 93.  CDF was also involved in the operations of Defendant in that it established three funds at Defendant's direction to subsidize co-pays for Defendant's drug, and provided "detailed financial reports" to Defendant "containing information about how many patients were enrolled in the fund, how much the fund had already paid out, and how much had been allocated to enrolled patients," as well as "the percentage of patients approved to receive co-pay subsidies, the average co-pay amount paid by the fund, the total number of resulting drug 'dispenses' (broken out by new dispenses vs. refills), and the remaining fund balance."  Id. ¶¶ 88-92, 98.

Plaintiff has sufficiently alleged conduct of the Acthar Enterprise.

### 2. Pattern of Racketeering Activity

#### a. Mail and Wire Fraud

"The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud."  Eclectic Properties, 751 F.3d at 997 (citing Schreiber, 806 F.2d at 1400).

Where RICO predicates are fraud based, allegations must comply with Federal Rule of Civil Procedure 9(b), which requires that circumstances constituting fraud be stated with particularity.  Alan Neuman Prods., Inc. v. Albright, 862 F.2d 1388, 1392 (9th Cir. 1988) (Where RICO claim is based on mail and wire fraud, Rule 9(b) "requires that circumstances constituting fraud be stated with particularity"; complaint is fatally flawed when "[t]he allegations of predicate acts in

19

**Ex. 33**
p. 108 p. 469

the complaint concerning those elements of RICO are entirely general; no specifics of time, place, or nature of the alleged communications are pleaded."). However, "[t]he only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself." <u>Odom</u>, 486 F.3d at 554. Because "the formation of a scheme or artifice to defraud" and the "specific intent to deceive or defraud" require "a showing of the defendants' state of mind, general rather than particularized allegations are sufficient." <u>Id.</u>

    **Compliance with State and Federal Law.** Plaintiff alleges that Defendant "directly misrepresented to [Plaintiff] that it was complying with state and federal law, including laws related to bribery, kickbacks, and false claims" when Defendant (and CuraScript) submitted data for Prescription Drug Event (PDE) claims "certifying that such data is true, accurate, and complete." FAC ¶¶ 111-116. Defendant notes that Plaintiff "does not allege that [Defendant] denied to [Plaintiff] that they had made contributions to CDF's co-pay assistance funds, nor misrepresented to [Plaintiff] the details of those funds,"[7] but allegedly misrepresented that they were complying with the law because the co-pay assistance programs violated federal statutes, including the Anti-Kickback Statute (AKS) and the False Claims Act (FCA). Mot. at 13.

    First, Defendant asserts in conclusory fashion that "[t]his allegation lacks sufficient particularity to satisfy Rule 9(b)." Mot at 13. Plaintiff has alleged that each time Defendant certified that it was in compliance with federal and state laws, it knowingly made a false

---

[7] The Court notes that the FAC could be read to make such a claim. <u>See</u> FAC ¶ 89 ("Questcor's donation agreement [for the MS Fund] falsely represented that the funds were generally for treatment of patients with acute exacerbations of MS, when in fact Questcor knew it was just for patients using Acthar."), ¶ 91 (The Lupus Fund agreement "falsely stated that the fund was for 'any medically appropriate therapy,' when in fact Questcor intended to fund only Acthar and exclude other therapies."). However, Plaintiff does not allege that it actually saw the donation agreements at any point in time.

statement because it knew at the time it made the statements that its co-pay assistance violated federal statutes and its doctor payments violated state law.  This is sufficient.

Next, Defendant contends that Plaintiff has failed to allege fraudulent intent because "the OIG had issued guidance expressly endorsing patient assistance programs for Medicare Part D enrollees, including pharmaceutical manufacturer funding of such programs." Mot. at 13.[8]  However, this misstates the Court's inquiry on a motion to dismiss.  It need not determine whether Defendant in fact had a fraudulent intent.  Rather, it must only determine whether Plaintiff has plausibly alleged a fraudulent intent with general allegations. Plaintiff has done so.  See FAC ¶¶ 101 ("The Company's knowledge and willfulness is evidenced by internal training materials that instructed its employees on these laws and their relevant prohibitions; corporate policies reflecting the Company's knowledge of its illegality; trade publications and articles circulated among the key executives and consultants warning against the practice; and longstanding and repeated warnings about the practice from the Office of the Inspector General of the United States Department of Health and Human Services."), 147 (Defendant "established the Acthar Enterprise to fraudulently increase its sales of Acthar" by making payments "in exchange for an increased rate of prescriptions of Acthar in lieu of less expensive alternative treatment" and "Mallinckrodt, CDF, and the Prescribing Doctors knew that their scheme violated federal and state laws.").

Even were the Court to consider the 2005 OIG SAB, that guidance does not support Defendant's position that it could not have acted with fraudulent intent "as a matter of law" because it "had a good-faith basis to certify compliance in light of OIG guidance that

---

[8] Pursuant to Federal Rule of Evidence 201(b), the Court GRANTS Defendant's unopposed request for judicial notice (RJN) of the 2005 and 2014 OIG Special Advisory Bulletins.  Dkt. 48 (RJN), Exs. A (2005 SAB), K (2014 SAB).

continued in effect until 2014."  Reply at 5; see also Mot. at 15 ("[T]he OIG's guidance indisputably establishes a good faith basis for a general representation of compliance with law").  Specifically, the 2005 SAB provides that "pharmaceutical manufacturer PAPs [patient assistance programs] that subsidize Part D cost-sharing amounts present heightened risks under the antikickback statute," but "cost-sharing subsidies provided by bona fide, independent charities unaffiliated with pharmaceutical manufacturers should not raise anti-kickback concerns, even if the charities receive manufacturer contributions."  RJN, Ex. A at 8.  However, the OIG "would not consider a charitable foundation (or similar entity) formed, funded or controlled by a manufacturer . . . to be a bona fide, independent charity, because . . . the foundation would receive all of its funding from the pharmaceutical manufacturer (or its affiliates) and would provide subsidies only for the manufacturer's products."  Id. at 8 n.3.  Similarly, the 2005 SAB notes that subsidies provided by a drug manufacturer for the manufacturer's product "would implicate the antikickback statute and pose a substantial risk of program and patient fraud and abuse" and "would be squarely prohibited by the statute."  Id. at 9.  Here, Plaintiff alleges that the CDF funds at issue were "exacerbation funds" for diseases that the CDF's other funds already covered, that these funds received all of their funding from Defendant and provided subsidies only for Acthar, and that the CDF provided data to Acthar about the subsidies that were paid.  FAC ¶¶ 88-98; see also Opp'n at 15.  Therefore, the Court rejects Defendant's contention.  Accepting the FAC's allegations as true, it is more than plausible that Defendant acted with fraudulent intent in certifying that the co-pay assistance funds complied with federal law.[9]

---

[9] That the 2014 SAB was purportedly stricter does not change the import of the clear language in the 2005 SAB.  Neither does the Court find the OIG advisory opinions, RJN, Exs. B-I, J, were it appropriate to consider them, convincing.  See United States ex rel. Strunck v. Mallinckrodt Ard LLC, No. CV 12-175, 2020 WL 362717, at *6 (E.D. Pa. Jan. 22, 2020) (denying Mallinckrodt's motion to dismiss based on similar arguments, specifically rejecting proposed implication from footnote in OIG guidance and advisory

Third, Defendant argues that any racketeering acts related to the co-pay assistance funds occurred outside the four-year statute of limitations.[10]  Mot. at 16.  Plaintiff alleges that Defendant "marketed guaranteed co-pay assistance to physicians and patients . . . throughout the relevant time period," that "through 2014, the Lupus Exacerbation fund paid the co-pays of Acthar but no other drug," and that "[o]n information and belief, Mallinckrodt continued to pay or substantially subsidize required patient co-payments for Acthar after 2014 and continues to do so until today."  FAC ¶¶ 91, 95, 102 (citing Defendant's website).  Plaintiff further alleges that it "could not have discovered and remained unaware of the foregoing conduct until the Federal Trade Commission and the United States Department of Justice brought these acts and practices to light through investigations, legal actions, and/or settlements."  Id. ¶ 123.

The Ninth Circuit "follow[s] the 'injury discovery' statute of limitations rule for civil RICO claims."  Pincay v. Andrews, 238 F.3d 1106, 1109 (9th Cir. 2001).  In other words, the statute begins running when plaintiff has either actual or constructive notice.  Id.  Defendant argues that Plaintiff "had constructive notice of its injury when patients used the program to meet a co-pay for a prescription that Humana covered" because of "the publicized nature of the co-pay assistance program."  Mot. at 16 n.5.  It is not alleged in the FAC that Plaintiff was in any way notified whether co-pays were subsidized by

---

opinion that there are "rare circumstances" where there may be only one drug covered by Medicare for a particular disease).  Importantly, as Plaintiff notes, Opp'n at 15-16, MS, RA, and Lupus, the conditions for which Defendant established co-pay funds, have other drugs that are the "first-line" treatment and therefore the "rare circumstance" where only one drug is approved for certain diseases does not apply in any event.

[10] Defendant's related argument that Plaintiff "makes no factual allegations that the challenged conduct continued after the OIG revised its guidance regarding patient assistance programs in 2014," Mot. at 16, is not relevant to resolution of this motion for the reasons discussed in the preceding paragraph.

assistance funds. In fact, Plaintiff's allegations about its members indicate otherwise. <u>See</u> FAC ¶ 120 ("Humana members are required to pay what they owe for drug coverage under Medicare Part D and other kinds of plans . . . . Through its illegal scheme to pay patient co-pays through phony charitable funds at CDF, Mallinckrodt caused Humana members to unintentionally misrepresent that they had paid their contractual share of prescription drug coverage"). The mere receipt or payment of claims, when there is "no reason to think that Plaintiff knew those [claims] were fraudulent or excessive when it paid them," does not establish constructive knowledge of Plaintiff's injury. <u>State Comp. Ins. Fund v. Capen</u>, No. SACV 15-1279 AG (CWx), 2015 WL 13298073, at *5 (C.D. Cal. Dec. 18, 2015).

Nor is there anything in the FAC that indicates the allegedly illegal aspects of Defendant's co-pay assistance program were widely publicized, or that the information to be gleaned from the purported publicity could be imputed to Plaintiff. <u>See</u> <u>Living Designs, Inc. v. E.I. Dupont de Nemours & Co.</u>, 431 F.3d 353, 365 (9th Cir 2005) ("[T]he district court erred in determining that, as a matter of law, the attention received by [a sanction order against defendants] could be imputed to the Plaintiffs"). Although the FAC alleges that Defendant "marketed guaranteed co-pay assistance to ***physicians and patients*** as a way to neutralize concerns about the price and to induce sales and Medicare reimbursement," FAC ¶ 95 (emphasis added), nothing in the FAC supports the conclusion that this marketing put the doctors or patients on notice of the allegedly illegal aspects of those funds, or that insurance providers (who were not recipients on this advertising) would somehow know about the illegal aspects. For example, there is no allegation to support the fact that it was publicized that Defendant was even a donor to those funds, let alone the exclusive owner that referred nearly 100% of the patients to the fund or that the funds only covered Acthar. Further, Plaintiff has alleged that the donation agreements fraudulently misrepresented that the funds were not limited to patients using Acthar. FAC ¶¶ 89, 91. Therefore, had Plaintiff inquired into the funds, it would not have discovered that the funds were illegal. <u>Cf.</u> <u>Living Designs</u>, 431 F.3d at 365 (plaintiff has constructive notice where

"an investigation which, if reasonably diligent, would have led to discovery of the fraud").

Therefore, Plaintiff's allegation that it did not, and could not have, discovered its injury until the "United States Department of Justice brought these acts and practices to light through investigations, legal actions, and/or settlements," FAC ¶ 123, is plausible. Because the DOJ press release announcing it filed a complaint against Defendant for its conduct related to the co-pay assistance funds was published on June 5, 2019,[11] Plaintiff brought these claims well within the four-year limitations period.[12]

Finally, Defendant contends that because the AKS and FCA are not predicate acts, wire fraud and mail fraud based on alleged violations of those statutes should not result in RICO liability. Mot. at 16. However, unlike the cases cited by Defendant,[13] it is not the

---

[11] The Court takes judicial notice of the date of the DOJ press release available at https://www.justice.gov/opa/pr/united-states-intervenes-false-claims-act-lawsuit-against-drug-maker-mallinckrodt-alleging. Fed. R. Evid, 201(b); Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998-99 (9th Cir. 2010) (The Court may "take judicial notice of [] information . . . made publicly available by government entities" whose accuracy is not disputed by the parties."); Taleff v. Sw. Airlines Co., 554 F. App'x 598, 599 (9th Cir. 2014) (taking judicial notice of a Department of Justice press release).

[12] The Court therefore need not address the issue of fraudulent concealment.

[13] See Ayres v. Gen. Motors Corp., 234 F.3d 514, 521 (11th Cir. 2000) ("Plaintiffs have identified no affirmative misrepresentation on the part of the Defendants" and rely solely on a duty to disclose under the National Traffic and Motor Vehicle Safety Act); Danielsen v. Burnside-Ott Aviation Training Ctr., Inc., 941 F.2d 1220, 1229 (D.C. Cir. 1991) (Plaintiff alleged only that Defendant violated the Service Contract Act, but a violation of that act "fall[s] short" of a "scheme or artifice to defraud"); Norman v. Niagara Mohawk Power Corp., 873 F.2d 634, 636 (2d Cir. 1989) (RICO allegations that defendant retaliated against plaintiff was essentially a whistleblower complaint that must be brought before the Secretary of Labor); Butchers' Union, Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.,

violation of the AKS or the FCA itself that is alleged to form the basis for the wire and mail fraud, but the false certifications to Plaintiff about compliance with those statutes.  See Opp'n at 17.

**Doctor Misrepresentations.**  Plaintiff alleges that when the doctors who prescribed Acthar got prior authorization from Plaintiff, they falsely represented that "the prescription medication is medically necessary, up-to-date, and non-duplicative" and "that they are not violating state or federal law applicable to the provision of their services" because they had accepted money in exchange for those prescriptions."  FAC ¶¶ 117-118.  Defendant does not address this type of misrepresentation separately.  However, for the reasons stated above, Plaintiff has sufficiently alleged that such statements are predicate RICO acts of the Acthar Enterprise.

**Insured Misrepresentations.**  Plaintiff also alleges that Defendant caused patients to "unintentionally misrepresent that they had paid their contractual share of prescription drug coverage" when in fact their co-pays were paid by "phony charitable funds at CDF."  FAC ¶ 120.  However, Plaintiff has failed to allege how a representation by patients that they paid their co-pays is rendered false merely because they received the funding from a co-pay assistance program.  The 2005 SAB specifically contemplates this scenario.  RJN, Ex. A at 9 ("[C]ost-sharing assistance furnished by a PAP, including a manufacturer PAP, will count toward a beneficiary's [true out-of-pocket] expenditures, even if the PAP does not comply with the fraud and abuse laws.").

---

631 F. Supp. 1001, 1010 (E.D. Cal. 1986) (any claim that is "arguably within the [Labor] Board's jurisdiction . . . is preempted" and therefore any RICO claim based on conduct that "otherwise falls within the exclusive jurisdiction [of] the NLRB" will be preempted); see also Bodimetric Health Servs., Inc. v. Aetna Life & Cas., 903 F.2d 480, 488 n.7 (7th Cir. 1990) (plaintiff had withdrawn the civil RICO count for jurisdictional purposes).

Therefore, Plaintiff has failed to plead mail or wire fraud based on this conduct.

      b.    <u>Bribery</u>

**<u>Co-pay Assistance.</u>**  Defendant contends that co-pay assistance is not a bribe under the relevant state laws because it was not given to 1) an "employee to induce the employee to use his or her employment for the benefit of the person," or 2) a physician to induce a breach of the physician's duty to a patient."  Mot. at 12 n.4 (citing the California and Alaska bribery statutes as examples).  Plaintiff contends that bribery also applies to "the acceptance of 'compensation or inducement' for referral of patients . . . by those processing or presenting insurance claims."  Opp'n at 17 (citing Cal. Ins. Code § 750).

The Travel Act prohibits, among other things, use of interstate commerce to conduct "unlawful activity."  Unlawful activity includes "bribery . . . in violation of the laws of the State in which committed." 18 U.S.C. § 1952(b)(2).  The Supreme Court has interpreted "bribery" in this statute to mean "the generic definition of bribery, rather than a narrow common-law definition."  <u>Perrin v. United States</u>, 444 U.S. 37, 49 (1979).  Therefore, "the Travel Act [] encompass[es] conduct in violation of state commercial bribery statutes."  <u>Id.</u> at 50.  Other courts in this district have interpreted this to include statutes prohibiting bribery-like conduct, whether or not the statute is identified as a bribery statute.  <u>See, e.g.</u>, <u>United States v. Rogers</u>, 389 F. Supp. 3d 774, 787 (C.D. Cal. 2019) (California Insurance Code Section 750 prohibits bribery, as that term is used in the Travel Act); <u>United States v. Gross</u>, 370 F. Supp. 3d 1139, 1149 (C.D. Cal. 2019) (same); <u>cf. United States v. Nardello</u>, 393 U.S. 286, 295 (1969) ("[T]he inquiry [under the Travel Act] is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged.").  This Court finds the analysis in those cases to be convincing.  A violation of California Insurance Code Section 750 constitutes bribery under the Travel Act.

However, the FAC fails to allege how Section 750 was violated. That statute prohibits "any person . . . who engages in the practice of processing, presenting, or negotiating claims, including claims under policies of insurance" from "offer[ing], deliver[ing], receiv[ing], or accept[ing] any . . . consideration . . . as compensation or inducement to or from any person for the referral or procurement of clients, cases, patients, or customers."  Cal. Ins. Code § 750(a).  Plaintiff does not allege which relevant party purportedly "engages in the practice of" presenting insurance claims and accepted money in exchange for the referral of patients.  The only parties that receive consideration as part of the co-pay funds are CDF and the patients.  Plaintiff does not allege that CDF engages in the practice of presenting insurance claims, nor is it clear that this statute applies to patients themselves.  Therefore, Plaintiff has not sufficiently alleged that the co-pay assistance funds constituted bribery.

**Bribes to Doctors.**  Defendant also contends that Plaintiff has failed to allege more than "conclusory contentions" showing the payments to doctors were for an unlawful, rather than lawful, purpose.  See Mot. at 17-19.  The Court disagrees.  Plaintiff's allegations go beyond the evidence of correlation identified in the journal article in paragraph 106 of the FAC.  Plaintiff also alleges that 1) in 2007, Defendant "knew that it might have priced itself out of the MS market," 2) Defendant "heavily marketed" Acthar to doctors who treated conditions such as MS, rheumatoid arthritis, and sarcoidosis, 3) "Acthar had not been prescribed in large quantities for these conditions" prior to 2014, 4) in 2014, the president of the business selling Acthar told investors about "a strategy to expand Acthar's sales to patients" with these and other conditions even though "there were no new medical studies suggesting Acthar was needed to treat any of these conditions," 5) today, "fewer than 10% of Acthar's sales come from prescriptions for infantile spasms," and 6) 88% of doctors who submitted more than 10 Medicare claims for Acthar received payment from Defendant, while only 35% of all specialists "receive payments from the pharmaceutical industry."  FAC ¶¶ 94, 104-06.  In addition, eight of the nine doctors who prescribed the most Acthar to Plaintiff's

members are rheumatologists or neurologists, and one specializes in sarcoidosis: all specialties that treat conditions for which Plaintiff has extensively alleged there are cheaper and more effective treatment options.  See, e.g., id. ¶¶ 6, 13, 45-49, 84, 108.[14]  Taken together, these allegations plausibly suggest the payments to doctors were in exchange for prescribing Acthar, and not some other lawful purpose.  See Eclectic Properties, 751 F.3d at 996 (quoting Starr, 652 F.3d at 1216) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).  Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible.").[15]

Although Plaintiff has not succeeded in each of its arguments, it has sufficiently alleged a pattern of racketeering activity.

### 3.  Proximate Harm

Plaintiff alleges that the "effect of Mallinckrodt's racketeering activity was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct" and Plaintiff "suffered injuries when it reimbursed those prescriptions for Acthar that otherwise would not

---

[14] Plaintiff cites a case noting that "compensation that exceeds fair market value is smoke . . . that makes fire plausible."  Opp'n at 19 (alterations omitted) (internal quotation marks omitted).  However, Plaintiff does not allege the doctors were paid above fair market value.

[15] Defendant moves to strike paragraph 109 of the FAC, which refers to a settlement between Defendant and the Department of Justice regarding illegal kickbacks.  Mot. at 3, 10, 18.  Defendant correctly notes that "the settlement is not proof that the underlying allegations were true," Mot. at 3, but the allegation that Defendant reached a settlement is not "redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The motion to strike is DENIED.

29

have been made and/or paid the higher prices that resulted from the illegal conduct." FAC ¶¶ 154-55.

Defendant argues that this is insufficient because Plaintiff "does not contend that the alleged misconduct resulted in any Acthar prescriptions that were inappropriate given the patient's particular condition" nor any Acthar prescriptions that were "harmful or ineffective." Mot. at 23. As a factual matter, this is simply not correct. See, e.g., FAC ¶¶ 6 ("But other than [infantile spasms] and a handful of similarly rare conditions, Acthar is . . . either a drug of last resort or not known to be clinically effective"), 13 (Without the bribery scheme, "doctors would not otherwise be inclined to prescribe what for most purposes is an antiquated and expensive drug that requires refrigeration and injection when cheaper, more effective pills and remedies were available"), 46 ("there remains a lack of evidence to support the use of Acthar for most indications"), 49 ("it was expensive to produce, difficult to apply, and (except for certain indications such as infantile spasms) not known to be more effective than simpler, cheaper, and more widely available drugs"), 108 (Defendant "knew that in order to increase the prescription rates of Acthar, the Prescribing Doctors would need to prescribe Acthar in situations in which it was not called for and in lieu of considerably more cost-effective medications"), 128 ("[B]ut for Mallinckrodt's kickback scheme and illegal co-pay assistance through CDF, prescription rates for Acthar would have been lower, and Humana members would have received different care from their physicians that was more effective, less harmful, or more cost effective than doses of Acthar").

And as a legal matter, Defendant has not shown why this is relevant. Plaintiff's "damages do not depend on the effectiveness of the" Acthar that Plaintiff paid for, but rather on "the inflationary effect that [Defendant's] allegedly fraudulent behavior had on the price of [Acthar]." In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.,

804 F.3d 633, 640 (3d Cir. 2015).[16]  Defendant's reliance on Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352 (11th Cir. 2011) is misplaced.  In Ironworkers, the alleged false representation was "concerning the drug's safety and efficacy in that use."  Id. at 1363.  The Eleventh Circuit held that a plaintiff must allege that the misrepresentation about the drug's safety and efficacy affected the doctor's prescription decision.  Without any direct evidence, the court posited that "a plaintiff must allege that she not only paid for the drug, but also that its prescription was medically unnecessary or inappropriate."  Id.  Here, Plaintiff explicitly alleges that the doctors, who were themselves allegedly making false representations, would not have prescribed Acthar absent the allegedly illegal conduct.  Therefore, allegations of indirect evidence are unnecessary.[17]

Defendant cites Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258 (1992), which opines that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."  Id. at 269.  But Holmes does not stand for the proposition that proximate harm cannot be established any time it is difficult to ascertain damages.  Rather, as the Ninth Circuit recently noted, this is one of the "three practical factors" that describe the "direct relation" requirement for proximate cause.  Painters, 943 F.3d at 1249.  Under this first

---

[16] The Ninth Circuit cited Avandia with approval in Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd., 943 F.3d 1243, 1257 (9th Cir. 2019).

[17] To the extent Ironworkers can be interpreted to eliminate insurance companies' ability to bring lawsuits against drug manufacturers for fraud, see 634 F.3d at 1360, 1364, this Court, along with the Third Circuit and other courts in this district, see Opp'n at 21 (citing Avandia, 804 F.3d at 641 n.45 and In re Lidoderm Antitrust Litig., 2017 WL 679367, at *22 n.32 (N.D. Cal. Feb. 21, 2017)), respectfully disagrees.  Further, unlike in Ironworkers where the plaintiff potentially could have uncovered the alleged fraud through preauthorization, Plaintiff here already required preauthorization but alleges the doctors made false representations as part of that process.

factor, courts are to determine "whether it would be ***too difficult*** to ascertain what damages are attributable to Defendants' alleged RICO violation, as opposed to factors other than, and independent of, Defendants' alleged misrepresentations." Id. (emphasis added). Further, Defendant has not explained how damages would be too difficult to ascertain merely because some prescriptions may have been medically necessary. To the contrary, Defendant implies it would be quite easy to "review the propriety of each Acthar prescription that [Plaintiff] covered" and determine "its medical necessity." See Mot. at 23.[18]

Defendant also cites United Food & Commercial Workers Cent. Pennsylvania & Reg'l Health & Welfare Fund v. Amgen, Inc., 400 F. App'x 255 (9th Cir. 2010), which held that the plaintiff had "failed to plead a cognizable theory of proximate causation that links [defendant's] alleged misconduct to [plaintiff's] alleged injury." Id. at 257. In Amgen, the plaintiff alleged that defendant drug manufacturer had "concealed adverse test results while promoting [its drugs] for various off-label uses." Id. The Ninth Circuit held that there was an "attenuated causal chain" involving 1) an industry reference guide's inclusion of the drug as treatment for anemia of cancer, 2) Medicare's and third-party payor's decisions to cover the drug for anemia of cancer, and 3) the doctors' decision to prescribe the drug for anemia of cancer. Id. None of those third parties were alleged to have participated in any wrongdoing. In contrast, here the doctors were allegedly bribed to prescribe Acthar and were participants in the RICO conspiracy. That causal link is far from attenuated.[19] Where the doctors are alleged to

---

[18] The other relevant Holmes factor, "whether there are more directly injured victims we can count on to hold Defendants liable" also weighs in favor of proximate causation. Painters, 943 F.3d at 1252. Because of the co-pay assistance, Plaintiff and other insurers are "the most direct victims of those who suffered economic injury." Id.

[19] The other cases cited by Defendant are similarly distinguishable in that the doctors were not alleged to be part of the criminal activity. See UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 134 (2d Cir. 2010) ("the conduct

be a part of the scheme, and to have made false statements themselves, the doctors' prescription decisions do not break the causal chain. Moreover, the Ninth Circuit has now held that even unknowing doctors do not constitute an intervening cause. <u>Painters</u>, 943 F.3d at 1257-58 (to hold "that prescribing physicians' and pharmacy benefit managers' decisions constitute an intervening cause to sever the chain of proximate cause" would insulate drug manufacturers "from liability for their fraudulent marketing schemes, as they could continuously hide behind prescribing physicians and pharmacy benefit managers," which is "not the purpose the requirement of proximate cause is intended to serve").

Similarly, <u>Health Care Serv. Corp. v. Olivares</u>, No. 2:10-CV-221-TJW-CE, 2011 WL 4591913 (E.D. Tex. Sept. 2, 2011), <u>report and recommendation adopted,</u> No. 2:10-CV-221-DF-CE, 2011 WL 4591915 (E.D. Tex. Sept. 30, 2011) is distinguishable because the alleged fraudulent conduct was the marketing of defendant's drugs for off-label use. <u>Id.</u> at *1. The plaintiff failed to allege "that any doctors or other health care professional relied on any . . . misrepresentation promoting an off-label use" or that any misrepresentations "were made directly to it." <u>Id.</u> at *7. The complaint failed even to allege when plaintiff added defendant's drug to its approved list or the "circumstances [under which] those drugs were added." <u>Id.</u> Here, Plaintiff has alleged that the doctors prescribed Acthar because of the bribes and the availability of the co-pay assistance funds, and the false certifications from

_____

directly causing the harm was distinct from the conduct giving rise to the fraud" where doctors prescribed defendant's drug because of misinformation about the drug, not bribes, and plaintiff's harm was not based on over-prescription of drugs, but plaintiff's reliance on third parties to place the drug on their list of approved drugs and subsequent failure to negotiate the price of the drug at a lower level); <u>Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.</u>, 873 F.3d 574, 577 (7th Cir. 2017) ("The absence of data leaves a serious problem in showing plausible causation" where the alleged fraud "may not have changed their prescribing practices at all"). Moreover, as Defendant concedes, Reply at 11, their "persuasiveness" has been "call[ed] into question" by <u>Painters</u>.

Defendant and the doctors directly caused Plaintiff to pay for Acthar in an amount and for a price higher than it otherwise would have absent the alleged illegal conduct.  Like in <u>Painters</u>, Plaintiff here is the direct recipient of the false statement.  943 F.3d at 1251 ("Plaintiffs' alleged injury is that they purchased . . . prescriptions for which they would not have paid ***had they been warned*** about [the drug's] risk of bladder cancer." (emphasis added)).

Plaintiff has sufficiently alleged the Acthar Enterprise's conduct proximately caused its injury.

Defendant's motion to dismiss Counts Four and Five is DENIED.

## C.    State Law Claims (Counts Six through Ten)

Defendant contends that because Plaintiff's unfair competition, consumer fraud and deceptive trade practices, insurance fraud, and unjust enrichment claims "rest on the same factual allegations or legal theories" as the antitrust and RICO claims, they should be dismissed for the same reasons as those claims.  Mot. at 25.  Even if this were so, because the Court denies Defendant's motion to dismiss the RICO claims, the state law claims survive as well.  Defendant's motion to dismiss counts six through eight and ten is DENIED.

As to the tortious interference claim, which alleges that Defendant interfered with Plaintiff's contracts with its members by providing co-pay assistance, FAC ¶ 191, Defendant notes that accepting co-pay assistance is not a breach of the insurance agreement that requires members to pay their share of costs for prescription drugs, Mot. at 25.  As noted above, the OIG guidance states that co-pay assistance, even if from an illegal fund, "will count toward a beneficiary's [true out-of-pocket] expenditures."  RJN, Ex. A at 9.  Therefore, Plaintiff has not alleged that its members breached their contract.[20]  Count Ten is DISMISSED with leave to amend.

---

[20] The additional provision identified in Plaintiff's opposition is more convincing.  Opp'n at 24 (contract provision that "specifies that Humana 'will not pay for any share of . . . drug costs' for drugs obtained through a

**Ex. 33**
p. 123 p. 484

Case 3:21-cv-00165-JSC Document 1-6 Filed 01/08/21 Page 275 of 392

## IV. CONCLUSION

Counts One through Three and Ten are DISMISSED with leave to amend.[21]  An amended complaint may be filed and served no later than April 10, 2020.  Failure to file by that date will waive the right to do so.  The Court does not grant leave to add new defendants or new claims.  Leave to add new defendants or new claims must be sought by a separate, properly noticed motion.

IT IS SO ORDERED.

Date: March 9, 2020

Dale S. Fischer
United States District Judge

---

manufacturer's 'patient assistance program.'").  However, because this was not included in the FAC, the Court does not consider it at this time.

[21] Although the Court does not dismiss the RICO-based counts, Plaintiff is free to amend those claims consistent with the deficiencies identified in this order.

# EXHIBIT K

**Table of Out of State Authorities I**

**Count VII**
**Relevant Insurance Fraud Statutes & Lack of Independent, Private**
**Enforcement Mechanisms (or Legal Defenses in Lieu)**

| State Act | Permitted Enforcement Mechanism |
|---|---|
| Alaska Stat. §§ 21.36.360, et seq. | Civil penalties only for government enforcer, Alaska Stat. §§ 21.36.910; *O.K. Lumber Co., Inc. v. Providence Washington Ins. Co.* 759 P.2d 523, 526 (Alaska 1988) (holding that no private right of action is implied) |
| Ariz. Rev. Stat. §§ 20-463, et seq. | Civil penalties only for government enforcer, Ariz. Rev. Stat. § 20-466.02 |
| Ark. Code §§ 23-66-501, et seq. | Civil penalties only for government enforcer, Ark. Code § 23-66-512(1)(B) |
| Cal. Ins. Code §§ 1871, et seq. | Private enforcement only after conviction, *Farmers Ins. Grp. Of Companies v. Workers' Comp. Appeals Bd.*, 128 Cal. Rptr. 2d 353, 355 (Cal. Dist. Ct. App. 2002), *review denied* (holding that insurance company could pursue civil proceedings to enforce criminal restitution order) |
| Conn. Gen. Stat. §§ 53a-215, et seq. | Criminal penalties only, Conn. Gen. Stat. § 53a-215(d) |
| Colo. Rev. Stat. § 10-1-128, et seq. | Civil penalties only for government enforcer, Colo. Rev. Stat. § 10-1-128(e) |
| Fla. Stat. §§ 817.234, et seq. | Private enforcement only after conviction, Fla. Stat. § 817.234(5) |
| Ga. Code Ann. §§ 33-1-9, et seq. | Criminal penalties only, Ga. Code § 33-1-9(d), (e) |
| Iowa Code Ann. §§ 505.1, et seq. | Civil penalties only for government enforcer, Iowa Code Ann. § 505.7A |

1

| State Act | Permitted Enforcement Mechanism |
|---|---|
| 740 Ill. Comp. Stat. 92/1, et seq.; (ii) 720 Ill. Comp. Stat. 5/17-10.5 | (i) Qui tam action in the name of the State only, 740 Ill. Comp. Stat. 92/15; *Advanced Physicians, S.C. v. Provena Glenwood Med. Imaging*, 127 N.E.3d 546, 552 (Ill. App. Ct. 2018) (noting that the Act is a whistleblower law under which "interested" persons may proceed only with the Attorney General's consent because the state is the real party in interest)<br><br>(ii) Open civil penalties, 720 Ill. Comp. Stat. 5/17-10.5(e)<br><br>In lieu of lack of private enforcement defense:<br><br>(1) Claim under Act must be dismissed on the ground that pleadings for claims sounding in fraud require specificity, *see Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 270 (Ill. App. Ct. 2015); *Mitchell v. Norman James Constr. Co.*, 684 N.E. 2d 872, 938 (Ill. App. Ct. 1997), and allegations in Complaint fail to meet this requirement.<br><br>(2) HCSC fails to allege actual injury from the alleged violation. *See Greer v. Illinois Hous. Dev. Auth.*, 524 N.E.2d 561, 572 (Ill. 1988) (requiring plaintiff to demonstrate the alleged conduct caused it to suffer injury in fact).<br><br>(3) Claim to recover damages for an injury done to property barred by five year statute of limitations.  735 Ill. Comp. Stat. 5/13-205. |
| Ind. Code §§ 35-43-5-4.5, et seq. | Criminal penalties only, Ind. Code §§ 35-43-5-4.5 |
| Kan. Stat. Ann. §§ 40-2,118, et seq. | Criminal penalties only, Kan. Stat. Ann. § 40-2,118(e), (f) |
| Ky. Rev. Stat. §§ 304.47-011, et seq. | Private enforcement only after conviction, Ky. Rev. Stat. § 304.47-020(6), *Readnour v. Gibson*, 452 S.W.3d 617, 621 (Ky. Ct. App. 2014) (holding that "KRS 304.47-020 provides for a private right of action—but only where there has been a 'criminal adjudication of guilt'") |
| La. Stat. Ann. §§ 22:1924, et seq. | Criminal penalties only, La. Stat. Ann. § 22:1924A(1) |
| Me. Rev. Stat. Ann. tit. 24-A, §§ 2186 | Civil penalties only for government enforcer, Me. Rev. Stat. Ann. tit. 24-A, § 2186(6) |
| Mass. Ann. Laws ch. 266, § 111A et seq. | Criminal penalties only, Mass. Ann. Laws ch. 266, § 111A |

| State Act | Permitted Enforcement Mechanism |
|---|---|
| Md. Code Ins. §§ 27-401, et seq. | Civil penalties only for government enforcer, Md. Code Ins. § 27-408(c)(1), (3) |
| Mich. Stat. §§ 500.4511, et seq. | Criminal penalties only, Mich. Stat. § 500.4511 |
| Minn. Stat. §§ 609.611, et seq. | Criminal penalties only, Minn. Stat. § 609.611, Subd. 3 |
| Miss. Code Ann. §§ 71-3-69, et seq. | Criminal penalties only, Miss. Code Ann. § 71-3-69 |
| Mo. Rev. Stat. §§ 375.99, et seq. | Civil penalties only for government enforcer, Mo. Rev. Stat. § 375.994(4), (5) |
| Mont. Code §§ 33-1-1202, et seq. | Civil penalties only for government enforcer, Mont. Code § 33-1-1211 |
| Neb. Rev. Stat. §§ 44-6604, et seq. | Civil penalties only for government enforcer, Neb. Rev. Stat. § 44-6607(1) |
| Nev. Rev. Stat. §§ 686A.2815, et seq. | Criminal penalties only, Nev. Rev. Stat. §§ 686A.291, 686A.292 |
| N.H. Rev. Stat. §§ 638:20, et seq. | Criminal penalties only, N.H. Rev. Stat. § 638:20.IV(a) |

**Ex. 33**
p. 128 p. 489

| State Act | Permitted Enforcement Mechanism |
|---|---|
| N.J. Stat. §§ 17:33A, et seq. | Open civil penalties, N.J. Stat. § 17:33A-7<br><br>In lieu of lack of private enforcement defense:<br><br>(1) Claim under New Jersey Insurance Fraud Prevention Act must be dismissed on the ground that a claim of statutory insurance fraud must be pled with particularity, *see Aetna Health, Inc. v. Carabasi*, 2006 WL 66460, at *2 (N.J. Super. Ct. App. Div. Jan. 13, 2006), and allegations in Complaint fail under that standard.<br><br>(2) HCSC fails to allege actual injury from the alleged violation. N.J. Stat. § 17:33A-7(a) ("Any insurance company damaged as the result of a violation of any provision of this act may sue therefor."); *accord Allstate New Jersey Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015) ("The insurance company must also prove a fourth element—that it was 'damaged as a result of a violation of [the IFPA].'").<br><br>(3) HCSC fails to allege that it complied with the procedures provided in the New Jersey Insurance Fraud Prevention Act. *See* § 17:33A-7(c) ("A claimant under this section shall mail a copy of the initial claim, amended claim, counterclaims, briefs and legal memoranda to the [Attorney General] at the time of filing of such documents with the court wherein the matter is pending."). |
| N.M. Stat. §§ 59A-16C-1, et seq. | Civil penalties only for government enforcer, N.M. Stat. §§ 59A-16C-4(E), 59A-16C-10(E) |
| N.Y. Penal Law §§ 176.00, et seq. | Criminal penalties only, N.Y. Penal Law §§ 176.10, 176.15, 176.20, 176.25, 176.30, 176.35 |
| N.C. Gen. Stat. §§ 58-2-160, et seq. | Private enforcement only after conviction, N.C. Gen. Stat. § 58-2-161; *see also Harleysville Mut. Ins. Co. v. Gray*, No. 1:11CV234, 2012 WL 2568147, at *6 (W.D.N.C. July 2, 2012) (holding that the statute only permits a plaintiff to bring a civil cause of action for insurance fraud after the defendant has been convicted) |
| N.D. Cent. Code §§ 26.1-01, et seq. | Civil penalties only for government enforcer, N.D. Cent. Code § 26.1-01-03.1 |
| Ohio Rev. Code §§ 2913.47, et seq. | Criminal penalties only, Ohio Rev. Code § 2913.47(C) |
| Okla. Stat. tit. 36, §§ 101, et seq. | Civil penalties only for government enforcer, Okla. Stat. tit. 36, §§ 1207, 1211 |

| State Act | Permitted Enforcement Mechanism |
|---|---|
| Or. Rev. Stat. §§ 165.692, et seq. | Criminal penalties only, Or. Rev. Stat. §§ 165.692, 165.696, 165.990 |
| 18 Pa. Stat. and Cons. Stat. Ann. §§ 4117 | Open civil penalties, 18 Pa. Stat. § 4117(g)<br><br>In lieu of lack of private enforcement defense:<br><br>(1) Claim under Act must be dismissed on the ground that averments of fraud must be pled with particularity, Pa. R. Civ. P. 1019(b), and allegations in Complaint fail under that standard.<br><br>(2)  HCSC fails to allege actual injury from the alleged violation. *See* 18 Pa. Stat. § 4117(g) ("An insurer damaged as a result of a violation of this section may sue therefore.").<br><br>(3) Claim under Act founded on fraud barred by two year statute of limitations.  42 Pa. Stat. § 5524. |
| S.C. Code §§ 38-55-570, et seq. | Civil penalties only for government enforcer, S.C. Code § 38-55-550 |
| Tenn. Code Ann. §§ 56-53-101, et seq. | Open civil penalties, Tenn. Code Ann. § 56-53-107<br><br>In lieu of lack of private enforcement defense:<br><br>(1) Claim under Tennessee Insurance Fraud Act must be dismissed on the ground that claims sounding in fraud must be "stated with particularity."  Tenn. R. Civ. P. 9.02.<br><br>(2) HCSC fails to allege actual injury from the alleged violation. *See* Tenn. Code Ann. § 56-53-107(a)(1) ("Any person injured in the person's business or property by reason of a violation of § 56-53-103 may recover for the injury from the person or persons violating § 56-53-103.").<br><br>(3) Claim for treble damages under Tennessee Insurance Fraud Act barred by three year statute of limitations.  § 56-53-107(2)(c); *see also* § 56-53-107(e) (five year statute of limitations applies for actions not seeking treble damages). |
| Tex. Penal Code Ann. §§ 35.01, et seq. | Criminal penalties only, Texas Penal Code § 35.02 |

| State Act | Permitted Enforcement Mechanism |
|---|---|
| Utah Code §§ 31A-31-103, et seq. | Civil penalties only for government enforcer, Utah Code § 31A-31-109; *Machan v. UNUM Life Ins. Co. of Am.*, 116 P.3d 342, 347-49 (Utah 2005) (holding that another provision of Utah's insurance code, Section 31A-26-301, did not create a private right of action for an insured against an insurer using the U.S. Supreme Court's four-factor test from *Cort v. Ash*, 422 U.S. 66, 78 (1975) as guidance)); *Buckner v. Kennard*, 99 P.3d 842, 853 (Utah 2004) ("Utah courts have rarely, if ever, found a Utah statute to grant an implied private right of action."); *Miller v. Weaver*, 66 P.3d 593, 598 (Utah 2003) ("In the absence of language expressly granting a private right of action in the statute itself, the courts of this state are reluctant to imply a private right of action based on state law.") |
| Wis. Stat. §§ 943.395, et seq. | Criminal penalties only, Wis. Stat. § 943.395(2) |
| Wyo. Stat. §§ 26-1-101, et seq. | Civil penalties only for government enforcer, Wyo. Stat. § 26-1-107; *see also Nat'l Surety Corp. v. CJM Hospitality, LLC*, Nos. 12-CV-03-F, 12-CV-101-F, 2013 WL 12161452, at *4–5 (D. Wyo. Nov. 18, 2013) (citing *Sorenson v. State Farm Auto. Ins. Co.*, 234 P.3d 1233, 1243 (Wyo. 2010); *Herrig v. Herrig*, 844 P.2d 487, 494 (Wyo. 1992)) (holding that the civil penalties in Wyo. Stat. Ann. § 26-1-107 do not create a private right of action given the absence of an express provision establishing one and the inclusion of other means of enforcement in the statute) |

# EXHIBIT L

**Table of Out of State Authorities II**

**Counts III, IV & V**
**Relevant States' Authorities Adopting**
**Rule of Reason for Nonprice Vertical Restraints**

| State | Authorities |
|---|---|
| Arizona | *Wedgewood Inv. Corp. v. International Harvester Co.*, 613 P.2d 620, 624–25 (Ariz. Ct. App. 1979) (expressly adopting *GTE Sylvania*). |
| Arkansas | *Edgar Lumber Co. v. Cornie Stave Co.*, 130 S.W. 452, 454–55 (Ark. 1910) (upholding a railroad owner's right to contract to haul timber exclusively for one person, firm, or operation and citing to a Virginia state case finding a similar contract to be a reasonable restraint of trade); *see also Vincent v. Indep. Gin Corp.*, 237 S.W.2d 486, 487–88 (Ark. 1951) (finding that a contract wherein a cotton planter who sold his gin agreed that for five years he would use that gin to process all the cotton he grew was not an invalid restraint of trade). |
| California | *Bert G. Gianelli Distributing Co. v. Beck & Co.*, 172 Cal. App. 3d 1020, 1045, 1047-48 (1985) (expressly adopting *GTE Sylvania*). |
| Colorado | *Hutton v. Memorial Hospital*, 824 P.2d 61, 63 (Colo. App. 1991) (adopting rule of reason). |
| Connecticut | *Hydro Air of Conn. v. Versa Techs.*, 599 F. Supp. 1119, 1122–23 (D. Conn. 1984) (applying rule of reason to federal and state antitrust law claims challenging exclusive distributorship); *Elida, Inc. v. Harmor Realty Corp.*, 413 A.2d 1226, 1230–31 (Conn. 1979) (noting that Connecticut antitrust statute incorporates federal antitrust law and the rule of reason has been applied to nonprice vertical restraints under federal law). |
| D.C. | D.C. Code § 28-4515 (providing that interpretations of federal law are a guide). |
| Florida | *Parts Depot Co. v. Fla. Auto Supply*, 669 So. 2d 321, 326 (Fla. Dist. Ct. App. 1996) (expressly adopting *GTE Sylvania*). |
| Hawaii | Haw. Rev. Stat. § 480-3 (construed in accordance with federal law); *Courbat v. Dahana Ranch, Inc.*, 141 P.3d 427, 435 n.6 (Haw. 2006) (same "in light of conditions in Hawaii"). |
| Idaho | Idaho Code § 48-102(3) (construed in accordance with federal law). |

| State | Authorities |
|---|---|
| Illinois | *International Parts v. Caterpillar, Inc.*, 631 N.E.2d 1258, 1264 (Ill. App. Ct. 1994) (holding that a vertical nonprice restraint was to be reviewed under the rule of reason). |
| Indiana | *Miller Brewing Co. v. Bartholemew County Beverage Co.*, 674 N.E.2d 193, 204–05 (Ind. Ct. App. 1996) (indicating in *dictum* that the court would apply rule of reason to a nonprice vertical restraint challenged under state antitrust law). |
| Iowa | Iowa Code § 553.2 (construed in accordance with federal law); *State v. Cedar Rapids Bd. of Realtors*, 300 N.W.2d 127, 128 (Iowa 1981) (holding that the rule of reason will generally apply to alleged restraints of trade challenged under state antitrust law claims). |
| Kansas | Kan. Stat. Ann. § 50-163(b) (construed in accordance with federal law); Kan. Stat. Ann. § 50-163(c) (exempting from state antitrust law any "reasonable restraint of trade or commerce" defined as a restraint that is "reasonable in view of all of the facts and circumstances of the particular case and does not contravene public welfare"). |
| Louisiana | *Plaquemine Marine v. Mercury Marine*, 859 So. 2d 110, 118 (La. Ct. App. 2003) (expressly adopting *GTE Sylvania*). |
| Maine | *McKinnon v. Honeywell Intern., Inc.*, 977 A.2d 420, 426 (Me. 2009) (holding that Maine antitrust statute is construed in accordance with federal law); *State v. MaineHealth*, No. CIV.A.CV-00-548, 2001 WL 1711006, at *2 (Me. Super. Ct. July 26, 2001) (holding that courts ordinarily apply the rule of reason to determine whether practice is prohibited by state antitrust law). |
| Maryland | *Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663, 666–68 (Md. 1984) (holding that federal antitrust precedent is a guide and indicating in *dictum* that the court would adopt *GTE Sylvania* to assess whether a nonprice vertical restriction constitutes an unreasonable restraint of trade under state antitrust law); *Eastside Vend Distribs., Inc. v. Coca-Cola Enters., Inc.*, No. 24-C-04-003998, 2006 WL 1516012, at *17 (Md. Cir. Ct. May 8, 2006) (holding that *GTE Sylvania* applies to nonprice vertical restraints). |
| Massachusetts | *Parikh v. Franklin Med. Ctr.*, 940 F. Supp. 395, 401 (D. Mass. 1996) (applying *GTE Sylvania* to federal and Massachusetts law claims challenging exclusive dealing arrangement). |

| State | Authorities |
|-------|-------------|
| Michigan | *McDill v. McDonald Coop. Dairy Co.*, 283 N.W.2d 819, 823 (Mich. Ct. App. 1979) (expressly adopting *GTE Sylvania* in case brought under previous state antitrust statute); *see also* Mich. Comp. Laws § 445.784(2) (providing that "courts shall give due deference" to federal precedent, "including, without limitation, the doctrine of . . . the rule of reason"). |
| Minnesota | *State by Humphrey v. Road Constructors, Inc.*, 474 N.W.2d 224, 225 (Minn. Ct. App. 1991) (adopting *GTE Sylvania* in an antitrust action brought by the state); *Hough Transit, Ltd. v. Nat'l Farmers Org.*, 472 N.W.2d 358, 360–61 (Minn. Ct. App. 1991) (holding that the Section 325D.51 of the Minnesota Antitrust Law codifies the "rule of reason" and that an exclusive arrangement between a milk co-op and delivery driver was not a per se illegal refusal to deal under Section 325D.53, subd. 1(3)); *see also State by Humphrey v. Alpine Air Prods.*, 490 N.W.2d 888, 894 (Minn. Ct. App. 1992) (holding that Minnesota antitrust law should be construed in accordance with federal law). |
| Mississippi | *Walker v. U-Haul Co.*, 734 F.2d 1068, 1071 (5th Cir. 1984) (upholding district court's application of *GTE Sylvania* to federal and Mississippi state antitrust claims challenging an alleged vertical restraint of trade). |
| Missouri | Mo. Rev. Stat. § 416.141 (construed in accordance with federal law); *Marc's Restaurant, Inc. v. CBS, Inc.*, 730 S.W.2d 582, 586 (Mo. Ct. App. 1987) (same); *see also Mo. Portland Cement Co. v. Denny Concrete Co.*, 499 S.W.2d 432, 435–37 (Mo. 1973) (applying an analysis consistent with the rule of reason to evaluate the validity of an exclusive requirements contract under a prior state antitrust statute). |
| Montana | *Smith v. Video Lottery Consultants, Inc.*, 858 P.2d 11 (Mont. 1993) (noting that § 30-14-205 is modeled after § 1 of the Sherman Act and that where "the statutes are similar, we will give due weight to the federal courts' interpretation of this type of alleged antitrust violation"). |
| Nebraska | Neb. Rev. Stat. § 59-829 (construed in accordance with federal law when same or similar language to federal antitrust law); *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 35, 38 (Neb. 2004) (interpreting Neb. Rev. Stat. § 59-829 as aiming for "uniform application" of state and federal antitrust laws to the extent its consistent with the state antitrust statute's purpose). |

3

| State | Authorities |
|---|---|
| Nevada | Nev. Rev. Stat. § 598A.050 (construed in accordance with federal law); *Boulware v. Nev. Dep't of Human Res.*, 960 F.2d 793, 800–01 (9th Cir. 1992) (same). |
| New Hampshire | N.H. Rev. Stat. § 356:14 (providing that interpretations of federal law are a guide); *Minuteman, LLC v. Microsoft Corp.*, 795 A.2d 833, 836 (N.H. 2002) (finding that the legislature "expressly encouraged" and it has "long been the practice" for courts to apply federal case law to interpret state antitrust law). |
| New Mexico | N.M. Stat. § 57-1-15 (construed in accordance with federal law); *Smith Mach. Corp. v. Hesston, Inc.*, 694 P.2d 501, 505 (N.M. 1985) (holding that New Mexico courts should apply federal antitrust case law when no state cases are directly on point). |
| New York | *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 538–39 (N.Y. 1988), *rev'g* 512 N.Y.S.2d 802 (N.Y. App. Div. 1987) (holding that the Donnelly Act should generally be construed in accordance with federal law and that although vertical territorial restraints are not per se legal, the Act only prohibits "unreasonable" restraints of trade). |
| North Carolina | *Stearns v. GenRad, Inc.*, 564 F. Supp. 1309, 1315–16, 1318 (M.D.N.C. 1983), *aff'd*, 752 F.2d 942 (4th Cir. 1984) (applying the rule of reason to state and federal antitrust claims challenging alleged vertical restraints). |
| North Dakota | *Ag Acceptance Corp. v. Glinz*, 684 N.W.2d 632 (N.D. 2004) (applying federal antitrust case law to determine whether tying arrangement violated N.D. Cent. Code §§ 51-08.1-01, et seq). |
| Oregon | Or. Rev. Stat. § 646.715(2) (providing that interpretations of federal law are persuasive authority); *Willamette Dental Group, P.C. v. Oregon Dental Services Corp.*, 882 P.2d 637, 640–41 (Or. Ct. App. 1994) (interpreting state antitrust law based on federal case law in the absence of Oregon state court decisions). |
| Pennsylvania | *Maxwell v. Schaefer*, 112 A.2d 69, 71–72 (holding that defendant in contract dispute failed to show how exclusive distribution agreement was an unreasonable restraint of trade); *see also Collins v. Main Line Bd. of Realtors*, 304 A.2d 493, 496 (Pa. 1973) (applying federal precedent to determine whether an agreement unreasonably restrained trade). |
| Puerto Rico | *Gen. Gases & Supplies Corp. v. Shoring & Forming Sys., Inc.*, 2001 P.R. Offic. Trans. 54 (P.R. 2001) (holding that interpretations |

| State | Authorities |
|---|---|
| | of federal law are a guide but Puerto Rico's "particular economic reality" requires courts to be even more flexible and to generally apply the rule of reason to local antitrust claims). |
| Rhode Island | *Auburn News Co. v. Providence Journal Co.*, 504 F. Supp. 292, 300, 304 (D.R.I. 1980), *rev'd on other grounds*, 659 F.2d 273 (1st Cir. 1981) (applying rule of reason to state and federal antitrust claims challenging an exclusive dealership); *see also ERI Max Entm't, Inc. v. Streisand*, 690 A.2d 1351, 1353, n.1 (R.I. 1997) (holding that the state antitrust statute is construed in accordance with federal law). |
| South Carolina | *Blanton Enters. v. Burger King Corp.*, 680 F. Supp. 753, 765–68 (D.S.C. 1988) (applying *GTE Sylvania* to state and federal antitrust claims challenging an alleged nonprice vertical restraint); *Walter A. Wood Mowing & Reaping Co. v. Greenwood Hardware Co.*, 55 S.E. 973, 974–76 (S.C. 1906) (applying an analysis consistent with the rule of reason to evaluate the legality of a territorial restraint under a prior state antitrust statute). |
| South Dakota | *Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 313–15 (8th Cir. 1986) (applying *GTE Sylvania* to state antitrust claim challenging a vertical nonprice restraint). |
| Tennessee | *State ex rel. Att'y Gen. v. Burley Tobacco Growers, Co-operative Ass'n*, 2 Tenn. App. 674, 681 (1926) (holding that the rule of reason applies to Tennessee antitrust law). |
| Utah | Utah Code § 76-10-3118 (providing that interpretations of federal law are a guide); *Evans v. State*, 963 P.2d 177, 181 (Utah 1998) (looking to federal and other state courts for guidance to interpret Utah antitrust statute). |
| Vermont | Vt. Stat. Ann. tit. 9, § 2453(b) (providing that interpretations of federal law are a guide). |
| Virginia | *Thompson-Everett, Inc. v. National Cable Advertising*, 850 F. Supp. 470, 480–82 (E.D. Va. 1994), *aff'd*, 57 F.3d 1317 (4th Cir. 1995) (applying *GTE Sylvania* to state and federal antitrust claims challenging vertical exclusive distributorships). |
| West Virginia | W. Va. Code § 47-18-16 (construed in accordance with federal law). |
| Wisconsin | *Grams v. Boss*, 294 N.W.2d 473, 480 (Wis. 1980), *overruled on other grounds by Beidel v. Sideline Software Inc.*, 842 N.W.2d 240 (Wis. 2013) (holding that federal case law controls interpretation of |

| State | Authorities |
|---|---|
|  | Wisconsin antitrust statute); *Ford Motor Co. v. Lyons*, 405 N.W.2d 354, 367 (Wis. Ct. App. 1987) (same). |
| Wyoming | *State v. Langley*, 84 P.2d 767, 772–74 (Wyo. 1938) (recognizing the common law principles relating to unreasonable restraints of trade and looking to federal and other state court decisions when assessing constitutionality of state competition statute). |

**Ex. 33**
p. 138 p. 499

# EXHIBIT M

**Table of Out of State Authorities III**

**Count V
Relevant State Unfair and Deceptive Trade Practices Acts &
Limitations Periods (or Legal Defenses in Lieu)**

| State Act | Limitation Period (Other Legal Defenses Where > 5 Years) |
|---|---|
| Ark. Code Ann. §§ 4-88-101, et seq. | **5 years** from occurrence of violation, Ark. Code Ann. § 4-88-115 |
| Ariz. Rev. Stat. §§ 44-1522, et seq. | **1 year** after the cause of action accrues, Ariz. Rev. Stat. § 12-541(5) |
| Cal. Bus. & Prof. Code §§ 17200, et seq. | **4 years** after the cause of action accrues, Cal. Bus. & Prof. Code § 17208 |
| Colo. Rev. Stat. § 6-1-105, et seq. | **3 years** from the unlawful act or after a person discovers or should have discovered it, which may be extended by 1 year if plaintiff proves defendant engaged in conduct to induce plaintiff not to commence suit, Colo. Rev. Stat. § 6-1-115 |
| D.C. Code §§ 28-3901, et seq. | **3 years** from the time the right to maintain the action accrues, D.C. Code § 12-301(8) |
| Fla. Stat. §§ 501.201, et seq. | **4 years** from occurrence of actual damages, Fla. Stat. § 95.11(3)(f) |
| Idaho Code §§ 48-601, et seq. | **2 years** after the cause of action accrues, Idaho Code § 48-619 |
| 815 Ill. Comp. Stat. 505/1, et seq. | **3 years** after the cause of action accrues, 815 Ill. Comp. Stat. 505/10a(e) |
| Ind. Code §§ 24-5-0.5-1, et seq. | **2 years** after the occurrence of the deceptive act, Ind. Code § 24-5-0.5-5 |
| Kan. Stat. Ann. §§ 50-623, et seq. | **3 years** from occurrence of violation for claims seeking actual damages and **1 year** from occurrence of violation for claims seeking civil penalties, Kan. Stat. Ann. § 60-512 |
| La. Stat. Ann. § 51:1401, et seq. | **1 year** from the unlawful act, La. Stat. Ann. § 51:1409 |

| State Act | Limitation Period (Other Legal Defenses Where > 5 Years) |
|---|---|
| Me. Rev. Stat. Ann. tit. 5, §§ 207, et seq. | **6 years** after the cause of action accrues, Me. Rev. Stat. Ann. tit. 14, § 752<br><br>In lieu of statute of limitations defense: Claim under Act is barred on the ground that it permits only injunctive relief for private plaintiffs, Me. Rev. Stat. Ann. tit. 10, § 1213, and allegedly unlawful conduct discontinued over five years before HCSC filed its Complaint. |
| Mass. Ann. Laws ch. 93A, et seq. | **4 years** after the cause of action accrues, Mass. Gen. Laws Ann. ch. 260, § 5A |
| Mich. Stat. §§ 445.901, et seq. | **6 years** after the occurrence or **1 year after the last payment** in a transaction involving the unlawful act, whichever comes later, Mich. Stat. § 445.911(7)<br><br>In lieu of statute of limitations defense: Claim under Act is barred on the ground that Mich. Stat § 445.904(1)(a) exempts conduct that is part of a transaction already regulated by other federal or state laws and regulations.  This exemption applies when the general transaction at issue, not the alleged misconduct, is specifically authorized under other laws administered by a regulatory board or officer acting under state or federal statutory authority, as is the case for the allegedly unlawful conduct in HCSC's Complaint.  *See Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203, 212-13 (Mich. 2007); *Smith v. Globe Life Ins. Co.*, 460 Mich. 446, 464-65 (Mich. 1999).  The conduct at issue is part of a transaction for prescription drug coverage, which is regulated by federal statute and the Centers for Medicare & Medicaid Services. |
| Minn. Stat. §§ 325D.43, et seq. | **6 years** from the occurrence of the alleged statutory violation, Minn. Stat. § 541.05<br><br>In lieu of statute of limitations: Claim under Act is barred on the ground it permits only injunctive relief and attorneys' fees for private plaintiffs, Minn. Stat. § 325D.45; *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1041 (D. Minn. 2013) (citing *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999)); *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1070 (D. Minn. 2013); *Alsides v. Brown Institute, Ltd.*, 592 N.W.2d 468, 476 (Minn. Ct. App. 1999), and allegedly unlawful conduct discontinued over five years before HCSC filed its Complaint. |
| Miss. Code Ann. §§ 75-24-1, et seq. | **3 years** after the cause of action accrues, Miss. Code Ann. § 15-1-49 |

| State Act | Limitation Period (Other Legal Defenses Where > 5 Years) |
|---|---|
| Mo. Rev. Stat. §§ 407.010, et seq. | **5 years** from the time the plaintiff has knowledge of the wrong and at least nominal damage or knowledge of something that puts plaintiff on notice to inquire further, Mo. Rev. Stat. § 516.120(2) |
| Neb. Rev. Stat. §§ 59-1601, et seq. | **4 years** after the cause of action accrues, Neb. Rev. Stat. § 59-1612 |
| Nev. Rev. Stat. §§ 598.0903, et seq. | **4 years** after the cause of action accrues (which does not start until party discovers or should have discovered by due diligence the deceptive trade practice), Nev. Rev. Stat. Ann. § 11.190(d) |
| N.H. Rev. Stat. §§ 358-A:1, et seq. | **3 years** from the time the plaintiff knew, or reasonably should have known, of the unlawful conduct, N.H. Rev. Stat. § 358-A:3(IV-a) |
| N.M. Stat. Ann. §§ 57-12-1, et seq. | **4 years** from the time the plaintiff sustains actual injury and discovers, or should have discovered through reasonable diligence, the facts essential to the cause of action, N.M. Stat. Ann. § 37-1-4 |
| N.Y. General Business Law §§ 349, et seq. | **3 years** from the time the plaintiff was injured, N.Y. C.P.L.R. 214(2) |
| N.C. Gen. Stat. §§ 75-1.1, et seq. | **4 years** after the cause of action accrues, N.C. Gen. Stat. § 75-16.2 |
| N.D. Cent. Code §§ 51-15-01, et seq. | **6 years** after the cause of action accrues, N.D. Cent. Code, § 28-01-16<br><br>In lieu of statute of limitations defense: Claim under Act is barred on the ground that N.D. Cent. Code §§ 51-15-01, *et seq.* only applies to statements made directly to the private party in connection with the sale or advertisement of merchandise. *Thimjon Farms P'ship v. First Int'l Bank & Trust*, 837 N.W.2d 327, 337–38 (N.D. 2013). In the Complaint, HCSC only alleges that certifications were made to HCSC and only in connection with a determination regarding prescription drug coverage. |
| Or. Rev. Stat. §§ 646.605, et seq. | **1 year** from the discovery of the unlawful method, act or practice. Or. Rev. Stat. § 646.638 |
| 73 Pa. Stat. and Cons. Stat. Ann. §§ 201-1, et seq. | **6 years** after the cause of action accrues, 42 Pa. Stat. and Cons. Stat. Ann. § 5527(b)<br><br>In lieu of statute of limitations defense: Claim under Act is barred on the ground that it requires the goods purchased to be for "personal, family, or household purposes," 73 Pa. Stat. Ann. § 201-9.2, and the purchases made by HCSC alleged in the Complaint were not made for any of the enumerated purposes. |

| State Act | Limitation Period (Other Legal Defenses Where > 5 Years) |
|---|---|
| S.C. Code Ann. §§ 39-5-10, et seq. | **3 years** after discovery of the unlawful conduct, S.C. Code Ann. § 39-5-150 |
| S.D. Codified Laws §§ 37-24-1, et seq. | **4 years** after the occurrence or discovery of the conduct, S.D. Codified Laws § 37-24-33 |
| Utah Code Ann. §§ 13-11-1, et seq. | **3 years** after the cause of action accrues, Utah Code Ann. § 78B-2-305 |
| Vt. Stat. Ann. tit. 9, § 2451, et seq. | **6 years** after the cause of action accrues, Vt. Stat. Ann. tit. 12, § 511<br><br>In lieu of statute of limitations defense: Claim under Act is barred on the ground that a "consumer" who can sue for relief under the Act is defined as a "person who purchases . . . goods or services . . . for his or her use or benefit or the use or benefit of a member of his or her household, or in connection with the operation of his or her household," Vt. Stat. Ann. tit. 9, § 2451a, and HCSC does not meet this definition, as its alleged purchases were not made for any of the enumerated purposes. |
| Va. Code Ann. §§ 59.1-196, et seq. | **2 years** after the cause of action accrues.  Va. Code Ann. § 59.1-204.1 |
| W. Va. Code §§ 46A-6-101, et seq. | **1 year** after the right to bring the action accrues, W. Va. Code § 55-2-12(c) |
| Wis. Stat. § 100.18, et seq.; Wis. Stat. § 100.20, et seq. | **3 years** after the occurrence of the unlawful act or practice, Wis. Stat. § 100.18 |
| Wyo. Stat. Ann. § 40-12-101, et seq. | **1 year** after the required written notice is furnished to the alleged violator (which must be furnished either within 1 year after the unlawful deceptive trade practice or within 2 years following the consumer transaction, whichever occurs first), Wyo. Stat. Ann. § 40-12-109 |

# EXHIBIT N

**Table of Out of State Authority IV**

**Counts III & IV**
**Relevant State Antitrust Acts Injury Requirements**

| State Acts | Authorities |
|---|---|
| Ariz. Rev. Stat. §§ 44-1403, et seq. (Count III)<br><br>Ariz. Rev. Stat. §§ 44-1402, et seq. (Count IV) | Ariz. Rev. Stat. § 44-1408 ("A person threatened with injury or injured in his business or property by a violation of this article may bring an action for . . . damages sustained . . ."). |
| Cal. Bus. & Prof Code §§ 17200, et seq. (Count III)<br><br>Cal. Bus. & Prof Code §§ 16700, et seq. (Count IV) | Cal. Bus. & Prof Code § 16750(a) ("Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor . . ."); *Chicago Title Ins. Co. v. Great Western Fin. Corp.*, 69 Cal.2d 305, 317–318 (Cal. 1968) (holding that plaintiff bringing a civil action for damages under California's antitrust statute must "allege and prove that his business or property has been injured" from the reduction in competition). |
| Conn. Gen. Stat. Ann. § 35-24, et seq. (Counts III & IV) | Conn. Gen. Stat. Ann. § 35-35 ("[A]ny person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of this chapter shall recover treble damages, together with a reasonable attorney's fee and costs."); *Roncari Dev. Co. v. GMG Enters., Inc.*, 718 A.2d 1025, 1031 (Conn. Super. Ct. 1997) (holding that plaintiff must plead injury to its business or property as a result of the alleged violation to state a cause of action under Connecticut Antitrust Act). |
| D.C. Code §§ 28-4503, et seq. (Count III)<br><br>D.C. Code §§ 28-4502, et seq. (Count IV) | D.C. Code § 28-4508(a) ("Any person who is injured in that person's business or property by reason of anything forbidden by this chapter may bring a civil action for damages . . ."). |

**Ex. 33**
p. 145 p. 506

| State Acts | Authorities |
|---|---|
| Fla. Stat. §§ 501.201, et seq. (Counts III & IV) | Fla. Stat. § 501.211(2) ("In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105."); *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. Dist. Ct. App. 2006) (holding that claims for damages under Florida's unfair competition statute require the plaintiff to show (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages). |
| Haw. Rev. Stat. §§ 480, et seq. (Count III)<br><br>Haw. Rev. Stat. §§ 480-1, et seq. (Count IV) | Haw. Rev. Stat. § 480-13(a)(1) ("[A]ny person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter may sue for damages sustained by the person."). |
| 740 Ill. Comp. Stat. 10/3, et seq. (Counts III & IV) | 740 Ill. Comp. Stat. 10/7(2) ("Any person who has been injured in his business or property, or is threatened with such injury, by a violation of Section 3 of this Act may maintain an action in the Circuit Court for damages, or for an injunction, or both, against any person who has committed such violation."); *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 620 N.E.2d 1349, 1351–53 (Ill. App. Ct. 1993) (holding that federal precedent should be used in construing state antitrust law); *Collins v. Associated Pathologists, Ltd.*, 676 F. Supp. 1388, 1405–06 (C.D. Ill. 1987) (applying analysis under federal antitrust laws to state antitrust claims). |
| Iowa Code §§ 553.5, et seq. (Counts III & IV) | Iowa Code § 553.12 ("[A] person who is injured or threatened with injury by conduct prohibited under this chapter may bring suit to . . . [r]ecover actual damages resulting from conduct prohibited under this chapter [or] [r]ecover, at the court's discretion, exemplary damages [if certain conditions are met]."); *Davies v. Genesis Med. Ctr.*, 994 F. Supp. 1078, 1103 (S.D. Iowa 1998) (dismissing state antitrust claim based on same reasoning for dismissing claim under Section 2 of the Sherman Act because Iowa courts "are required by section 553.2 to give considerable weight to federal cases construing similar section of the Sherman Act") (citing *Neyens v. Roth*, 326 N.W.2d 294, 297–98 (Iowa 1932)). |

| State Acts | Authorities |
|---|---|
| Kansas Stat. Ann. §§ 50-101, et seq., §§ 50-158, et seq. (Count IV) | Kansas Stat. Ann. § 50-161(b) ("[A]ny person who may be damaged or injured by any agreement, monopoly, trust, conspiracy or combination which is declared unlawful by the Kansas restraint of trade act shall have a cause of action against any person causing such damage or injury. Such action may be brought by any person who is injured in such person's business or property by reason of anything forbidden or declared unlawful by the Kansas restraint of trade act . . ."); *O'Brien v. Leegin Creative Leather Prods., Inc.*, 277 P.3d 1062, 1076 (Kan. 2012) (holding that under Kansas antitrust statues, "a plaintiff must show that the plaintiff was injured or damaged by the defendant's forbidden behavior"). |
| Md. Code Ann., Com. Law § 11-201, et seq. (Counts III & IV) | Md. Code Ann., Com. Law § 11-209(b)(2)(i) ("A person whose business or property has been injured or threatened with injury by a violation of § 11-204 of this subtitle may maintain an action for damages or for an injunction or both against any person who has committed the violation . . ."). |
| Mass. Gen. L. Ch. 93A, et seq. (Count III) | Mass. Gen. L. ch. 93A, § 11) ("Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court . . . for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."). |
| Me. Rev. Stat. Ann. tit. 10, §§ 1102, et seq. (Count III)<br><br>Me. Rev. Stat. Ann. tit. 10, §§ 1101, et seq. (Count IV) | Me. Rev. Stat. Ann. tit. 10, § 1104 ("Any person . . . injured directly or indirectly in its business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by section 1101, 1102 or 1102-A, may sue for the injury in a civil action."); *McKinnon v. Honeywell Intern., Inc.*, 977 A.2d 420, 426 (holding that a plaintiff must prove injury or damage before plaintiff can recover under Maine's antitrust statute). |

| State Acts | Authorities |
|---|---|
| Mich. Comp. Laws Ann. §§ 445.773, et seq. (Count III)<br><br>Mich. Comp. Laws Ann. §§ 445.771, et seq. (Count IV) | Mich. Comp. Laws Ann. § 445.778(2) ("Any other person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring an action for . . . actual damages sustained by reason of a violation of this act, and, as determined by the court, interest on the damages from the date of the complaint, taxable costs, and reasonable attorney's fees."). |
| Minn. Stat. §§ 325D.52, et seq.; Minn. Stat. § 8.31, et seq. (Count III)<br><br>Minn. Stat. §§ 325D.49, et seq. (Count IV) | Minn. Stat. § 325D.57 ("Any person, any governmental body, or the state of Minnesota or any of its subdivisions or agencies, injured directly or indirectly by a violation of sections 325D.49 to 325D.66, shall recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees."). |
| Miss. Code Ann. §§ 75-21-3, et seq. (Counts III & IV) | Miss. Code Ann. § 75-21-9 ("Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars ($500.00), by suit in any court of competent jurisdiction."). |
| Mont. Code Ann. § 30-14-205 (Count IV) | Mont. Code Ann. § 30-14-222(1) ("A person who is or will be injured . . . may bring an action to enjoin an act that is in violation of 30-14-205 through 30-14-214 or 30-14-216 through 30-14-218 and for the recovery of damages."). |
| Neb. Code Ann. §§ 59-802, et seq. (Count III)<br><br>Neb. Code Ann. §§ 59-801, et seq. (Count IV) | Neb. Code Ann. § 59-821 ("Any person who is injured in his or her business or property by any other person or persons by a violation of sections 59-801 to 59-831, whether such injured person dealt directly or indirectly with the defendant, may bring a civil action in the district court in the county in which the defendant or defendants reside or are found . . . and shall recover actual damages or liquidated damages . . ."). |
| Nev. Rev. Stat. Ann. §§ 598A.060, et seq. (Counts III & IV) | Nev. Rev. Stat. Ann. § 598A.210(2) ("Any person injured or damaged directly or indirectly in his or her business or property by reason of a violation of the provisions of this chapter may institute a civil action and shall recover treble damages, together with reasonable attorney fees and costs."); *Nev. Recycling & Salvage, Ltd. V. Reno Disposal Co., Inc.*, 423 P.3d 605, 608 (Nev. 2018) (holding that plaintiffs lacked standing to bring state antitrust claims because they did not demonstrate any injuries to their business resulting from alleged violation). |

4

| State Acts | Authorities |
| --- | --- |
| N.H. Rev. Stat. Ann. §§ 356.1, et seq. (Count III)<br><br>N.H. Rev. Stat. Ann. §§ 356.2, et seq. (Count IV) | N.H. Rev. Stat. Ann. § 356:11 ("Any person injured in his business or property by reason of a violation of this chapter may recover the actual damages sustained, and as determined by the court, the costs of the suit and reasonable attorney's fees regardless of whether that person dealt directly or indirectly with the defendant. If the trier of facts finds that the violation is willful or flagrant, they may increase damages to an amount not in excess of 3 times the actual damages sustained."); *Donovan v. Digital Equip. Corp.*, 883 F. Supp. 775, 785, (D.N.H. 1994) ("[T]he court applies the federal antitrust standing requirements as this promotes the uniform construction of antitrust laws as contemplated.") (granting summary judgment for lack of standing). |
| N.M. Stat. Ann. §§ 57-1-2, et seq. (Counts III & IV) | N.M. Stat. Ann. § 57-1-3 ("[A]ny person threatened with injury or injured in his business or property, directly or indirectly, by a violation . . . may bring an action . . .") |
| N.Y. Gen. Bus. Law § 340, et seq. (Count IV) | N.Y. Gen. Bus. Law § 340(5) ("[A]ny person who shall sustain damages by reason of any violation of this section, shall recover three-fold the actual damages sustained thereby"); *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335, 520 N.E.2d 535, 539 (1988) ("[T]he Donnelly Act—often called a "Little Sherman Act"—should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result."); *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 244 (S.D.N.Y.), *aff'd*, 80 F. App'x 722 (2d Cir. 2003) ("The Sherman Act and Donnelly Act claims are discussed as if one claim [including for injury purposes] because New York's antitrust law is modeled on the Sherman Act and should be construed in light of federal precedent." (internal quotations omitted)). |
| N.C. Gen. Stat. §§ 75-2.1, et seq. (Count III)<br><br>N.C. Gen. Stat. §§ 75-1, et seq. (Count IV) | N.C. Gen. Stat. § 75-16 ("If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict."). |

| State Acts | Authorities |
|---|---|
| N.D. Cent. Code §§ 51-08.1-03, et seq. (Count III)<br><br>N.D. Cent. Code §§ 51-08.1-02, et seq. (Count IV) | N.D. Cent. Code § 51-08.1-08(2) ("A person threatened with injury or injured in that person's business or property by a violation of [the Act] may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees."). |
| Or. Rev. Stat. §§ 646.705, et seq. (Counts III & IV) | Or. Rev. Stat. § 646.780(1)(a) ("A person . . . injured in its business or property . . . may sue therefor and shall recover threefold the damages sustained."). |
| 10 L.P.R.A. §§ 257, et seq. (Count III)<br><br>10 L.P.R.A. §§ 260, et seq. (Count IV) | 10 L.P.R.A. § 269a ("Every person shall have the right to institute proceedings for injunctions before the Court of First Instance to prevent losses or damages to his business or property by any other person, by reason of acts or intended acts, forbidden or declared to be unlawful by this chapter."). |
| R.I. Gen. Laws §§ 6-36-1, et seq. (Counts III & IV) | § 6-36-11 ("Any person . . . injured in his or her business or property by reason of a violation of the [antitrust statute] may sue in superior court."); § 6-36-2(b) ("This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable."); *accord Siena v. Microsoft Corp.*, 796 A.2d 461 (R.I. 2002). |
| S.D. Codified Laws §§ 37-1-3.2, et seq. (Count III)<br><br>S.D. Codified Laws §§ 37-1-3.1, et seq. (Count IV) | § 37-1-14.3 ("A person injured in his business or property by a violation of this chapter may bring an action."); *Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985) (instructing that "great weight should be given to the federal cases interpreting the federal [antitrust] statute"). |
| Tenn. Code Ann. §§ 47-25-101, et seq. (Count IV) | § 47-25-106 ("Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue."); *Sherwood v. Microsoft Corp.*, 2003 WL 21780975 (Tenn. Ct. App. July 31, 2003) (noting "that the purposes of the TTPA are furthered by granting a private remedy to any person *injured by anticompetitive* conduct"). |
| Utah Code Ann. §§ 76-10-911, et seq. (Count III)<br><br>Utah Code Ann. §§ 76-10-3101, et seq. (Count IV) | § 76-10-3109(1)(a) ("A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages."). |
| Vt. Stat. Ann. 9, §§ 2453, et seq. (Count III & IV) | § 2465(a) ("Any person who sustains damages or injury as a result of any violation of State antitrust laws . . . may sue and recover from the violator."). |

| State Acts | Authorities |
|---|---|
| W.Va. Code §§ 47-18-4, et seq. (Count III)<br><br>W. Va. Code §§ 47-18-1, et seq. (Count IV) | § 47-18-9 ("Any person who shall be injured in his business or property by reason of a violation of the provisions of this article may bring an action therefor."). |
| Wis. Stat. §§ 133.03, et seq. (Count III)<br><br>Wis. Stat. §§ 133.01, et seq. (Count IV) | § 133.18(1)(a) ("[A]ny person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor."). |

# EXHIBIT O

## Table of Out of State Authorities V

### Counts III & IV
### Relevant State Antitrust Acts & Limitations Periods

| State Act | Limitation Period |
|---|---|
| Ariz. Rev. Stat. §§ 44-1403, et seq. (Count III)<br><br>Ariz. Rev. Stat. §§ 44-1402, et seq. (Count IV) | "An action . . . to recover damages is barred if it is not commenced **within four years** after the cause of action accrues." Ariz. Rev. Stat.§ 44-1410. |
| Cal. Bus. & Prof Code §§ 17200, et seq. (Count III)<br><br>Cal. Bus. & Prof Code §§ 16700, et seq. (Count IV) | "Any action to enforce [the Unfair Competition Law] shall be commenced **within four years** after the cause of action accrued." Cal. Bus. & Prof. Code § 17208.<br><br>"Any civil action to enforce any cause of action for a violation of [the Cartwright Act] shall be commenced **within four years** after the cause of action accrued."  Cal. Bus. & Prof. Code § 16750(a). |
| Conn. Gen. Stat. Ann. § 35-24, et seq. (Count III & IV) | "Any action . . . shall be forever barred unless commenced **within four years** after the cause of action shall have accrued." Conn. Gen. Stat. Ann. § 35-40. |
| D.C. Code §§ 28-4503, et seq. (Count III)<br><br>D.C. Code §§ 28-4502, et seq. (Count IV) | "An action . . . to recover damages is barred if the action is not commenced **within four (4) years** after the cause of action accrues . . ." D.C. Code Ann. § 28-4511(b). |
|  | For the cited provisions, Florida's unfair and deceptive trade practices statute: "Actions other than for recovery of real property shall be commenced . . . **within four years**" for "[a]n action founded on a statutory liability."  *See S. Motor Co. of Dade Cty. v. Doktorczyk*, 957 So. 2d 1215, 1216–17 (Fla. Dist. Ct. App. 2007) ("Section 95.11(3)(f), Florida Statutes (1996), covers '[a]n action founded on a statutory liability,' which would apply to [a] FDUTPA claim.").<br><br>*See also the Florida antitrust statute (Fla. Stat. §§ 542.15 et seq.): "Any action . . . must be commenced **within 4 years** after the cause of action accrues." Fla. Stat. § 542.26. |

1

| State Act | Limitation Period |
|---|---|
| Haw Code §§ 480, et seq. (Count III)<br><br>Haw. Code §§ 480-1, et seq. (Count IV) | "Any action to enforce a cause of action arising under this chapter shall be barred unless commenced **within four years** after the cause of action accrues." Haw. Code § 480-24. |
| 740 Ill. Comp. Stat. 10/3, et seq. (Count III & IV) | "Any action for damages under this subsection is forever barred unless commenced **within 4 years** after the cause of action accrued." 740 Ill. Comp. Stat. 10/7. |
| Iowa Code §§ 553.5, et seq. (Count III & IV) | "Suit . . . must be commenced **within four years** after the cause of action accrues." Iowa Code § 553.16(2). |
| Kansas Stat. Ann. §§ 50-101, et seq., §§ 50-158, et seq. (Count IV) | "The following actions shall be brought **within three (3) years**: . . . [a]n action upon a liability created by a statute other than a penalty or forfeiture." Kan. Stat. Ann. § 60-512(2).<br><br>*See* Kan. Stat. Ann. § 50-139 ("All actions brought to enforce this act shall be brought pursuant to chapter 60 of the Kansas Statutes Annotated, and amendments thereto."); *O'Brien v. Leegin Creative Leather Prod., Inc.*, 294 Kan. 318, 351-55 (2012) (holding that the Kansas Restraint of Trade Act is governed by the three-year statute of limitations). |
| Md. Code Ann., Com. Law § 11-201, et seq. (Count III & IV) | "An action brought to enforce this subtitle shall be commenced **within 4 years** after the cause of action accrues." Md. Code Ann., Com. Law § 11-209(d)(1). |
| Mass. Gen. L. Ch. 93A, et seq. (Count III) | "An action brought to enforce the provisions of this Act shall be barred unless commenced **within four years** after the cause of action accrued." Mass. Gen. Laws Ch. 93, § 13. |
| Me. Rev. Stat. Ann. 10, §§ 1102, et seq. (Count III)<br><br>Me. Rev. Stat. Ann. 10, §§ 1101, et seq. (Count IV) | "All civil actions shall be commenced **within 6 years** after the cause of action accrues and not afterwards." Me. Rev. Stat. Ann. 14, § 752; *see McKinnon v. Honeywell Int'l, Inc.*, 977 A.2d 420, 424 (Me. 2009). |
| Mich. Comp. Laws Ann. §§ 445.773, et seq. (Count III)<br><br>Mich. Comp. Laws Ann. §§ 445.771, et seq. (Count IV) | "An action . . . is barred if not commenced **within 4 years** after the claim of relief or cause of action accrues." Mich. Comp. Laws Ann. § 445.781. |

| State Act | Limitation Period |
|---|---|
| Minn. Stat. §§ 325D.52, et seq.; Minn. Stat. § 8.31, et seq. (Count III)<br><br>Minn. Stat. §§ 325D.49, et seq. (Count IV) | "An action . . . shall be forever barred unless commenced **within four years** of the date upon which the cause of action arose." Minn. Stat. § 325D.64. |
| Miss. Code Ann. §§ 75-21-3, et seq. (Count III & IV) | "All actions for which no other period of limitation is prescribed shall be commenced within **three (3) years** next after the cause of such action accrued, and not after." Miss. Code. Ann. § 15-1-49(1). |
| Mont. Code Ann. 30-14-205 (Count IV) | "An action for relief not otherwise provided for must be commenced **within 5 years** after the cause of action accrues." Mont. Code. Ann. § 27-2-231. |
| Neb. Code Ann. §§ 59-802, et seq. (Count III)<br><br>Neb. Code Ann. §§ 59-801, et seq. (Count IV) | "Any action to enforce a claim for damages . . . shall be forever barred unless commenced **within four years** after the cause of action accrues." Neb. Rev. Stat. Ann. § 59-1612. |
| Nev. Rev. Stat. Ann. §§ 598A.060, et seq. (Count III & IV) | "An action . . . is barred if it is not commenced . . . **[w]ithin 4 years** after the cause of action accrues, or if the cause of action is based upon a conspiracy in violation of this chapter, within 4 years after the plaintiff discovered, or by the exercise of reasonable diligence, should have discovered the facts relied upon for proof of the conspiracy." Nev. Rev. Stat. Ann. § 598A.220(2)(a). |
| N.H. Rev. Stat. Ann. §§ 356.1, et seq. (Count III)<br><br>N.H. Rev. Stat. Ann. §§ 356.2, et seq. (Count IV) | "An action . . . to recover damages is barred if it is not commenced **within 4 years** after the cause of action accrues." N.H. Rev. Stat. Ann. § 356:12(II). |
| N.M. Stat. Ann. §§ 57-1-2, et seq. (Count III & IV) | "An action . . . is barred if it is not commenced **within four years** after the cause of action accrues or within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered, the facts relied upon for proof of the cause of action, whichever is later." N.M. Stat. Ann. § 57-1-12. |
| N. Y. General Business Law § 340, et seq. (Count IV) | "An action to recover damages caused by a violation of this section must be commenced **within four years** after the cause of action has accrued." N.Y. Gen. Bus. Law § 340(5). |

3

| State Act | Limitation Period |
|---|---|
| N.C. Gen. Stat. §§ 75-2.1, et seq. (Count III)<br><br>N.C. Gen. Stat. §§ 75-1, et seq. (Count IV) | "Any civil action brought under this Chapter to enforce the provisions thereof shall be barred unless commenced **within four years** after the cause of action accrues." N.C. Gen. Stat. § 75-16.2. |
| N.D. Cent. Code §§ 51-08.1-03, et seq. (Count III)<br><br>N.D. Cent. Code §§ 51-08.1-02, et seq. (Count IV) | "An action . . . to recover damages is barred if it is not commenced **within four years** after the claim for relief accrues." N.D. Cent. Code § 51-08.1-10(2). |
| Or. Rev. Stat. §§ 646.705, et seq. (Count III & IV) | "An action . . . recover damages shall be commenced **within four years** after the cause of action accrued.' Or. Rev. Stat. § 646.800(2). |
| 10 L.P.R.A. §§ 257, et seq. (Count III)<br><br>10 L.P.R.A. §§ 260, et seq. (Count IV) | "The judicial action to recover damages . . . shall be commenced **within four (4) year**s after the cause of action accrued." 10 L.P.R.A. § 268(c). |
| R.I. Gen. Laws §§ 6-36-1, et seq. (Count III & IV) | "Any action brought to enforce the provisions of this chapter shall be barred unless commenced **within four (4) years** after the cause of action arose, or if the cause of action is based upon a conspiracy in violation of this chapter, within four (4) years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered, the facts relied upon for proof of the conspiracy." 6 R.I. Gen. Laws § 6-36-23. |
| S.D. Codified Laws §§ 37-1-3.2, et seq. (Count III)<br><br>S.D. Codified Laws §§ 37-1-3.1, et seq. (Count IV) | "An action . . . to recover damages is barred if it is not commenced **within four years** after the claim for relief accrues." S.D. Codified Laws § 37-1-14.4. |
| Tenn. Code Ann. §§ 47-25-101, et seq. (Count IV) | "The following actions shall be commenced **within three (3) years** from the accruing of the cause of action . . . [a]ctions for injuries to personal or real property." Tenn. Code Ann. § 28-3-105(1); *See State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *1 (Tenn. Ch. Sept. 25, 1980) (applying the three-year statute of limitations for property torts, then listed at T.C.A. § 28-305, in a case where the state of Tennessee sued in its capacity as a purchaser of the defendants' products). |

4

| State Act | Limitation Period |
|---|---|
| Utah Code Ann. §§ 76-10-911, et seq. (Count III)<br><br>Utah Code Ann. §§ 76-10-3101, et seq. (Count IV) | "Any other action pursuant to this act is barred if it is not commenced **within four years** after the cause of action accrues." Utah Code Ann. § 76-10-3117(2). |
| Vt. Stat. Ann. 9, §§ 2453, et seq. (Count III & IV) | "A civil action . . . shall be commenced **within six years** after the cause of action accrues and not thereafter." Vt. Stat. Ann. 12, § 511. |
| W.Va. Code §§ 47-18-4, et seq. (Count III)<br><br>W. Va. Code §§ 47-18-1, et seq. (Count IV) | "Any action brought to enforce the provisions of this article shall be barred unless commenced **within four years** after the cause of action arose, or if the cause of action is based upon a conspiracy in violation of this article, within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered the facts relied upon for proof of the conspiracy." W. Va. Code Ann. § 47-18-11. |
| Wis. Stat. §§ 133.03, et seq. (Count III)<br><br>Wis. Stat. §§ 133.01, et seq. (Count IV) | "A civil action for damages or recovery of payments under this chapter is barred unless commenced **within 6 years** after the cause of action accrued." Wis. Stat. § 133.18(2). |

**Ex. 33**
p. 157 p. 518

# EXHIBIT 34



```
Superior Court of California, County of Alameda        Receipt Nbr: 922289
Rene C. Davidson Alameda County Courthouse             Clerk: jmoyer
1225 Fallon Street                                     Date: 06/02/2020
Oakland, CA  94612
```

| Type | Case Number | Description | Amount |
|------|-------------|-------------|--------|
| Filing | RG20056354 | Other Ex Parte | $20.00 |

```
        Total Amount Due:      $20.00
        Prior Payment:
        Current Payment:       $20.00
        Balance Due:            $.00
        Overage:
        Excess Fee:
        Change:

Payment Method:
        Cash:
        Check:                 $20.00
```

ENDORSED
FILED
ALAMEDA COUNTY

MAY 29 2020

CLERK OF THE SUPERIOR COURT
JERRIE MONKERT
By _____
Deputy

1  ARNOLD & PORTER KAYE SCHOLER LLP
2  Matthew M. Wolf (*PHV* to be filed)
   Laura S. Shores (*PHV* to be filed)
3  Sonia Kuester Pfaffenroth (SBN 223984)
   Michael B. Bernstein (*PHV* to be filed)
4  Adam M. Pergament (SBN 267557)
   601 Massachusetts Avenue, N.W.
5  Washington, D.C. 20001-3743
6  Telephone:      (202) 942-5000
   Facsimile:      (202) 942-5999
7  matthew.wolf@arnoldporter.com
   laura.shores@arnoldporter.com
8  sonia.pfaffenroth@arnoldporter.com
   michael.b.bernstein@arnoldporter.com
9  adam.pergament@arnoldporter.com
10
   D. Eric Shapland (SBN 193853)
11  777 South Figueroa Street, 44th Floor
   Los Angeles, CA 90017-5844
12  Telephone:      (213) 243-4000
   Facsimile:      (213) 243-4199
13  eric.shapland@arnoldporter.com
14
   Attorneys for Defendant
15  Mallinckrodt ARD LLC and
   Mallinckrodt plc
16

SCHNEIDER WALLACE COTTRELL
KONECKY LLP
Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:      (415) 421-7100
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mweiler@schneiderwallace.com
kbates@schneiderwallace.com

Attorneys for Plaintiff
Health Care Service Corporation
**[Additional counsel on signature page]**

17

18              SUPERIOR COURT OF THE STATE OF CALIFORNIA
19                          COUNTY OF ALAMEDA
20

21  HEALTH CARE SERVICE CORP.,

22                  Plaintiff,

23          v.

24  MALLINCKRODT ARD LLC (f/k/a Mallinckrodt
25  ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and
   MALLINCKRODT plc,
26
                  Defendants.
27

28

Case No. RG20056354

**STIPULATION TO AMEND
BRIEFING SCHEDULE AND
[PROPOSED] ORDER**

Dept:           19
Judge:          Hon. Stephen Kaus

Action Filed:   February 27, 2020

---

STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

1    **WHEREAS,** Plaintiff Health Care Service Corp. ("HCSC") filed its Complaint in this

2    action on February 27, 2020 and personally served the Summons and Complaint on Defendants

3    Mallinckrodt ARD, LLC and Mallinckrodt plc (collectively "Mallinckrodt") on March 5, 2020.

4    **WHEREAS,** prior to the assignment of this case to Department 19 and while the Court

5    was closed to filings of civil pleadings motions to help prevent the spread of the coronavirus,

6    HCSC and Mallinckrodt submitted to the Court a stipulated order in which they agreed to a

7    briefing schedule on Mallinckrodt's pleadings motions under which Mallinckrodt would "serve

8    and (if the Court is accepting such filings) file a demurrer or answer to the Complaint … [on] May

9    20, 2020," HCSC would "file any brief in opposition to a demurrer [on] June 5, 2020," and

10   Mallinckrodt would "file a reply in support of a demurrer [on] June 19, 2020."

11   **WHEREAS,** in their stipulation, the parties also requested an extension of the page limits

12   to allow 25 pages for the opening memorandum, 25 pages for the opposition, and 12 pages for the

13   reply, given that the claims in the Complaint cover five different categories of conduct and arise

14   under more than 30 states' laws.

15   **WHEREAS,** on May 12, 2020 the Court entered an order approving HCSC and

16   Mallinckrodt's stipulation on a briefing schedule and page-limit extensions.

17   **WHEREAS,** on May 19, 2020, the Court entered an order setting the hearing on

18   Mallinckrodt's coming pleading motions for June 26, 2020, and Mallinckrodt requested a hearing

19   reservation for that date but did not receive a response.

20   **WHEREAS,** on May 20, 2020 Mallinckrodt placed in the Court's filing drop box and

21   served a Notice of Demurrer and Demurrer to HCSC's Complaint, a Notice of Motion and Motion

22   to Strike Allegations from Plaintiff HCSC's Complaint, and a Request for Judicial Notice in

23   Support of the Defendant Mallinckrodt Entities' Demurrer and Motion to Strike.

24   **WHEREAS,** on May 22, 2020, this case was reassigned to Department 19 and all

25   previously scheduled hearings were vacated.

26   **WHEREAS,** on May 27, 2020, the Court's clerk returned Mallinckrodt's May 20 filing

27   for the lack of a hearing reservation number from Department 19.

28

- 2 -
STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

Ex. 34
p. 522

1   **WHEREAS,** on May 28, 2020 Mallinckrodt reserved a hearing date in Department 19 for

2   its demurrer and motion to strike of August 5, 2020, reservation #(s) R-2179414 -Demurrer & R-

3   2179416 -Motion To Strike, filed its papers with the new reservation numbers, department

4   assignment, and hearing date, and it re-served its papers with the updated hearing information.

5   **NOW THEREFORE,** pursuant to Cal. R. Court, Rules 3.501(17) and 3.503, the parties

6   submit this Stipulation and [Proposed] Order and request the Court's confirmation of the Court's

7   May 12 Order approving the page-limit extensions for briefing on Mallinckrodt's pleading

8   motions and the Court's consent to the revised briefing scheduled proposed herein. HCSC and

9   Mallinckrodt agree that (1) HCSC should have up until June 23, 2020 to file responses to

10  Mallinckrodt's demurrer, motion to strike, and request for judicial notice, and (2) Mallinckrodt

11  should have until July 21, 2020 to file reply briefs.

12  **IT IS SO STIPULATED.**

13

14  Dated: May 29, 2020                    By: *Matthew Weiler (with consent by DES)*

15                                         Todd M. Schneider (SBN 158253)
                                           Jason H. Kim (SBN 220279)
16                                         Matthew S. Weiler (SBN 236052)
                                           Kyle G. Bates (SBN 299114)
17                                         **SCHNEIDER WALLACE**
                                           **COTTRELL KONECKY LLP**
18                                         2000 Powell Street, Suite 1400
                                           Emeryville, CA 94608
19                                         Telephone:    (415) 421-7100
                                           TSchneider@schneiderwallace.com
20                                         JKim@schneiderwallace.com
                                           MWeiler@schneiderwallace.com
21                                         KBates@schneiderwallace.com

22
                                           **LOWEY DANNENBERG, P.C.**
23                                         Peter D. St. Phillip *(PHV* to be filed)
                                           44 South Broadway, Suite 1100
24                                         White Plains, NY 10601
                                           Telephone:    (914) 997-0500
25                                         pstPhillip@lowey.com

26

27

28

- 3 -

STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

Renee A. Nolan *(PHV* to be filed*)*
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone:    (215) 399-4770
molan@lowey.com

*Counsel for Plaintiff Health Care Service
Corporation*

Dated:  May 29, 2020               By: _____
                                         D. Eric Shapland
                                         **ARNOLD & PORTER KAYE
                                         SCHOLER LLP**
                                         777 South Figueroa Street, 44th Floor
                                         Los Angeles, CA 90017-5844
                                         Telephone:    (213) 243-4000
                                         Facsimile:    (213) 243-4199
                                         eric.shapland@arnoldporter.com

                                         *Attorneys for Defendants Mallinckrodt ARD
                                         LLC  and Mallinckrodt plc*

**IT IS SO ORDERED:**

Dated: _____     By: _____
                                         HON. JUDGE STEPHEN KAUS
                                         OF THE SUPERIOR COURT
                                         FOR THE COUNTY OF ALAMEDA

- 4 -
STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

COURTESY COPY
ENDORSED
FILED
ALAMEDA COUNTY

MAY 2 9 2020

CLERK OF THE SUPERIOR COURT
JERRIE MOYER
Deputy

1   ARNOLD & PORTER KAYE SCHOLER LLP
2   Matthew M. Wolf (*PHV* to be filed)
    Laura S. Shores (*PHV* to be filed)
3   Sonia Kuester Pfaffenroth (SBN 223984)
    Michael B. Bernstein (*PHV* to be filed)
4   Adam M. Pergament (SBN 267557)
    601 Massachusetts Avenue, N.W.
5   Washington, D.C. 20001-3743
6   Telephone:   (202) 942-5000
    Facsimile:   (202) 942-5999
7   matthew.wolf@arnoldporter.com
    laura.shores@arnoldporter.com
8   sonia.pfaffenroth@arnoldporter.com
    michael.b.bernstein@arnoldporter.com
9   adam.pergament@arnoldporter.com

10
11  D. Eric Shapland (SBN 193853)
    777 South Figueroa Street, 44th Floor
12  Los Angeles, CA 90017-5844
    Telephone:   (213) 243-4000
13  Facsimile:   (213) 243-4199
    eric.shapland@arnoldporter.com

14

15  Attorneys for Defendant
    Mallinckrodt ARD LLC and
16  Mallinckrodt plc

SCHNEIDER WALLACE COTTRELL
KONECKY LLP
Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:   (415) 421-7100
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mweiler@schneiderwallace.com
kbates@schneiderwallace.com

Attorneys for Plaintiff
Health Care Service Corporation
**[Additional counsel on signature page]**

17

18              SUPERIOR COURT OF THE STATE OF CALIFORNIA

19                          COUNTY OF ALAMEDA

20

21  HEALTH CARE SERVICE CORP.,                 Case No. RG20056354

22              Plaintiff,                      **STIPULATION TO AMEND
                                                BRIEFING SCHEDULE AND
23      v.                                      [PROPOSED] ORDER**

24  MALLINCKRODT ARD LLC (f/k/a Mallinckrodt
25  ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and    Dept:        19
    MALLINCKRODT plc,                           Judge:       Hon. Stephen Kaus
26
                Defendants.                     Action Filed:  February 27, 2020
27

28

    ———————————————————————————————————————
              STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

1    **WHEREAS,** Plaintiff Health Care Service Corp. ("HCSC") filed its Complaint in this

2   action on February 27, 2020 and personally served the Summons and Complaint on Defendants

3   Mallinckrodt ARD, LLC and Mallinckrodt plc (collectively "Mallinckrodt") on March 5, 2020.

4    **WHEREAS,** prior to the assignment of this case to Department 19 and while the Court

5   was closed to filings of civil pleadings motions to help prevent the spread of the coronavirus,

6   HCSC and Mallinckrodt submitted to the Court a stipulated order in which they agreed to a

7   briefing schedule on Mallinckrodt's pleadings motions under which Mallinckrodt would "serve

8   and (if the Court is accepting such filings) file a demurrer or answer to the Complaint … [on] May

9   20, 2020," HCSC would "file any brief in opposition to a demurrer [on] June 5, 2020," and

10   Mallinckrodt would "file a reply in support of a demurrer [on] June 19, 2020."

11    **WHEREAS,** in their stipulation, the parties also requested an extension of the page limits

12   to allow 25 pages for the opening memorandum, 25 pages for the opposition, and 12 pages for the

13   reply, given that the claims in the Complaint cover five different categories of conduct and arise

14   under more than 30 states' laws.

15    **WHEREAS,** on May 12, 2020 the Court entered an order approving HCSC and

16   Mallinckrodt's stipulation on a briefing schedule and page-limit extensions.

17    **WHEREAS,** on May 19, 2020, the Court entered an order setting the hearing on

18   Mallinckrodt's coming pleading motions for June 26, 2020, and Mallinckrodt requested a hearing

19   reservation for that date but did not receive a response.

20    **WHEREAS,** on May 20, 2020 Mallinckrodt placed in the Court's filing drop box and

21   served a Notice of Demurrer and Demurrer to HCSC's Complaint, a Notice of Motion and Motion

22   to Strike Allegations from Plaintiff HCSC's Complaint, and a Request for Judicial Notice in

23   Support of the Defendant Mallinckrodt Entities' Demurrer and Motion to Strike.

24    **WHEREAS,** on May 22, 2020, this case was reassigned to Department 19 and all

25   previously scheduled hearings were vacated.

26    **WHEREAS,** on May 27, 2020, the Court's clerk returned Mallinckrodt's May 20 filing

27   for the lack of a hearing reservation number from Department 19.

28

- 2 -
STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

1     **WHEREAS,** on May 28, 2020 Mallinckrodt reserved a hearing date in Department 19 for

2   its demurrer and motion to strike of August 5, 2020, reservation #(s) R-2179414 -Demurrer & R-

3   2179416 -Motion To Strike, filed its papers with the new reservation numbers, department

4   assignment, and hearing date, and it re-served its papers with the updated hearing information.

5     **NOW THEREFORE,** pursuant to Cal. R. Court, Rules 3.501(17) and 3.503, the parties

6   submit this Stipulation and [Proposed] Order and request the Court's confirmation of the Court's

7   May 12 Order approving the page-limit extensions for briefing on Mallinckrodt's pleading

8   motions and the Court's consent to the revised briefing scheduled proposed herein. HCSC and

9   Mallinckrodt agree that (1) HCSC should have up until June 23, 2020 to file responses to

10   Mallinckrodt's demurrer, motion to strike, and request for judicial notice, and (2) Mallinckrodt

11   should have until July 21, 2020 to file reply briefs.

12     **IT IS SO STIPULATED.**

13

14   Dated:  May 29, 2020              By:   *Matthew Weiler* (with consent by DES)

15                                   Todd M. Schneider (SBN 158253)

16                                   Jason H. Kim (SBN 220279)
                                    Matthew S. Weiler (SBN 236052)

17                                   Kyle G. Bates (SBN 299114)

18                                   **SCHNEIDER WALLACE**
                                    **COTTRELL KONECKY LLP**

19                                   2000 Powell Street, Suite 1400
                                    Emeryville, CA 94608

20                                   Telephone:     (415) 421-7100
                                  TSchneider@schneiderwallace.com

21                                   JKim@schneiderwallace.com
                                  MWeiler@schneiderwallace.com

22                                   KBates@schneiderwallace.com

23                                   **LOWEY DANNENBERG, P.C.**
                                  Peter D. St. Phillip *(PHV* to be filed)

24                                   44 South Broadway, Suite 1100
                                  White Plains, NY 10601

25                                   Telephone:     (914) 997-0500
                                  pstPhillip@lowey.com

26

27

28

STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

1

2

3

4

5

6

7    Dated:  May 29, 2020

8

9

10

11

12

13

14

15    **IT IS SO ORDERED:**

16

17    Dated: _____

18

19

20

21

22

23

24

25

26

27

28

Renee A. Nolan *(PHV* to be filed*)*
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone:    (215) 399-4770
molan@lowey.com

*Counsel for Plaintiff Health Care Service Corporation*

By:  _____
D. Eric Shapland
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:    (213) 243-4000
Facsimile:    (213) 243-4199
eric.shapland@arnoldporter.com

*Attorneys for Defendants Mallinckrodt ARD LLC  and Mallinckrodt plc*

By: _____
HON. JUDGE STEPHEN KAUS
OF THE SUPERIOR COURT
FOR THE COUNTY OF ALAMEDA

- 4 -

STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

ARNOLD & PORTER KAYE SCHOLER LLP
Matthew M. Wolf (*PHV* to be filed)
Laura S. Shores (*PHV* to be filed)
Sonia Kuester Pfaffenroth (SBN 223984)
Michael B. Bernstein (*PHV* to be filed)
Adam M. Pergament (SBN 267557)
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001-3743
Telephone:      (202) 942-5000
Facsimile:      (202) 942-5999
matthew.wolf@arnoldporter.com
laura.shores@arnoldporter.com
sonia.pfaffenroth@arnoldporter.com
michael.b.bernstein@arnoldporter.com
adam.pergament@arnoldporter.com

D. Eric Shapland (SBN 193853)
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:      (213) 243-4000
Facsimile:      (213) 243-4199
eric.shapland@arnoldporter.com

Attorneys for Defendant
Mallinckrodt ARD LLC and
Mallinckrodt plc

SCHNEIDER WALLACE COTTRELL
KONECKY LLP
Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:      (415) 421-7100
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mweiler@schneiderwallace.com
kbates@schneiderwallace.com

Attorneys for Plaintiff
Health Care Service Corporation
**[Additional counsel on signature page]**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| HEALTH CARE SERVICE CORP.,<br><br>                    Plaintiff,<br><br>          v.<br><br>MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT plc,<br><br>                    Defendants. | Case No. RG20056354<br><br>**STIPULATION TO AMEND BRIEFING SCHEDULE AND [PROPOSED] ORDER**<br><br>Dept:              19<br>Judge:            Hon. Stephen Kaus<br><br>Action Filed:    February 27, 2020 |

STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

**WHEREAS,** Plaintiff Health Care Service Corp. ("HCSC") filed its Complaint in this action on February 27, 2020 and personally served the Summons and Complaint on Defendants Mallinckrodt ARD, LLC and Mallinckrodt plc (collectively "Mallinckrodt") on March 5, 2020.

**WHEREAS,** prior to the assignment of this case to Department 19 and while the Court was closed to filings of civil pleadings motions to help prevent the spread of the coronavirus, HCSC and Mallinckrodt submitted to the Court a stipulated order in which they agreed to a briefing schedule on Mallinckrodt's pleadings motions under which Mallinckrodt would "serve and (if the Court is accepting such filings) file a demurrer or answer to the Complaint … [on] May 20, 2020," HCSC would "file any brief in opposition to a demurrer [on] June 5, 2020," and Mallinckrodt would "file a reply in support of a demurrer [on] June 19, 2020."

**WHEREAS,** in their stipulation, the parties also requested an extension of the page limits to allow 25 pages for the opening memorandum, 25 pages for the opposition, and 12 pages for the reply, given that the claims in the Complaint cover five different categories of conduct and arise under more than 30 states' laws.

**WHEREAS,** on May 12, 2020 the Court entered an order approving HCSC and Mallinckrodt's stipulation on a briefing schedule and page-limit extensions.

**WHEREAS,** on May 19, 2020, the Court entered an order setting the hearing on Mallinckrodt's coming pleading motions for June 26, 2020, and Mallinckrodt requested a hearing reservation for that date but did not receive a response.

**WHEREAS,** on May 20, 2020 Mallinckrodt placed in the Court's filing drop box and served a Notice of Demurrer and Demurrer to HCSC's Complaint, a Notice of Motion and Motion to Strike Allegations from Plaintiff HCSC's Complaint, and a Request for Judicial Notice in Support of the Defendant Mallinckrodt Entities' Demurrer and Motion to Strike.

**WHEREAS,** on May 22, 2020, this case was reassigned to Department 19 and all previously scheduled hearings were vacated.

**WHEREAS,** on May 27, 2020, the Court's clerk returned Mallinckrodt's May 20 filing for the lack of a hearing reservation number from Department 19.

- 2 -

STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

1    **WHEREAS,** on May 28, 2020 Mallinckrodt reserved a hearing date in Department 19 for

2    its demurrer and motion to strike of August 5, 2020, reservation #(s) R-2179414 -Demurrer & R-

3    2179416 -Motion To Strike, filed its papers with the new reservation numbers, department

4    assignment, and hearing date, and it re-served its papers with the updated hearing information.

5    **NOW THEREFORE,** pursuant to Cal. R. Court, Rules 3.501(17) and 3.503, the parties

6    submit this Stipulation and [Proposed] Order and request the Court's confirmation of the Court's

7    May 12 Order approving the page-limit extensions for briefing on Mallinckrodt's pleading

8    motions and the Court's consent to the revised briefing scheduled proposed herein. HCSC and

9    Mallinckrodt agree that (1) HCSC should have up until June 23, 2020 to file responses to

10   Mallinckrodt's demurrer, motion to strike, and request for judicial notice, and (2) Mallinckrodt

11   should have until July 21, 2020 to file reply briefs.

12   **IT IS SO STIPULATED.**

13

14   Dated: May 29, 2020                          By:   *Matthew Weiler* (with consent

15                                                      Todd M. Schneider (SBN 158253) by DES)

                                                        Jason H. Kim (SBN 220279)
16                                                      Matthew S. Weiler (SBN 236052)
                                                        Kyle G. Bates (SBN 299114)
17                                                      **SCHNEIDER WALLACE**
                                                        **COTTRELL KONECKY LLP**
18                                                      2000 Powell Street, Suite 1400
                                                        Emeryville, CA 94608
19                                                      Telephone:     (415) 421-7100
                                                        TSchneider@schneiderwallace.com
20                                                      JKim@schneiderwallace.com
                                                        MWeiler@schneiderwallace.com
21                                                      KBates@schneiderwallace.com

22
                                                        **LOWEY DANNENBERG, P.C.**
23                                                      Peter D. St. Phillip *(PHV* to be filed)
                                                        44 South Broadway, Suite 1100
24                                                      White Plains, NY 10601
                                                        Telephone:     (914) 997-0500
25                                                      pstPhillip@lowey.com

26

27

28
                                     - 3 -

1

2

3

4

5

6

7  Dated: May 29, 2020

8

9

10

11

12

13

14

15  **IT IS SO ORDERED:**

16

17  Dated: _____

18

19

20

21

22

23

24

25

26

27

28

**Renee A. Nolan** *(PHV* to be filed*)*
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone:     (215) 399-4770
molan@lowey.com

*Counsel for Plaintiff Health Care Service
Corporation*

By: _____

D. Eric Shapland
**ARNOLD & PORTER KAYE
SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:     (213) 243-4000
Facsimile:      (213) 243-4199
eric.shapland@arnoldporter.com

*Attorneys for Defendants Mallinckrodt ARD
LLC  and Mallinckrodt plc*

By: _____
HON. JUDGE STEPHEN KAUS
OF THE SUPERIOR COURT
FOR THE COUNTY OF ALAMEDA

- 4 -

STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE

# EXHIBIT 35

Schneider Wallace Cottrell Konecky
Wotkyns LLP
Attn:  Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA   94608____

Mallinckrodt ARD LLC

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Health Care Service Corp<br><br>_Plaintiff/Petitioner(s)_<br><br>VS.<br><br>Mallinckrodt ARD LLC<br>_Defendant/Respondent(s)_<br>(Abbreviated Title) | No. <u>RG20056354</u><br><br>Stipulation and Order Re: Other Ex Parte Granted |

IT IS ORDERED that the Defendant's Stipulation and Order Re: Other Ex Parte is granted and the terms are approved.

Dated:  06/02/2020

_____
Judge Stephen Kaus

# EXHIBIT 36

**FILED BY FAX**
ALAMEDA COUNTY

June 19, 2020

CLERK OF
THE SUPERIOR COURT
By Keisha Ghee, Deputy

CASE NUMBER:

**RG20056354**

1  Todd M. Schneider (SBN 158253)
   Jason H. Kim (SBN 220279)
2  Matthew S. Weiler (SBN 236052)
   Kyle G. Bates (SBN 299114)
3  **SCHNEIDER WALLACE**
   **COTTRELL KONECKY LLP**
4  2000 Powell Street, Suite 1400
   Emeryville, CA 94608
5  Telephone: (415) 421-7100
   TSchneider@schneiderwallace.com
6  JKim@schneiderwallace.com
   MWeiler@schneiderwallace.com
7  KBates@schneiderwallace.com

8

9  Peter D. St. Phillip (*Pro hac vice* to be filed)
   **LOWEY DANNENBERG, P.C.**
10 44 South Broadway, Suite 1100
   White Plains, NY 10601
11 Telephone: (914) 997-0500
   PStPhillip@lowey.com
12

13 [Additional counsel on signature page]

14      **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15      **IN AND FOR THE COUNTY OF ALAMEDA**

16

17 | HEALTH CARE SERVICE CORP., | Case No.: RG20056354 |

18 |          Plaintiff | Hon. Stephen Kaus |

19

20 |     v. | **CASE MANAGEMENT CONFERENCE STATEMENT FOR JUNE 23, 2020 CASE MANGEMENT CONFERENCE** |

21 | MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT PLC, |

22

23

24 |          Defendants |

25

26

27

28

**Ex. 36**
p. 536

**I.      INTRODUCTION**

Plaintiff Health Care Service Corporation and Defendants Mallinckrodt ARD LLC ("Mallinckrodt") and Mallinckrodt plc have met and conferred in advance of the Case Management Conference scheduled for June 23, 2020.

**II.     PLAINTIFF'S STATEMENT OF DISPUTED FACTUAL AND LEGAL ISSUES**

Health Care Service Corp. ("HCSC"), a Blue Cross licensee that provides health care services and purchases pharmaceutical products for thousands of patients, brings claims against Mallinckrodt relating to anticompetitive conduct and fraudulent sales and marketing practices for H.P.Acthar® Gel ("Acthar"). Acthar is an adrenocorticotropic hormone ("ACTH") treatment with humble beginnings. Developed in 1952, it is derived from the pituitary glands slaughtered pigs, and is a critical treatment used to control infantile seizures, a rare disease with around 1,200 cases per year. After Mallinckrodt's predecessor Questcor Pharmaceuticals, Inc. ("Questcor") acquired the drug in 2001, the price leapt 97,500% from $40 per vial in 2001 to over $39,000 in 2018 for that same vial.

HCSC alleges this price increase is the result of a complex, multipart scheme involving a monopoly, the abuse of exclusive distribution agreements, bribery, racketeering, fraud, and other deceptive and unfair practices that have imposed exorbitant costs on those financially responsible for the costs of the drug, including third-party payors ("TPPs") like HCSC here. No other explanation exists for these unconscionable price increases, which by far outstrip the prices of any inputs, such as pigs.

Mallinckrodt manufactures Acthar and orchestrated a monopoly in the market for ACTH drugs, through its control of pricing and distribution of Acthar. Questcor initiated a series of escalating price increases, while at the same time taking measures to ensure that competing ACTH products and channels of distribution were eliminated.

Starting in 2007, CuraScript SD became the exclusive distributor of Acthar. Questcor/Mallinckrodt consolidated this control by operating Express Scripts in a vertically integrated operation. This dynamic allowed Questcor/Mallinckrodt to control prices of Acthar. In 2013, Questcor acquired the rights to develop a synthetic ACTH drug called Synacthen Depot

**Ex. 36**
p. 537

1   ("Synacthen"). Through Questcor, Mallinckrodt kept Synacthen off the market by out-bidding

2   potential buyers at the last minute and has 'mothballed' Synacthen after acquiring it.

3        Mallinckrodt's multi-faceted campaign of fraudulent sales and marketing tactics further

4   inflated prices. Mallinckrodt used a charitable foundation, the Chronic Disease Fund ("CDF"), for

5   the illegal purpose of paying patient co-pays for Acthar prescriptions only, instead of any medically

6   appropriate therapy. Mallinckrodt created, controlled, and financed multiple CDF co-pay funds for

7   patients prescribed Acthar, and only Acthar, under the guise of creating disease-specific funds such

8   as the "MS Exacerbation Fund." The co-pay funds expanded the prescription base of Acthar beyond

9   infant spasms to other diseases, while helping to overcome any patient or doctor resistance to

10   prescribing Acthar due to the high cost.

11        To encourage wider prescription, Mallinckrodt developed and promoted an "off label" dosing

12   regimen that only required patients to use Acthar for five days, even though the typical regimen is

13   several vials over two to three weeks. Although highly lucrative for Mallinckrodt, this dosing

14   regimen was not FDA approved, not indicated on the Acthar label, and not supported by clinical

15   evidence of its efficacy. However, this shorter dosing protocol lent credibility to Mallinckrodt's

16   unsupported claim of superior tolerability for Acthar because patients reported fewer side effects and

17   made the price seem affordable when compared with the cost of administering the drug according to

18   the label's instructions.

19        Finally, Mallinckrodt funneled millions of dollars to doctors through the facade of speaking

20   engagements and sham clinical research studies to promote the foregoing and reward high

21   prescribers of the drug. These payments were necessary because in addition to Acthar's expense, its

22   mechanism of action requires refrigeration and injection into the body, making it more difficult for

23   patients to use and doctors less inclined to prescribe it. HCSC contends that under the circumstances

24   these payments for sham speaking engagements and studies are 'bribes' and not legitimate education

25   or marketing programs.

26        The foregoing facts give rise to the following legal issues:

27        1.   Whether Defendant fraudulently concealed any of the foregoing facts.

28

**Ex. 36**
p. 538

2. Whether Defendant violated New Jersey's Racketeer Influenced and Corrupt Organizations Act ("NJ RICO"), N.J.S.A. §§ 2C:41-1(b), 2C:41-2(c), et al.

3. Whether Defendant violated Section 2C:41-2(d) of NJ RICO by conspiring to engage in the foregoing acts.

4. Whether Defendant violated state antitrust laws by monopolizing the market for ACTH.

5. Whether Defendant violated state antitrust law by entering into agreements in restraint of trade relating to Acthar.

6. Whether Defendant engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of state consumer protection statutes.

7. Whether Defendant's conduct constitutes fraud under state laws.

8. Whether Defendant violated state insurance fraud laws.

9. Whether Defendant profited and benefited unjustly from the forgoing facts.

III. **DEFENDANTS' STATEMENT OF DISPUTED FACTUAL AND LEGAL ISSUES**

HCSC is one of the nation's largest healthcare insurers. It claims that for eight years it paid too much for too many prescriptions for Acthar, despite having contemporaneously reviewed for medical necessity each Acthar prescription that it covered. (Cmplt. ¶ 16, ¶ 271.) Acthar is a unique, complex injectable biopharmaceutical product that is approved by the FDA for use in nineteen serious and hard-to-treat rare medical conditions, such as infantile spasms, lupus, multiple sclerosis, nephrotic syndrome, and rheumatoid arthritis. While HCSC labels a 2007 price increase for Acthar "price gouging," HCSC admits that Mallinckrodt's predecessor-in-interest Questcor raised the price to pull Acthar out of, as HCSC describes it, a "financial sinkhole" to "save" the product from being removed from the marketplace. (Cmplt. ¶¶ 7-9.) Thereafter, the price of Acthar has risen at only five percent per year, not counting inflation. (*Id.*)

Saving Acthar was critically important for the small patient population that needs it. Questcor's 2007 price increase was necessary to make manufacturing and selling the injectable specialty therapy viable. Questcor and later Mallinckrodt (whose parent Defendant Mallinckrodt plc acquired Questcor in 2014) made significant investments in medical research into the product's safety and efficacy for existing and new indications as well as educating prescribers about Acthar's FDA-

Ex. 36
p. 539

1  approved indications so the therapy is appropriately prescribed to the patients for whom it is a suitable

2  treatment.  Questcor also improved the distribution system for Acthar by shifting to a specialty-

3  pharmaceutical distribution model, which provides greater care, speed, and expertise in ensuring this

4  perishable specialty therapeutic is efficiently delivered to patients who need it urgently.  As is typical

5  for specialty pharmaceutical products, Questcor also established a patient support program, or "hub,"

6  that helps patients for whom Acthar has been prescribed submit claims for insurance coverage, appeal

7  denials of coverage, secure financial assistance with co-payment obligations, coordinate home

8  delivery, and provides injection training and support.

9       HCSC attempts to recast Acthar's turnaround as the result of illegal monopoly, bribery,

10  racketeering, and fraud by Questcor, after it purchased the rights to Acthar in 2001, and later by

11  Mallinckrodt, which Defendant Mallinckrodt plc purchased from Questcor in 2014.  In essence,

12  HCSC's suit seeks to retroactively renegotiate the price it paid over the last eight years for medically

13  necessary prescriptions.  Once stripped of HCSC's incendiary labels, none of the categories of alleged

14  misconduct supports the Complaint's nine counts under forty states' laws.

15       HCSC complains about Questcor's enhancements to the distribution system for Acthar using

16  nefarious phrases like "exclusive" and "vertically integrated operation," but exclusive distribution and

17  other "vertical" agreements are presumptively procompetitive.

18       HCSC further alleges that Questcor violated 32 states' antitrust laws when, in June 2013,

19  Questcor  acquired the development rights to a synthetic ACTH product called Synacthen Depot

20  ("Synacthen"), which is not FDA approved, and thus secured an illegal monopoly in the "ACTH drug

21  market."  But HCSC's alleged market definition is legally deficient, and HCSC does not and cannot

22  plead injury resulting from the acquisition.  If these claims were not subject to dismissal, the

23  appropriate relevant antitrust market, Synacthen's realistic prospects for FDA approval, and whether

24  the acquisition in fact injured both competition and HCSC would be significant factual and legal issues

25  in dispute.  Questcor acquired rights to Synacthen to continue its sale in various countries outside the

26  United States where it had received approval and also to explore indications for which it might have a

27  potential for FDA-approval for use in the United States.  Infantile spasms, for which Acthar is the

28  standard of care, would not be among those indications without a reformulation to remove benzyl

5

1   alcohol, which the FDA and doctors in the United States likely would be reluctant to administer to

2   infants. Synacthen's viability as a US product proved to be less than initially hoped. This fact has

3   been demonstrated in the real world because three years ago, Mallinckrodt divested its rights to

4   develop and market Synacthen for infantile spasms and nephrotic syndrome in the United States, yet

5   Synacthen is still not FDA approved for any indication, and the sublicensee recently announced that

6   Synacthen's "development is no longer feasible in a timely manner."

7         HCSC also complains that Mallinckrodt has funded programs that help patients insured by

8   HCSC who have been prescribed Acthar pay their co-payments for the therapy. But Mallinckrodt's

9   conduct in regard to those programs was lawful and consistent with relevant industry guidance, and

10   HCSC fails to state a claim otherwise; in any event, because the alleged misconduct has been well

11   known since 2013, HCSC's claims are time barred. Under these claims, Mallinckrodt's intent to

12   operate in compliance with applicable laws, and the effect of co-payment assistance on utilization

13   would be issues in dispute.

14         Similarly, HCSC attempts to label Questcor's and Mallinckrodt's respective significant

15   investments in medical research and education from 2011 to the present as "bribes" paid to doctors in

16   exchange for writing Acthar prescriptions. But HCSC pleads no facts supporting that

17   mischaracterization. If these claims were not subject to dismissal, the parties would dispute whether

18   payments to doctors were legitimate compensation for services, whether prescriptions written by the

19   subject doctors were medically appropriate, and HCSC's policies and practices concerning coverage

20   of Acthar.

21         HCSC also alleges that Questcor promoted Acthar for an off-label dosing regimen to treat

22   multiple sclerosis. Doctors are, of course, free to prescribe off label. HCSC fails to identify with the

23   requisite particularity any unlawful promotional activity by anyone at Questcor or Mallinckrodt to any

24   particular doctor, let alone a connection between any such alleged promotion, reliance thereon, and

25   reimbursement by HCSC, which mandates dismissal of HCSC's fraud-based claims. If these claims

26   were not subject to dismissal, promotional activity by Questcor and Mallinckrodt for Acthar, and

27   HCSC's policies and practices concerning coverage of Acthar would be issues in dispute.

28

**Ex. 36**
p. 541

## IV.  AGREED UPON AND DISPUTED CASE MANAGEMENT ISSUES

A hearing on Defendant's demurrer and motion to strike is scheduled for August 5, 2020, at 3 PM in Department 19.  The parties propose a staged approach to discovery under which the they begin with a four-month period for document discovery and then reconvene for a case management conference in November, when more is known about the scope of the case and the impact of the pandemic on the pace of litigation, to schedule subsequent stages of the case.

In the event the Court is inclined to set a more complete case schedule at this time, the parties jointly and tentatively propose as follows:

| Date | Event |
| --- | --- |
| June 30, 2021 | Fact discovery deadline |
| July 2021 | Parties to conduct mediation at a time and place to be determined |
| September 22, 2021 | Plaintiff to produce expert reports |
| November 19, 2021 | Defendants to produce expert reports |
| January 20, 2022 | Summary judgment or summary adjudication deadline |
| TBD | Trial |

This Court has ordered that it "expects the parties to engage in focused, limited discovery" prior to a hearing on Defendant's demurrer and motion to strike. May 18, 2020 Case Management Order at 2.  To that end, the parties are discussing a preliminary exchange of documents.  Under that exchange, Mallinckrodt will provide to HCSC documents that Mallinckrodt has produced in government investigations and other civil actions relating to the conduct alleged in the Complaint, along with an index of custodians and search terms.  HCSC will provide to Mallinckrodt its claims data and purchase data, and will meet and confer with Mallinckrodt concerning whether there are other documents appropriate for early exchange.  Specifically, Mallinckrodt requested that two other categories of documents be part of this initial exchange: (a) pre-authorization claim forms for Acthar prescriptions and (b) the allocation between HCSC and Medicare of the cost of Acthar prescriptions for members of HCSC's Medicare Part D plans.  HCSC, however, wants to meet and confer over any such productions.  HCSC will also provide Mallinckrodt with requested information so that they can

**Ex. 36**
p. 542

1  begin a discussion regarding the designation of document custodians for HCSC's collection and

2  production of custodial documents.

3      The parties agree that they will submit for entry by the Court a Protective Order, and

4  stipulations concerning electronically stored information ("ESI") and expert discovery. Should the

5  parties not agree on certain aspects of these orders, they will meet and confer to resolve their

6  differences and, if they cannot, they will abide by the Court's procedures to resolve their differences.

7      The parties have discussed the use of alternative dispute resolution ("ADR") and mediation

8  services, as provided for the Court's May 21, 2020 Notice of Reassignment. The parties have

9  proposed provision for private mediation as part of their proposed case schedule.

10      A.    Plaintiff's Position on Additional Case Management Issues and Discovery

11      HCSC believes that periodic status conferences will help with the progress of this litigation.

12  HCSC proposes that the Court conduct bi-monthly status conferences, and that the parties submit a

13  statement outlining any outstanding issues one week before any scheduled conference. In light of the

14  COVID-19 pandemic, which has impacted the Court and parties alike, HCSC proposes to conduct

15  status conferences by video conference or some other method convenient to the Court. Based on

16  Defendants' proposal, described below, to conduct "substantial" discovery against HCSC when the

17  most germane issues with respect to HCSC will be the straight-forward matters of the nature and

18  extent HCSC's purchases, HCSC anticipates that periodic conferences will assist the parties in

19  conducting efficient and focused discovery.

20      B.    Defendants' Position on Additional Case Management Issues and Discovery

21      Mallinckrodt urges the Court to consider strongly accepting the parties' proposal to stage

22  discovery. HCSC challenges five categories of conduct alleging nine separate counts under the laws

23  of over forty different states, and it places at issue all Acthar prescriptions that HCSC covered back to

24  2011. As previewed above, there are several grounds on which to dismiss and/or strike the Complaint

25  in its entirety or to substantially narrow the scope of the case by eliminating entire categories of

26  alleged misconduct or narrowing the relevant period. Courts addressing similar claims by other

27  Acthar payors have substantially narrowed or dismissed the actions on the pleadings.[1]

28
_____

[1] *See MSP Recovery Claims, Series LLC, et al. v. Mallinckrodt ARD Inc*., No. 3:20-cv-50056 (N.D.
Ill. Mar. 23, 2020) (dismissing, with leave to amend, complaint for failure to plead standing);

Ex. 36
p. 543

1    Once the scope of the case is established, discovery will not be a one-way street. Many of

2  HCSC's claims are fraud-based claims that, on a prescription-by-prescription basis, raise questions

3  about what was said, whether it was relied on, and whether the statement or other conduct caused

4  HCSC to cover an Acthar prescription that it otherwise would not have covered. HCSC will also have

5  discoverable admissions regarding the alternative treatments to Acthar for the various conditions for

6  which it is used, and those admissions will bear on the antitrust claims. In addition, discovery into

7  HCSC's actual or constructive knowledge of its claims could give rise to statute of limitations

8  defenses given that it complains about very old conduct.

9    With respect to HCSC's proposal to schedule regular conferences with the Court, Mallinckrodt

10  draws some confidence from the parties' ability to cooperate informally to date in this action, and it

11  believes that they will be able to informally resolve many discovery disputes as they arise.

12  Mallinckrodt therefore does not think the Court should dedicate some of its limited resources to the

13  resolution of disputes that have not yet arisen.

---

*Humana Inc. v. Mallinckrodt ARD LLC*, No. CV 19-06926 (C.D. Cal. March 9, 2020) ("*Humana Order*") (dismissing, with leave to amend, antitrust and tortious interference—but allowing RICO, consumer protection, and common law—claims); *Acument Global Technologies, Inc. v. Mallinckrodt ARD, Inc.*, No. CT-2275-19 (Cir. Ct. Shelby Cty. Tenn. Feb. 21, 2020) (dismissing fraud and consumer protection, but allowing antitrust and unjust enrichment, claims); *Washington Cty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, __ F. Supp. 3d __, No. CV JKB-19-1854, 2020 WL 43016 (D. Md. Jan. 3, 2020) (dismissing action by rejecting fraud and consumer-protection claims); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730 (N.D. Ill. 2019) (dismissing RICO and common-law, but allowing antitrust, claims; *but see Steamfitters Local Union No. 420 v. Mallinckrodt ARD*, LLC, No. 19-cv-03047 (E.D. Pa. Dec. 19, 2019) (denying, without an opinion, motion to dismiss RICO, consumer-protection, and common-law claims); *Int'l Union of Operating Engineers Local 542 v. Mallinckrodt ARD, LLC*, No. 2018-14059 (Pa. Commw. Ct., Montgomery Cty. Jan. 8, 2019) (denying preliminary objections to antitrust-related theories of harm brought under consumer protection statute)

Ex. 36
p. 544

1

2      Dated:  June 16, 2020                        Respectfully submitted:

3

4                                                   **SCHNEIDER WALLACE COTTRELL
                                                    KONECKY LLP**

5                                                   */s/ Matthew S. Weiler*
                                                    Todd M. Schneider (SBN 158253)
6                                                   Jason H. Kim (SBN 220279)
                                                    Matthew S. Weiler (SBN 236052)
7                                                   Kyle G. Bates (SBN 299114)
                                                    2000 Powell Street
8                                                   Suite 1400
                                                    Emeryville, CA 94608
9                                                   (415) 421-7100
                                                    TSchneider@schneiderwallace.com
10                                                  JKim@schneiderwallace.com
                                                    MWeiler@schneiderwallace.com
11                                                  KBates@schneiderwallace.com

12
                                                    **LOWEY DANNENBERG, P.C.**
13                                                  Peter D. St. Phillip (*Pro hac vice* to be filed)
                                                    44 South Broadway, Suite 1100
14                                                  White Plains, NY 10601
                                                    (914) 997-0500
15                                                  PStPhillip@lowey.com

16
                                                    Renee A. Nolan (*Pro hac vice* to be filed)
17                                                  One Tower Bridge
                                                    100 Front Street, Suite 520
18                                                  West Conshohocken, PA 19428
                                                    (215) 399-4770
19                                                  rnolan@lowey.com

20
                                                    *Counsel for Plaintiff Health Care Service
21                                                  Corporation*

22

23

24

25

26

27

28

US 167804944v9
US 167804944v14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARNOLD & PORTER KAYE SCHOLER LLP**

By:        /s/ Eric Shapland (*with permission*)

D. Eric Shapland

777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:    (213) 243-4000
Facsimile:    (213) 243-4199
eric.shapland@arnoldporter.com

*Attorneys for Defendant Mallinckrodt ARD LLC
and Mallinckrodt plc*

Ex. 36
p. 546

# EXHIBIT 37

Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

[*Additional counsel on signature page*]

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF ALAMEDA**

| | |
|---|---|
| HEALTH CARE SERVICE CORP., | Case No. RG20056354 |
| Plaintiff, | **PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE** |
| v. | |
| MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT PLC, | |
| Defendants. | Judge: Hon. Stephen Kaus<br>Location: Dept. 19<br>Hearing: August 5, 2020; 3:00 p.m. |
| | Complaint Filed: February 27, 2020 |
| | Trial Date:   Not Set |

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 37
p. 548

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................................ii

I.  INTRODUCTION ....................................................................................................................... 1

II.  FACTUAL ALLEGATIONS ...................................................................................................... 2

III.  LEGAL STANDARD ON DEMURRER.................................................................................... 4

IV.  ARGUMENT............................................................................................................................... 5

    A.  HCSC Sufficiently Alleges Violations of State Antitrust Law. ........................................... 5

        1.  Mallinckrodt's Conduct Impacted a Relevant Antitrust Market......................... 5

        2.  The Synacthen Acquisition Caused HCSC Injury. ............................................ 7

        3.  HCSC's Allegations of Exclusive Distribution Are Actionable.......................... 9

    B.  Mallinckrodt Has Violated New Jersey's RICO Act. ....................................................... 11

        1.  HCSC's Off-Label Promotion Allegations State a Cause of Action.................. 12

        2.  HCSC's Physician Kickback Allegations State a Cause of Action. ................... 15

    C.  HCSC States a Cause of Action for Tortious Interference With Contracts........................... 17

    D.  Mallinckrodt's Insurance Fraud is Actionable ................................................................. 18

    E.  HCSC's Claims Are Timely.............................................................................................. 19

        1.  Mallinckrodt's Allegations Control and Defeat Mallinckrodt's Arguments from Documents Outside the Pleadings.................................................................... 20

        2.  Fraudulent Concealment Tolls HCSC's Claims. ............................................. 22

        3.  The "Continuing Violation" Doctrine Prevents Dismissal Because Mallinckrodt Continues to Overcharge for Acthar. ............................................................... 22

    F.  Defendants' Motion to Strike Is Improper. ...................................................................... 24

VII.  CONCLUSION......................................................................................................................... 25

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD, LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

# TABLE OF AUTHORITIES

## Cases

*Alch v. Superior Court,*
   122 Cal. App. 4th 339 (2004) .......................................................................... 24

*Allerton v. King,*
   96 Cal. App. 230 (1929) ................................................................................. 24

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,*
   592 F.3d 991 (9th Cir. 2010) .......................................................................... 10

*Allstate Ins. Co. v. Parfrey,*
   830 P.2d 905 (Colo. 1992) .............................................................................. 19

*Am. Pipe & Constr. Co. v. Utah,*
   414 U.S. 538 (1974) ....................................................................................... 20

*AMTRAK v. Morgan,*
   536 U.S. 101 (2002) ....................................................................................... 24

*Andrx Pharms., Inc. v. Biovail Corp. Int'l,*
   256 F.3d 799 (D.C. Cir. 2001) .......................................................................... 9

*Arvizu v. Medtronic Inc.,*
   41 F. Supp. 3d 783 (D. Ariz. 2014) ................................................................ 13

*Batte-Holmgren v. Commissioner of Public Health,*
   281 Conn. 277 (2007) ..................................................................................... 19

*Bernson v. Browning-Ferris Indus.,*
   7 Cal. 4th 926 (1994) ..................................................................................... 22

*Biocad JSC v. F. Hoffmann-La Roche,*
   942 F.3d 88 (2d Cir. 2019) ............................................................................... 9

*Blue Cross of Cal. Inc. v. Insys Therapeutics Inc.,*
   390 F. Supp. 3d 996 (D. Ariz. 2019) .......................................................... 16, 18

*Brandon G. v. Gray,*
   111 Cal.App.4th 29 (2003) .............................................................................. 22

*Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.,*
   2004 U.S. Dist. LEXIS 11552 (E.D. Pa. June 21, 2004) ..................................... 9

*United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA,*
   296 F.Supp.3d 1142 (N.D. Cal. 2017) ............................................................... 6

*City of Rockford v. Mallinckrodt ARD, Inc.,*
   360 F. Supp. 3d 730 (N.D. Ill. 2019) ....................................................... passim

*Cmty. Cause v. Boatwright,*
   124 Cal. App. 3d 888 (1981). ......................................................................... 22

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.,*
   35 Cal. 3d 197 (1983) ................................................................................ 13, 16

*Cort v. Ash,*
   422 U.S. 66 (1975) ......................................................................................... 19

*Costco Wholesale Corp. v. Maleng,*
   522 F.3d 874 (9th Cir. 2008) ............................................................................ 9

*Del E. Webb Corp. v. Structural Materials Co.,*
   123 Cal.App.3d 593 (1981) .......................................................................... 4, 5

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 37
p. 550

*E&L Consult., Ltd. v. Doman Indus. Ltd.,*
   472 F.3d 23 (2nd Cir. 2006) ................................................................................. 10

*Ferrick v. Santa Clara Univ.,*
   231 Cal. App. 4th 1337 (2014) ............................................................................. 4

*Ferraro v. Camarlinghi,*
   161 Cal. App. 4th 509 (2008) ............................................................................... 24

*Fox v. Ethicon Endo-Surgery, Inc.,*
   35 Cal. 4th 797 (2005) .......................................................................................... 22

*Gryczman v. 4550 Pico Partners, Ltd.,*
   107 Cal.App.4th 1 (2003) ..................................................................................... 21

*Humana Inc. v. Mallinckrodt ARD, LLC,*
   2020 U.S. Dist. LEXIS 101378 (C.D. Cal. Mar. 9, 2020) .......................... passim

*In re Avandia Mktg.,*
   804 F.3d 633 (3d Cir. 2015) ................................................................................. 14

*In re Buspirone Patent & Antitrust Litig.,*
   185 F.Supp.2d 363 (S.D.N.Y. 2002) .................................................................... 23

*In re Cipro Cases I & II,*
   61 Cal. 4th 116 (2015) .......................................................................................... 6

*In re Evanston Northwestern Healthcare,*
   2008 U.S. Dist. LEXIS 42437 (N.D. Ill. May 29, 2008) ..................................... 23

*In re Glumetza Antitrust Litig.,*
   2020 U.S. Dist. LEXIS 39649 (N.D. Cal. Mar. 5, 2020) ..................................... 23

*In re Loestrin 24 Antitrust Litig.,*
   261 F.Supp.3d 307 (D.R.I. 2017) ......................................................................... 7

*In re Nat'l Ass'n of Music Merchants, Musical Instruments & Equip. Antitrust Litig.,*
   2011 WL 3702453 (S.D. Cal. Aug. 22, 2011) .............................................. 17, 25

*In re Neurontin Mktg. & Sales Practices Litig.,*
   712 F.3d 21 (1st Cir. 2013) ............................................................................ 14, 15

*In re Nexium (Esomeprazole) Antitrust Litig.,*
   968 F.Supp.2d 367 (D. Mass. 2013) ............................................................ 6, 7, 23

*In re Pre-Filled Propane Tank Antitrust Litig.,*
   860 F.3d 1059 (8th Cir. 2017) .............................................................................. 23

*Klehr v. A.O. Smith Corp.,*
   521 U.S. 179 (1997) .............................................................................................. 22

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,*
   431 F.3d 353 (9th Cir. 2005) ................................................................................ 21

*Lopez v. Sony Electronics, Inc.,*
   5 Cal.5th 627 (2018) ............................................................................................. 22

*Magic Kitchen LLC v. Good Things Int'l., Ltd.,*
   153 Cal.App.4th 1144 (2007) ............................................................................... 14

*McKelvey v. Boeing North American, Inc.,*
   74 Cal.App.4th 151 (1999) ................................................................................... 22

*McWane, Inc. v. FTC,*
   783 F.3d 814 (11th Cir. 2015) .............................................................................. 10

*Med. Res. Corp. v. Ethicon Inc.*,
    2006 U.S. Dist. LEXIS 12845 (C.D. Cal. Feb. 2, 2006) ................................................ 9

*Meijer, Inc. v. Biovail Corp.*,
    533 F.3d 852 (D.C. Cir. 2008) ................................................................................... 9

*Mekbeb v. Westin Hotel*,
    2015 Cal. Super. LEXIS 12481 ................................................................................... 5

*Midwestern Mach. Co., Inc. v. Northwest, Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ................................................................................... 23

*Mishawaka v. Am. Elec. Power Co.*,
    616 F.2d 976 (7th Cir. 1980) ................................................................................... 9

*Napoletano v. CIGNA Healthcare of Connecticut, Inc.*,
    680 A.2d 127 (Conn. 1996) ................................................................................... 19

*Nelson v. Indevus Pharm., Inc.*,
    142 Cal.App.4th 1202 (2006) ................................................................................... 21

*Olivia N. v. Nat'l Brod. Co.*,
    74 Cal. App. 3d 383 (1977) ................................................................................... 13

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,
    50 Cal.3d 1118 (1990) ................................................................................... 17

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*,
    943 F.3d 1243 (9th Cir. 2019) ................................................................................... 13

*PH II, Inc. v. Superior Court*,
    33 Cal. App. 4th 1680 (1995) ................................................................................... 25

*Pierson v. Sharp Mem'l Hosp.*,
    216 Cal. App. 3d 340 (1989) ................................................................................... 2

*Richtek USA, Inc. v. uPI Semiconductor Corp.*,
    242 Cal. App. 4th 651 (2015) ................................................................................... 20

*Rodas v. Spiegel*,
    87 Cal.App.4th 513 (2001) ................................................................................... 4, 8

*Shasta Douglas Oil Co. v. Work*,
    212 Cal. App. 2d 618 (1963) ................................................................................... 11

*Sidney Hillman Health Center v. Abbott Labs.*,
    873 F.3d 574, 577 (7th Cir. 2017) ................................................................................... 14

*State ex rel. Wilson v. Superior Court*,
    227 Cal. App. 4th 579 (2014) ................................................................................... 17

*State v. Ball*,
    141 N.J. 142 (1995) ................................................................................... 11

*StorMedia, Inc. v. Superior Court*,
    20 Cal.4th 449 (1999) ................................................................................... 19

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.*,
    711 F.3d 1264 (11th Cir. 2013 ................................................................................... 9

*Tawfilis v. Allergan, Inc.*,
    157 F.Supp.3d 853 (C.D. Cal. 2015) ................................................................................... 8

*U.S. v. Caronia*,
    703 F.3d 149 (2d Cir. 2012) ................................................................................... 12

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010) ............................................................................ 14

*Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ........................................................................................ 9

*United States ex rel. Brown v. Celgene Corp.*,
   No. CV 10-3165, 2014 U.S. Dist. LEXIS 99815 (C.D. Cal. July 10, 2014) ....... 14

*United States ex rel. Westmoreland v. Amgen, Inc.*,
   812 F. Supp. 2d 39 (D. Mass. 2011) ................................................................ 16

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) ............................................................................ 9

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ........................................................................................ 6

*Unruh-Haxton v. Regents of Univ. of Cal.*,
   162 Cal.App.4th 343 (2008) ............................................................................ 21

*Wash. Cty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*,
   2020 U.S. Dist. LEXIS 1020 (D. Md. Jan. 3, 2020) ......................................... 12

*Wilke & Holzheiser, Inc. v. Dep't of Alcoholic Beverage Control*,
   65 Cal. 2d 349 (1966) ...................................................................................... 11

*Z Techs Corp. v. Lubrizol Corp.*,
   753 F.3d 594 (6th Cir. 2014) ........................................................................... 24

**Statutes**
Cal. Code Civ. Proc. § 436 ................................................................................... 24
Cal. Code Civ. Proc. §452 .................................................................................... 4

18 U.S.C. §1341 ................................................................................................... 11
18 U.S.C. §1343 ................................................................................................... 11
18 U.S.C. § 1952 .................................................................................................. 11
18 U.S.C. § 1961 .................................................................................................. 11
42 U.S.C. § 1320 .................................................................................................. 15

Ariz. Rev. Stat. §§ 20-463 .................................................................................... 18
Ark. Code §§ 23-66-501 ....................................................................................... 18
Colo. Rev. Stat. § 10-1-128 .................................................................................. 18
Iowa Code Ann. §§ 505.1 ..................................................................................... 18
Md. Code Ins. §§ 27-401 ...................................................................................... 18
Me. Rev. Stat. Ann. tit. 24-A, §§ 2186 ................................................................. 18
Mont. Code §§ 33-1-1202 ..................................................................................... 18
N.D. Cent. Code §§ 26.1-01 ................................................................................. 18
N.J. Stat. § 2C:41-1(a) ......................................................................................... 11
N.M. Stat. §§ 59A-16C-1 ..................................................................................... 18
Neb. Rev. Stat. §§ 44-6604 ................................................................................... 18
Okla. Stat. tit. 36, §§ 101 ...................................................................................... 18
S.C. Code §§ 38-55-570 ........................................................................................ 18

**Other Authorities**
Weil & Brown, et al., CALIFORNIA PRACTICE GUIDE: CIVIL PROCEDURE BEFORE TRIAL
............................................................................................................................ 5

## I.    INTRODUCTION

Plaintiff Health Care Service Corporation ("HCSC") respectfully submits this opposition to the demurrer and motion to strike filed by Defendants Mallinckrodt ARD LLC and Mallinckrodt plc (together, "Mallinckrodt"). HCSC's claims relate to its payments for H.P. Acthar Gel ("Acthar"), a prescription drug used to treat infant seizures. Although Acthar had been available in the United States since 1952, Acthar has seen some of the largest price hikes in the history of medicine, increasing nearly ten thousand-fold from 2001 to 2018. To pull this off, Mallinckrodt acquired the rights to Acthar, and subsequently (i) eliminated competition in the market for Acthar through an exclusive distribution agreement; (ii) completed a "catch and kill" acquisition of Synacthen, Acthar's only biologically-equivalent competitor; and (iii) created artificial demand for Acthar by illegally subsidizing patient co-payments, promoting off-label use of the drug, and bribing physicians to prescribe it. As a result of Mallinckrodt's anticompetitive and fraudulent conduct, HCSC has paid millions of dollars more for Acthar than it otherwise would have.

Mallinckrodt makes a hodge-podge of arguments as to why HCSC's allegations are legally insufficient, many of which have been rejected by other courts that have sustained substantially identical claims. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 757 (N.D. Ill. 2019) ("defendants' conduct was anticompetitive under the Seventh Circuit's broad definition of exclusionary, predatory, or anticompetitive. … Rockford alleged that defendants conspired to price-fix and prevent competitors from entering the market, implemented through a joint-effort (the ASAP) that allowed Mallinckrodt to unlawfully acquire the rights to Synacthen") (sustaining claims under Section 1 and 2 of the Sherman Act); *Humana Inc. v. Mallinckrodt ARD, LLC*, 2020 U.S. Dist. LEXIS 101378, at \*\*7–19 (C.D. Cal. Mar. 9, 2020). ("Here, there is more than a conclusory allegation as to the other parties' involvement in, and knowledge of, the alleged fraud. There are specific allegations that CDF and the prescribing doctors acted in ways unrelated to ordinary business aims.") (sustaining RICO, unfair competition, consumer fraud and deceptive trade practices, insurance fraud, and unjust enrichment claims).

HCSC alleges claims for violations of New Jersey's Racketeer Influenced Corrupt Organizations Act (Counts I & II), antitrust violations (Counts III & IV), unfair and deceptive trade practices (Count

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 37
p. 554

V), fraud (Count VI), insurance fraud (Count VII), tortious interference with contract (Count VIII), and unjust enrichment (Count IX). Mallinckrodt's demurrer to these causes of action should be overruled for the reasons set forth below. Similarly, Mallinckrodt's motion to strike—which improperly asks the Court to strike relevant allegations that they contend do not constitute a cause of action—should be denied, as "[a] motion to strike does not lie to attack a complaint for insufficiency of allegations to justify relief; that is a ground for general demurrer." *Pierson v. Sharp Mem'l Hosp.*, 216 Cal. App. 3d 340, 342-43 (1989).

## II.    FACTUAL ALLEGATIONS

Acthar is an adrenocorticotropic hormone ("ACTH") drug manufactured from the pituitary gland of pigs. Complaint, ¶¶ 56–57.[1] Approved for marketing in the United States since 1952, Acthar is an anti-inflammatory that can be used to treat multiple conditions including sarcoidosis, multiple sclerosis, and rheumatoid arthritis in limited clinical settings. ¶¶ 58–67. Aside from use to treat a rare epileptic disorder in infants, however, there is almost no clinical evidence to support its use over much cheaper alternatives. *Id.* Mallinckrodt's predecessor, Questcor Pharmaceuticals, acquired the right to produce Acthar in 2001 for $100,000 plus modest royalties. ¶¶ 7, 69. At that time, Acthar was priced at $40 per vial, but Mallinckrodt drastically increased Acthar's price over the course of a few years. ¶¶ 8, 70–71. By 2018, a vial of Acthar cost $38,892. ¶¶ 8, 72. In order to make this dramatic price hike, Mallinckrodt engaged in a five-part scheme.

*First*, Mallinckrodt entered into an exclusive distribution arrangement with Express Scripts Holding Company and its subsidiaries. ¶ 11. This arrangement had the effect of foreclosing competition in the distribution market for Acthar which allowed Mallinckrodt to abusively price the drug. ¶¶ 76–85. This was carried out through the Acthar Support and Access Program ("ASAP"), a vehicle that Mallinckrodt used to further raise prices and stifle competition. ¶¶ 106-112.

*Second*, Mallinckrodt increased and then maintained artificially high demand for Acthar by marketing it as "free" to patients by using a phony charitable foundation to pay patient co-payments,

---

[1] All "¶" references herein are to HCSC's Complaint, filed on February 27, 2020. "MPA" refers to The Defendant Mallinckrodt Entities Memorandum In Support of Demurrer and Motion to Strike, dated May 20, 2020, and filed in this action on May 28, 2020.

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 32
p. 555

while sticking their insurers with tens or hundreds of thousands of dollars in costs. ¶ 12, 89–119 (the "CDF Co-Pay Scheme"). "In other words, the co-payment subsidies were bribes to patients and a vehicle through which Mallinckrodt could persuade physicians that the astronomical price of the drug should not be a barrier to prescribing it." ¶ 12. Mallinckrodt accomplished this fraud by conspiring with the Chronic Disease Fund ("CDF"), an existing charity, to create disease- and symptom-specific funds whose only qualifying drug was Acthar and whose sole source of funds was Mallinckrodt. *Id.* The Co-Pay Scheme violated anti-kickback statutes and the federal False Claims Act. *E.g.*, ¶ 191; *see also* ¶¶ 30–43 (regulatory framework).

*Third*, Mallinckrodt further expanded the market with aggressive promotion of an unproven and ineffective dosing regimen. ¶¶ 13, 121–45. Acthar's label instruct patients to inject the drug as part of a daily dosing regimen to be used for two to three weeks at a time. ¶ 13. This regimen is extremely expensive because it requires use of multiple vials of the drug and increases the risk of side effects in patients. *Id.* To solve these problems, Mallinckrodt developed a different dosing regimen that only required patients to use Acthar for five days, even though there was no clinical evidence that the five-day dosing regimen was effective. *Id.* This dosing regimen was not FDA approved or indicated on the Acthar label. *Id.* This dosing protocol had a two-fold effect: (1) patients reported fewer side effects, lending credibility to Mallinckrodt's unsupported claim of superior tolerability for Acthar when compared to steroids; and (2) the price seemed affordable when compared with the cost of administering the drug according to the label's instructions. *Id.* These off-label promotion efforts violated FDA regulations. *See* ¶¶ 44–55.

*Fourth*, Mallinckrodt simultaneously maintained artificially high demand through a pervasive scheme to pay doctors to prescribe Acthar. ¶¶ 14, 149–160. These payments were necessary because Acthar is an antiquated and expensive drug that requires refrigeration and injection, and it is not the first-line treatment for most of its indicated conditions. ¶ 14. Instead, much cheaper and more effective treatments are recommended. *Id.* Under the guise of "education" and "marketing," Mallinckrodt paid millions of dollars to thousands of doctors, and particularly large sums to a smaller number of doctors who then prescribed a disproportionate amount of Acthar. ¶¶ 14, 159–60. Mallinckrodt paid more than $15 million to the United States Department of Justice ("DOJ") to settle a False Claims Act case arising

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 37
p. 556

1  from this conduct. ¶ 161.

2  *Finally*, Mallinckrodt eliminated competition by acquiring the exclusive right to sell in the U.S.

3  Acthar's much cheaper synthetic equivalent ACTH, Synacthen Depot ("Synacthen"). ¶¶ 15, 162 –173.

4  To do so, Mallinckrodt substantially outbid competing bidders for the Synacthen rights, but rather than

5  trying to commercialize the drug, it shelved those rights to protect its Acthar monopoly. ¶¶ 15, 165–

6  172. Mallinckrodt paid $100 million to settle the Federal Trade Commission's ("FTC") claim that its

7  acquisition of the rights to Synacthen was anticompetitive and illegal. ¶ 175.

8  Because of Mallinckrodt's scheme, HCSC has overpaid for Acthar. ¶ 16. In addition to

9  Mallinckrodt's competition-eliminating conduct that allowed Mallinckrodt to maintain artificially high

10  prices for Acthar (¶¶ 204–15), HCSC was defrauded when it paid for Acthar. In making its decision to

11  pay for Acthar therapy for its beneficiaries, HCSC relied on representations made by, or caused to be

12  made by, Mallinckrodt, that Mallinckrodt had not violated laws prohibiting the CDF Co-Pay Scheme,

13  the off-label promotion efforts, and the physician kickbacks. *E.g.*, ¶¶ 220, 228, 239, 259–63, 267–78.

14  Mallinckrodt actively concealed the illegal scheme and its underlying acts through false or misleading

15  statements. *E.g.*, ¶¶ 177–79. HCSC was not aware of and could not have discovered Mallinckrodt's

16  illegal conduct until the FTC and the DOJ brought that illegal conduct to light through their

17  enforcement efforts in 2017 (FTC) and 2019 (DOJ). ¶¶ 161, 175, 180.

18  ## III.    LEGAL STANDARD ON DEMURRER

19  "As a general rule in testing a pleading against a demurrer the facts alleged in the pleading are

20  deemed to be true, however improbable they may be." *Del E. Webb Corp. v. Structural Materials Co.*, 123

21  Cal.App.3d 593, 604 (1981). "[A]ll material facts pleaded in the complaint and those that arise by

22  reasonable implication . . . are deemed admitted by the demurring party. The complaint must be

23  construed liberally by drawing reasonable inferences from the facts pleaded." *Rodas v. Spiegel*, 87

24  Cal.App.4th 513, 517 (2001) (citation omitted). "A complaint's allegations are construed liberally in

25  favor of the pleader." *Ferrick v. Santa Clara Univ.*, 231 Cal. App. 4th 1337, 1341 (2014); Cal. Code Civ.

26  Proc. § 452.

27  Mallinckrodt contends "plausibility" is the standard that governs HCSC's allegations. MPA at

28  17, 24, 25, 31. This is error. California pleading practice does not require that allegations be "plausible."

*See, e.g., Del E. Webb Corp.*, 123 Cal. App. 3d at 604 ("As a general rule in testing a pleading against a demurrer the facts alleged in the pleading are deemed to be true, however improbable they may be."); *see also Mekbeb v. Westin Hotel*, 2015 Cal. Super. LEXIS 12481, *6 ("It is difficult to conceive of how that could be so but generally demurrers at least in state court do not test for plausibility."); Weil & Brown, et al., CALIFORNIA PRACTICE GUIDE: CIVIL PROCEDURE BEFORE TRIAL ¶ 7:44 (2015).

## IV.   ARGUMENT

### A.   HCSC Sufficiently Alleges Violations of State Antitrust Law.

Central to its antitrust theories, HCSC alleges that Mallinckrodt overpaid for and then shelved the exclusive licensing rights to Synacthen, the only potential competition to Acthar in the United States ACTH market. ¶¶ 162–176. Mallinckrodt does not dispute that this conduct amounts to an unlawful restraint of trade or monopoly in violation of the antitrust laws. Indeed, in *City of Rockford*, the court found that "[o]ne can plausibly infer that the Synacthen Acquisition and Mallinckrodt's immediate 'shelving' of Synacthen had no legitimate business justification and resulted in the maintenance and entrenchment of Mallinckrodt's monopoly." *City of Rockford*, 360 F. Supp. 3d at 757. HCSC alleges that Mallinckrodt entered into an exclusive distribution agreement with Express Scripts to maintain Mallinckrodt's monopoly in the ACTH market. ¶¶ 11, 76–85. This arrangement foreclosed competition in the ACTH market to the detriment of consumers. This conduct is part of Mallinckrodt's scheme to monopolize the ACTH market in violation of state law equivalents to Section 1 and 2 of the Sherman Act. *City of Rockford*, 360 F. Supp. 3d at 730 ("Rockford alleges two anticompetitive understandings— the exclusive dealing arrangement and the Synacthen Acquisition—that together form the basis of their § 1 claims.").

Mallinckrodt attacks HCSC's theories by arguing (i) ACTH is not a relevant antitrust market, (ii) that HCSC was uninjured, and (iii) HCSC's exclusive distribution allegations state no claim. Mallinckrodt is wrong on all points.

### 1.   Mallinckrodt's Conduct Impacted a Relevant Antitrust Market.

Mallinckrodt argues that HCSC has failed to allege a proper antitrust market because "Acthar represents 100% of the [ACTH] market" and HCSC also alleges that non-ACTH drugs are *medical* substitutes for the treatment of many Acthar indications. MPA at 30–31. Mallinckrodt's arguments

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 37
p. 558

1  ignore a great body of relevant case law that define relevant antitrust markets in the pharmaceutical

2  context as a brand drug and its biological equivalent.

3        A "relevant market" is properly defined as consisting of "commodities reasonably

4  interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351

5  U.S. 377, 395 (1956). "The Supreme Court has held that a properly constituted market may indeed be

6  comprised of a single product … and lower courts across the country have on numerous occasions

7  ruled that both a brand-name drug and its generic analogs can fall within the bounds of a relevant

8  market." *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F.Supp.3d 367, 388 (D. Mass. 2013) (collecting

9  cases showing the market consists of a brand drug and a generic substitute). In other words, ACTH and

10 its biological equivalents (e.g., Synacthen) is a proper antitrust market.

11       Here, HCSC alleges that there are no economic substitutes for Acthar, other than a biologically

12 equivalent ACTH. ¶ 184 ("Acthar does not exhibit significant, positive cross-elasticity of demand

13 regarding price with any other product."); *see also* ¶¶ 182–183, 185, 191 ("No other ACTH product

14 (except Synacthen or AB-rate[d] generic versions of Acthar) will, or would, take away sufficient sales

15 from this drug to prevent Mallinckrodt from raising or maintaining the price of its product above levels

16 that would prevail in a competitive market."). These allegations give boundaries to the market

17 commonly accepted in pharmaceutical antitrust litigation: it is Acthar and its biological equivalent, as

18 no other drug could take away sales anywhere close to as much as a generic could have done. *See In re*

19 *Cipro Cases I & II*, 61 Cal. 4th 116, 157 (2015) (relevant market under the Cartwright Act is a brand drug

20 and its generic substitute); *Nexium*, 968 F.Supp.2d at 387–88 (market defined by "cross-elasticity of

21 demand for the product in question — the extent to which purchasers will accept substitute products

22 in instances of price fluctuation and other changes").

23       Mallinckrodt posits that some other treatments may offer similar therapeutic relief. MPA at 31.

24 What is missing from this analysis is that the other treatment are **not** biological equivalents. *Cf. United*

25 *Food & Commer. Workers Local 1776 v. Teikoku Pharma USA*, 296 F.Supp.3d 1142, 1172 (N.D. Cal.

26 2017) ("something *more* than mere therapeutic equivalency is required to define the relevant antitrust

27 product market."). In any event, the definition of the market at issue is a question of fact, not properly

28 resolved on a demurrer. *See In re Loestrin 24 Antitrust Litig.*, 261 F.Supp.3d 307, 326 (D.R.I. 2017) ("courts

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 30
p. 559

1   generally treat this fact-intensive issue as one to be decided on a motion for summary judgment (if no

2   genuine issue of material fact exists) or at trial."); *Nexium*, 968 F.Supp.2d at 388 n.19 ("the reasonable

3   interchangeability of brand Nexium with other drugs" is "a factually intensive determination [that] is

4   better left for resolution by a jury").

5       Mallinckrodt points to the *Humana* decision where the court dismissed with leave to amend

6   antitrust claims based on an ACTH-only market. MPA at 31. However, the *Humana* court did not

7   consider the *economic* substitutability of other products with Acthar, did not address the line of cases

8   cited above, and did not consider well-pled allegations of biological equivalents and relative cross-

9   elasticity, which demonstrate that only biological equivalents could take significant market share away

10  from Acthar. *See Humana Inc. v. Mallinckrodt ARD, LLC*, No. CV-19-06296, 2020 U.S. Dist. LEXIS

11  101378, at **7–19 (C.D. Cal. Mar. 9, 2020).

12              **2.        The Synacthen Acquisition Caused HCSC Injury.**

13      Mallinckrodt contends that HCSC "fails to offer 'specific facts' making th[e] connection

14  between the [Synacthen acquisition] and injury plausible[.]" MPA at 31. This argument ignores HCSC's

15  allegations. HCSC alleges that three firms negotiated for the rights to license Synacthen, a lower-priced

16  Acthar alternative. ¶ 165; *see also* ¶ 174. The firms planned to develop Synacthen to compete with, and

17  price below, Acthar. ¶ 166. The firms had the requisite expertise, financing, business, and regulatory

18  plans to develop Synacthen for the United States market. *Id*.; *see also* ¶ 167. Had Mallinckrodt not swept

19  in at the eleventh hour with an outsize bid, another company would have "begun manufacturing

20  Synacthen shortly after acquiring the license from Novartis and launched the product earlier than

21  Mallinckrodt." ¶ 202. This course of conduct enabled Mallinckrodt to prevent entry of Synacthen into

22  the United States market, raise the price of Acthar, and maintain its monopoly power in the ACTH

23  market. ¶ 201; *see also* ¶ 203. And "but for Mallinckrodt's monopolistic conduct, including its acquisition

24  of Synacthen, HCSC would have benefitted from increased competition in the market for ACTH drugs

25  and would have either paid lower prices for Acthar or steered its members to lower priced Synacthen."

26  ¶ 214. These allegations clearly allege that Mallinckrodt's acquisition of Synacthen and its subsequent

27  shelving caused HCSC injury. No more is needed.

28

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD,
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

1    Mallinckrodt's contention that HCSC failed to allege "when Synacthen would have gone

2    through the extensive clinical trials to establish its safety and efficacy necessary to gain FDA approval

3    an[d] enter the market" and "which indications FDA would approve it for" (MPA at 32) ignores HCSC's

4    allegations. HCSC alleges the when (¶¶ 202, 203, 205), and it is reasonable to infer that another company

5    would have sought approval of Synacthen for the same indications as Acthar. *See* ¶ 162 ("In Europe,

6    Canada, and other parts of the world, doctors treat patients with Synacthen for the same conditions

7    that are treated with Acthar in the U.S."); ¶ 163 ("Questcor itself considered the drugs so similar that it

8    submitted Synacthen information to support its application to the FDA to expand the label indications

9    for Acthar."); *Rodas v. Spiegel*, 87 Cal.App.4th 513, 517 (2001) (when ruling on a demurrer, courts are to

10   construe complaints "liberally by drawing reasonable inferences from the facts pleaded.")[2]

11   Moreover, HCSC need not allege the specific mechanisms through which a hypothetical

12   Synacthen licensor would have sought FDA approval, or what the FDA would have done, if

13   Mallinckrodt had not illegally overpaid for the rights to sell the drug. This case presents similar

14   circumstances as *Tawfilis v. Allergan, Inc.*, 157 F.Supp.3d 853 (C.D. Cal. 2015). In *Tawfilis*, as here,

15   defendant monopolist acquired the exclusive rights to market a competing drug in the United States,

16   although the drug had not yet been approved to be marketed in the United States. *Id.* at 856–58. And

17   like Synacthen, the competing drug had already received foreign regulatory approval and was marketed

18   abroad. *Id.* at 858. The hypothetical potential market entrant, as here, had "extensive experience selling

19   drugs throughout the world[.]" *Id.* at 866. Against this background, the court rejected defendant's

20   argument that plaintiffs failed to allege causation because they "allege nothing at all regarding [potential

21   entrant's] ability to obtain an approved manufacturing plant . . . obtain FDA approval, market and sell

22

23

24

25

---

26   [2] Mallinckrodt moves to strike HCSC's claimed overcharges "starting in 2011 or sometime prior to

27   2014." MPA at 33. This argument ignores that HCSC alleges claims based on Mallinckrodt's conduct well before 2011, as well as the inappropriate use of a motion to strike as a "line item veto" of otherwise relevant allegations as discussed in Section IV.F. below. The scope and nature of HCSC's damages are

28   not properly resolved on pleadings motions.

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 37
p. 561

1  [the competing drug] in the U.S., or any other steps to overcome the high barrier to entry." *Id.* at 865–

2  68 (quotations omitted). This Court should do the same.[3]

3          **3.**     **HCSC's Allegations of Exclusive Distribution Are Actionable**.

4          Mallinckrodt argues that one aspect of HCSC's allegations—that HCSC was able to maintain

5  inflated prices through an exclusive distribution agreement through Express Scripts—fails to state a

6  claim. MPA at 17-20. Mallinckrodt misconstrues HCSC's allegations, which do not exist in a vacuum.

7  Mallinckrodt improperly considers the exclusive distribution agreements in isolation, which is fatal to

8  its challenge because "in the antitrust context, the 'character and effect of a conspiracy are not to be

9  judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.' " *Costco*

10  *Wholesale Corp. v. Maleng*, 522 F.3d 874, 886 (9th Cir. 2008) (quoting *Continental Ore Co. v. Union Carbide*

11  *& Carbon Corp.*, 370 U.S. 690, 699 (1962)). A wholistic view is also applied to monopolization claims.

12  *See Med. Res. Corp. v. Ethicon Inc.*, 2006 U.S. Dist. LEXIS 12845, a *17 (C.D. Cal. Feb. 2, 2006) (in

13  determining willfulness, "what is dispositive is the overall effect of the conduct"); *Mishawaka v. Am.*

14  *Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980) ("[Defendant] would have us consider each separate

15  aspect of its conduct separately and in a vacuum. If we did, we might agree with the utility that no one

16  aspect standing alone is illegal. It is the mix of the various ingredients of utility behavior in a monopoly

17  broth that produces the unsavory flavor.").

18          The *Continental Ore* principle has equal application here: While exclusive distribution

19  arrangements are "not illegal **in themselves**," they can run afoul of antitrust laws as "an improper

20  means of maintaining a monopoly." *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005)

21  (emphasis added). Such arrangements violate the antitrust laws when they "foreclose competition in a

22  

23  ―――――――――――――――――――――

24  [3] Mallinckrodt's cases concern complaints that failed altogether to allege competing products could be
brought to market, because regulatory approval was lacking either on the face of the complaint or on
summary judgment. *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 807 (D.C. Cir. 2001); *Brotech*

25  *Corp. v. White Eagle Int'l Techs. Group, Inc.*, 2004 U.S. Dist. LEXIS 11552, at *21 (E.D. Pa. June 21, 2004);
*Meijer, Inc. v. Biovail Corp.*, 533 F.3d 852, 862 (D.C. Cir. 2008); *Sunbeam Television Corp. v. Nielsen Media*

26  *Research, Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013). Here HCSC alleges that the potential market entrants
were prepared to bring Synacthen to market, anticipated FDA approval, and that FDA approval would

27  have happened in the absence of Mallinckrodt's conduct. Additionally, "*Andrx* requires neither probable
approval nor specific facts about the plaintiff's approval process" to show intent and preparedness.

28  *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 104 (2d Cir. 2019) (Katzmann, J., concurring).

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 37
p. 562

1  substantial share of the line of commerce affected." *Allied Orthopedic Appliances Inc. v. Tyco Health Care*

2  *Group LP*, 592 F.3d 991, 996 (9th Cir. 2010). In other words, the arrangements are unlawful when they

3  "harm the competitive process, and thereby harm consumers." *McWane, Inc. v. FTC*, 783 F.3d 814, 835–

4  36 (11th Cir. 2015).

5       HCSC sufficiently alleges that the challenged arrangement has completely foreclosed

6  competition in the ACTH market.[4] The exclusive arrangement foreclosed other distributors from

7  competing with Express Scripts, meaning there is no competition for the downstream sales to

8  consumers. By engaging with only Express Scripts, Mallinckrodt has restricted patient access to Acthar

9  and "eliminat[ed] other distributors from negotiating for lower prices for Acthar." *Rockford*, 360

10 F.Supp.3d at 744 (determining that plaintiffs sufficiently allege competitive harm flowing from

11 Mallinckrodt's exclusive dealing arrangement). Here, as in *Rockford*, "Express Scripts had no interest in

12 lowering the price for Acthar because it was making money off all aspects of its exclusive arrangement

13 with the manufacturer." *Id.* at 744–45. The arrangement "thus allowed Mallinckrodt to maintain its

14 dominant monopoly power in the ACTH drug market, maintain prices at artificially high levels, and

15 exclude less expensive competitive products from the ACTH drug market." *Id.* at 755.

16      Mallinckrodt argues that an exclusive distribution arrangement "provides no monopolistic

17 benefit to [a monopolist] that it does not already enjoy." MPA at 19, quoting *E&L Consult., Ltd. v.*

18 *Doman Indus. Ltd.*, 472 F.3d 23, 29 (2nd Cir. 2006). However, reliance on *E&L* is misplaced. Central to

19 the court's holding in *E&L* was the fact that the manufacturer in that case could have distributed the

20 product itself and did not have to rely on the intermediary. *Id.* at 29. HCSC's complaint does not suggest

21 that Mallinckrodt had the ability to act as its own distributor; Mallinckrodt needed Express Scripts so

22 that   it   could   sell Acthar   without   interference   from   competing   distributors   who   might

23 impede Mallinckrodt's ability to control Acthar's price. And in *E&L*, unlike here, "nothing in the

24 complaint suggest[ed] that th[e] agreement result[d] in . . . [an] effect on competition." *Id.* at 29; *see also*

25 *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 17 C 50107, 2019 U.S. Dist. LEXIS 103885, at *8 (N.D.

26

27 ───────────────────

28 [4] To the extent that cases hold that the anticompetitive effect must be on competition in the *interbrand*
    market (*see* MPA at 19), the *interbrand* requirement is not applicable here as Acthar is currently the only
    brand in the United States ACTH market, which, as discussed above, is a proper antitrust market.

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 17
p. 563

1     Ill. May 3, 2019) (rejecting same *E&L*-based argument that Mallinckrodt makes here).[5]

2         **B.**     **Mallinckrodt Has Violated New Jersey's RICO Act.**

3         Mallinckrodt does not for these purposes dispute that HCSC sufficiently alleges claims under

4 New Jersey's Racketeer Influenced and Corrupt Organizations Act ("RICO"), but instead attacks only

5 certain categories of conduct. Mallinckrodt's only challenge to the RICO claims is an argument that the

6 CDF Co-Payment Scheme does not qualify as commercial bribery. MPA at 20–21. Separately,

7 Mallinckrodt argues HCSC has not alleged kickbacks to Prescribing Doctors were unlawful. MPA at

8 24-27. Both of these contentions lack merit.

9         "The gravamen of a RICO violation . . . is the involvement in the affairs of an enterprise through

10 a pattern of racketeering activity." *State v. Ball*, 141 N.J. 142, 155, 661 A.2d 251, 257 (1995). New Jersey

11 defines "racketeering activity" broadly to include, among other things, "any conduct defined as

12 'racketeering activity' under Title 18, U.S.C. § 1961(1)(A), (B) and (D)." N.J. Stat. § 2C:41-1(a). In turn,

13 18 U.S.C. § 1961 defines "racketeering activity" to include acts indictable under 18 U.S.C. §§ 1341 (mail

14 fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity). The

15 "enterprise" alleged by Plaintiffs includes the CDF charity and Mallinckrodt's agents, such as

16 "Prescribing Physicians" who issued Acthar prescriptions in exchange for bribes and kickbacks and

17 made false representations of compliance with federal laws. ¶¶ 149-157, 220. HCSC alleges that

18 Mallinckrodt engaged in "a pattern of racketeering activity . . . including acts indictable under 18 U.S.C.

19 §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity),

20 *and* state bribery statutes[.]" ¶ 223 (emphasis added); *see also* ¶¶ 209, 220, 225, 237.

21         Several courts have already held that the scheme alleged by HCSC here violates RICO because

22 the Acthar Enterprise increased sales of Acthar through bribes, kickbacks, and false representations of

23

24 _____

25 [5] Mallinckrodt's argument that "HCSC's allegations amount to nothing more than that CuraScript was a consignment seller" (MPA at 19) is unsupported by the facts and the law. *Shasta Douglas*, cited by Mallinckrodt, shows "it is lawful for a consignor selling through a consignee to fix the price at which he authorizes the consignee to sell the goods of the consignor." *Shasta Douglas Oil Co. v. Work*, 212 Cal. App. 2d 618, 622 (1963). *Wilke & Holzheiser, Inc. v. Dep't of Alcoholic Beverage Control*, 65 Cal. 2d 349, 366 n.13 (1966) observed that any retail outlets or consignment by a manufacturer is "subject of course to the antitrust laws." Neither case addresses the circumstance here where a monopolist has used an exclusive distribution agreement to suppress competition in the relevant market.

26

27

28

compliance with laws governing prescription. *See, e.g., Humana*, 2020 U.S. Dist. LEXIS 101378, at **19–37 (denying motion to dismiss RICO claims based on Mallinckrodt's scheme); *id.* at *38 (allegations that "'the prescription medication is medically necessary, up-to-date, and non-duplicative' and '[Prescribing Doctors] are not violating state or federal law applicable to the provision of their services' because they had accepted money in exchange for those prescriptions'" state mail and wire fraud claims for purposes of RICO). This Court should do the same.

### 1.    HCSC's Off-Label Promotion Allegations State a Cause of Action.

HCSC states a claim under New Jersey RICO and its other causes of action relying on off-label promotion because it alleges that Mallinckrodt misrepresented to HCSC that it was complying with federal law, when in fact, Mallinckrodt had violated federal law by promoting Acthar for off-label indications. *See* ¶¶ 13, 44–55, 121–146, 259, 267. Mallinckrodt's representations concerning its compliance with the law were false. HCSC alleges who made the misrepresentation (Mallinckrodt), to whom it was made (HCSC), what it was (that Mallinckrodt complied with federal law), when it was made (when Mallinckrodt made Acthar-related certifications to HCSC), and by what means it was made (through Mallinckrodt's certifications to HCSC). Contrary to Mallinckrodt's argument (MPA at 27-28), the thrust of HCSC's claims is **not** that the off-label promotions themselves were misrepresentations. Rather, it is the false statements of compliance with the law by Mallinckrodt (and Prescribing Doctors) that were false. Mallinckrodt's arguments concerning lack of specificity are thus misguided. *See Humana*, 2020 U.S. Dist. LEXIS 101378, at *48 ("Here, Plaintiff has alleged that the doctors prescribed Acthar because of the bribes and the availability of the co-pay assistance funds, and the false certifications from Defendant and the doctors directly caused Plaintiff to pay for Acthar in an amount and for a price higher than it otherwise would have absent the alleged illegal conduct.").[6]

---

[6] Mallinckrodt's reliance on *Wash. Cty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, 2020 U.S. Dist. LEXIS 1020, at *28 (D. Md. Jan. 3, 2020), is misplaced as HCSC's claims do not rely on the specifics of the off-label marketing scheme and HCSC does not plead the Maryland consumer statute at issue there. Mallinckrodt's reliance on *U.S. v. Caronia*, 703 F.3d 149, 165-69 (2d Cir. 2012), is similarly misplaced. There, the court construed the Federal Food, Drug, and Cosmetics Act as not criminalizing the simple promotion of a drug's off-label use because such a construction would raise First Amendment concerns. *Id.* at 160. The court did not immunize a defendant for falsely representing that it had complied with statutes and regulations when, in fact, it had not; this type of fraud is not protected speech. *See Olivia*

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD, LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

1    To the extent more particulars are required about the inner-workings of Mallinckrodt's off-label

2    scheme, that information is within Mallinckrodt's control and knowledge and need not be alleged for

3    HCSC's fraud-based claims to withstand demurrer. *See Comm. on Children's Television, Inc. v. Gen. Foods*

4    *Corp.*, 35 Cal. 3d 197, 216–17 (1983) ("Less specificity is required when it appears from the nature of

5    the allegations that the defendant must necessarily possess full information concerning the facts of the

6    controversy"). Here, the allegations are "sufficient to enable the court to determine whether, on the

7    facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." *Id.* at 217 (quotations

8    omitted). No more is needed.

9    Mallinckrodt argues HCSC fails to allege causation for its fraud-based claims. MPA at 28-29.

10   Not so. HCSC alleges that it paid for Acthar prescriptions that it otherwise would not have because

11   HCSC relied on Mallinckrodt's misrepresentation that Mallinckrodt had complied with the law. *See* ¶¶

12   13, 44-55, 121-146, 259, 267, 275-78. No more is needed to sufficiently allege that Mallinckrodt's

13   misrepresentations caused HCSC injury. *See Painters & Allied Trades Dist. Council 82 Health Care Fund v.*

14   *Takeda Pharm. Co.*, 943 F.3d 1243, 1251 (9th Cir. 2019) ("Here, the alleged violation is that Defendants

15   actively concealed Actos's risk of causing bladder cancer to sell more Actos to unsuspecting persons,

16   thereby increasing Actos's revenue. And [payors'] alleged injury is that they purchased Actos

17   prescriptions for which they would not have paid had they been warned about Actos's risk of bladder

18   cancer. Because Plaintiffs were immediate victims of Defendants' alleged fraudulent scheme to conceal

19   Actos's risk of bladder cancer, the alleged RICO violation … has a direct relation to Plaintiffs' alleged

20

21   *N. v. Nat'l Brod. Co.*, 74 Cal. App. 3d 383, 388 (1977) (misrepresentation is among the "narrowly limited
     classes of speech [which] may be prevented or punished by the state consistent with the principles of

22   the First Amendment."). *Caronia* has limited application outside of the criminal context. *See Arvizu v.
     Medtronic Inc.*, 41 F. Supp. 3d 783, 795 (D. Ariz. 2014) ("*Caronia* was an appeal of a criminal case and

23   the court considered whether the FDCA criminalized off-label promotion of prescription drugs. … The
     court said that the misbranding provisions of the FDCA do not prohibit and criminalize 'the truthful

24   off-label promotion of FDA-approved prescription drugs,' and then stated that its conclusion was
     'limited to FDA-approved drugs for which off-label use is not prohibited[.]' … This case involves

25   allegations of misrepresentation in off-label promotion of a Class III medical device. *Caronia* is not

26   relevant to this claim, nor are the district court cases cited by Defendants that have relied on it.").

27

28

1   harm.").

2   Similarly, Mallinckrodt's contention that doctors' "independent medical judgment" breaks a

3   causal chain is inconsistent with the allegations of the complaint and has been rejected by the Ninth

4   Circuit in *Painters* and numerous courts. *See, e.g.*, *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21,

5   39 (1st Cir. 2013) (rejecting argument that there were too many steps in causal chain between

6   defendant's off-label promotion and insurance company's injuries); *In re Avandia Mktg.*, 804 F.3d 633,

7   645–46 (3d Cir. 2015) (rejecting argument "that the presence of intermediaries, doctors and patients,

8   destroys proximate causation" of insurance company's injuries flowing from defendant's fraudulent

9   pharmaceutical marketing); *United States ex rel. Brown v. Celgene Corp.*, No. CV 10-3165, 2014 U.S. Dist.

10  LEXIS 99815, at **30–32 (C.D. Cal. July 10, 2014) ("To suggest that [defendant's] alleged expansive,

11  multi-faceted efforts to create an off-label market for Thalomid and Revlimid did not cause physicians

12  to prescribe Thalomid or Revlimid for non-reimbursable uses strains credulity.").[7] Exactly these same

13  arguments were rejected in *Humana*. U.S. Dist. LEXIS 101378, at *47 ("here the doctors were allegedly

14  bribed to prescribe Acthar and were participants in the RICO conspiracy. That causal link is far from

15  attenuated.").

16  Mallinckrodt's reliance on *Sidney Hillman Health Center v. Abbott Labs.*, 873 F.3d 574, 577 (7th

17  Cir. 2017) and *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010) is misplaced because

18  in those cases misrepresentations were made *to the doctors*, who were **innocent** conduits of the alleged

19  falsehoods. There were no allegations that payors *themselves* relied on the false representations, and this

20  was a "crucial[]" factor negating proximate cause. *UFCW*, 620 F.3d at 134; *Sidney Hillman*, 873 F.3d at

21  578 (distinguishing itself from case where "misrepresentations are made directly to Payors"). Here, by

22  contrast, HCSC alleges that it was *itself* the victim of misrepresentations made directly by Mallinckrodt.

23

---

24  [7] HCSC construes these arguments to apply to its claims for unfair and deceptive practices, Count V of

25  the Complaint, as well as other claims that require causation such as unjust enrichment (Count IX). *See*
    MPA at 26 n.9. With respect to Count IX, these appear to be the sole challenge and any further arguments

26  concerning this Count on reply are waived. *See Magic Kitchen LLC v. Good Things Int'l., Ltd.*, 153

27  Cal.App.4th 1144, 1161 (2007) ("Contentions are waived when a party fails to support them with
    reasoned argument and citations to authority . . . The waiver is not cured by argument and citations in

28  [a] reply brief: It is elementary that points raised for the first time in a reply brief are not considered by
    the court.").

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

1   Mallinckrodt argues that because HCSC "pre-reviewed" certain claims, HCSC's fraud claims are

2   too attenuated. MPA at 26, 28. However, no causal chain was broken by HCSC's claim review process,

3   as the process was tainted by Mallinckrodt's conduct and whatever HCSC may have reviewed did not

4   disclose the crucial aspects of the scheme. *See Neurontin*, 712 F.3d at 38–41 (discussing how off-label

5   promotion influences third party payor's coverage determinations and rejecting argument that there are

6   too many steps in causal chain between defendant's off-label promotion and insurance company's

7   injuries). The argument also ignores the allegation that HCSC relied on physicians' representations that

8   the prescription was medically necessary, which representations, as discussed above, were influenced by

9   the off-label promotion scheme. *See* ¶ 271.

10   2.   **HCSC's Physician Kickback Allegations State a Cause of Action.**

11   Mallinckrodt argues that HCSC's claims related to payments to physicians fail because (1)

12   HCSC's bribery allegations are conclusory, and (2) facts concerning causation are lacking. MPA 24 to

13   27. Mallinckrodt's contentions contest the truth of the facts alleged, or ignore them altogether, and must

14   be rejected.

15   HCSC alleges that payments Mallinckrodt made to physicians constitute undisclosed unlawful

16   kickbacks supporting RICO and state law causes of action. *See* ¶ 14 ("Mallinckrodt funneled millions of

17   dollars to thousands of doctors to encourage the use of Acthar as a first-line treatment and to promote

18   the five-day dosing regimen. Mallinckrodt paid bribes thinly disguised as compensation for speaking

19   engagements and sham clinical research studies, and even paid undisguised bribes such as gift cards to

20   doctors' staff."); *see also* ¶¶ 149-161 (identifying specific instances), 220 (alleging these practices violate

21   RICO). Mallinckrodt does not dispute that HCSC sufficiently alleges that these payments constituted

22   unlawful kickbacks in violation of the Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); *see also*

23   ¶¶ 38-43.[8] Contrary to Mallinckrodt's assertion (MPA at 26), HCSC sufficiently alleges that the unlawful

24   physician kickbacks caused HCSC injury as Mallinckrodt and Prescribing Physicians made false

25   statements about compliance with kickbacks and bribery laws. *See* ¶¶ 267, 271, 274, 278, 283 ("The

26

27

28

[8] That sometimes HCSC labels the kickbacks as bribes is of no import.

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

1   compliance certifications were material to HCSC decision to reimburse claims for Acthar that

2   Mallinckrodt caused to be submitted.").

3           Mallinckrodt's arguments concerning bribery being conclusorily alleged are not well-taken, even

4   if the Court agrees with Mallinckrodt that federal pleading standards apply.[9] Contesting the facts

5   supporting causation, Mallinckrodt posits that the payments are simply "industry standard" (MPA at

6   25), and supporting studies such as the 2018 JAMA Network study showing with regression analysis

7   that the percentage of doctors who receive financial assistance for prescribing Acthar is abnormally high

8   get it wrong. *Id.* at 25-26. These arguments cannot be resolved by demurrer. *Comm. On Children's*

9   *Television,* 35 Cal. 3d at 213 (a demurrer does not "test the truth of the plaintiff's allegations or the

10  accuracy with which he describes the defendant's conduct"). In any event, the JAMA study supports

11  HCSC's allegations that the payments from Mallinckrodt influenced doctor's decision to prescribe

12  Acthar, and the extent to which that is true will be determined in discovery. *See* ¶ 158 ("JAMA Network

13  Open concluded that '[a]ggressive sales tactics and payments from [Mallinckrodt] may influence

14  prescribing behavior for [Acthar].'").

15          Mallinckrodt's causation arguments are misguided as they sweep aside the allegations that

16  physicians did not, in fact, exercise "independent medical judgment." *See* ¶¶ 149, 150, 152, 154, 157;

17  *Blue Cross of Cal. Inc. v. Insys Therapeutics Inc.*, 390 F. Supp. 3d 996, 1008 (D. Ariz. 2019) ("The thrust of

18  [defendant's] argument . . . is that, when prescribing Subsys, providers were exercising their independent

19  medical judgment, which breaks the causal chain between [defendant's] actions and [plaintiff's] alleged

20  injury. As pled, however, the complaint alleges that prescribers were not exercising independent medical

21  judgment. That is, prescribers were prescribing Subsys in exchange for kickbacks."); *United States ex rel.*

22  *Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 53 (D. Mass. 2011) ("Kickbacks are designed to influence

23  providers' independent medical judgment"); *State ex rel. Wilson v. Superior Court*, 227 Cal. App. 4th 579,

24

25  _____

26  [9] Mallinckrodt's characterization of HCSC's allegations is inaccurate. *See* ¶159 ("Although speakers were compensated on the high end of the industry standard, what qualified as a speaking engagement for which the speaker was compensated was a very low bar. Only as few as three people- who need not be physicians- were required to attend for a physician to be eligible for the full fee. Even spouses were

27  allowed to attend"). Considered in full context, HCSC is not admitting payments to physicians and their

28  families were "industry standard," but is alleging the opposite.

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

606-07 (2014) ("Given a choice among two or more medically appropriate drugs, the reasons why a physician would prescribe one over another could include many possible factors, including not just the physician's independent medical judgment as to the particular prescription, but also, for example, patient requests and preferences, direct advertising, relative costs of alternative treatments and drugs, dictates of institutional formularies, availability of particular drugs, insurance company preferences, and—of course—the unlawful conduct [unlawful physician kickbacks] in which [defendant] had engaged to induce such prescriptions.").

Finally, Mallinckrodt argues that its settlement with regulators does not support an inference of wrongdoing generally, or alternatively that only misconduct from 2009 to 2013 is alleged. MPA at 25. [10] The DOJ settlement strongly supports HCSC's claims that Mallinckrodt made illegal payments to prescribing physicians. *See, e.g., In re Nat'l Ass'n of Music Merchants, Musical Instruments & Equip. Antitrust Litig.,* 2011 WL 3702453, at *2 (S.D. Cal. Aug. 22, 2011)(denying motion to strike references to FTC complaint and consent decree from pleading and holding that FTC consent decree enhanced plausibility of anticompetitive conduct allegations). Whatever weight the Court may give the settlements, however, HCSC provides ample supporting facts demonstrating a marketing scheme that persisted over many years, including details about specific payments to certain physicians. ¶¶ 121-161. HCSC's allegations that Mallinckrodt, at minimum, paid over $27 million in improper payments "from 2013 to 2016" (¶ 156) is dispositive of Mallinckrodt's contention that the wrongdoing is limited in time.

### C.     HCSC States a Cause of Action for Tortious Interference With Contracts

Mallinckrodt argues HCSC has not stated a claim for intentional interference because there has been no breach of contract by HCSC's customers. MPA at 24. As the California Supreme Court has held, however, a claim can be stated by either "actual breach or disruption of the contractual relationship." *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126 (1990) (citations omitted). Here, HCSC explicitly alleges disruption of contractual benefits because Mallinckrodt

---

[10] That the amount of Mallinckrodt's payments to doctors may have been public in 2014 is not controlling. *See* MPA at 26. The true nature and purpose of the payments, i.e., that they were unlawful kickbacks, was not discovered until much later. *See* ¶¶ 177-180..

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 37
p. 570

1   knowingly frustrated the operation of co-pay obligations that are designed to benefit all members by

2   keeping costs low. ¶¶ 286, 288.

3       The Office of Inspector General ("OIG") advisory bulletin quoted by Mallinckrodt (MPA at

4   24) is not dispositive of HCSC's tortious interference claim. That bulletin relates to *only* Medicare Part

5   D beneficiaries, not other HCSC members. *See* Defs' RJN, Ex. A (guidance entitled "Patient Assistance

6   Programs for Medicare Part D Enrollees"); *cf.* ¶ 18 ("HCSC . . . provides . . . private commercial health

7   insurance plan benefits that cover the medical expenses incurred by plan beneficiaries on an individual

8   or group basis."). Because the court in *Humana* exclusively relied on the OIG guidance in dismissing

9   the tortious interference claims, reliance on that case is misplaced. *See* MPA at 24; *Humana*, 2020 U.S.

10  Dist. LEXIS 101378, at ** 49–50.[11]

11      **D.    Mallinckrodt's Insurance Fraud is Actionable**

12      In its request for judicial notice, Mallinckrodt argues that HCSC's claims under the laws of

13  California and other states that purportedly do not provide a private right of action should be dismissed,

14  and that claims for states that provide such a private right are time-barred, or otherwise deficient. MPA

15  at 17, n. 2. These arguments are not properly raised, as demonstrated in HCSC's opposition to

16  Mallinckrodt's RJN. Mallinckrodt's recitation of the law is inaccurate in some respects and legal claims

17  should not be resolved through request for judicial notice. More specifically, Mallinckrodt is wrong that

18  California, Kentucky, New Jersey, and Florida provide no private right of action in these circumstances.

19      Although many states do not have express rights of action for insurance fraud, such a right

20  should be inferred here. A number of states have insurance fraud statutes in states that allow a

21  government enforcer to pursue civil penalties for insurance fraud.[12] For these states that do not

22

23  ────────────

24  [11] Mallinckrodt's reliance on *Blue Cross of California Inc. v. Insys Therapeutics Inc.*, 390 F.Supp.3d 996, 1009
    (D. Az. 2019), is unavailing. That claim does not apply California law, and plaintiff did not allege that
25  defendant "induced or caused a breach of this provisions of the members' contracts. . . . At most,
    [plaintiff] allege[d] that [defendant] interfered with a '**contractual incentive**.'" *Id.*

26  [12] These statutes are: Ariz. Rev. Stat. §§ 20-463, et seq.; Ark. Code §§ 23-66-501, et seq.; Colo. Rev. Stat.
    § 10-1-128, et seq.; Iowa Code Ann. §§ 505.1, et seq.; Me. Rev. Stat. Ann. tit. 24-A, §§ 2186; Md. Code
27  Ins. §§ 27-401, et seq.; Mo. Rev. Stat. §§ 375.99, et seq.; Mont. Code §§ 33-1-1202, et seq.; Neb. Rev.
    Stat. §§ 44-6604, et seq.; N.D. Cent. Code §§ 26.1-01, et seq.; N.M. Stat. §§ 59A-16C-1, et seq.; Okla.
28  Stat. tit. 36, §§ 101, et seq.; and S.C. Code §§ 38-55-570, et seq.

────────────

expressly provide a private cause of action, this Court should recognize an implied private cause of action in the statute. Many states have examined statutes similar to the insurance fraud statutes here and concluded that a private right of action exists even when it is not express in the statutory scheme. *See, e.g. Allstate Ins. Co. v. Parfrey,* 830 P.2d 905 (Colo. 1992) (concluding private right of action existed for violation of statute requiring that automobile liability insurers provide uninsured/underinsured motorist coverage to their insureds); *Napoletano v. CIGNA Healthcare of Connecticut, Inc.*, 680 A.2d 127, 145 (Conn. 1996) (determining private cause of action implied in Public Act governing managed care organizations), *overruled on other grounds by Batte-Holmgren v. Commissioner of Public Health,* 281 Conn. 277, 284-85 (2007). If the plaintiff is one for whose benefit the statute was enacted, there was expressly or implied legislative intent to create such a remedy, and it is consistent with the underlying purpose of the statute to imply such a remedy for the plaintiff, then a private remedy is implicit in the statute. *See Cort v. Ash*, 422 U.S. 66 (1975).

An implied private right of action should likewise be recognized under the statutes at issue here. *See* fn. 12. All of the insurance fraud statutes are designed to benefit those paying increased costs due to insurance fraud, and so payors like HCSC would fall within this specific group of plaintiffs. The statutes here have not express prohibition on private litigants pursuing actions, which they would have done if they wanted to forbid private actions. Finally, the purposes of the insurance fraud statutes are to deter this type of conduct and recouping some of the overcharges that result from this fraud. Allowing a private cause of action under the insurance fraud statute would accomplish both of these goals.

**E.     HCSC's Claims Are Timely.**

Mallinckrodt seeks dismissal based on the statute of limitations for HCSC's claims flowing from the CDF Co-Pay Scheme and its acquisition of Synacthen. MPA at 22–24, 33–34. Mallinckrodt relies on facts from purportedly judicially noticeable documents, which cannot be used on demurrer to resolve factual disputes about issues such as notice for purposes of the statute of limitations. *StorMedia, Inc. v. Superior Court,* 20 Cal.4th 449, 457, fn. 9 (1999) ("When judicial notice is taken of a document, however, the truthfulness and proper interpretation of the document are disputable."). Although the wrongdoing alleged by HCSC stretches back over ten years, HCSC alleges it did not become aware of the scheme

Ex. 37
p. 572

1   now alleged until federal investigations, including the FTC's investigation of antitrust claims and the

2   DOJ's claims concerning fraudulent sales practices, were disclosed. ¶¶ 180, 177 ("Mallinckrodt also

3   failed to disclose to HCSC its arrangements with CDF that created specialized funds that were illegally

4   to reimburse co-payments for Acthar"); *see also* Plaintiffs' Request for Judicial Notice, Ex. 1-3 (certain

5   facts supporting HCSC's claims were made public in March and June 2019). None of the facts or

6   documents Mallinckrodt seeks to judicially notice can defeat these allegations. Moreover, the doctrines

7   of fraudulent concealment and ongoing violation make all of HCSC's claims timely.

8       As an initial matter, HCSC is a putative class member in two separate class actions filed in April

9   and October of 2017. *See City of Rockford v. Mallinckrodt ARD, Inc.*, No. 3:17-cv-50107 (N.D. Ill.) and

10  *MSP Recovery Claims, Series LLC et al v. Mallinckrodt ARD Inc., et al.*, No. 2:17-cv-07928 (C.D. Cal.). With

11  respect to its antitrust claims, HSCS is entitled to tolling as of the date those complaints were filed,

12  because in those cases HCSC is a putative member of the classes and its antitrust claims share a common

13  factual and legal basis with the class claims. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974). As none

14  of HCSC's claims are barred on the face of the Complaint or any materials Mallinckrodt seeks to include,

15  these *Am. Pipe* issues need not be resolved at this time.

16          **1.     Mallinckrodt's Allegations Control and Defeat Mallinckrodt's
                     Arguments from Documents Outside the Pleadings.**

17

18      All of Mallinckrodt's arguments fail because they rely on facts from judicially-noticed

19  documents. These cannot be credited over HCSC's allegations it discovered the wrongdoing when the

20  results of government investigations became public. *Richtek USA, Inc. v. uPI Semiconductor Corp.*, 242 Cal.

21  App. 4th 651, 660 (2015) (it is "improper" to consider on demurrer facts from a judicially noticed

22  document that are "contrary to the allegations" in the complaint). For this reason alone, the demurrer

23  must be overruled in its entirety.

24      Mallinckrodt argues that HCSC was on constructive notice of, and should have discovered, its

25  claims "at least six years ago" because "the precise manner in which HCSC alleges the CDF funds

26  violated the AKS has long been in the public record." MPA at 22–23.  The court in *Humana* rejected

27  this precise argument. *Humana*, 2020 U.S. Dist. LEXIS 101378, at **33–37. Here, as in *Humana*, it "is

28  not alleged . . . that Plaintiff was in any way notified whether co-pays were subsidized by assistance

1    funds. In fact, Plaintiff's allegations about its members indicate otherwise." *Id.* at \*34; *see* ¶ 274

2    ("Through its illegal scheme to pay patient co-pays through phony charitable funds at CDF,

3    Mallinckrodt caused HCSC's members to unintentionally misrepresent that they had paid their

4    contractual share of prescription drug coverage."). "The mere receipt or payment of claims, when there

5    is no reason to think that Plaintiff knew those claims were fraudulent or excessive when it paid them,

6    does not establish constructive knowledge of plaintiff's injury." *Humana*, 2020 U.S. Dist. LEXIS 101378,

7    at \*35 (quotations and brackets omitted).

8         As noted in *Humana*, there is nothing in HCSC's complaint "that indicates the allegedly illegal

9    aspects of Defendant's co-pay assistance program were widely publicized, or that the information to be

10   gleaned from the purported publicity could be imputed to Plaintiff." *Id.*, citing *Living Designs, Inc. v. E.I.*

11   *Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005) ("[T]he district court erred in determining

12   that, as a matter of law, the attention received by [a sanction order against defendants] could be imputed

13   to the Plaintiffs"). Further, HCSC alleges that the donation agreements fraudulently misrepresented that

14   the funds were not limited to patients using Acthar. *See* ¶¶ 100, 108. Therefore, had HCSC "inquired

15   into the funds, it would not have discovered that the funds were illegal." *See Humana*, 2020 U.S. Dist.

16   LEXIS 101378, at \*36.

17        Mallinckrodt contends that HCSC was put on constructive suspicion of its injuries by mere

18   publication of two news articles and a guidance bulletin, the latter of which made no refence to Acthar.

19   MPA 22-23. However, the concept of "constructive suspicion" was rejected in *Nelson v. Indevus Pharm.,*

20   *Inc.*, 142 Cal.App.4th 1202, 1204–06 (2006); *id.* at 1206 ("The statute of limitations does not begin to

21   run when some members of the public have a suspicion of wrongdoing, but only once the plaintiff has a

22   suspicion of wrongdoing.") (quotations and brackets omitted); *see also Unruh-Haxton v. Regents of Univ. of*

23   *Cal.*, 162 Cal.App.4th 343, 364 (2008) (rejecting idea "that public awareness of a problem through media

24   coverage alone creates constructive suspicion for purposes of discovery."); *Gryczman v. 4550 Pico*

25   *Partners, Ltd*, 107 Cal.App.4th 1, 6 (2003) ("we cannot say as a matter of law plaintiff had a duty to

26   continually monitor public recordings"). Two articles, which themselves cast doubt on whether CDF

27   was controlled by Mallinckrodt, cannot constitute notice under these circumstances. Ex. C at 21, 23

28   (CDF received funds from Novartis, Genentech, Roche;  "collaboration" was a "savvy move[]" that

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 37
p. 574

increased stock price; and outside counsel represented "There is no steering that takes place whatsoever."); Ex. D at 27 ("Questcor and the charity have said they are victims of a campaign by short-sellers"). Moreover, none of the materials cited by Mallinckrodt say anything of the off-label marketing, or other aspects of the scheme to inflate demand.[13]

### 2.    Fraudulent Concealment Tolls HCSC's Claims.

HCSC's claims are timely because Mallinckrodt fraudulently concealed its wrongdoing. "[T]he fraudulent concealment by the defendant of a cause of action tolls the relevant statute of limitations, which does not begin to run until the aggrieved party discovers the existence of the cause of action." *Cmty. Cause v. Boatwright*, 124 Cal. App. 3d 888, 899 (1981). HCSC alleges it could not have discovered Mallinckrodt's wrongdoing earlier because it repeatedly and falsely represented to HCSC it was complying with federal law.  ¶¶ 176; *see also* ¶ 114, 120, 177 (Mallinckrodt "falsely maintained that it would develop and seek FDA approval of Synacthen"), 178.[14] These allegations are sufficient to toll the statute of limitations on HCSC's claims.

### 3.    The "Continuing Violation" Doctrine Prevents Dismissal Because Mallinckrodt Continues to Overcharge for Acthar.

HCSC's antitrust claims premised on the purchase of Synacthen continue to accrue because HCSC alleges that it is suffering "continuing harm" in that it continues to pay for Acthar prescriptions. *See* ¶ 181. "Antitrust law provides that, in the case of a 'continuing violation,' . . . each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period

---

[13] Mallinckrodt's authorities concerning when a plaintiff discovered she was injured have no application because HCSC's allegations control. *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 805 (2005) (leave to amend granted to allege "why she did not have reason to discover earlier the factual basis"); *Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 938 (1994) (remanding case  to determine "whether plaintiff exercised reasonable diligence in attempting to  discover defendants' identity."). Nor is Mallinckrodt's position supported by *Brandon G. v. Gray*, 111 Cal.App.4th 29 (2003), where the plaintiff parents' claims accrued from the date when they discovered, by examining the county's files, that the county had misrepresented the absence of complaints against the daycare facility. *Id.* at 34–36. Finally, *McKelvey v. Boeing North American, Inc.*, 74 Cal.App.4th 151 (1999), cannot supply the rule here as it has been abrogated by statue. *See Lopez v. Sony Electronics, Inc.*, 5 Cal.5th 627, 633 n.3 (2018) ("Legislature also declared an intent to disapprove [McKelvey] to the extent that case put the burden on plaintiffs to show they were unaware of published reports suggesting a defendant's wrongdoing.").

[14] The FTC action concerning antitrust violations was publicized on January 18, 2017 (¶ 175). The Department of Justice announced its action filed a detailed complaint in intervention on June 4, 2019 and made a press release the next day. *See* Pl.'s RJN Exs. 1, 3. Additionally, a separate *qui tam* complaint with different allegations of off-label promotion was unsealed on March 8, 2019. *Id.*, Ex. 2. The DOJ announced a settlement of these matters in September 2019. ¶ 161.

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quotations omitted); *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1065-66 (8th Cir. 2017) ("Every other circuit to consider this issue applies *Klehr*, holding that each sale in a price-fixing conspiracy is an overt act that restarts the statute of limitations"). The idea that "continued overcharges constitute a continuing violation" applies with equal force in drug monopoly cases. *In re Glumetza Antitrust Litig.*, 2020 U.S. Dist. LEXIS 39649, at **24–27 (N.D. Cal. Mar. 5, 2020) (applying doctrine in action challenging reverse payment settlement and collecting cases); *see also In re Buspirone Patent & Antitrust Litig.*, 185 F.Supp.2d 363, 378 (S.D.N.Y. 2002) ("[I]f a party commits an initial unlawful act that allows it to maintain market control and overcharge purchaser for a period longer than four years, purchasers maintain a right of action for any overcharges paid within four years prior to their filings.").

Mallinckrodt contends that the continuing violation doctrine does not apply "because once an acquisition is completed 'no overt acts can be undertaken to further that plan.'" MPA at 33–34 (quoting *Midwestern Mach. Co., Inc. v. Northwest, Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004)). However, *Midwestern* is inapposite because it concerned a merger in violation of the Clayton Act, which has no continuing violation doctrine. *Id.* at 271 ("A continuing violation theory based on overt acts that further the objectives of an antitrust conspiracy in violation of § 1 of the Sherman Act or that are designed to promote a monopoly in violation of § 2 of that act cannot apply to mergers under § 7 of the Clayton Act.").[15]

Here, HCSC alleges that Mallinckrodt's acquisition of Synacthen and its subsequent shelving was in furtherance of its continuing monopoly in the ACTH market that included lying about the intentions of the transaction itself. ¶ 177; *cf. In re Evanston Northwestern Healthcare*, 2008 U.S. Dist. LEXIS 42437, at *14 (N.D. Ill. May 29, 2008) ("Although it may be likely that plaintiffs knew or should have known of their potential injury at the time the merger was consummated, neither the legal precedents cited by ENH nor the allegations pleaded in plaintiffs' complaint definitively require such a conclusion);

---

[15] Mallinckrodt's reliance on *Midwestern* to defeat fraudulent concealment is misplaced. *See* MPA at 34, relying on Midwestern, 392 F.3d at 272. *Midwestern* did not concern a claim of fraudulent concealment, nor did it concern a "catch and kill" scheme contrary to false claims to develop the drug. ¶ 177.

*see also Nexium*, 968 F.Supp.2d at 399–400 (rejecting similar argument based on *Midwestern*, explaining that "[a]lthough the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a <u>purchaser</u>, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price.").[16]

### F.   Defendants' Motion to Strike Is Improper.

Along with their demurrer, Mallinckrodt challenges the sufficiency of HCSC's allegations by a motion to strike, but a motion to strike "is not the proper method of attacking a pleading which is merely insufficient to state a cause of action, or defense, or which is defective in form." *Allerton v. King*, 96 Cal. App. 230, 233 (1929). Under Cal. Civ. Proc. Code 436(a) any "matter that is essential to a cause of action should not be struck and it is error to do so." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1281 (2006). An argument that a complaint did not state facts sufficient to constitute a cause of action is ground for demurrer and is not, therefore, a proper ground for a motion to strike. *Ferraro v. Camarlinghi*, 161 Cal. App. 4th 509 (2008). Thus, allegations of wrongdoing such as would demonstrate knowledge, scienter, or a consistent behavioral practice remain relevant and should not be stricken, even if some of the alleged conduct occurred outside the limitations period. *Alch v. Superior Court*, 122 Cal. App. 4th 339, 374 n.30 (2004) ("consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period.") (quoting *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002)). Mallinckrodt's use of a motion to strike is improper in three ways.

First, Mallinckrodt requests the court strike a multitude of factual allegations in the complaint that support otherwise valid causes of action, including: ¶¶ 11, 76-85 (Mallinckrodt has a vertically integrated distribution system); ¶¶ 12, 89-120, 273-75, 281, 323 (Mallinckrodt's co-pay funds were fraudulent); ¶¶ 14, 149-61, 181, 257, 272-273 (Mallinckrodt funneled kickbacks to prescribing doctors);

---

[16] *Z Techs Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014), does not help Mallinckrodt either. There, the court recognized that the continuing violations doctrine applies to claims, where, as here, "a party unilaterally monopolized a market or undertook action, in addition to price increases, to monopolize a market." *Id.* at 598; *id.* at 599 ("this court has applied the continuing violations doctrine . . . to unilateral monopolization claims when a party already possesses a monopoly and takes action to preserve the monopoly[.]")

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD, LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

Ex. 3
p. 577

1   ¶¶ 13, 121-48 (Mallinckrodt promoted Acthar off-label); ¶¶ 15, 162-76, 200, 203, 244-47, 249-53

2   (Mallinckrodt acquired and killed Synacthen). This is improper. Mallinckrodt fails to show how any of

3   the individual paragraphs are irrelevant, false or improper; if the Court overrules Mallinckrodt's

4   demurrer *a fortiori* they cannot be any of these things. A motion to strike is not a "line item veto."[17]

5        Second, Mallinckrodt moves to strike allegations regarding its settlement with the DOJ to

6   resolve claims the company paid illegal kickbacks to physicians (¶ 161) and allegations regarding

7   Mallinckrodt's settlement with the FTC of charges that it violated antitrust laws in its acquisition of an

8   Acthar competitor (¶ 175). The FTC and DOJ settlements are relevant to HCSC's antitrust claims. *See,*

9   *e.g., In re Nat'l Ass'n of Music Merchants, Musical Instruments & Equip. Antitrust Litig.*, 2011 WL 3702453, at

10   *2 (S.D. Cal. Aug. 22, 2011)(denying motion to strike references to FTC complaint and consent decree).

11   At minimum, facts developed in the FTC and DOJ matters will frame, in part, the scope of the factual

12   and legal issues to be resolved here, and the actions taken help inform statute of limitations issues.

13        Third, Mallinckrodt seeks to have the court strike HCSC's state law claims for relief based on

14   supposed legal deficiencies (¶¶ 245, 253, 257,[18] and 280). Just as with the factual allegations above, the

15   proper mechanism for challenging the legal sufficiency of these allegations is through a demurrer, not

16   a motion to strike. And these paragraphs are necessary to describe the legal grounds under which HCSC

17   is entitled to relief. Mallinckrodt's motion is without merit and should be denied.

18   **VII.   CONCLUSION**

19        For the reasons set forth above, Mallinckrodt's demurrer should be overruled and the motion

20   to strike should be denied. Should the Court be inclined to dismiss any aspect of HCSC's claims, HCSC

21   respectfully requests leave to amend.

22   Dated: June 23, 2020                Respectfully submitted,

23                            **SCHNEIDER WALLACE COTTRELL**
                         **KONECKY LLP**

24

25   [17] Mallinckrodt's own authorities demonstrate that "use of the motion to strike should be cautious and

26   sparing" and that motions to strike do not create "a procedural 'line item veto' for the civil defendant."
*PH II, Inc. v. Superior Court*, 33 Cal. App. 4th 1680, 1683 (1995). Mallinckrodt's motion to strike here is

27   neither cautious nor sparing, and instead is precisely the sort of line-item veto that *PH II* cautioned
against.

28   [18] Mallinckrodt incorrectly cites paragraph 245 in its motion to strike.

1         */s/ Matthew S. Weiler*
                Todd M. Schneider

2         Jason H. Kim
                Matthew S. Weiler

3         Kyle G. Bates
                2000 Powell Street

4         Suite 1400
                Emeryville, CA 94608

5         (415) 421-7100
                TSchneider@schneiderwallace.com

6         JKim@schneiderwallace.com
                MWeiler@schneiderwallace.com

7         KBates@schneiderwallace.com

8         **LOWEY DANNENBERG, P.C.**
                Peter D. St. Phillip (*Pro hac vice* to be filed)

9         44 South Broadway, Suite 1100
                White Plains, NY 10601

10       (914) 997-0500
                PStPhillip@lowey.com

11

12       Renee A. Nolan (*Pro hac vice* to be filed)
                One Tower Bridge

13       100 Front Street, Suite 520
                West Conshohocken, PA 19428

14       (215) 399-4770
                rnolan@lowey.com

15

16       *Counsel for Plaintiff Health Care Service Corporation*

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD
LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE

# EXHIBIT 38

Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

[*Additional counsel on signature page*]

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| HEALTH CARE SERVICE CORP., <br><br> Plaintiff, <br><br> v. <br><br> MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT PLC, <br><br> Defendants. | Case No. RG20056354 <br><br> **PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE** <br><br> Judge: Hon. Stephen Kaus <br> Location: Dept. 19 <br> Hearing: August 5, 2020; 3:00 p.m. <br> Complaint Filed: February 27, 2020 <br><br> Trial Date:   Not Set |

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

## I.      INTRODUCTION

Defendants Mallinckrodt ARD LLC and Mallinckrodt plc (together, "Mallinckrodt") request that this Court take judicial notice of a number of documents issued created by federal regulators.  As explained below, Plaintiff Health Care Service Corporation ("HCSC") objects to Mallinckrodt's repeated attempts to judicially notice the truth of contents in documents, even if the documents are otherwise judicially noticeable. The Court should reject Mallinckrodt's use of Exhibits A through D, H, and I because they are used to contest the facts pled by HCSC. The Court should deny judicial notice of Exhibits K through O because each exhibit is problematic in at least one way, and each is unnecessary to the resolution of Mallinckrodt's motion to strike. The Court should deny judicial notice of Exhibit E because, although potentially judicially noticeable, it is nowhere cited and therefore irrelevant.

## II.     LEGAL STANDRD FOR JUDICIAL NOTICE

Matters are "subject to judicial notice only if the matter is reasonably beyond dispute." *Tenet Healthsystem Desert, Inc. v. Blue Cross of California*, 245 Cal. App. 4th 821, 835 (2016). A demurrer may not be turned into a contested evidentiary hearing through the guise of having the court take judicial notice of documents whose truthfulness or proper interpretation are disputable. *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 114 (2007). While the existence of a document may be judicially noticeable, the truth of statements contained in the document and their proper interpretation are not subject to judicial notice. *Tenet Healthsystem Desert, Inc.,* 245 Cal. App. 4th 821 at 836; *see also Aquila, Inc.*, 148 Cal. App. 4th at 569 ("[T]he taking of judicial notice of the official acts of a governmental entity does not in and of itself require acceptance of the truth of factual matters which might be deduced therefrom").

## III.    ARGUMENT

### A.     Mallinckrodt Improperly Seeks to Judicially Notice Disputed Facts.

California courts draw a distinction between judicial notice of the existence of a document,

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

and judicial notice of the truth of the contents of a document. "Strictly speaking, a court takes judicial notice of facts, not documents." *Scott v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 743, 755 (2013). Thus while courts are permitted to take judicial notice of the "existence" of documents in ruling on a demurrer, as the California Supreme Court explained in *StorMedia Inc. v. Superior Court*, 20 Cal. 4th 449, 457 n.9 (1999), "[w]hen judicial notice is taken of a document… the truthfulness and proper interpretation of the document are disputable." While "a court may take judicial notice of a recorded deed, or similar document," the Court may not "take judicial notice of factual matters stated therein." *Poseidon Dev., Inc. v. Woodland Lane Estates, LLC*, 152 Cal. App. 4th 1106, 1117 (2007).

Mallinckrodt disregards these well-established principles in seeking to cherry-pick statements from documents outside the pleadings in support of its demurrer and motion to strike.

### 1.   Mallinckrodt Improperly Relies on Facts in Exhibits A through D to Make Arguments Regarding the Statute of Limitations.

Mallinckrodt improperly relies on the truth of matters contained in Exhibits A through D to argue that HCSC was on "constructive notice" of the facts and how they relate to HCSC's claims. MPA at 23-24. It is well established that a court may not use media sources to create "constructive suspicion" of the existence of facts to trigger the statute of limitations, as this requires the Court to accept the contents of the materials as true. *Unruh-Haxton v. Regents of Univ. of Cal.*, 162 Cal. App. 4th 343, 365 (2008) ("the court interpreted the widespread media coverage to conclusively refute the patients' allegations they either (1) did not see or read the media coverage, or (2) saw the publicity, but failed to discover any wrongdoing. [J]udicial notice was improperly taken in both instances."). HCSC was not required to accept the reporting as true, particularly where Mallinckrodt and CDF issued categorical and qualified denials. *See* RJN Ex. C at 23 (outside counsel represented "There is no steering that takes place whatsoever."); Ex. D at 27 ("Questcor and the charity have said they are victims of a campaign by short-sellers"). In any event, Mallinckrodt improperly uses Exhibits A through D to create constructive notice and its request should be denied.[1]

---

[1] *Hurvitz v. Hoefflin*, 84 Cal. App. 4th 1232, 1235 n.1 (2000), cited by Mallinckrodt, recognizes that courts "cannot and do not take judicial notice of the truth of the matters contained therein." *See also Ragland v. U.S. Bank Nat'l Ass'n*, 209 Cal. App. 4th 182, 193, 147 (2012) ("While we may take judicial

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

Ex. 38
p. 583

1    Mallinckrodt's request with respect to two news articles from *Barron's* and *The New York Times*

2  is an improper attempt to introduce evidence of when HCSC was on notice of certain allegations. *See*

3  RJN Ex. C and D; *see also Voris v. Lampert*, 7 Cal. 5th 1141, 1147, (2019) (declining to take judicial

4  notice of newspaper articles that were "not proper authorities to establish the truth of the matters

5  asserted therein."); *People ex rel. Lockyer v. Shamrock Foods Co.*, 24 Cal. 4th 415, (2000) (refusing to take

6  judicial notice of articles not relevant to state statutory issue).

7    Similarly, Mallinckrodt relies on guidance from the Department of Health and Human

8  Services Office of Inspector General ("OIG") concerning co-payments for Medicare Part D enrollees

9  in 2005 (Ex. A) and May 2014 (Ex. B) arguing they provide "constructive notice" to HCSC. MPA at

10  22. This is another improper use of judicial notice. Neither document can be used to establish a date

11  of discovery that is different from that which is alleged by HCSC. HCSC alleges it discovered the

12  wrongdoing after federal investigations were made public. Those allegations are entitled to the

13  presumption of truth. *Richtek USA, Inc. v. uPI Semiconductor Corp.*, 242 Cal. App. 4th 651, 660 (2015) (it

14  is "improper" to consider on demurrer facts from a judicially noticed document that are "contrary to

15  the allegations" in the complaint).

16    Exhibits A and B cannot provide any type of constructive notice because they disclose no

17  wrongdoing. Neither Exhibit A nor B mentions Acthar at all, and in no sense would they put a

18  reasonable person on notice of any wrongdoing. Nor does Exhibit A establish that HCSC reviewed

19  this document in 2005—prior to when the wrongdoing alleged here began—or at any other time.

20  With respect to Exhibit B, it too has no indicia of HCSC having reviewed it.

21        2.    **Mallinckrodt Makes Improper Use of Exhibits I & H to Dispute the**

22              **Truth of Other Facts HCSC Alleges.**

23    Mallinckrodt seeks judicial notice of facts contained within a DOJ press release (Ex. H), which

24

25  ───────────────────

26  notice of the existence of the audit report, Web sites, and blogs, we may not accept their contents as true").

27

28

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN
SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

1   Mallinckrodt seeks to use to establish the fact that the DOJ allegations "were limited to the conduct

2   of 'twelve Questcor sales representatives' 'from 2009 and 2013.'" RJN at 4. Mallinckrodt uses Ex. H

3   to invent a fact—that its sales representative misconduct ended in 2013—that is not found anywhere

4   in press release. MPA at 25 ("The settlement would not support HCSC's claim for damages between

5   2014 and the present, and it should be stricken from the complaint as irrelevant matter….").

6   Mallinckrodt improperly uses this document to establish the truth of its contention that there was no

7   actionable misconduct concerning sales representatives from 2014 to the present. This is contradicted

8   by HCSC's specific allegations that identify similar kickbacks and improper payments to doctors into

9   2016. ¶¶ 156-158. The DOJ's Complaint in intervention contradicts the fact Mallinckrodt improperly

10   seeks to notice. *See* Pl.'s' Request for Judicial Notice, Ex. 2; Complaint, *United States of America ex rel.*

11   *Strunck*, No. 12-cv-0175 (E.D. Pa. June 4, 2019) at Exhibits 1 to 4 (alleging and documenting false

12   claims through 2014).

13        Mallinckrodt similar makes improper use of judicial notice in seeking notice Exhibit I, an

14   article published in the JAMA Open Network in 2018 that Mallinkrodt contends makes certain of

15   HCSC's allegations "implausible." *See* MPA at 25-26. The JAMA study supports HCSC's allegations

16   that the payments from Mallinckrodt influenced doctor's decision to prescribe Acthar by comparing

17   the correlation between payments to prescribing doctors and Acthar prescriptions written, finding a

18   statistically significant correlation. *See* ¶ 158 ("JAMA Network Open concluded that '[a]ggressive sales

19   tactics and payments from [Mallinckrodt] may influence prescribing behavior for [Acthar].'"). As a

20   threshold matter, scientific articles that have bearing on disputed issues cannot be judicially noticed.

21   *People v. Ireland*, 33 Cal. App. 4th 680, 685 (1995) ("As to the scientific literature, we take judicial notice

22   only to the existence of the writings; the truth of the scientific claims written about cannot be

23   judicially noticed, but must be proved, since some of those claims are currently the subject of

24   controversy.")

25        Mallinckrodt contends that because the JAMA article says its "conceivable" that something

26   else other than bribes was causing the high incidence of prescription, HCSC's allegation is

27   implausible. *See* RJN Ex. I at 84 ("[T]he temporal sequence between payments and prescriptions

28   cannot be definitely established."). Once again, Mallinckrodt attempts to extrapolate from documents

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN
SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

Ex. 38
P. 585

1  the truth of a fact that is found nowhere in the document itself. The JAMA article expressly does **not**

2  say that other behavior caused higher incidence of Acthar, it simply states that it studied the

3  remarkable correlation and not the underlying causes. In any event, HCSC's other allegations strongly

4  support causation. ¶¶ 153-154, 159 (alleging irregularities in Mallinckrodt's paid speaker programs and

5  identifying specific abnormally large payments).

6        B.    <u>Mallinckrodt's Request to Judicially Notice Other State Laws and Cases Interpreting</u>

7                <u>the Same Exceeds the Allowed Scope of Judicial Notice.</u>

8        Mallinckrodt seeks judicial notice of five tables purporting to be compilations of out of state

9  authorities relating to HCSC's state law claims. *See* RJN Exhibits K-O. These tables, however, are not

10  complete quotations of the relevant statutes and only include cherry-picked sections, along with

11  citations to caselaw that Mallinckrodt believes is favorable to the defense position. General

12  suppositions about the legal developments cannot be judicially noticed. *See Barker v. Garza*, 218 Cal.

13  App. 4th 1449, 1452, n 1 (2013) (declining to take judicial notice of article about model Drug Dealer

14  Liability Act and portions of law review article interpreting same because information contained in

15  those sources was reasonably subject to dispute and plaintiff did not provide sufficient information to

16  determine if judicial notice is proper). HCSC objects to all of Exhibits K through O because they

17  resemble self-published law review articles, which are not an enumerated part of the Evidence Code.

18  *See Cty. of Orange v. Smith*, 132 Cal. App. 4th 1434, 1450 (2005) ("Evidence Code section 452

19  enumerates the matters of which a court may take judicial notice. Law review articles are not listed in

20  either of those statutory provisions.").

21        Mallinckrodt's presentation of the laws in the table are argumentative, and not a complete and

22  accurate picture of the relevant statutory language.

23        **Exhibit K**: HCSC objects to the legal conclusions drawn in the Exhibit K, which purport to

24  recite statutory enforcement mechanisms, as this is beyond the scope of appropriate judicial notice.

25  Mallinckrodt's request is filled with improper contentions and arguments.[2] Mallinckrodt's contentions

26  ───────────────

27  [2] RJN Ex. K at 127, 129, 130 ("HCSC fails to allege actual injury from the alleged violation."); *id.* at
129 (arguing HCSC's claims under New Jersey Insurance Fraud Prevention lack specificity); *id.* at 130

28  (arguing HCSC's claims fail Pennsylvania pleading standard); *id.* (arguing claims under Tennessee

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN
SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

1  concerning application of states' laws is beyond the "decisional … law" of a state that may be judicial

2  noticed under Evidence Code Section 452(a).

3        Mallinckrodt's recitation of these laws is also inaccurate. Mallinckrodt argues that Kentucky's

4  law requires a conviction for there to be a private right of action for insurance fraud claim (Ex. K at

5  127), but Kentucky repealed this provision in 2018. *See* Declaration of Matthew S. Weiler, Ex. 4 (2018

6  Kentucky Laws Ch. 178 (HB 323) (removing requirement of a "criminal adjudication of guilt" for a

7  private party to state a claim for damages)).

8        California permits insurers to bring *qui tam* actions for private insurance fraud. *See People ex rel.*

9  *Allstate Ins. Co. v. Suh*, 37 Cal.App.5th 253, 255 (2019); Cal. Ins. Code § 1871.7; Cal. Penal Code § 550.

10  Moreover, an insurance fraud claim does not require an affirmative misstatement of fact, only one

11  that is "characterized by deceit." *People ex rel. Allstate Ins. Co,* 37 Cal.App.5th 253 at 260. California's

12  Unfair Competition Law ("UCL") also allows for a private action violation predicated on violation of

13  the Insurance Code, and an implied private right of action where an express right does not exist. *See*

14  *Hangarter v. Paul Revere Life Ins. Co.*, 236 F. Supp. 2d 1069, 1107 (N.D. Cal. 2002) (allowing UCL claim

15  based on violation of California's insurance code); *Stevens v. Superior Court*, 75 Cal. App. 4th 594, 606,

16  (1999) (allowing violation of insurance code licensing requirements as basis for UCL claim because

17  UCL "allows nearly any law or regulation to serve as its basis unless the predicate statute explicitly

18  bars a private right of action.").

19        Contrary to Mallinckrodt's contention (Ex. K at 126), Florida permits a private insurer to

20  pursue a civil insurance fraud claim. *Molina v. Provident Life and Accident Ins. Co.*, 18-24413-CV, 2019

21  WL 3429889, at *3 (S.D. Fla. May 31, 2019), *report and recommendation adopted*, 18-24413-CIV, 2019 WL

22  7937935 (S.D. Fla. June 27, 2019). While Florida's statutes have incorporated criminal liability into the

23  statute, the requirement of a criminal conviction before pursuing a civil penalty has been thrown into

24  question. *See Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr.*, Inc., 657 F. Supp. 2d 1279, 1287 (M.D.

25  Fla. 2009) ("Nothing in this statute provides that a cause of action exists only if there is a conviction,

26  or that other causes of action are pre-empted."). Thus, the Court should allow HCSC's insurance

27

28

Insurance Fraud Act are time-barred).

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN
SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

1    fraud claim under Florida law to proceed.

2         Similarly, Mallinckrodt argues that "HCSC fails to allege that it complied with the procedures

3    provided in the New Jersey Insurance Fraud Prevention Act." Ex. K at 129. But the New Jersey IPFA

4    only requires that "pleadings" and "briefs" be sent to the New Jersey Attorney General "at the time of

5    filing." N.J. Stat. § 17:33A-7(c). This procedural provision is not an element of a New Jersey insurance

6    fraud claim and is no basis for dismissal of HCSC's claim. *Cf. In re Generic Pharm. Pricing Antitrust Litig.*,

7    368 F. Supp. 3d 814, 835 (E.D. Pa. 2019) (declining to dismiss claims under statutes with more

8    stringent pre-suit notice requirements because "they do not alter the substantive elements of

9    Plaintiffs' claims and are not a pleading requirement for the Complaints").

10        **Exhibit L**: HCSC objects to the entire exhibit, purportedly showing what states adopt the rule

11   of reason for certain vertical restraints, because it is irrelevant. Mallinckrodt supplies the laws to

12   support their contention that the exclusive distribution allegations should be viewed in insolation and

13   examined under the rule of reason. MPA at 18. Mallinckrodt's characterization of states purportedly

14   "Adopting Rule of Reason for Nonprice Vertical Restraints" should be rejected as it mischaracterizes

15   HCSC's allegations, which allege a price-fixing and monopolization scheme. As HCSC does not

16   simply allege vertical restraints, the Exhibit L supplies the wrong legal paradigm for HCSC's claims.

17        The Court need not, at this juncture, determine whether HCSC's claims are subject to the *per*

18   *se rule* of illegality or the rule of reason: "While courts generally assess exclusive dealing arrangements

19   under the rule of reason analysis, it is less clear that the rule of reason analysis applies here where

20   plaintiffs have alleged that the conspiracy included both the exclusive dealing arrangement and the

21   Synacthen Acquisition, which plaintiff argues deserves a 'per se' analysis. However, the court agrees

22   with plaintiffs that the court need not make this determination at this time." *City of Rockford v.*

23   *Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 754 (N.D. Ill. 2019); *In re: EpiPen (Epinephrine Injection,*

24   *USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 2018 WL 3973153, at *19 n.8 (D.

25   Kan. 2018) ("In ruling [on a motion to dismiss], the court just needs to determine whether the class

26   plaintiffs have alleged a plausible conspiracy under the antitrust laws."); *CSR Ltd. v. Fed. Ins. Co.*, 40 F.

27   Supp. 2d 559, 564 (D.N.J. 1998) ("At this early [motion to dismiss] stage of the proceeding, the court

28   does not find it necessary to determine which mode of analysis [per se or rule of reason] it will

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN
SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

1   ultimately employ in evaluating the defendants' activities."); *In re High-Tech Employees' Antitrust Litig.*,

2   856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) ("Defendants' argument relies on the false assumption

3   that the Court should apply a rule of reason analysis, but as the parties agree … the Court need not

4   decide now whether per se or rule of reason analysis applies. Indeed, that decision is more appropriate

5   on a motion for summary judgment.").

6   **Exhibits M & O**: HCSC objects to Mallinckrodt's chart reciting state law unfair practices

7   statutes of limitations and "other defenses" (Exhibit M), and statute of limitations for antitrust claims

8   (Exhibit O), because none of the issues Mallinckrodt raises concerning the application of the statute

9   of limitations can be resolved on the record before the Court on demurrer.

10   With respect to Exhibit M, as with Exhibit K, Mallinckrodt makes a number of legal

11   arguments against the application of certain states' laws that is inappropriate for a request for judicial

12   notice. *See* RJN Ex. M at 141 (Maine law claim barred based on contention "allegedly unlawful

13   conduct discontinued over five years before HCSC filed its Complaint"); *id.* (Michigan law claim

14   barred based on exemption defense); *id.* (Minnesota law claim barred as only injunctive relief and

15   attorneys' fees may be recovered); *id.* at 142 (raising as a defense privity under North Dakota law); *id.*

16   (arguing HCSC's purchases were outside scope of consumer statute); *id.* at 143 (same with respect to

17   Vermont law). The Court should deny judicial notice of these arguments and disregard them in

18   resolving Mallinckrodt's demurrer and motion to strike.

19   With respect to Exhibit O, judicial notice of the statute of limitations period needs to be

20   considered in connection with rules concerning accrual, as well as HCSC's allegations of continuing

21   violation and fraudulent concealment. It would be a waste of judicial resources to judicially notice

22   these materials in a vacuum, when none of these laws require dismissal here.

23   **Exhibit N**: Exhibit N, purporting to summarize various state laws concerning antitrust injury,

24   is irrelevant. The Court need not judicially notice dozens of state laws when resolving the demurrer

25   because under ***any*** state's law HCSC pleads the common sense elements of antitrust injury, namely

26   that "but for Mallinckrodt's monopolistic conduct, including its acquisition of Synacthen, HCSC

27   would have benefitted from increased competition in the market for ACTH drugs and would have

28   either paid lower prices for Acthar or steered its members to lower priced Synacthen." ¶ 214.

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN
SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

Finally, HCSC objects to Exhibits K through O to the extent it seeks an end-run around the parties' agreed-upon 25 pages limit by attempting to litigate the state law claims through judicial notice, instead of briefing the issues through development of evidence and legal analysis.

C.      Mallinckrodt's Request for "Mandatory" Judicial Notice Must Be Denied In Part.

Mallinckrodt claims that discretionary judicial notice can automatically become mandatory and seeks mandatory notice of facts contained in Exhibits E through H, and K through O. RJN at 3-5. Judicial notice can be mandatory or discretionary. Certain matters, such as the laws of the state of California or the Federal government, must be judicially noticed. *See* Cal. Evid. Code § 451 (a). Other records may be judicially noticed if an adverse party has notice of the request and the party requesting notice has furnished the court with sufficient information to enable the court to take notice. *See Id.* §§ 452 and 453. Mallinckrodt's request for mandatory notice is improper in two ways.

First, the Court at all times maintains the discretionary power to decline to take judicial notice Cal. Evidence Code §455(a) (information on the matter and the tenor of the matter to be noticed is required). As noted above, much of the law that Mallinckrodt seeks to judicially notice is improper argument or characterization, and is not necessary to the resolution of the demurrer because factual matters, such as the relevant dates to resolve statute of limitations, are disputed. More specifically, although included in its RJN, Mallinckrodt does not cite to Exhibit E anywhere in its demurrer or supporting memorandum of law, and so the Court should not take judicial notice because the document is not relevant. *Aquila, Inc. v. Superior Court*, 148 Cal. App. 4th 556, 569 (2007) (only "relevant material may be noticed.").

Second, Mallinckrodt must provide the Court with "sufficient information." Cal. Evidence Code § 453(b). If information the requesting party supplied to the court is not sufficient, the trial court is entitled to refuse to take judicial notice of matter requested. *People v. Moore*, 59 Cal. App. 4th 168, 177 (1997). As shown above, judicial notice of certain principles of antitrust laws (Ex. L), and the statute of limitations (Exs. N & O) require the context of consideration of other points and

1  authorities about the application of these laws.

2      D.    <u>HCSC Agrees Judicial Notice of Exhibits A, B, F, G, and J Are Appropriate.</u>

3      HCSC not dispute that the Court should take judicial notice of some of the documents in

4  Mallinckrodt's RJN. HCSC agrees that the Court should take judicial notice of Exhibit J, *Humana Inc.*

5  *v. Mallinckrodt ARD LLC*, No. CV 19-06926 (C.D. Cal. Mar. 9, 2020). HCSC would point out,

6  however, that no factual findings from the Humana case would be applicable here, and the Humana

7  decision is no binding precedent. Courts have reached conflicting conclusions regarding the Humana

8  court's decision to dismiss, without prejudice, Plaintiff Humana's antitrust claims, and as explained in

9  HCSC's opposition brief HCSC's allegations differ in material respect to those that were considered in

10  the Humana decision, and the Humana court's approach to market definition is not widely accepted.

11

12      HCSC does not oppose the Court taking judicial notice of the Center for Drug Evaluation and

13  Research ("CDER") letter and labeling documents as executive department records. *See* Cal. Evid.

14  Code § 452(c); RJN Ex. F and G. To the extent that the Court takes notice of those documents,

15  HCSC requests that notice be limited to the existence of the documents and not the truth of the

16  contents. Similarly, Exhibits A & B are both documents appearing in the Federal Register and are

17  judicially noticeable. *See* Cal. Evid. Code § 451; RJN Exs. A and B. As explained above, however,

18  HCSC objects to the use of these documents to show that HCSC was on constructive notice of claims

19  against it. The Court can only notice the existence of the document and not their truth. *See Stockton*

20  *Citizens for Sensible Planning v. City of Stockton*, 210 Cal. App. 4th 1484, 1488 n.2 (2012) ("While courts

21  are permitted to take judicial notice of the existence of that decision and the factual findings contained

22  therein [citing Evid. Code, § 451(a)], they are not permitted to take judicial notice of the truth of such

23  findings").

24

25  **III.    CONCLUSION**

26      For the reasons set forth above, Mallinckrodt's request for judicial notice should be denied in

27  part.

28

Ex. 38

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN
SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

Dated: June 23, 2020

Respectfully submitted,

**SCHNEIDER WALLACE COTTRELL KONECKY LLP**

*/s/ Matthew S. Weiler*
Todd M. Schneider
Jason H. Kim
Matthew S. Weiler
Kyle G. Bates
2000 Powell Street
Suite 1400
Emeryville, CA 94608
(415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

**LOWEY DANNENBERG, P.C.**
Peter D. St. Phillip (*Pro hac vice* to be filed)
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
PStPhillip@lowey.com

Renee A. Nolan (*Pro hac vice* to be filed)
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
(215) 399-4770
rnolan@lowey.com

*Counsel for Plaintiff Health Care Service Corporation*

PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN
SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

# EXHIBIT 39

Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

[*Additional counsel on signature page*]

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| HEALTH CARE SERVICE CORP., <br><br> Plaintiff, <br><br> v. <br><br> MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT PLC, <br><br> Defendants. | Case No. RG20056354 <br><br> **PLAINTIFF HEALTH CARE SERVICE CORP.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE** <br><br> Judge: Hon. Stephen Kaus <br> Location: Dept. 19 <br> Hearing: August 5, 2020; 3:00 p.m. <br> Complaint Filed: February 27, 2020 <br><br> Trial Date: Not Set |

PLAINTIFF HEALTH CARE SERVICE CORP.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEMURRER AND MOTION TO STRIKE

Ex. 39
p. 594

## REQUEST FOR JUDICIAL NOTICE

Plaintiff Health Care Services Corporation ("HCSC") respectfully requests that the Court take judicial notice, pursuant to Cal. Evid. Code §§ 451-53, of the following documents in support of HCSC's concurrently-filed Opposition to Defendant Mallinckrodt ARD LLC and Mallinckrodt plc's Demurrer and Motion to Strike: (1) Order, *United States of America ex rel. Strunck*, No. 12-cv-0175 (E.D. Pa. Mar. 8, 2019), **RJN Exhibit 1**; (2) Complaint in intervention filed by the U.S. Department of Justice ("DOJ") in *United States of America ex rel. Strunck*, No. 12-cv-0175 (E.D. Pa. June 4, 2019), **RJN Exhibit 2**; and (3) a press release by the U.S. DOJ, "United States Intervenes in False Claims Act Lawsuit Against Drug Maker Mallinckrodt Alleging Illegal Kickbacks," June 5, 2019, available at *https://www.justice.gov/opa/pr/united-states-intervenes-false-claims-act-lawsuit-against-drug-maker-mallinckrodt-alleging* (last accessed, June 18, 2020), **RJN Exhibit 3**. The documents are attached as Exhibits 1 through 3 to the Declaration of Matthew S. Weiler.

## BACKGROUND

HCSC alleges it was put on notice of antitrust-related claims by the publication of the FTC investigation in January of 2017. ¶ 175.

HCSC alleges that it put on notice of allegations of other wrongdoing, such as bribes paid to doctors and the scope and extent of the fraud related to the Chronic Disease Fund ("CDF") by the actions taken by the U.S. DOJ in 2019. ¶¶ 178-180.

Mallinckrodt argues that HCSC's claims are time-barred because they could have been discovered earlier through a number of sources including newspaper articles published in 2013. MPA at 23-24.

## ARGUMENT

This Court may take judicial notice of "[r]ecords of (1) any court of this state or (2) any court of record of the United States or of any state of the United States." Evid. Code § 452(d). Exhibits 1 & 2 are such court records noticeable under this rule because they are a court order issued by the United States District Court for the Eastern District of Pennsylvania, and a complaint filed in the same court by the U.S. DOJ. These documents are subject to mandatory judicial notice as (1) this filing serves

1   sufficient notice to Mallinckrodt and (2) the true and accurate copy attached provides sufficient

2   information to the Court to satisfy Evidence Code § 453.

3        This Court may take judicial notice of "[o]fficial acts of the . . . executive . . . departments of

4   the United States." Evid. Code § 452(c). Exhibit 3 is such an executive record noticeable under this

5   rule because it explains and announces action taken by the U.S. DOJ. *Licudine v. Cedars-Sinai Med. Ctr.*,

6   3 Cal. App. 5th 881, 902 (2016) ("[W]e can take judicial notice of official acts and public records.").[1]

7   Exhibit 2, which is the U.S. DOJ's complaint in intervention, similarly reflects "official acts" of the

8   United States. These acts are subject to mandatory judicial notice as (1) this filing serves as sufficient

9   notice to the defendants in this action and (2) the true and accurate copies attached (and the internet

10  addresses listed above) provide sufficient information to the Court to satisfy Evid. Code § 453.

11       Exhibits 1 through 3 should be judicially noticed because they provide the dates of publication

12  of actions taken by the U.S. DOJ, including the filing of a complaint that publicly disclosed

13  wrongdoing. The date of publication is relevant to refuting claims made by Mallinckrodt that HCSC's

14  claims are time-barred. *See Trinity Park, L.P. v. City of Sunnyvale*, 193 Cal. App. 4th 1014, 1045 (2011),

15  disapproved on other grounds, *Sterling Park, L.P. v. City of Palo Alto*, 57 Cal. 4th 1193, 1210 (2013).

16  Dates of documents reflecting acts such as issuing an order or filing a complaint may be judicially

17  noticed under Section 452(c) of the Evidence Code. *See Cahill v. San Diego Gas & Elec. Co.*, 194 Cal.

18  App. 4th 939, 950 (2011) ("we hereby grant Owners' February 1, 2011, motion for judicial notice and

19  take judicial notice of the certificate issued on January 27, 2011, by the Secretary of State.").

20       The date that a *qui tam* complaint is unsealed or published can provide relevant dates for

21  purposes of statute of limitations, even when Defendants argue that the wrongdoing should have

22  been discovered earlier. *See Williams v. Countrywide Fin. Corp.*, No. 2:16-cv-04166-CAS (AGRx), 2017

23  U.S. Dist. LEXIS 36495, at *21 (C.D. Cal. Mar. 13, 2017) ("As relevant here, plaintiffs allege that they

24  first became aware that their appraisals were fraudulent on May 13, 2012, when the Lagow complaint

25  alleging misconduct by LandSafe was first unsealed."); *Int'l Union of Operating Eng'rs, Stationary Eng'rs*

26  _____

27  [1] The comments by the Assembly Committee on Judiciary to Evid. Code § 452(c) note: "Under this
28  provision, the California courts have taken judicial notice of a wide variety of administrative and
    executive acts, such as proceedings and reports . . . ."

PLAINTIFF HEALTH CARE SERVICE CORP.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
OPPOSITION TO DEMURRER AND MOTION TO STRIKE

*Local 39 Pension Tr. Fund v. Bank of N.Y. Mellon Corp.*, No. C 11-03620 WHA, 2012 U.S. Dist. LEXIS 18281, at *21 (N.D. Cal. Feb. 14, 2012) ("Plaintiff pleads sufficient facts to establish equitable tolling of the statutes of limitation. Plaintiff alleges that it was unaware of defendants' 'deceptive practices' until the recent unsealing of several whistleblower complaints filed by defendants' employees. Nothing in the FX rates reported to plaintiff indicated that the rates were false and included hidden and unauthorized markups or markdowns").

### CONCLUSION

HCSC seeks to establish the following facts:

The operative complaint in the *qui tam* action, *United States of America ex rel. Strunck*, was ordered unsealed on March 8, 2019. Exhibit 1.

The U.S. DOJ filed its own complaint in intervention on or about June 4, 2019 in the *Strunck* action. Exhibit 2.

The U.S. DOJ publicized the existence of the *qui tam* actions on June 5, 2019. Exhibit 3.


Dated: June 23, 2020                            Respectfully submitted,

                                                **SCHNEIDER WALLACE COTTRELL
                                                KONECKY LLP**

                                                */s/ Matthew S. Weiler*
                                                Todd M. Schneider
                                                Jason H. Kim
                                                Matthew S. Weiler
                                                Kyle G. Bates
                                                2000 Powell Street
                                                Suite 1400
                                                Emeryville, CA 94608
                                                (415) 421-7100
                                                TSchneider@schneiderwallace.com
                                                JKim@schneiderwallace.com
                                                MWeiler@schneiderwallace.com
                                                KBates@schneiderwallace.com

                                                **LOWEY DANNENBERG, P.C.**
                                                Peter D. St. Phillip (*Pro hac vice* to be filed)
                                                44 South Broadway, Suite 1100
                                                White Plains, NY 10601
                                                (914) 997-0500
                                                PStPhillip@lowey.com

                                                Renee A. Nolan (*Pro hac vice* to be filed)

PLAINTIFF HEALTH CARE SERVICE CORP.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEMURRER AND MOTION TO STRIKE

One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
(215) 399-4770
rnolan@lowey.com

*Counsel for Plaintiff Health Care Service Corporation*

PLAINTIFF HEALTH CARE SERVICE CORP.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
OPPOSITION TO DEMURRER AND MOTION TO STRIKE

# EXHIBIT 40

Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
Kyle G. Bates (SBN 299114)
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel:  (415) 421-7100
Fax:  (415) 421-7105
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mweiler@schneiderwallace.com
kbates@schneiderwallace.com


Attorneys for Plaintiffs

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| HEALTH CARE SERVICE CORP.,<br><br>        Plaintiffs,<br>        v.<br>MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), and MALLINCKRODT PLC,<br><br>        Defendant. | Case No.  RG20056354<br><br>**PROOF OF SERVICE** |

Ex. 40
p. 600

## PROOF OF SERVICE

I, Tyler B. Smith, declare the following:

I am over the age of eighteen years and not a party to the within entitled action.  I am employed at Schneider Wallace Cottrell Konecky LLP located at 2000 Powell Street, Suite 1400, Emeryville, CA 94608.

On **June 23, 2020**, I served the following document(s) described as:

- PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE
- [PROPOSED] ORDER GRANTING PLAINTIFF HEALTH CARE SERVICE CORP.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE
- [PROPOSED] ORDER OVERRULING DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER
- DECLARATION OF MATTHEW S. WEILER [PROPOSED] ORDER OVERRULING DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER
- PLAINTIFF HEALTH CARE SERVICE CORP.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S DEMURRER AND MOTION TO STRIKE
- [PROPOSED] ORDER DENYING DEFENDANTS MALLINCKRODT ARD LLC AND MALLINCKRODT PLC'S MOTION TO STRIKE
- PLAINTIFF HEALTH CARE SERVICE CORP.'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE
- [PROPOSED] ORDER RE DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE DEFENDANT MALLINCKRODT ENTITIES' DEMURRER AND MOTION TO STRIKE

on the following interested party(s):

D. Eric Shapland
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:  (213) 243-4000
Facsimile:  (213) 243-4199
eric.shapland@arnoldporter.com

1

2
[✓]  **BY ELECTRONIC SERVICE** by electronically mailing a true and correct copy in PDF format through SWCKW's electronic mail system to the email address(s) set forth above.

3
I declare under penalty of perjury under the laws of the State of California that the foregoing is

4
true and correct.  Executed on June 23, 2020, at Emeryville, California.

5

6

7
Tyler B. Smith

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28